Gregory A. Vega, Esq. (CABN 141477)
Ricardo Arias, Esq. (CABN 321534)
Philip B. Adams, Esq. (CABN 317948)
SELTZER CAPLAN McMAHON VITEK
A Law Corporation
750 B Street, Suite 2100
San Diego, California  92101-8177
Telephone: (619) 685-3003
Facsimile: (619) 685-3100
E-Mail:      vega@scmv.com; padams@scmv.com;
                 arias@scmv.com

Attorneys for Defendant DUNCAN D. HUNTER

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

(Hon. Thomas J. Whelan)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>DUNCAN D. HUNTER,<br><br>　　　　　Defendant. | Case No. 18-CR-3677-W<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COUNTS 58-60**<br><br>DATE:　　　　July 1, 2019<br>TIME:　　　　10:00 a.m.<br>COURTROOM:　3C<br>JUDGE:　　　Hon. Thomas J. Whelan |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**POINTS AND AUTHORITIES IN SUPPORT OF MOTION　　18-CR-3677-W
TO DISMISS COUNTS 58-60**

## TABLE OF CONTENTS

Page

I. FACTUAL BACKGROUND .................................................................................. 5

II. ANALYSIS .............................................................................................................. 7

    A. Counts 58-60 Violate the Separation of Powers and Should be Dismissed as Non-Justiciable ................................................................. 7

    B. The Government's Contention that Hunter violated 52 U.S.C. 30114(b)(1) Necessarily Requires Judicial Interpretation of Inherently Ambiguous Rules ................................................................... 9

    C. Section 30114(b) is Unconstitutionally Vague as Applied By the Government. ............................................................................................ 12

    D. Congress Designed The Federal Election Campaign Act to Encourage Civil Resolution and Prevent Arbitrary Prosecution. .............. 12

    E. Section 30114(b)'s "Irrespective Test" Violates Hunter's Constitutional Right to Due Process as Applied by the Government. ........ 15

    F. The Government's Overreaching Construction of Section 30114(b) risks a chilling effect on first amendment activities ................................. 16

III. CONCLUSION ..................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AFLCIO v. FEC*
  628 F.2d 97 (D.C. Cir. 1980) .................................................................. 14

*Baker v. Carr*
  369 U.S. 186 (1962) ........................................................................... 7, 11

*Buckley v. Valeo*
  424 U.S. 1 (1976) ........................................................................ 14, 15, 16

*Kolender v. Lawson*
  461 U.S. 352 (1983) ............................................................................ 15, 16

*Nat'l Right to Work Comm. v. FEC*
  716 F.2d 1401 (D.C. Cir. 1983) ............................................................. 14

*Parker v. Levy*
  417 U.S. 733 (1974) ................................................................................ 16

*Smith v. Goguen*
  415 U.S. 566 (1974) .......................................................................... 15, 16

*United States v. Curran*
  20 F.3d 560 (3d Cir. 1994) ..................................................................... 14

*United States v. Harris*
  347 U.S. 612 (1954) ................................................................................ 15

*United States v. Reese*
  92 U.S. 214 (1876) ............................................................................. 15, 16

*United States v. Rostenkowski*
  59 F.3d 1291 (D.C. Cir. 1995) ............................................... 7, 8, 9, 10, 11

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates*
  455 U.S. 489 (1982) ................................................................................ 16

**Other Authorities**

52 U.S.C. section 30106 ............................................................................. 12

52 U.S.C. section 30109 ...................................................................... 13, 14

52 U.S.C. section 30114 ............................................... 10, 12, 15, 16, 17, 18

**Regulations**

11 C.F.R. § 113.1 ........................................................................... 10, 11, 18

Cong. Rec. 6942 (Mar. 17, 1976) ............................................................... 17

Federal Election Commission. Federal Election Campaign Act of 1976, Pub. L. No. 94–283, §§ 112, 201(a), 90 Stat. 496 (1976) ........................................................ 12

*Federal Prosecution of Election Offenses* 135 (7th ed. May 2007) ................................ 14

