Gregory A. Vega, Esq. (CABN 141477)
Ricardo Arias, Esq. (CABN 321534)
Philip B. Adams, Esq. (CABN 317948)
SELTZER CAPLAN McMAHON VITEK
A Law Corporation
750 B Street, Suite 2100
San Diego, California 92101-8177
Telephone: (619) 685-3003
Facsimile: (619) 685-3100
E-Mail:       vega@scmv.com; padams@scmv.com;
              arias@scmv.com

Attorneys for Defendant DUNCAN D. HUNTER

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

(Hon. Thomas J. Whelan)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-3677-W |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE** |
| v. | |
| DUNCAN D. HUNTER, | Date:       July 1, 2019 |
| Defendant. | Time:       10:00 a.m. |
| | Judge:      Hon. Thomas J. Whelan |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

SELTZER CAPLAN McMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

1

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................. 7

II. ARGUMENT ..................................................................... 10

    A. In Order to Safeguard the Separation of Powers and Core Political Speech Protected by the First Amendment, Congress Created a Comprehensive Administrative, Civil and Criminal Regulatory Structure in FECA to Govern Campaign Finance Disclosures. ............................................................. 11

        1. Congress knew that campaign disclosure mistakes were inevitable. ................................................................ 13

        2. Congress created a regulatory regime that accounts for the inevitability of disclosure errors in modern political campaigns. ............................................................. 14

    B. Applying Section 1519 Here Would Displace Congress's Tailor-made Scheme with an Offense that has Lesser Proof Requirements and a Much Greater Penalty. ......................... 18

    C. There is No Established Practice of Applying Section 1519 to Police Campaign Disclosure Reports Filed with the FEC. ........ 21

    D. The Passive Receipt of Campaign Disclosures is not a "Matter" Within the Meaning of § 1519 ......................................... 21

    E. Section 1519 is Unconstitutionally Vague as Applied By the Government. ..................................................................... 23

        1. The government's expansive application of Section 1519 deprives candidates and politicians of due process by forcing them to comply with the unannounced reporting standards of nearly a hundred different prosecutorial offices. ....................................................................... 24

        2. Applying Section 1519 to Violations of the FECA would grant prosecutors too much discretion and risk a chilling effect on first amendment activities. .................................. 25

        3. Under The Rule of Lenity, any Ambiguity as to Whether Congress Intended Section 1519 to Extend to FECA Violations Must Be Resolved Against the Government. ............ 28

III. CONCLUSION ................................................................... 29

SELTZER CAPLAN McMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

2

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*AFLCIO v. FEC*
  628 F.2d 97 (D.C. Cir. 1980) ................................................................ 17

*Buckley v. Valeo*
  424 U.S. 1 (1976).................................................. 8, 12, 13, 18, 24, 26

*Kolender v. Lawson*
  461 U.S. 352 (1983)............................................................. 24, 25, 29

*Liparota v. United States*
  471 U.S. 419 (1985)........................................................................ 28

*McDonnell v. United States*
  136 S. Ct. 2355 (2016)................................................................ 22, 23

*McNally v. United States*
  483 U.S. 350 (1987)........................................................................ 28

*Monitor Patriot Co. v. Roy*
  401 U.S. 265 (1971) ....................................................................... 12

*NAACP v. Button*
  371 U.S. 415 (1963)........................................................................ 20

*Nat'l Right to Work Comm. v. FEC*
  716 F.2d 1401 (D.C. Cir. 1983)........................................................ 17

*Parker v. Levy*
  417 U.S. 733 (1974)........................................................................ 25

*Smith v. Goguen*
  415 U.S. 566 (1974).................................................................. 24, 25

*U.S. v. Boren*
  278 F.3d 911 (9th Cir. 2002) ........................................................... 11

*U.S. v. Panarella*
  277 F.3d 678 (3d Cir.2002) ............................................................. 11

*United States v. Carroll*
  320 F. Supp. 2d 748 (S.D. Ill. 2004) ............................................... 11

*United States v. Curran*
  20 F.3d 560 (3d Cir. 1994) ......................................................... 17, 19

*United States v. Ford*
  639 F.3d 718 (6th Cir. 2011) ........................................................... 28

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

3

*United States v. Harris*
    347 U.S. 612 (1954).................................................................... 24

*United States v. Katakis*
    800 F.3d 1017 (9th Cir. 2015) ................................................ 9, 18

*United States v. Marinello*
    138 S. Ct. 1101, 1104 (2018)............................................... 22, 23

*United States v. Reese*
    92  U.S. 214 (1876)................................................................ 24, 25

*United States v. Santos*
    553 U.S. 507 (2008)................................................................... 20

*United States v. Thompson*
    484 F.3d 877 (7th Cir. 2007) .................................................... 28

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates*
    455 U.S. 489 (1982).................................................................... 25

*Yates v. U.S.*
    135 S. Ct. 1074 (2015)........................................................... 27, 28

**Federal Statutes**

18 U.S.C. section 1519 .........7, 8, 9, 10, 11, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29

18 U.S.C. section 2............................................................................ 7, 18

26 U.S.C. section 7212 ........................................................................ 22

52 U.S.C. section 30102 ................................................................. 17, 26

52 U.S.C. section 30104 ....................................................... 13, 16, 17, 25

52 U.S.C. section 30106 ................................................................. 13, 15

52 U.S.C. section 30107 ........................................................................ 13

52 U.S.C. section 30109 .................................................. 13, 15, 17, 18, 19

52 U.S.C. section 30114 ............................................................. 9, 13, 14

**Rules**

Federal Rule of Criminal Procedure 12 ................................................ 10

**Other Authorities**

11 C.F.R. section 113.1........................................................................ 13

94th Cong., 2d Sess., Cong. Rec. 12181 (May 3, 1976)....................... 13

9th Circuit Model Jury Instruction 5.6 ................................................ 19

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

4

ADR 163 (Sullivan for Congress) (June 9, 2003 settlement regarding alleged misreporting of campaign debts) ............................................................... 26

ADR 209 (Bruderly for Congress) (Feb. 18, 2005 settlement regarding failure to report receipts and disbursements) ........................................................ 25

ADR 772 (Newt 2012) (Feb. 23, 2016 settlement regarding misidentification of a campaign debt as "travel") .................................................................. 25

Bipartisan Campaign Reform Act of 2002 (BCRA), P.L. 107-155, 116 Stat. 81 (Mar. 27, 2002) ..................................................................................... 20

*Charles Boustany, Jr. MD for Congress*, MUR 6698 (Feb. 23, 2016) .......... 14

Cong. Rec. 6942 (Mar. 17, 1976) ............................................................... 26