*Federal Prosecution of Election Offenses* 16 (7th ed. May 2007) ................................. 13

H.R. Rep. No. 917, 94th Cong., 2d Sess. 3, U.S. Code Cong. & Admin. News 1976, p. 929 ................................................................................................................ 12

Hearing before the Subcommittee on Privileges & Elections, 94th Cong., 2d Sess. (Feb. 18, 1976), at 86 ........................................................................................ 13

*House Ethics Manual: Proper Use of Campaign Funds and Resources*, p. 154 ..... 11, 17

MUR6511, FEC Factual and Legal Analysis, Congressman Robert E. Andrews ......... 18

Peter L. Strauss, *One Hundred Fifty Cases Per Year:  Some Implications of the Supreme Court's Limited Resources for Judicial Review of Agency Action*, 87 Colum. L. Rev. 1093, 1121 (1987) ........................................................................ 13

Robert H. Jackson, The Federal Prosecutor, 31 Am. Inst. of Crim. L. & Criminology 3, 5 (1940-41) ........................................................................................ 15

S. Rep. No. 94-677 (1976), at 3 ........................................................................................ 14

Statement of President Ford, H.D. No. 94-371 (Feb. 17, 1976) at 1 .............................. 12

United States Constitution ........................................................................................... 7, 15

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Defendant DUNCAN D. HUNTER ("Hunter"), by and through his attorneys, Gregory A. Vega, Ricardo Arias and Philip B. Adams, pursuant to Federal Rules of Criminal Procedure 12(b), respectfully moves this Court to dismiss Counts 58 through 60 of the indictment in this case. These Counts charge Hunter with prohibited use of campaign contributions in violation of 52 U.S.C. §§ 30109(d) and 30114(b) and 18 U.S.C. § 2. Counts 58 through 60 should be dismissed because the government's prosecution of Hunter under Section 30114(b) unconstitutionally infringes upon the separation of powers and runs afoul of protections that the Constitution and the Federal Election Campaign Act ("FECA") were designed to provide members of Congress. Specifically, Counts 58-60 are non-justiciable because they rely on the government's interpretation of rules governed by both the FECA and the House of Representatives that provide no judicially discoverable and manageable standard for determining whether Hunter's use of Campaign funds was permissible, such that the interpretation of those rules at his trial will require a policy determination unfit for judicial discretion. In addition, Section 30114(b) is unconstitutionally vague as applied by the government.

## I.     FACTUAL BACKGROUND

On August 21, 2018, the government obtained a sixty count indictment charging Hunter with offenses related to violating rules of the House of Representatives ("House") and the Federal Election Commission ("FEC") on the use of campaign funds and related offenses involving attempts to conceal the use of those funds in FEC filings. The indictment alleges that Hunter and his wife, Margaret Hunter, converted Campaign funds for their personal use over the course of a six year period (2010-2016). In particular, the indictment contains the following counts subject to this motion to dismiss:

Count 58, which alleges that:

In the calendar year 2014, within the Southern District of California and elsewhere, Defendants DUNCAN HUNTER and MARGARET HUNTER knowingly and willfully converted $25,000 and more of Campaign funds to their personal use by using them to fulfill personal commitments,

obligations, and expenses that would have existed irrespective of defendant DUNCAN HUNTER's election campaign or duties as a holder of federal office. All in violation of Title 52, United States Code, Sections 30109(d) and 30114(b)(1), and Title 18, United States Code, Section 2;

Count 59, which alleges that:

In the calendar year 2015, within the Southern District of California and elsewhere, Defendants DUNCAN HUNTER and MARGARET HUNTER knowingly and willfully converted $25,000 and more of Campaign funds to their personal use by using them to fulfill personal commitments, obligations, and expenses that would have existed irrespective of defendant DUNCAN HUNTER's election campaign or duties as a holder of federal office. All in violation of Title 52, United States Code, Sections 30109(d) and 30114(b)(1), and Title 18, United States Code, Section 2; and

Count 60, which alleges that:

In the calendar year 2016, within the Southern District of California and elsewhere, Defendants DUNCAN HUNTER and MARGARET HUNTER knowingly and willfully converted $25,000 and more of Campaign funds to their personal use by using them to fulfill personal commitments, obligations, and expenses that would have existed irrespective of defendant DUNCAN HUNTER's election campaign or duties as a holder of federal office. All in violation of Title 52, United States Code, Sections 30109(d) and 30114(b)(1), and Title 18, United States Code, Section 2.