FEC Form 3, available at http://www.fec.gov/pdf/forms/fecfrm3.pdf ......................... 21

FEC Statement of Policy: "Purpose of Disbursement" Entries for Filings with the Commission, 72 Fed. Reg. 887, 888 (Jan. 9, 2007) ............................... 14

Federal Corrupt Practices Act ..................................................................... 15

Federal Election Campaign Act ................................................................... 12

Federal Election Commission. Federal Election Campaign Act of 1976, Pub. L. No. 94–283, §§ 112, 201(a), 90 Stat. 496 (1976) .................................... 15

*Federal Prosecution of Election Offenses* 135 (7th ed. May 2007) ................ 17

*Federal Prosecution of Election Offenses* 16 (7th ed. May 2007) ................ 16

H.R. Rep. 92-564, at 27 ............................................................................. 14

H.R. Rep. No. 917, 94th Cong., 2d Sess. 3, U.S. Code Cong. & Admin. News 1976, p. 929 ......................................................................................... 15

H.R. Rep. No. 94-917 (Mar. 17, 1976) at 3 ............................................... 12

H.R. Rep. No. 96-422 (1979), at 18............................................................ 17

Hearing before the Subcommittee on Privileges & Elections, 94th Cong., 2d Sess. (Feb. 18, 1976), at 86.......................................................................... 15

http://www.fec.gov/pages/brochures/fecfeca.shtml#Clarifying_Law ............................ 14

MUR 4328 (Democratic-Republican-Independent Voter Education Committee) (July 14, 2000 conciliation agreement regarding misidentification of an independent expenditure as an "operating expense")............................... 26

MUR 5408 (Sharpton 2004) (Apr. 2, 2009 conciliation agreement regarding material misstatements of receipts and disbursements) ........................... 25

MUR 5808 (Planned Parenthood Action Fund Inc. PAC) (Mar. 6, 2007 conciliation agreement regarding failure to report receipts and

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

5

disbursements) ........................................................................... 25

MUR 6204 (Dallas Cnty. Republican Party) (Oct. 15, 2009 conciliation
    agreement regarding fifty expenditures worth $215,000 that failed to
    disclose the correct purpose) ................................................. 26

MUR 6977 (House Majority PAC) (Mar. 28, 2016 conciliation agreement
    regarding failure to disclose seven expenditures) ......................... 25

Peter L. Strauss, *One Hundred Fifty Cases Per Year: Some Implications of the
    Supreme Court's Limited Resources for Judicial Review of Agency Action*,
    87 Colum. L. Rev. 1093, 1121 (1987) ..................................... 15

Rep. Tim Roemer, Why Do Congressmen Spend Only Half Their Time Serving
    Us?  Newsweek (July 29, 2015), available at
    http://www.newsweek.com/why-do-congressmen-spendonly-half-their-
    time-serving-us-357995 ....................................................... 16

Robert H. Jackson, The Federal Prosecutor, 31 Am. Inst. of Crim. L. &
    Criminology 3, 5 (1940-41) ................................................. 24

S. Rep. No. 94-677 (1976), at 3 ........................................... 18, 20

Sarbanes-Oxley Act of 2002, Pub. L. 107–204, 116 Stat. 745 (July 30, 2002) ............. 11

Sen. Rep. 107-146 (2002), at 27 .......................................... 27

Statement of President Ford, H.D. No. 94-371 (Feb. 17, 1976) at 1 ........................ 15

Tr. of Oral Arg. 31:21-23, *Yates v. United States*, No. 13-7451 .................. 20

United States Constitution, First Amendment ................... 12, 18, 20, 23, 29

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

6

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Defendant DUNCAN D. HUNTER ("Hunter"), by and through his attorneys, Gregory A. Vega, Ricardo Arias and Philip B. Adams respectfully moves the Court to dismiss Counts 45 through 57 of the indictment in this case pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v). Counts 45 through 57, which charge Hunter with violations of 18 U.S.C. §§ 1519 and 2, improperly apply the twenty-year felony offense in the Sarbanes-Oxley Act to routine campaign filings with the Federal Election Commission ("FEC"). These counts fail to state an offense because they are unconstitutionally vague as applied to FEC disclosure reports, infringe Hunter's constitutional rights both as an individual and as a United States Representative, and upset the careful legal and regulatory framework Congress crafted in the Federal Election Campaign Act ("FECA") to balance campaign regulation and core First Amendment political activity.

## I.    INTRODUCTION

Counts 45 through 57 of the indictment charge Hunter and his wife, Margaret Hunter ("Mrs. Hunter"), with "Falsification of Records Related to Campaign Finance" in violation of 18 U.S.C. §§ 1519 and 2. Specifically, the government alleges that Mr. and Mrs. Hunter (collectively "the Hunters") knowingly falsified and made false entries within FEC Form 3, Report of Receipts and Disbursements ("FEC Form 3") with "the intent to impede, obstruct, and influence the investigation and proper administration of matters within the jurisdiction of the Federal Election Commission and the Federal Bureau of Investigation" ("FBI"). The basis of these charges is unclear, however, as each Count merely lists a separate FEC Form 3 report submitted by the Hunter campaign, without explanation as to the alleged false entry contained within the report. Similarly, indictment paragraphs 1-17, which the government re-alleged and incorporated into Counts 45-57, do not specify which entries within each report qualify as a false entry and do not contend that the FEC deemed any of the entries within the thirteen FEC Form 3 reports at issue inaccurate.

Instead, these counts appear to rest on the government's theory that certain

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**        18-CR-3677-W

unspecified descriptions of undisclosed expenditures did not meet the government's own reporting standards, which were crafted by prosecutors for purposes of this prosecution and never publicly disclosed. By applying its own undisclosed interpretation of the FEC's reporting rules without guidance from the FEC experts, the government violated the Due Process Clause by permitting its prosecutors usurp legislative authority. Rather than relying on instructions from Congress or the FEC on how to properly make campaign disclosures, the indictment alleges, without explanation, that Hunter made false statements within his FEC Form 3 reports, presumably based on the prosecutors' own interpretations of FEC reporting requirements. Moreover, even if the FEC had determined that Hunter's FEC Form 3 reports contained inaccurate descriptions in violation of the FECA, section 1519 has no application to violations of the FECA, which has carefully designed internal mechanisms for regulating, enforcing and punishing such conduct.

Preliminarily, the due process violations here are particularly problematic because the indictment treads on ground protected by the First Amendment, which "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976). The regulation of campaign contributions and expenditures "operate[s] in an area of the most fundamental First Amendment activities." *Id*. at 14. Even requiring the disclosure of those contributions and expenditures "has the potential for substantially infringing the exercise of First Amendment rights" by chilling protected speech and discouraging political association. *Id*. at 66.