Each of these counts is predicated upon the government's interpretation of Section 30114(b), which provides that Campaign funds "shall not be converted by any person to personal use." Section 30114(b), subparagraph (2) provides the following test to determine whether the use of Campaign funds under certain circumstances constitutes a conversion of funds for personal use:

> [A] contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office, including--
> **(A)** a home mortgage, rent, or utility payment;
> **(B)** a clothing purchase;
> **(C)** a noncampaign-related automobile expense;

**(D)** a country club membership;
**(E)** a vacation or other noncampaign-related trip;
**(F)** a household food item;
**(G)** a tuition payment;
**(H)** admission to a sporting event, concert, theater, or other form of entertainment not associated with an election campaign; and
**(I)** dues, fees, and other payments to a health club or recreational facility.

52 U.S.C. § 30114. This "irrespective test," forms the basis for the government's charges in Counts 58-60.

## II.   ANALYSIS

### A.   Counts 58-60 Violate the Separation of Powers and Should be Dismissed as Non-Justiciable

The government cannot avoid the Constitutional issues that arise from its attempt to prosecute Hunter for a violation of Congress' own internal rules. By prosecuting Hunter for violations of section 30114, the government seeks to utilize the Judicial branch's interpretive authority to prosecute a member of the Legislative branch for matters squarely within Congress's power to adjudicate. For Counts 58-60 to constitute justiciable charges, the government must demonstrate that Hunter's alleged personal use of campaign funds could not have been authorized *under any reasonable interpretation* of the relevant rule or standard of the House. *See United States v. Rostenkowski*, 59 F.3d 1291, 1309-10 (D.C. Cir. 1995). (Emphasis added).

Preliminarily, the Constitution's Rulemaking clause provides that "[e]ach House [of Congress] may determine the rules of its Proceedings." U.S. Const. art I § 5, cl. 2. In addressing prosecutions of members of Congress where charges are premised on alleged violations of Congress' internal rules, courts have consistently held that charges are non-justiciable if their adjudication would require judicial interpretation of ambiguous house rules. *See e.g.*, *Rostenkowski*, 59 F.3d at 1304.

In *Rostenkowski*, the court applied the Supreme Court's justiciability decision in *Baker v. Carr*, 369 U.S. 186, 217 (1962), and other cases, to an indictment that implicated House rules. The *Rostenkowski* court opined that a matter is considered non-

justiciable if, among other reasons, there are no "judicially discoverable and manageable standards for resolving it." *Id*. at 1304 (citation omitted). This rule sounds in separation of powers principles, a doctrine that lies at the heart of our constitutional system. *Id*. at 1312. Accordingly, the *Rostenkowski* court concluded that where a court "cannot be confident that its interpretation [of a House rule] is correct the court would effectively be making Rules – a power that the Rulemaking Clause reserves to each House alone. *Id*. at 1306-07. Thus, a sufficiently ambiguous House rule is non-justiciable." *Id*. at 1306. "Unless we can determine that the facts set out in a particular allegation could not be authorized *under any reasonable interpretation* of the House Rules, we must find that allegation non-justiciable." *Id*. at 1310. (emphasis added).