In essence, these counts are based on a broad criminal obstruction statute combined with the prosecutors' own interpretations of the reporting requirements of the FECA—an act that Congress created for the express purpose of governing the reports Hunter is charged with falsifying. Embedded in the FECA's expenditure reporting requirements is a comprehensive legal and regulatory regime in which errors or even knowing false statements on campaign forms are addressed through an established

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**                18-CR-3677-W

administrative process.  Congress also declined to nitpick which campaign expenses were permissible and how they were described by generally allowing all expenditures other than for the candidate's personal use, which 52 U.S.C. 30114(b)(2) describes as any use of campaign funds used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election or individual's duties as a holder of Federal office." Notably, however, even in the context of alleged personal use of campaign funds, criminal penalties—even the suggestion of which can be an unreviewable knock-out blow to candidates for elected office—are reserved for knowing and *willful* false statements.  But even then, willful misstatements begin only as a misdemeanor and rise, based on the amount of money involved in the offense, to a maximum of five years' imprisonment. Finally, Congress left this regime predominately under the supervision of the FEC, an expert agency steeped in the practical realities of modern politics and with the ability to set uniform standards across the Nation.

By prosecuting Hunter under Sarbanes-Oxley's anticipatory obstruction of justice provision, the government would topple Congress's careful balance in the FECA. Section 1519 was not designed to avoid chilling the First Amendment rights of every member of and candidate for Congress—it "was drafted to prevent corporate document shredding."  *United States v. Katakis*, 800 F.3d 1017, 1030 (9th Cir. 2015).  Under the government's theory, even the most miniscule false statement in a FEC filing constitutes a 20-year offense regardless of the amount of funds involved.  As a practical matter, the government's theory dissolves the FECA's established protections and procedures for campaign finance compliance and renders the FEC's expert judgment all but irrelevant. Perhaps most important, applying Section 1519 as the government would here has the effect of eliminating the FECA's minimum threshold for criminal violations while radically enlarging the maximum sentence for conduct that Congress has soundly placed in the regulatory discretion of the FEC.

That is what has happened in this very case.  In addition to passively receiving the

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**          18-CR-3677-W

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

reports at issue in the ordinary course of business, the indictment alleges in paragraph 21, sub-paragraph 16 (which was not incorporated into Counts 45-57), that "the FEC highlighted what appeared to be the 'personal use of campaign funds' and warned [Hunter] that it might consider taking further legal action." Rather than permitting the FEC to determine whether Hunter in fact converted campaign funds to his personal use or inaccurately reported certain expenditures to the FEC, the prosecution substituted its own interpretation of the FECA's reporting requirements and unilaterally decided that the reports at issue violate the FECA according to the prosecution's self-generated reporting standard (a standard that remains known only to the government).

If allowed, that substitution would leave every politician, whether aspiring or incumbent, vulnerable to indictment because, according to one of 93 U.S. Attorney's Offices around the country, they made the wrong choice in how to characterize an otherwise legitimate campaign expenditure. In addition to upsetting Congress's carefully crafted framework for enforcing the regulation of core political activity, such elasticity in reporting standards at the discretion of prosecutors across the country would deprive all candidates and politicians of fair notice of what the law is and foster discriminatory enforcement of the law. That sort of "compliance first, standard later" regime would turn the constitutional guarantee of due process on its head, and the government cannot justify this type of unconstitutional application of Section 1519.

The discussion below proceeds as follows: First, Hunter addresses the legal and regulatory regime created by the FECA, and how application of Section 1519 to campaign disclosure reports would unsettle the careful balance Congress struck in the FECA. Second, Hunter contends that Section 1519 is unconstitutionally vague as applied by the government in the instant matter and explains how the government's continued use of Section 1519 to punish FECA violations could create a chilling effect on the core political activity that the FECA was designed to protect.

## II.   ARGUMENT

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) allows for pretrial dismissal

10

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

based on the indictment's "failure to state an offense" when the motion to dismiss "can be determined without a trial on the merits." In ruling on a motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment. *U.S. v. Boren* 278 F.3d 911, 914 (9th Cir. 2002). An indictment should be dismissed for failure to state an offense when, as here, "'the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation.'" *United States v. Carroll*, 320 F. Supp. 2d 748,752 (S.D. Ill. 2004) (quoting  *U.S. v. Panarella,* 277 F.3d 678, 685 (3d Cir.2002)). The Government's Application of Section 1519 to FEC Filings Upsets the Carefully Crafted Balance Congress created in the FECA.

Counts 45 through 57 of the indictment charge violations of 18 U.S.C. § 1519. Section 1519, which was enacted as part of the Sarbanes-Oxley Act of 2002, Pub. L. 107–204, 116 Stat. 745 (July 30, 2002), provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

The indictment alleges that certain false entries were made in reports filed with the FEC, with the intent to impede, obstruct or influence the proper administration of a matter within the jurisdiction of the FEC and FBI.

**A.** **In Order to Safeguard the Separation of Powers and Core Political Speech Protected by the First Amendment, Congress Created a Comprehensive Administrative, Civil and Criminal Regulatory Structure in FECA to Govern Campaign Finance Disclosures.**

When Congress decided to revamp the federal government's election laws in the 1970s, it was well aware of the dangers posed by regulation in this area. In particular, Congress saw the potential for election laws to be manipulated as a weapon for partisan warfare against other branches of government. *See*, *e.g.*, H.R. Rep. No. 94-917 (Mar.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

11

17, 1976) at 3 ("[E]lection campaigns are the central expression of this country's democratic ideal. It is therefore essential in this sensitive area that the system of administration and enforcement enacted into law does not provide room for partisan misuse.").

Congress also could not miss the serious First Amendment concerns with regulating election campaigns. "[I]t can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). The FECA's regulation of campaign contributions and expenditures "operate[s] in an area of the most fundamental First Amendment activities" because "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley*, 424 U.S. at 14. As the Supreme Court recognized in *Buckley*, the same is true of *disclosures* about contributions and expenditures; "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights." *Id.* at 66. Disclosure requirements are accordingly subject to a "strict test" and must "directly serve substantial governmental interests." *Id.* at 66, 68. Although the compelled disclosure of expenditures may be justied in some respects by the need to "provide[] the electorate with information as to . . . how [political campaign money] is spent" and to deter corruption "by exposing large . . . expenditures to the light of publicity," *id.* at 66-67, the constitutional concerns remain. *See id.* at 64 ("[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment.").