Applying this principle, the *Rostenkowski* court ordered the dismissal or limitation of several counts. For example, one count alleged that the Congressman had embezzled funds by paying members of his staff for personal services and not for official work. Noting that the House had not defined the meaning of "official work" (as is still the case) and had vested Members with significant discretion to make the relevant determination (as is still the case), the court asked whether the activities allegedly performed by the staff members … *can clearly be classified as "personal*…." *Id*. at 1309 (emphasis added). For example, the government alleged that one employee had done "little or no official work" and had performed personal services such as picking up laundry and working at campaign events. *Id*. 1310-11. The *Rostenkowski* court held this charge was non-justiciable because the government failed to show that the indictment did not implicate ambiguous House Rules. The court reasoned that "we cannot be confident, without more information," that the listed services "could not be considered 'official' rather than 'personal' under any reasonable interpretation of the House Rules." *Id.* at 1310. If there is any "reasonable doubt" as to whether a defendant's conduct actually violated a House Rule, then a court "cannot presume to interpret the rule." *Id*. at 1312.

**B.  The Government's Contention that Hunter violated 52 U.S.C. 30114(b)(1) Necessarily Requires Judicial Interpretation of Inherently Ambiguous Rules.**

Here, the Court should dismiss Counts 58-60 as non-justiciable unless the government demonstrates that no reasonable interpretation of the relevant rules (under the FECA or House Rules/Ethics Manual) exists that would have permitted Hunter to use Campaign funds for each of the allegedly prohibited purposes. *See Rostenkowski*, 59 F.3d at 1309-10. We submit that the government cannot satisfy this burden for a majority of the funds at issue in the indictment and certainly not for any of the allegations specifically realleged and incorporated into Counts 58-60.[1]

For example, paragraph 12 of the indictment alleges as follows:

> Defendant MARGARET HUNTER married Defendant DUNCAN HUNTER in 1998. According to the Campaign's published spending reports, MARGARET HUNTER served as a campaign consultant on DUNCAN HUNTER's congressional campaigns. Between 2010 and 2017, the Committee reported paying MARGARET HUNTER $116,000 for "management services," "consulting," and "salary." During this time, DUNCAN HUNTER also gave MARGARET HUNTER access to Campaign funds through Campaign debit cards, credit cards, and reimbursements for funds expended on behalf of the Campaign.

Setting aside the fact that the government does not actually allege that the $116,000 in Campaign funds used to pay Mrs. Hunter's salary as Campaign Manager constituted a conversion of Campaign funds for personal use in violation of 52 U.S.C. 30114(b)(2), Hunter reasonably anticipates that the government will contend as much at trial.[2] Similar to the government's argument in *Rostenkowski* that the Congressman's payment of a staff member was not permissible because the individual had performed "little or no official work," the government here will likely contend that the

---

[1] As evidenced in paragraphs 29, 31, and 33 of the indictment, the government only realleged and incorporated "Paragraphs 1 through 17 and all sub-paragraphs" of the indictment into counts 58-60.

[2] Notably, the $116,000 of Campaign funds used to pay Mrs. Hunter's salary represents nearly half of the funds at issue in this case.

9

**POINTS AND AUTHORITIES IN SUPPORT OF MOTION          18-CR-3677-W
TO DISMISS COUNTS 58-60**

Congressman's payment of Mrs. Hunter's salary constitutes impermissible "personal use" of Campaign funds because she did not provide bona fide services. *See Rostenkowski*, 59 F.3d at 1309-10. However, Section 30114(b) does not prohibit the payment of a salary to a candidate's family member when the "family member provides bona fide services to the campaign." 11 C.F.R. § 113.1(g)(1)(i)(H). This rule is ambiguous at best because it affords significant discretion to Members to determine what qualifies as "bona fide services to the campaign." Indeed, unless the Court can determine that paying Mrs. Hunter a salary "could not be authorized under any reasonable interpretation" of the rules, it must find the allegations in Counts 58-60 non-justiciable. See *Rostenkowski*, 59 F.3d at 1310. In light of the fact that it is uncontested that Mrs. Hunter actually provided bona fide services to the campaign and the fact that the statutory definition of "personal use" expressly carves out an exception for the payment of a salary to a candidate's family member, the government cannot legitimately contend that no "reasonable doubt" exists as to whether Mrs. Hunter's salary constituted a permissible use of campaign funds under the House Rules or the FECA. *See id.*; *see also* 11 C.F.R. § 113.1(g)(1)(ii). As such, the Court "cannot presume to interpret the rule" governing the "personal use" of campaign funds in this instance. *See Rostenkowski*, 59 F.3d at 1312.