In this sensitive area, Congress crafted an "intricate statutory scheme" in the FECA "to regulate federal election campaigns." *Id.* at 12. Congress later created an independent agency—the Federal Election Commission—with "primary and substantial responsibility for administering and enforcing" the Federal Election Campaign Act. *Id.* at 109. In addition to being free from direct supervision by the executive branch, the

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**          18-CR-3677-W

Commission includes no more than three Commissioners from each party to prevent partisan domination. 52 U.S.C. § 30106(a)(1). Enforcement action requires the agreement of at least four Commissioners, 52 U.S.C. § 30109(a)(2), (4)(A)(i), (5)(C), (6)(A), so that any enforcement requires bipartisan agreement that dilutes the threat to the separation of powers. Congress's design "g[a]ve the Federal Election Commission more extensive and flexible civil enforcement and regulatory powers, as well as to provide for a more balanced and equitable operation of these laws." 94th Cong., 2d Sess., Cong. Rec. 12181 (May 3, 1976); *Buckley*, 424 U.S. at 141 ("Congress viewed these broad powers as essential to the effective and impartial administration of the entire substantive framework of the Act."). Indeed, Congress assigned to the FEC the "exclusive" authority for civil enforcement of the nation's campaign finance laws. 52 U.S.C. § 30107(e).

### 1. Congress knew that campaign disclosure mistakes were inevitable.

The nature of modern campaigning means that errors in campaign disclosures are inevitable. The FECA requires disclosures for each committee's "receipts and disbursements." 52 U.S.C. § 30104(a)(1). In a typical campaign, those rules can require hundreds of expenditures to be disclosed in a single quarterly reporting period. For many politicians, including most members of the House, the campaign season is ceaseless, and the campaign must keep track of never-ending expenditures. Furthermore, expenditures often require difficult judgment calls. For example, the FECA allows virtually any sort of expenditure so long as it is not a "personal" expense. § 30114(b)(1). But even the determination as to what constitutes a "personal" or a lawful campaign purpose depends on a variety of facts and circumstances requiring a "case-by-case" evaluation. 11 C.F.R. § 113.1(g)(1)(ii).

In addition, the FECA provides no guidance on how to characterize a given expenditure nor does it establish any metrics by which a candidate or his campaign committee can determine when an expense incurred with an individual satisfies the section 30114(b)'s "irrespective test." *See* 52 U.S.C. § 30104(b)(5)(A) (requiring

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

13

disclosure of the recipient, "date, amount, and purpose of [each] operating expenditure"); *See also* 52 U.S.C. § 30114(b).

The FEC acknowledges that it has a role in "clarifying the law," see http://www.fec.gov/pages/brochures/fecfeca.shtml#Clarifying_Law, but the FEC's approach is to encourage cooperative discussions with committees to achieve the disclosures it considers necessary. *See* FEC Statement of Policy: "Purpose of Disbursement" Entries for Filings with the Commission, 72 Fed. Reg. 887, 888 (Jan. 9, 2007) ("[I]f a committee uses a description that is listed as lacking sufficient detail, a [Reports Analysis Division] analyst may review the report more closely but the Commission would not automatically take any particular action. In most instances, the Commission will merely contact the reporting committee and the committee may then amend its report.").

When it enacted and amended the FECA throughout the 1970s, Congress knew that complex practical realities of campaigning would create problems for disclosure issues requiring some means of resolution. As one Representative observed in 1971, there would be "endless questions arising from factual situations which candidates, and committee treasurers, could be confronted with." H.R. Rep. 92-564, at 27 (Rep. Dickinson) (1971) (criticizing an earlier FECA bill, which proposed liability for non-willful expenditure reporting violations). Even the Commissioners disagree about how to characterize expenditures. *See*, *e.g.*, *Charles Boustany, Jr. MD for Congress*, MUR 6698 (Feb. 23, 2016) (dividing 3-3 and therefore not pursuing enforcement action based on an alleged mischaracterization of the purpose of an expenditure and failure to disclose an "ultimate payee").

### 2. Congress created a regulatory regime that accounts for the inevitability of disclosure errors in modern political campaigns.

By design, the FECA was enacted to avoid fragmented enforcement of campaign finance and expenditure requirements, the kind of arbitrary and disjointed enforcement that is occasioned by the differing views and standards applied by individual

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**                    18-CR-3677-W

prosecutors in the nation's 93 U.S. Attorneys' offices. Prior to 1971, the Department of Justice enforced the election laws via a few restrictions in the Federal Corrupt Practices Act located in Title 18.  As a result, "enforcement responsibility was fragmented, and the line between improper conduct remediable in civil proceedings and conduct punishable as a crime blurred." H.R. Rep. No. 917, 94th Cong., 2d Sess. 3, U.S. Code Cong. & Admin. News 1976, p. 929.  Congress moved those offenses from Title 18 to the FECA and put them under the purview of the newly created Federal Election Commission. Federal Election Campaign Act of 1976, Pub. L. No. 94–283, §§ 112, 201(a), 90 Stat. 496 (1976).

As reconstituted in 1976, the FEC is a bipartisan expert independent agency designed "to interpret, advise [and] provide needed certainty to the candidates with regard to the complexities of the Federal Election law." Statement of President Ford, H.D. No. 94-371 (Feb. 17, 1976) at 1. *See also* 52 U.S.C. § 30106(a)(1). The FEC is structured and constituted such that it requires agreement from members of both parties to enforce the FECA against a candidate. 52 U.S.C. § 30109(a)(2), (4)(A)(i), (5)(C), (6)(A). And unlike the U.S. Attorneys' Offices, which might produce 93 different interpretations of the same statute and relevant regulations, the FEC can give candidates clear and uniform notice of the election laws it administers. *See* Hearing before the Subcommittee on Privileges & Elections, 94th Cong., 2d Sess. (Feb. 18, 1976), at 86 ("We must have a commission to assist the over 1,000 Federal candidates, their staffs, and the network of volunteers all of whom need the guidance of an independent commission to understand and abide by the mandates of the sweeping and often complex reforms we have written into the campaign law.") (Sen. Mondale); *see also* Peter L. Strauss, *One Hundred Fifty Cases Per Year:  Some Implications of the Supreme Court's Limited Resources for Judicial Review of Agency Action*, 87 Colum. L. Rev. 1093, 1121 (1987) ("When national uniformity in the administration of national statutes is called for, the national agencies responsible for that administration can be expected to reach single readings of the statutes for which they are responsible and to

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**                    18-CR-3677-W

enforce those readings within their own framework.").[1]