Golf is another category of expenses contained within the indictment that the government alleges is unlawful, yet cannot show why the expense "could not be authorized *under any reasonable interpretation*" of section 30114. Indeed Hunter's use of Campaign funds on golf outings with Campaign donors, Campaign volunteers and the former Representative of his District (his father) exemplifies the precise type of ambiguities that warrant the dismissal of Counts 58-60 as non-justiciable.

Section 30114(a)(6) permits the use of campaign funds "for any other lawful purpose unless prohibited by subsection (b) of this section." 52 U.S.C. § 30114. Not only is golf a "lawful purpose" that is not prohibited by Section 30114 subsection (b), it represents an activity so commonly engaged in by members of Congress that its absence

10

**POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS COUNTS 58-60**                                     18-CR-3677-W

from the list of expenditures that constitute an automatic "personal use" suggests that Congress appreciated the multiple scenarios wherein it would be appropriate to use Campaign funds for golf. Moreover, Congress understood the wide range of foreseeable circumstances within which the use of Campaign funds would actually be permissible, despite appearances to the contrary, and instituted a catch-all provision within 11 C.F.R. § 113.1(g)(1)(ii) whereby the FEC could "determine, on a case-by-case basis" whether the use of Campaign funds for a particular purpose would exist "irrespective of the candidate's campaign or duties as a Federal officeholder." *See* 11 C.F.R. § 113.1. Needless to say, the inherent ambiguities that arise from a rule so pliable that Congress anticipated the need for a "case-by-case" determination does not provide a "judicially discoverable and manageable standard" for determining whether Hunter's use of Campaign funds for each golf outing alleged by the government truly constituted a prohibited use of campaign funds. *See Rostenkowski*, 59 F.3d at 1310-11.

The Court cannot merely assign a blanket classification of "personal use" to all golf related expenditures when the determination as to what constitutes a "personal" or a lawful campaign purpose depends on a variety of facts and circumstances requiring a "case-by-case" evaluation. *See id*. Indeed, the complex realities of modern politics and the "wide discretion" afforded to members of Congress to determine whether any particular expenditure would serve a sufficiently political purpose is precisely why the Court cannot conclude that Hunter's use of Campaign funds to pay for golf outings could not be considered permissible under any reasonable interpretation of the rules. *See House Ethics Manual: Proper Use of Campaign Funds and Resources*, p. 154 (Hereinafter "House Ethics Manual"). Furthermore, should the Court attempt to interpret these inherently ambiguous rules at Hunter's trial, it would risk making a policy determination unfit for judicial discretion and invite "the embarrassment of multifarious pronouncements by various departments." *See Baker v. Carr*, 369 U.S. 186, 217 (1962). Instead, the Court should dismiss Counts 58-60 as non-justiciable because

the government cannot establish that the charges do not implicate inherently ambiguous rules within the FECA and House of Representatives Handbook.

### C. Section 30114(b) is Unconstitutionally Vague as Applied By the Government.

Section 30114(b) is unconstitutionally vague as applied to Hunter because the government's rigid and idiosyncratic interpretation of what constitutes "personal use" of Campaign funds as measured by the "irrespective test" does not sufficiently define the proscribed conduct. Additionally, allowing the government such expansive discretion to interpret Section 30114(b) invites arbitrary and discriminatory enforcement in an arena already ripe for political gamesmanship, and threatens to chill core First Amendment political activity through the threat of criminal prosecution that the FECA was designed to avoid.

### D. Congress Designed The Federal Election Campaign Act to Encourage Civil Resolution and Prevent Arbitrary Prosecution.