Congress also recognized that candidates, Representatives, and Senators could not themselves realistically track and disclose all the contributions and expenditures reportable under the FECA. Indeed, holding candidates liable for such reports would discourage them from campaigning in the first place because, realistically, attention to such administrative detail is impossible in the midst of the constant fundraising and campaigning that marks modern political life.[2]  Instead, the FECA puts the burden of reporting campaign cash flows on a professional class of campaign administrators, namely the treasurers of political committees. *See* 52 U.S.C. § 30104(a)(1) ("Each treasurer of a political committee shall file reports of receipts and disbursements in accordance with the provisions of this subsection.  The treasurer shall sign each such report.").  In fact, even though treasurers are often political committee compliance experts, the FECA does not require treasurers to report expenditures perfectly.  Rather, a

---

[1] The Justice Department itself recognizes the importance of having national standards in campaign finance cases:  "The Department's consultation requirements for election crime matters are designed to ensure that national standards are maintained for the federal prosecution of election crimes, that investigative resources focus on matters that have prosecutive potential, and that appropriate deference is given to the FEC's civil enforcement responsibilities over campaign financing violations."  *Federal Prosecution of Election Offenses* 16 (7th ed. May 2007).  We are not aware of the existence or extent of any consultation in this case with the Public Integrity Section of the Department of Justice, under the authority of which this manual was promulgated or deference to the FEC.

[2] See Rep. Tim Roemer, Why Do Congressmen Spend Only Half Their Time Serving Us?  Newsweek (July 29, 2015), available at http://www.newsweek.com/why-do-congressmen-spendonly-half-their-time-serving-us-357995:

> "In 1990, I raised $850,000 in my campaign for Congress.  Between 1986 and 2012, the average cost of a Senate race increased 62 percent; the average cost of a Congressional seat increased a whopping 344 percent.  In 2012, House incumbents raised an average of $2,400 per day in the two-year cycle.  Senate incumbents raised an average of more than $4,700 per day over six years.

> How much of members' actual time is devoted to 'dialing for dollars'?  They are generally hard-working, honest, type A personalities, so in a typical 10-hour day, they might dedicate three hours.  In election cycles during the heat of battle, it might escalate to more than half of their time."

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**      18-CR-3677-W

treasurer's reports comply with the FECA's disclosure requirements as long as "best efforts have been used to obtain, maintain, and submit the information required by this Act."   52 U.S.C. § 30102(i). Because of the burden of tracking and disclosing each expenditure, Congress requires only a bare-bones description of its purpose.   *See* 52 U.S.C.A. § 30104(b)(5) (requiring disclosure of the name and address of the recipient of each committee disbursement, "together with the date, amount, and purpose of such [disbursement]"); H.R. Rep. No. 96-422 (1979), at 18 ("[T]he purpose requirement will be satisfied by a short statement or description, no more than one or two words in most cases, of why the money was spent.").

Congress reserved criminal enforcement of the election law only for the most culpable acts by, among other steps, requiring the most demanding mens rea for criminal FECA violations. For violations involving "the making, receiving, or reporting of any contribution, donation, or expenditure," there is *no criminal liability* unless the violation is committed "knowingly and willfully." § 30109(d)(1)(A). As the Department of Justice's election crimes manual recognizes, the FECA's "words of specific criminal intent require proof that the offender was aware of what the law required, and that he or she violated that law notwithstanding that knowledge, i.e., that the offender acted in conscious disregard of a known statutory duty or prohibition." *Federal Prosecution of Election Offenses* 135 (7th ed. May 2007) (citing *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *Nat'l Right to Work Comm. v. FEC*, 716 F.2d 1401 (D.C. Cir. 1983); *AFLCIO v. FEC, 628 F.2d 97* (D.C. Cir. 1980)), available at https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf.  Indeed, the Department's own manual acknowledges that violations of the FECA that are "committed  with lesser intent . . . are not federal crimes."  *Id.* at 135 n.50.  Instead, "[t]hey are subject to civil and administrative enforcement by the [FEC]." *Id.*; *see also* supra at 9.

Congress also crafted the FECA to encourage conciliation rather than prosecution.  If the FEC finds probable cause that a violation occurred, it is required,

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

17

"for a period of at least 30 days, to correct . . . such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved." § 30109(a)(4)(A)(i). A conciliation agreement is not only "a complete bar to any further action by the Commission," *id*., but it also serves as a defense to a criminal prosecution and a basis for a more lenient sentence "[i]n any criminal action brought for a violation of any provision of [the FECA]," § 30109(d)(2)-(3).

Congress also limited criminal enforcement of FECA violations by restricting prosecutions to violations involving large amounts of money. *See* S. Rep. No. 94-677 (1976), at 3 (The FECA "provide[s] criminal penalties for substantial violations and civil penalties and disclosure for less substantial violations."). Disclosure violations involving less than $2,000 are not subject to criminal prosecution at all, and violations involving less than $25,000 are a misdemeanor. § 30109(d)(1)(A)(ii). Even for the most significant FECA violations, the statutory maximum is five years. § 30109(d)(1)(A)(i). This graduated structure accounts for the public's interest in "exposing large . . . expenditures to the light of publicity," *Buckley*, 424 U.S. at 66-67 (emphasis added), while ensuring that there is breathing room to avoid chilling campaign expenditures that are protected by the First Amendment.

**B.** **Applying Section 1519 Here Would Displace Congress's Tailor-made Scheme with an Offense that has Lesser Proof Requirements and a Much Greater Penalty.**

Unlike the FECA's elaborate system that is carefully calibrated for how campaigns actually work, Section 1519 of Title 18 says nothing about campaign finance. Instead, it "was drafted to prevent corporate document shredding." *United States v. Katakis*, 800 F.3d 1017, 1030 (9th Cir. 2015). Applying Section 1519 to a candidate based on a committee's disclosures would disrupt in numerous ways Congress's delicate balance between protecting First Amendment rights and enforcing the campaign finance laws.

First, applying Section 1519 in conjunction with § 2(b) to a candidate would be

**MEMO OF POINTS & AUTHORITIES TO DISMISS**          18-CR-3677-W
**COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

an end-run around the treasurer's reporting responsibilities. Under the FECA, it is the treasurer—not the candidate—who must document and verify expenditures. The treasurer is assigned this responsibility but is also protected by the "best efforts" safe harbor established by FECA and discussed above. But under the government's view, the FECA's explicit assignment of responsibility to the treasurer and the best efforts protection becomes irrelevant. Anyone submitting a "false" bill to a political committee would violate Section 1519 by "causing" the committee to record the false expenditure in its books and "causing" the treasurer to report the false expenditure in its disclosure reports to the FEC. *Cf. United States v. Curran*, 20 F.3d 560, 570 (3d Cir. 1994) ("Although Section 1001 is broad in its scope, it is not an all-encompassing counterpart of underlying agency reporting obligations. To read it as the government contends here, would in effect broaden the reporting duty imposed on campaign treasurers to be applicable to contributors as well. We find no indication that Congress intended such an expansion of its regulatory scheme.").