The FECA was enacted, in part, to avoid fragmented enforcement of campaign finance violations and to prevent the kind of arbitrary and disjointed enforcement that is occasioned by the differing views and standards applied by individual prosecutors in the nation's 93 U.S. Attorneys' offices. Prior to 1971, the Department of Justice enforced the election laws via a few restrictions in the Federal Corrupt Practices Act located in Title 18. As a result, "enforcement responsibility was fragmented, and the line between improper conduct remediable in civil proceedings and conduct punishable as a crime blurred." H.R. Rep. No. 917, 94th Cong., 2d Sess. 3, U.S. Code Cong. & Admin. News 1976, p. 929. Congress moved those offenses from Title 18 to the FECA and put them under the purview of the newly created Federal Election Commission. Federal Election Campaign Act of 1976, Pub. L. No. 94–283, §§ 112, 201(a), 90 Stat. 496 (1976).

As reconstituted in 1976, the FEC is a bipartisan expert independent agency designed "to interpret, advise [and] provide needed certainty to the candidates with regard to the complexities of the Federal Election law." Statement of President Ford, H.D. No. 94-371 (Feb. 17, 1976) at 1. *See also* 52 U.S.C. § 30106(a)(1). The FEC is

structured and constituted such that it requires agreement from members of both parties to enforce the FECA against a candidate. 52 U.S.C. § 30109(a)(2), (4)(A)(i), (5)(C), (6)(A). And unlike the U.S. Attorneys' Offices, which might produce 93 different interpretations of the same statute and relevant regulations, the FEC can give candidates clear and uniform notice of the election laws it administers. *See* Hearing before the Subcommittee on Privileges & Elections, 94th Cong., 2d Sess. (Feb. 18, 1976), at 86 ("We must have a commission to assist the over 1,000 Federal candidates, their staffs, and the network of volunteers all of whom need the guidance of an independent commission to understand and abide by the mandates of the sweeping and often complex reforms we have written into the campaign law.") (Sen. Mondale); *see also* Peter L. Strauss, *One Hundred Fifty Cases Per Year: Some Implications of the Supreme Court's Limited Resources for Judicial Review of Agency Action*, 87 Colum. L. Rev. 1093, 1121 (1987) ("When national uniformity in the administration of national statutes is called for, the national agencies responsible for that administration can be expected to reach single readings of the statutes for which they are responsible and to enforce those readings within their own framework.").[3]

Congress reserved criminal enforcement of the election law only for the most culpable acts by, among other steps, requiring the most demanding mens rea for criminal FECA violations. For violations involving the misuse of campaign funds, there is *no criminal liability* unless the violation is committed "knowingly and willfully." § 30109(d)(1)(A). As the Department of Justice's election crimes manual recognizes, the FECA's "words of specific criminal intent require proof that the offender was aware

---

[3] The Justice Department itself recognizes the importance of having national standards in campaign finance cases: "The Department's consultation requirements for election crime matters are designed to ensure that national standards are maintained for the federal prosecution of election crimes, that investigative resources focus on matters that have prosecutive potential, and that appropriate deference is given to the FEC's civil enforcement responsibilities over campaign financing violations." *Federal Prosecution of Election Offenses* 16 (7th ed. May 2007).

of what the law required, and that he or she violated that law notwithstanding that knowledge, i.e., that the offender acted in conscious disregard of a known statutory duty or prohibition." *Federal Prosecution of Election Offenses* 135 (7th ed. May 2007) (citing *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *Nat'l Right to Work Comm. v. FEC*, 716 F.2d 1401 (D.C. Cir. 1983); *AFLCIO v. FEC, 628 F.2d 97* (D.C. Cir. 1980)), available at https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf. Indeed, the Department's own manual acknowledges that violations of the FECA that are "committed with lesser intent . . . are not federal crimes." *Id.* at 135 n.50. Instead, "[t]hey are subject to civil and administrative enforcement by the [FEC]." *Id.*; *see also* supra at 9.

Congress also crafted the FECA to encourage conciliation rather than prosecution. If the FEC finds probable cause that a violation occurred, it is required, "for a period of at least 30 days, to correct . . . such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved." § 30109(a)(4)(A)(i). A conciliation agreement is not only "a complete bar to any further action by the Commission," *id*., but it also serves as a defense to a criminal prosecution and a basis for a more lenient sentence "[i]n any criminal action brought for a violation of any provision of [the FECA]," § 30109(d)(2)-(3).