Second, the indictment charges a lower mens rea than would apply to a criminal violation of the FECA. Whereas violations of the FECA's reporting rules can only be prosecuted if they are committed "knowingly *and willfully*," § 30109(d)(1)(A) (emphasis added), Counts 45-57 of the indictment in this case charge only "knowingly," which is the mens rea requirement stated in Section 1519. Knowledge is a lesser mens rea requirement and, in contrast to "willfully," does not require the government to show that the defendant knew his actions were illegal. *See* 9th Circuit Model Jury Instruction 5.6 ("Knowingly – Defined") ("An act is done knowingly if the defendant is aware of the act and does not [act] [fail to act] through ignorance, mistake, or accident. [The government is not required to prove that the defendant knew that [his] [her] acts or omissions were unlawful.]"). As discussed above, the "willfully" standard in the FECA is part of Congress's design to protect core political speech. The substitution of Section 1519 for an FECA crime would lead to the paradoxical result that a Title 18 offense aimed at corporate document shredding (1519) could be used to supply a four-

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

fold increased sentence over that provided by FECA for conduct that could not even be criminal under the FECA (where it was committed only knowingly but not willfully). Congress could not have intended such an odd and dangerous result.

Third, the "protection for persons who enter into and adhere to conciliation agreements" only applies to alleged violations of the FECA itself. S. Rep. No. 94-677 (1976), at 3. If allowed to proceed under Section 1519 instead of the FECA, the government would dramatically reduce the burden of proof that Congress thought appropriate for this notoriously difficult area of the law.

Perhaps most important, applying Section 1519 would eliminate the FECA's minimum threshold for criminal violations while radically enlarging the maximum sentence. As amended by the Bipartisan Campaign Reform Act of 2002 (BCRA), P.L. 107-155, 116 Stat. 81 (Mar. 27, 2002), the FECA does not allow any criminal charges for violations less than $2,000, and only creates a misdemeanor offense for violations less than $25,000. This carefully structured penalty scheme does not simply reflect relative assessments of culpability, it also leaves critical breathing room for the First Amendment and separation of powers. *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("First Amendment freedoms need breathing space to survive"). Section 1519, by contrast, has no monetary thresholds. Its 20-year hammer would drop as hard on a committee report that knowingly inflated expenditures by $1 as one that did so by $1 million.[3] *Cf. United States v. Santos*, 553 U.S. 507, 517 (2008) (finding "no explanation

---

[3] It is no answer in this context to claim that such matters could be taken into consideration at sentencing. Congress crafted the FECA to allow for the proper exercise of the First Amendment rights and other constitutional protections, and it clearly did not intend that Members run the gauntlet of potential federal investigation and prosecution every quarterly reporting cycle for potential false statements relating to small dollar amounts. Furthermore, the mere ability to charge violations of Section 1519 in this context would give federal prosecutors extraordinary coercive power over members of a coequal branch. *See* Tr. of Oral Arg. 31:21-23, *Yates v. United States*, No. 13-7451 ("'Look, if we prosecute you you're facing 20 years, so why don't you plead to a year, or something like that.' It's an extraordinary leverage that the broadest interpretation of

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

20

1  for why Congress would have wanted a transaction that is a normal part of a crime it

2  had duly considered and appropriately punished elsewhere in the Criminal Code to

3  radically increase the sentence for that crime" through the money laundering statute).

**C.   There is No Established Practice of Applying Section 1519 to Police Campaign Disclosure Reports Filed with the FEC.**

6      In light of all these conflicts with the carefully calibrated FECA, it is no surprise

7  that prosecutions for campaign disclosure violations under Section 1519 are exceedingly

8  rare.  In fact, the Department of Justice manual—which was last revised in 2007 more

9  than five years after Section 1519 was enacted—does not even mention Section 1519 as

10  a basis for false-statement offenses related to election disclosures. *Cf. Federal*

11  *Prosecution* 185-88. Similarly, the FEC's Form 3 ("Report of Receipts and Disburse-

12  ments") – the form that Hunter allegedly caused to contain false information – does not

13  mention Section 1519 as a consequence of misstatements.  Instead, FEC Form 3 states

14  only that "[s]ubmission of false, erroneous, or incomplete information may subject the

15  person signing this Report to the penalties of 52 U.S.C. § 30109"—that is, the FECA.

16  *See* FEC Form 3, available at http://www.fec.gov/pdf/forms/fecfrm3.pdf (em-

17  phases added).[4]

18      The government's theory is not only inconsistent with Congress's careful

19  approach to regulating campaign disclosures—its attempt to apply Section 1519 to

20  Hunter would violate the Constitution.

**D.   The Passive Receipt of Campaign Disclosures is not a "Matter" Within the Meaning of § 1519**

23      The indictment fails to specify the "matter" that Hunter intended to impede,

24  obstruct, or influence through the routine filing of the campaign disclosure reports

25  identified in Counts 45-57.  The indictment does not allege any ongoing FEC or FBI

_____

27  this statute would give Federal prosecutors.")  (Roberts, C.J.).

28  [4] The failure of these authorities to even list Section 1519 as a possible penalty only reinforces the vagueness and lack-of-notice concerns discussed below. *See infra* at Part

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

21

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**          18-CR-3677-W

investigation or audit that Hunter was aware of at the time his campaign submitted these reports.  This omission is fatal to the indictment, as recognized by the Supreme Court in a recent case analyzing a similar obstruction of justice provision.

Section 1519 does not penalize a mere false entry in a record or document.  Such an entry is only criminalized where it is made "with the intent to impede, obstruct, or influence the investigation or proper administration *of any matter* within the jurisdiction of any department or agency of the United States . . . ."  18 U.S.C. § 1519.  The FEC's passive, routine receipt of campaign filings, the only relevant conduct alleged in the indictment, is not a "matter" within the meaning of § 1519.  In *McDonnell v. United States*, the Supreme Court held that the meaning of the term "matter" in the federal bribery statute should be given a "confined interpretation," and limited to a "formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."  136 S. Ct. 2355, 2372 (2016).  In that case, the Supreme Court rejected the government's argument that "nearly any activity by a public official" constitutes a "matter," including mere "workaday functions."  *Id.* at 2368.

The Supreme Court has applied similar reasoning to an analogous tax obstruction statute.  That statute, 26 U.S.C. § 7212(a), makes it a felony "corruptly or by force" to "endeavo[r] to obstruct or imped[e] the due administration of" the Internal Revenue Code.  In *United States v. Marinello*, the Supreme Court held that:

> "[D]ue administration of [the Tax Code]" does not cover routine administrative procedures that are nearly universally applied to all taxpayers, such as the ordinary processing of income tax returns. Rather, the clause as a whole refers to specific interference with targeted governmental tax-related proceedings, such as a particular investigation or audit.