Congress also limited criminal enforcement of FECA violations by restricting prosecutions to violations involving large amounts of money. *See* S. Rep. No. 94-677 (1976), at 3 (The FECA "provide[s] criminal penalties for substantial violations and civil penalties and disclosure for less substantial violations."). Violations involving less than $2,000 are not subject to criminal prosecution at all, and violations involving less than $25,000 are a misdemeanor. § 30109(d)(1)(A)(ii). Even for the most significant FECA violations, the statutory maximum is five years. § 30109(d)(1)(A)(i). This graduated structure accounts for the public's interest in "exposing large . . . expenditures to the light of publicity," *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976) (emphasis added),

14

POINTS AND AUTHORITIES IN SUPPORT OF MOTION　　　　18-CR-3677-W
TO DISMISS COUNTS 58-60

while ensuring that there is breathing room to avoid chilling campaign expenditures that are protected by the First Amendment.

The government's decision to bring criminal charges against Hunter based on its stringent interpretation of Section 30114(b) is patently inconsistent with Congress' preference for conciliation over prosecution for FECA violations and the Department of Justice's own guidelines for the prosecution of FECA offenses.

### E. Section 30114(b)'s "Irrespective Test" Violates Hunter's Constitutional Right to Due Process as Applied by the Government.

"Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Buckley*, 424 U.S. at 77 (quoting *United States v. Harris*, 347 U.S. 612, 617 (1954)). "Where First Amendment rights are involved, an even 'greater degree of specificity' is required." *Id*. at 77 (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). A statute is void for vagueness when it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" as well as when the offense "encourage[s] arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The requirement that the legislature "establish minimal guidelines to govern law enforcement," is "the more important aspect of the vagueness doctrine." *Id*. at 357-58. That is because "the greatest danger of abuse of prosecuting power" is the prosecutor's ability to "pick[] some person whom he dislikes or desires to embarrass, or select[] some group of unpopular persons and then look[] for an offense." Robert H. Jackson, The Federal Prosecutor, 31 Am. Inst. of Crim. L. & Criminology 3, 5 (1940-41). The Fifth Amendment accordingly does not tolerate criminal laws that threaten to cast a "net large enough to catch all possible offenders" while leaving "it to the courts to step inside and say who could be rightfully detained." *United States v. Reese*, 92 U.S. 214, 221 (1876); see also *Kolender*, 461

U.S. at 358 (vagueness doctrine does not "permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections").

Vagueness concerns are amplified when penal statutes are deployed, as here, with the "potential for arbitrarily suppressing First Amendment liberties." *Kolender*, 461 U.S. at 358.  In those circumstances, "more precision in drafting may be required because of the vagueness doctrine in the case of regulation of expression," *Parker v. Levy*, 417 U.S. 733, 756 (1974), and courts demand a "greater degree of specificity" than in other contexts, *Smith*, 415 U.S. at 573; *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

As demonstrated by the government's decision to bring criminal charges against Hunter based on its own interpretation of Section 30114(b), the "irrespective test" provides neither reasonable notice of the prohibited conduct nor sufficient guideline to govern its enforcement. Indeed, the government's unreasonable interpretation of Section 30114(b) as applied to Hunter threatens to create the sort of "net large enough to catch all possible offenders" forbidden by the vagueness doctrine. *See Reese*, 92 U.S. at 221. Such a result not only violates Hunter's constitutional right to due process, but it also risks a chilling effect on First Amendment activity by legislators across the country.