138 S. Ct. at 1104.  The Supreme Court held that this obstruction statute applied only to "specific, targeted acts of administration," *id.* at 1106, which did not include "routine, day-to-day work carried out in the ordinary course by the IRS, such as the review of tax returns," *id.* at 1110.  Instead, the Court held that the statute required "a particular

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**

18-CR-3677-W

administrative proceeding, such as investigation, an audit, or other targeted administrative action." *Id.* at 1109.

Pursuant to the cabined definition of "matter" set out in *McDonnell* and the limited reach given to an analogous statute and enforcement regime in *Marinello*, it is not sufficient under Section 1519 for the government to merely allege that Hunter caused the passive receipt of routine disclosures by the FEC. This conclusion is particularly appropriate in the context of the FECA, in that, as noted, giving Section 1519 a broad interpretation would fundamentally undermine the carefully crafted campaign enforcement and penalty regime Congress created. Accordingly, the Court should dismiss Counts 45-57 because the indictment fails to allege any "matter," such as an FEC or FBI investigation, that Hunter sought to obstruct through his campaign's filing of routine campaign finance disclosures.

The FEC did not notified the Hunter campaign that a complaint had been filed alleging violations of the FECA by his campaign until May 5, 2016. Thus, consistent with *McDonnell* and *Marinello*, there was no "matter" regarding Hunter's FEC Form 3 reports until May 5, 2016. Counts 45-55 concern FEC Form 3 reports filed by the Hunter Campaign between July 15, 2013 and April 15, 2016 and charge that Hunter filed each of the reports *with the intent* to obstruct the investigation of matters within the jurisdiction of the FEC. Accordingly, the Court must, at a minimum, dismiss counts 45-55 because they concern FEC Form 3 reports filed by the Hunter Campaign before any "matter" concerning Hunter's alleged misuse of campaign funds existed.

## E.  Section 1519 is Unconstitutionally Vague as Applied By the Government.

The government's expansive interpretation of Section 1519 is unconstitutionally vague as applied to Hunter in the instant matter because it allows arbitrary and discriminatory enforcement in an arena already ripe for political gamesmanship, violates Hunter's First Amendment rights, and infringes upon the separation of powers that FECA was designed to protect.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**          18-CR-3677-W

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**1.    The government's expansive application of Section 1519 deprives candidates and politicians of due process by forcing them to comply with the unannounced reporting standards of nearly a hundred different prosecutorial offices.**

"Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'"  *Buckley*, 424 U.S. at 77 (quoting *United States v. Harris*, 347 U.S. 612, 617 (1954)).  "Where First Amendment rights are involved, an even 'greater degree of specificity' is required."  *Id.* at 77 (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). A penal statute like Section 1519 is void for vagueness when it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" as well as when the offense "encourage[s] arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The requirement that the legislature "establish minimal guidelines to govern law enforcement," is "the more important aspect of the vagueness doctrine."  *Id.* at 357-58. That is because "the greatest danger of abuse of prosecuting power" is the prosecutor's ability to "pick[] some person whom he dislikes or desires to embarrass, or select[] some group of unpopular persons and then look[] for an offense."  Robert H. Jackson, The Federal Prosecutor, 31 Am. Inst. of Crim. L. & Criminology 3, 5 (1940-41).  The Fifth Amendment accordingly does not tolerate criminal laws that threaten to cast a "net large enough to catch all possible offenders" while leaving "it to the courts to step inside and say who could be rightfully detained."  *United States v. Reese*, 92 U.S. 214, 221 (1876); see also *Kolender*, 461 U.S. at 358 (vagueness doctrine does not "permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections").

Vagueness concerns are amplified when penal statutes are deployed, as here, with the "potential for arbitrarily suppressing First Amendment liberties."  *Kolender*, 461 U.S. at 358.  In those circumstances, "more precision in drafting may be required

because of the vagueness doctrine in the case of regulation of expression," *Parker v. Levy*, 417 U.S. 733, 756 (1974), and courts demand a "greater degree of specificity" than in other contexts, *Smith*, 415 U.S. at 573; *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

As applied to the campaign filings of a sitting United States congressman, Section 1519 threatens to create the sort of "net large enough to catch all possible offenders" that vagueness doctrine forbids. *Reese*, 92 U.S. at 221.

### 2. Applying Section 1519 to Violations of the FECA would grant prosecutors too much discretion and risk a chilling effect on first amendment activities.

All political committees must file FEC reports. 52 U.S.C. § 30104(a)(1). Given the messy realities of the modern federal campaign, there will likely be many errors that could support a prosecution on the government's theory in this case—in all likelihood, far more errors than could ever be prosecuted. But prosecutors will have to select on some basis. Deployed in this context, Section 1519 "furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular [candidates] deemed to merit their displeasure." *Kolender*, 461 U.S. at 360. This gives prosecutors extraordinary leeway to arbitrarily pick candidates to target under Section 1519, notwithstanding the FEC's well-documented ability to bring civil enforcement measures to correct false disclosure entries. *See*, *e.g.*, MUR 6977 (House Majority PAC) (Mar. 28, 2016 conciliation agreement regarding failure to disclose seven expenditures); ADR 772 (Newt 2012) (Feb. 23, 2016 settlement regarding misidentification of a campaign debt as "travel"); MUR 5408 (Sharpton 2004) (Apr. 2, 2009 conciliation agreement regarding material misstatements of receipts and disbursements); MUR 5808 (Planned Parenthood Action Fund Inc. PAC) (Mar. 6, 2007 conciliation agreement regarding failure to report receipts and disbursements); ADR 209 (Bruderly for Congress) (Feb. 18, 2005 settlement regarding failure to report receipts and disbursements); ADR 163 (Sullivan for Congress) (June 9, 2003 settlement

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**                    18-CR-3677-W

regarding alleged misreporting of campaign debts); MUR 4328 (Democratic-Republican-Independent Voter Education Committee) (July 14, 2000 conciliation agreement regarding misidentification of an independent expenditure as an "operating expense").

The various cases just cited resulted in FEC action and conciliation agreements; this case was already the subject of FEC action yet the prosecutors chose to insert themselves into the FEC's domain and charge numerous criminal offenses based on conduct usually resolved by the FEC (or the House).  In fact, the FEC process has been used to resolve errors more significant than those alleged here.  *See*, *e.g.*, MUR 6204 (Dallas Cnty. Republican Party) (Oct. 15, 2009 conciliation agreement regarding fifty expenditures worth $215,000 that failed to disclose the correct purpose).  Nonetheless, the government singled out Hunter for this divergent treatment throughout its investigation and prosecution. It is clear that the government's view of the scope of Section 1519 invites and encourages just this sort of arbitrary and discriminatory enforcement action.