### F. The Government's Overreaching Construction of Section 30114(b) risks a chilling effect on first amendment activities

The First Amendment has "its fullest and most urgent application precisely to the conduct of campaigns for political office." *Buckley*, 424 U.S. 1, 15 (1976) As deployed in this context, Section 30114(b) "furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular [candidates] deemed to merit their displeasure." *See Kolender*, 461 U.S. at 360. The ambiguous nature of the "irrespective test" gives prosecutors extraordinary leeway to arbitrarily pick candidates to target under Section 30114(b) based on exceptionally vague enforcement standards. The vagueness concerns are unusually acute here because

applying Section 30114(b) in such a blunt and inflexible manner invites the executive branch to chill core political speech and erode the separation of powers through excessive meddling in the minutiae of a member of Congress's campaign expenditures. *See* Cong. Rec. 6942 (Mar. 17, 1976) (testimony of Sen. Claggett) (When expenditures and contributions are "subjected to regulation, especially with criminal sanctions, the inhibiting effect on political expression is acute."). Members of Congress must comply with extensive and highly convoluted provisions within both the FECA and the House rules governing the use of campaign funds. House Ethics Manual at 152.

Given the messy realities of modern campaigns for political office, there will inevitably be many expenditures incurred by other members of Congress that could support a prosecution based on the government's expansive interpretation of Section 30114(b). A political campaign involves countless interactions between a candidate (or incumbent) and their constituents. These interactions cover a wide spectrum ranging from official campaign events (such as town halls, fund-raisers, or social gatherings) to unofficial meetings (such as dinners or simply meeting for drinks) but all of these interactions are designed to get people to like the candidate enough (personally and politically) to vote for him on election day. Accordingly, campaign funds may be used for a wide array of expenditures that serve a "political purpose," which in itself is an inherently vague term. As a result, the rules governing use of campaign funds are "not interpreted 'to limit the use of campaign funds strictly to a Member's reelection campaign,' but instead is interpreted broadly to encompass the traditional politically-related activities of members of Congress." House Ethics Manual at 154.

One example of an inherently vague "political expense" is the cost incurred in connection with building (or maintaining) relationships with individuals of "value" to a member's campaign. There is simply no clear answer as to whether campaign funds may be used for such an expense, and the "irrespective test" provides no discernable standard in light of the constantly evolving nature of political relationships. For example, if a volunteer campaign consultant provides opposition research that helps the

17

**POINTS AND AUTHORITIES IN SUPPORT OF MOTION**　　　18-CR-3677-W
**TO DISMISS COUNTS 58-60**

candidate further his campaign, there is little doubt that campaign funds could be used to purchase a meal for that volunteer to share with the candidate as a token of appreciation for the value of his services. However, one year later, if the consultant no longer actively volunteers for the campaign, but the candidate reasonably believes the consultant will provide services for the campaign again in the next election cycle, it remains unclear whether campaign funds could be used to purchase a meal shared by the candidate and the consultant for the purpose of maintaining the relationship with this valuable individual, despite the fact that the relationship would not have existed irrespective of the candidate's campaign. Furthermore, neither the House rules nor the FECA provide any metrics to assess the "value" that an individual brings to a campaign, let alone asses how that "value" fluctuates over time. This hypothetical illustrates the inherent vagueness of Section 30114(b)'s "irrespective test" and why the FECA was designed to resolve such ambiguities on a civil, case-by-case basis. *See* 11 C.F.R. § 113.1(g)(1)(ii); *see also* MUR6511, FEC Factual and Legal Analysis, Congressman Robert E. Andrews.

Moreover, using Section 30114(b) to prosecute members of Congress for executing their independent judgement about the propriety of a specific use of campaign funds, rather than the process envisioned by the FEC, threatens divergent applications of the law in this sensitive area of First Amendment activity and undermines the ability of every member of Congress (and candidates) to engage in core political activity without the looming threat of criminal prosecution.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### III. CONCLUSION

For the aforementioned reasons, Defendant Duncan D. Hunter respectfully moves this Court to dismiss Counts 58 through 60 of the indictment as non-justiciable and unconstitutionally vague.

Respectfully submitted,

Dated: June 24, 2019

SELTZER CAPLAN McMAHON VITEK
A Law Corporation

By: *s/ Gregory A. Vega*
Gregory A. Vega
Philip B. Adams
Ricardo Arias
Attorneys for Defendant, DUNCAN D. HUNTER