The vagueness concerns are unusually acute here because applying Section 1519 would invite the executive branch to chill core political speech and erode the separation of powers through excessive meddling in the minutiae of a member of Congress's FEC reporting without the congressionally designed protections of the FECA.  *See* Cong. Rec. 6942 (Mar. 17, 1976) (testimony of Sen. Claggett) (When expenditures and contributions are "subjected to regulation, especially with criminal sanctions, the inhibiting effect on political expression is acute.").  Campaign expenditures are necessary for the "[d]iscussion of public issues and debate on the qualifications of candidates [that] are integral to the operation of the system of government established by our Constitution." *Buckley*, 424 U.S. at 14.  Anticipating errors and omissions in the FEC reports of most federal elected officials, Congress made appropriate accommodations.  *See* 52 U.S.C. § 30102(i) (reports are in compliance with the FECA's disclosure requirements as long as "best efforts have been used to obtain, maintain, and

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**                18-CR-3677-W

submit the information required by this Act").

Using Section 1519 in this manner, rather than the process envisioned by the FEC, allows every federal prosecutor across the land to make their own assessment regarding the adequacy of a disclosure. Not only does this approach threaten divergent applications of the law in this sensitive area, but it requires every candidate and politician to guess how to comply with prosecutors' individualized reporting standards that are only announced after the reports are filed. Under the government's theory in this case, the penalty for guessing wrong is a 20-year prison sentence. Furthermore, neither the FEC—whose Form 3 states that any misstatements are governed by the FECA—nor the DOJ—whose own manual omits Section 1519 from the list of applicable campaign disclosure crimes—gave any notice, much less the fair notice required for due process, that the 20-year felony in Section 1519 could apply.

Furthermore, the legislative history of Section 1519 demonstrates that Congress did not intend Section 1519 to be used in such a far reaching manner. At the time of its passage, several senators voiced their "concern that Section 1519, and in particular, the phrase 'or proper administration of any matter within the jurisdiction of any department or agency of the United States' could be interpreted more broadly than we intend," Sen. Rep. 107-146 (2002), at 27 (Additional views of Sens. Hatch et al.)—precisely as the government has done here. Those senators clarified that "Section 1519 should be used to prosecute only those individuals who destroy evidence with the specific intent to impede or obstruct a pending or future criminal investigation, a formal administrative proceeding, or bankruptcy case." *Id*. (emphasis added). The statute should be interpreted accordingly to prevent turning Section 1519 into a nearly universal false-statement statute. *See Yates v. U.S.*, 135 S. Ct. 1074, 1087 (2015) ("It is highly improbable that Congress would have buried a general spoliation statute covering objects of any and every kind in a provision targeting fraud in financial record-keeping.").

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**     18-CR-3677-W

### 3. Under The Rule of Lenity, any Ambiguity as to Whether Congress Intended Section 1519 to Extend to FECA Violations Must Be Resolved Against the Government.

The rule of lenity prohibits the government's expansive interpretation of Section 1519. "[W]hen there are two rational readings of a criminal statute, one harsher than the other, [courts] are to choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States*, 483 U.S. 350, 359–60 (1987); *see also United States v. Thompson*, 484 F.3d 877, 881 (7th Cir. 2007) (The rule of lenity "insists that ambiguity in criminal legislation be read against the prosecutor, lest the judiciary create, in common-law fashion, offenses that have never received legislative approbation."). Nothing about Section 1519 provides the necessary "clear and definite language" here.

Section 1519 is particularly susceptible to the application of the rule of lenity. The Supreme Court applied it to Section 1519 in *Yates* because the government urged a reading "that exposes individuals to 20-year prison sentences for tampering with any physical object that might have evidentiary value in any federal investigation into any offense, no matter whether the investigation is pending or merely contemplated, or whether the offense subject to investigation is criminal or civil." 135 S. Ct. at 1088; *see also United States v. Ford*, 639 F.3d 718, 721–22 (6th Cir. 2011) (rule of lenity applied to an alleged § 1001 violation because "[t]he meaning of 'any matter' and 'jurisdiction' requires interpretation of unspecific words at an extremely high level of abstraction").

Here, the government still reads Section 1519 as the basis of a 20-year sentence for any misstatement related to anything that might be regulated by the federal government. The rule of lenity properly insists that Congress grant such an extraordinary power to prosecutors using language that is "clear and definite," rather than opaque at best. *See Liparota v. United States*, 471 U.S. 419, 427 (1985) (The rule of lenity "strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

SELTZER CAPLAN McMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**          18-CR-3677-W

### III.   CONCLUSION

Section 1519 is unconstitutionally vague as applied to the FEC disclosure reports of a sitting Member of Congress.  Because the expenditures that must be reported under the FECA are so voluminous in modern federal campaigns—and therefore prone to misstatements—applying Section 1519 to FECA violations would place all federal elected representatives under a cloud of criminal suspicion.  Particularly given the harsh maximum sentence, the statute would "furnish[] a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular [candidates] deemed to merit their displeasure."  *Kolender*, 461 U.S. at 360. Even the threat of prosecution under those circumstances could well discourage vigorous campaigning or even running for office in the first place.  Furthermore, charges of this nature brought by the executive branch could have a debilitating effect on the operation of a coordinate branch of government. Given the disturbing incentives created by applying Section 1519 in this context, the statute is void for vagueness, and violates the First Amendment and separation of powers as applied here.

In sum, the indictment does not properly allege that the charged conduct within Counts 45-57 was subject to the "proper administration" of a "matter" under FEC or FBI jurisdiction as properly construed for a Section 1519 offense, and the government's expansive view of Section 1519's application is unconstitutional as applied to Mr. Hunter's campaign disclosure reports. As a result, the Court should dismiss counts 45-57 with prejudice for failure to state an offense.

Respectfully submitted,

Dated: June 24, 2019          SELTZER CAPLAN McMAHON VITEK
                              A Law Corporation


                          By:    *s/ Gregory A. Vega*
                                 Gregory A. Vega
                                 Philip B. Adams
                                 Ricardo Arias
                          Attorneys for Defendant, DUNCAN D. HUNTER

SELTZER CAPLAN McMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

**MEMO OF POINTS & AUTHORITIES TO DISMISS COUNTS 45–57 FOR FAILURE TO STATE AN OFFENSE**          18-CR-3677-W