DAVID D. LESHNER
Attorney for the United States
Acting under Title 28, U.S.C. Section 515
EMILY W. ALLEN (Cal. Bar No. 234961)
W. MARK CONOVER (Cal. Bar No. 236090)
PHILLIP L.B. HALPERN (Cal. Bar No. 133370)
BRADLEY G. SILVERMAN (D.C. Bar No. 1531664)
Assistant United States Attorneys
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-6345
Email: bradley.silverman@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 18CR3677(1)-W |
|---|---|
| Plaintiff, | **MOTION TO ADMIT EVIDENCE OF HUNTER'S PERSONAL FINANCIAL CIRCUMSTANCES** |
| v. | |
| DUNCAN D. HUNTER, | |
| Defendant. | |

The United States of America, by and through its counsel, David D. Leshner, Criminal Chief, U.S. Attorney's Office for the Southern District of California, and Emily W. Allen, W. Mark Conover, Phillip L.B. Halpern, and Bradley G. Silverman, Assistant U.S. Attorneys, hereby moves to admit evidence of Duncan D. Hunter's ("Hunter" or "the defendant") personal financial circumstances throughout the charged conspiracy and related offenses.

# I.

# INTRODUCTION

From Duncan Hunter's very first year in Congress, the Hunters remained in a state of continuous personal debt. They had less than $1,000 available in any one bank account as reflected in Hunter's public financial disclosures. Further, financial records reveal that the Hunters overdrew their bank account more than 1,100 times in a seven-year period resulting in approximately $37,761 in "overdraft" and "insufficient funds" bank fees, and carried maximum negative balances on their personal credit cards. The Hunters were by no means poor—as a sitting Congressman, Hunter earned more than $170,000 per year plus benefits, and with Margret Hunter's campaign salary, the Hunter family often took in more than $200,000 per year—far above the average American family income. Yet they lived a lifestyle well beyond their means, routinely spending money they did not have on luxuries like overseas travel, upscale hotel rooms, fine dining, and seemingly endless rounds of golf. To finance this lifestyle, they treated Hunter's campaign treasury as their personal piggybank, regularly embezzling funds to make personal purchases that their own finances could not support. So much strain did the Hunters' profligate spending put on their own finances, and so little compunction did they feel about stealing to make ends meet, that they began to use campaign funds for such basic expenses as cigarettes, gasoline, and groceries. Evidence of the Hunters' financial circumstances, as charged in the indictment, is admissible under Rules 401 and 403 because it is highly probative of Hunter's motive and intent to embezzle campaign funds, his knowledge that Margaret Hunter was doing the same, and his motive and intent to enable and facilitate her fraudulent purchases.

## II.

## STATEMENT OF FACTS[1]

### A.     The Hunters' Personal Financial Circumstances

Despite the stable income that was a staple of Duncan Hunter's congressional career and prior military service, the Hunters were in an exceptionally poor financial position. As set forth in the indictment, they were in continual debt since Hunter became a member of Congress and before. Indeed, as reflected in his United States House of Representatives Annual Financial Disclosure Statements, the Hunters possessed less than $1,000 in savings or reportable assets for the years 2009 through 2017—meaning that the Hunters had less than $1,000 available in any bank account.

Between April 2009 and August 2017, the Hunters incurred 1,100 "overdraft" and "insufficient funds" fees to their family bank account totaling more than $37,000. During roughly this same period, they also carried maximum negative balances on their USAA credit card (between $9,000 and $10,000) and their Discover Card credit card (between $7,500 and $10,000), and were charged over $20,000 in finance charges, interest, and other fees related to late, overdraft, and returned payment fees. They also owed money to a wide variety of merchants, including Macy's, Sears, Home Depot, and Target. In many cases, these debts extended at least as far back as 2010 and continued through late 2016 and beyond.

In July 2009, the Hunters bought a home in Alpine, California, but they had little or

---

[1] The following proffer is based on a number of different sources of evidence the United States intends to introduce at trial, including: (1) financial records of the Hunters' personal bank accounts and credit cards; (2) records of consumer, mortgage, educational, health care, and other debts and liabilities; (3) vendor receipts and business correspondence; (4) financial records of the Hunter campaign; (5) calendar entries; (6) email and text message communications, (7) social media posts and photographs; and (8) testimony by campaign staff and advisors and other witnesses. Due to the voluminous nature of the evidence and the large number of sources, the United States submits this proffer to provide a basis for the Court's ruling, without submitting specific pieces of evidence to be introduced at trial. Should the Court require evidentiary support, the United States will supplement this motion with exhibits as appropriate.

even negative equity in the residence. They were continually late making mortgage payments. They incurred at least eleven late fees of $110 each between October 2014 and August 2016 on their principal mortgage. Similarly, they incurred another fourteen late fees of $110 each between November 2014 and July 2016 on a separate home equity line of credit.

Even when it came to their children's education, the Hunters allowed tuition payments to fall into arrears. They were behind more than $15,000 in their payments for the 2015 school year. Because of their constant outstanding unpaid bills, the school eventually made an "arrangement" with the Hunters whereby their past due balance and future tuition would be reduced by 50%. The Hunters had similar trouble with delinquencies relating to their family dentist, dance school, and a host of other creditors. To help make ends meet, Hunter's parents regularly supplemented their income with monthly payments of around $1,000, as well as additional help when new expenses came up for basic needs like car repairs.

### B.     Hunter Kept a Watchful Eye on the Family's Financial Circumstances

Duncan[2] was well aware of his family's dismal financial state, and he and Margaret communicated regularly about the state of their family's finances. They did this in part to keep track of their balances, as well as to remind one another when payments were due and avoid overdrafts or insufficient funds at the end of the month. Some of Duncan's close friends and confidants were also aware of his financial woes. One of his advisors recalls that the Hunters' financial problems were so dire that Duncan had to check his account balance before he could buy a bottle of water. Another staffer noticed that Duncan had to check in with Margaret to ask whether they had enough money for him to buy a pair of nail clippers. Even after calling home, on one occasion, Duncan's credit card was declined and he had to use another form of payment. Over the years, this staffer noticed that Hunter did not have enough money to buy cigarettes, new shoes, clothes, or tires for his car.

These communications were ongoing and continuous throughout the relevant period.

---

[2] To aid the reader and avoid confusion, throughout the Statement of Facts the Hunters may be referred to separately as "Duncan" and "Margaret," rather than using their last names.

Several examples are set forth here.

On December 3, 2012, Margaret asked Duncan whether it was okay that she had purchased a new pair of boots (he said it was). At the time, both their personal funds and their campaign accounts were nearly depleted, so all sources of money were tight. About a week later, Margaret asked if he had any money left from a $200 gift Duncan's mother had given them. Duncan responded that they had spent it all on ice skating and food. Three days later, he told Margaret that he had filled his gas tank and left $100 on his card, and that he had some mileage reimbursements coming from the campaign. She told him she had some reimbursements and refunds from the campaign due as well.

By Christmas 2012, the Hunters still had almost nothing in their personal or campaign accounts. Duncan's next congressional paycheck was due to be deposited on December 31, but the Hunters feared the holiday would hold it up. On December 28, Duncan texted Margaret to ask, "How do I pay for gas . . . Will the card work?" She advised him to go to Shell, rather than a different gas station, as "[S]hell takes 3 days to actually clear the authorized amount and that will be payday." When Duncan's check cleared on January 1, earlier than expected, he texted Margaret, "It's a new year miracle!"

On February 12, 2013, the Hunters texted about their plans to refinance their mortgage after clearing up their credit scores. Duncan asked Margaret what his monthly "allotment" was, and she told him not to take more than $200 in cash. She also told him that he would need to wait until March to get a tattoo he wanted, because she needed the money to buy groceries. A week later, Hunter alerted Margaret that their personal checking account had a negative balance. "Hey!!! We are finally negative!," he said. "It was weird not being negative. I'm just teasing."

On September 19, 2013, Duncan tried to use his personal debit card at a DC liquor store, but it was declined. He texted Margaret, "My card just declined." She told Duncan that she would deposit money in his account for him "next week." A few hours later, he switched to his campaign card and paid a small tab at Bullfeathers, a bar around the corner from Hunter's congressional office. On September 23, 2013, Duncan noticed that their checking account had

a balance of negative $1,200. Margaret explained that they had incurred $1,500 in unexpected bills, and broke down what each payment was for. She also told him that they were due a refund from a doctor's office. Duncan replied, "Rad!!! Let me deposit it we can get cash." When the check arrived, Duncan told Margaret to take it "to a Chaldean liquor store and cash it. They'll charge you a surcharge. Just do it. Get cash in an envelope like my mom ☺."

On October 7, 2013, Duncan was pleasantly surprised when he went to a DC gas station, as he reported to Margaret: "First time I have had enough money to fill up my truck all the way in a few months." But by October 30, he texted Margaret, "I'm out of $." She responded that she was "down to cash only," and offered to share. She also asked him to reschedule a planned medical test that would cost $600, because the family needed that money. Duncan asked her, "[w]ould you please buy me a pack of cigarettes for tonight? I literally have no money." He then asked, "will that cost $30?"—*i.e.*, would buying cigarettes trigger an insufficient funds fee from the bank? Margaret said it would cost $34.

In February 2014, Margaret shared some good news: the Hunters' $3,600 outstanding property tax balance would be spread over the next 12 months, rather than due all at once in April. Duncan responded, "Holy shit!!!! Wheeeeee!!!!" Margaret replied that she was "beside herself" with happiness, and reminded him that it would soon be "vacation time!" A few months later, on June 10, 2014, Margaret emailed Duncan a list of expenses they had incurred that month, including $170 for his high school reunion. His response: "Run away! Run away!" A week later, he texted her, "I'm broke again."

But Hunter's campaign finances fared much better during this time—a fact not lost on Duncan or Margaret. In summer 2015, the campaign's public report to the Federal Election Commission ("FEC") showed $650,157 cash on hand. When the report was released on July 15, 2015, Margaret texted Duncan, "650 cash on hand at report closing June 30." Duncan replied, "Hot." Yet their personal finances remained in disarray. Indeed the same night Duncan and Margaret discussed the campaign's hefty cash balance, Duncan used campaign funds to pay a $137 tab at Bullfeathers. At around 1:20 a.m. that night, he texted Margaret, "I'm tired of having no cash and being embarrassed." She told him that they had $57 available,

6

and that he could take out $40. "Don't know why you always have these issues[.] Going to bed[.] Take $ out." About two weeks later, as the Hunters' personal account was more than $1,000 in the red, Duncan used his campaign card to buy $296 worth of groceries, taking $100 cash back.

By July 2015, the Hunters were more than $15,000 behind in tuition payments at the private school where their three children were enrolled. That month, Duncan met with a school official to discuss the possibility of reduced tuition for the Hunter family. The school agreed to reduce their tuition by 50%. On August 1, the Hunters made a tuition payment from their personal account, but stopped payment. Margaret asked an administrator whether the school would accept a credit card payment. She then used campaign funds to make a $3,500 payment toward the overdue tuition balance.

Margaret also used the campaign card to pay towards an overdue balance of $7,258 for the family's dental care, and to set up recurring monthly payments of $700 to make up the rest. In August, she admitted to the campaign treasurer that the dental charge was personal, but made no effort to repay it. She stopped the automatic monthly payments in September. When those payments stopped, the dentist's office manager emailed both Duncan and Margaret regarding their outstanding balance, which by then was up to $8,690. Receiving no response from the Hunters, the office manager followed up a second time. After talking with the dental office on the phone on October 1, 2015, Margaret texted Duncan to vent her frustration. Throughout their discussions, Duncan was well aware that they had no personal funds available. The same day, he told Margaret, "Need my USAA payment to hit today" (referring to an automatic payment from the Hunters' joint account to a separate bank account Duncan maintained). Margaret reminded him, "That payment is in [sic] 3rd or 5th."

On September 15, 2015, Hunter bought a new iMac at the Fashion Valley Apple Store. Although evidence suggests the computer was used by one of the Hunters' children, Duncan nevertheless paid for the laptop with campaign funds. The bill came to $2,503, but due to the card's spending limit Duncan was able to put only $2,000 on his campaign card. To cover the rest, he had to use his personal debit card. He texted Margaret to ask about the campaign

7

card's spending limit.  They spoke on the phone, and she texted him afterward, "pls send me personal portion right away need to get it back from [the campaign treasurer] asap."  She then admonished Duncan, "can't buy shoes today babe now"—evidently because he had spent the last of their money.  At Margaret's urgent request, the treasurer reimbursed the Hunters for the personal portion of the iMac purchase the next day.

On March 21, 2016, after a host of online gaming charges to the campaign credit card had caught his attention, Duncan noticed a $32 iTunes charge on the family account.  Duncan sent a text to his children and Margaret: "Do not charge anything in iTunes until next month please."  When his children did not respond by the next morning, he followed up: "Children, please acknowledge the text above regarding iTunes."  After another day of no response, he instructed them "not to buy anything until next month."  He then sent screenshots of receipts showing purchases of Minecraft Resource and Texture packs ($1.98) and a Clash of Clans Bucket of Gems ($9.99).  He added: "First of the month you can get whatever you want. It's on my dime now and unlike mom's my dimes are limited."

As these examples make clear, Duncan watched the family's pennies (and dimes) with a close eye.

### C. Hunter Embezzled Campaign Funds When His Personal Funds Were Tight

Throughout the conspiracy, Duncan routinely used campaign funds to make personal expenditures on days when his bank account was overdrawn.  Within one month of first opening his campaign credit card, Duncan began misusing the funds to pay for a trip he could not otherwise afford. On January 22, 2010, he spent $351 to rent a car in Reno, Nevada, drove to Lake Tahoe, and spent the weekend skiing, dining, and drinking with a female companion (identified in the indictment as "Individual 14") to the tune of $1,008, all of which he paid using campaign funds. Throughout the weekend, the Hunters' personal bank account had a negative balance and incurred numerous insufficient funds fees.  Duncan could not have paid for the trip without dipping into his campaign funds improperly.

Additional examples abound: Duncan himself spent campaign funds on the following personal items, all at times when the Hunters' personal bank account had a negative balance

and had recently incurred one or more insufficient funds fees (averaging around $30 or more apiece):

- $39.95 on August 28, 2010, for the video game ASPYR Civilization IV: Beyond the Sword
- $59.26 on July 21, 2012, to purchase Under Armor shorts
- $560 on November 23, 2012, at the Barona Creek Golf Resort playing golf with his friend and their two fathers
- $150 on June 17, 2013, at Best Buy to purchase SIE2i Sport Headphones
- $313.05 on November 26, 2013, to purchase various iPhone accessories for his phone at the Apple Store
- $204.34 on October 22, 2014, at the Rancho Bernardo Golf Resort to pay for two green fees, food, and drinks during a personal golf outing with a close friend
- $140.62 on January 3, 2016, at the Mount Woodson Golf Club for a golf outing with his brother
- $409.45 on June 24, 2016, at L'Hommage Bistro Francais socializing and partying with friends
- $592.63 on August 4, 2016, at LG's Prime Steakhouse in Palm Springs, California, to buy dinner during a golfing weekend with several friends

These examples, and many others, illustrate that Duncan's improper use of campaign funds was motivated by his personal financial circumstances, so that he could afford to pay for outings, dinners, electronic gadgets, games, and other luxuries beyond his means.

### D. Hunter Ensures Margaret's Continuous Access to Campaign Funds

In late 2009, Duncan directed his campaign treasurer to open a campaign credit card. Although Margaret had no official role with the campaign at the time, Duncan instructed the treasurer to provide Margaret with her own card. At the time (and frequently thereafter) the treasurer cautioned the Hunters that their campaign credit cards could be used only for campaign-related expenses. The cards arrived in December; by the end of the month, Margaret had already spent $129 at the Brigantine and Olive Garden restaurants. Four days into the new year, she paid $80 for gas at a Chevron. When the first credit card statement arrived days

later, the treasurer immediately grew concerned about Margaret's spending, and spoke to her about these personal charges.

Within just a few months, the treasurer had grown so alarmed over Margaret's spending that he began to warn Duncan about her problematic charges. Duncan promised to talk to Margaret, but her spending only escalated. In November 2010, after Margaret could not adequately explain the legitimate campaign purpose for a number of her credit card charges, the treasurer copied Duncan on his emails with Margaret, bringing Duncan's attention to her spending at Walmart, Costco, and Albertson's, as well as a meal at Olive Garden for an adult and three children. "[T]he chances of audit are high," he warned. "When they go over one item they go over the entire campaign." The next month, the treasurer again asked the Hunters to review their recent campaign card charges. Margaret's included purchases at Costco ($101), Walmart ($45), World Market ($124), Olive Garden ($130), and fast food restaurants, as well as several travel-related charges. The treasurer reminded the Hunters that campaign funds cannot be used "for a leisure outing at which the discussion occasionally focuses on the campaign." Duncan's defensive response indicates both that he knew Margaret was using campaign funds to benefit the Hunter family, and that he intended to continue allowing her to do so; he asked, "Are we attempting to create an email trail for some reason?" Later that month, after Margaret refused to provide satisfactory explanations for several suspicious charges, the treasurer threw up his hands, and told Duncan he would step down if Duncan did not resolve the situation. Only then did Duncan at last say he would act, promising that Margaret would put the card away (Duncan did not cancel the card outright, however).

Around the same time, Duncan first floated to his staff the idea of hiring Margaret as a paid member of his campaign staff—an idea they universally opposed. He ultimately did not hire her just then. Nine months later, however, he revived the idea, and even though his campaign advisors remained opposed, he hired Margaret in September 2011 and began paying her $2,000 per month for "campaign management services." Almost immediately, she resumed spending campaign funds at places like Wal-Mart, Albertsons, Vons, Costco, World Market, and Barnes & Noble. Over the next year, she spent thousands, if not tens of thousands,

of campaign dollars on personal expenses for the Hunter family. The treasurer continued to alert Duncan to Margaret's inappropriate expenditures, but Duncan did nothing. By October 2012, a month before the next election, the campaign coffers were left with only $17,000 in net cash available. One week out from the election, the campaign had so little cash on hand that it was forced to cancel an order for a flyer that was scheduled to be mailed that day, even though they had already sunk $18,000 into printing costs. After this fiasco, Duncan finally removed Margaret from the payroll (but even then, he did not take her campaign credit card away). Shortly thereafter, the treasurer resigned.

In early January 2013, the campaign hired a new treasurer and transferred the campaign account to a new bank. Duncan was issued a new campaign debit card in his name. For the first year, Margaret had little access to spend campaign funds, and the family's finances reflected the burden of having no access to embezzled funds. By December 2013, as the Hunters' personal finances remained in disarray, Duncan rehired Margaret as campaign manager once more, this time at a salary of $3,000 per month. Not only would this give Duncan a foolproof reason to provide Margaret with a campaign credit card, but it also helped to channel more campaign money to Duncan's household. Indeed, it is clear that Duncan and Margaret both had this in mind: as Margaret told Duncan, referring to her forthcoming campaign salary, "you need the extra money as much as I do." Soon after, Duncan gave Margaret access to his campaign card, and eventually obtained a card in Margaret's own name as well.

## III.
## ARGUMENT

In this case, Hunter is charged with crimes relating to his and his wife's knowing misuse of campaign funds. There will be little debate at trial that the Hunter family benefited from the chronic and blatant pilfering of campaign funds for clearly personal items including family groceries, vacations, shopping trips, and even medical bills. The salient facts the United States must establish, and that Hunter will dispute, are that Hunter *knew* about these expenditures,

*intended* to use campaign funds for his and his family's benefit, and *agreed* with his wife to allow the theft to continue for many years. Evidence that Hunter and Margaret could not afford to buy the things they wanted with their own money—and that he knew they could not afford them—is extremely probative of Hunter's knowledge, intent, and motive to instead raid his campaign's money.

The admissibility of this evidence is well-established. For over a century, the Ninth Circuit has recognized that "evidence that tends to show that a defendant is living beyond his means is of probative value in a case involving a crime resulting in financial gain." *United States v. Mitchell*, 172 F.3d 1104, 1108 (9th Cir. 1999) (quoting *United States v. Feldman*, 788 F.2d 544, 557 (9th Cir. 1986)); *accord Dimmick v. United States*, 135 F. 257, 266 (9th Cir. 1905) (no error in adducing evidence of defendant's "financial condition…in respect to your being in debt" on date of alleged theft). When a defendant "is charged with embezzlement or similar financial misconduct," for example, "the special nature of the crime charged may justify the use of evidence of financial embarrassment in order to show the accused's knowledge and motive." *U.S. ex rel. Mertz v. New Jersey*, 423 F.2d 537, 541 (3d Cir. 1970) (citing *Ray v. United States*, 114 F.2d 508, 510–11 (8th Cir. 1940)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) ("personal financial gain may weigh heavily in favor of a scienter inference…").

### A. The Hunters' Financial Difficulties Show Hunter's Motive and Intent to Embezzle Campaign Funds

The Hunters' financial difficulties are probative of Hunter's motive and his intent to embezzle campaign funds. Hunter was well-informed of his household's financial troubles, and knew that the only way he could support his lavish personal spending was to use campaign funds. He tracked spending on items as routine as gas, reimbursements due from the campaign, and cash gifts from his mother. He regularly checked in with Margaret about their bank account's balance, even asking whether so much as buying a pack of cigarettes would trigger an insufficient funds fee. Hunter was sufficiently attuned to his family's financial condition that he adjusted his spending behaviors when necessary. For example, when the Hunters'

personal account was virtually depleted, Hunter and Margaret discussed buying gas from Shell because Shell took longer than other filling stations to withdraw funds from the bank. Thus, when money was tight, Hunter would turn to pilfering campaign funds to make purchases he desired but could not otherwise afford—including, as detailed above, electronic gadgets, shorts, video games, and even a weekend ski getaway.

Courts regularly allow evidence of a defendant's financial difficulties to show motive and intent under similar circumstances. In *United States v. Kostopoulos*, for example, a police officer was charged with stealing money from motorists after pulling them over. 766 F. App'x 875 (11th Cir. 2019). Bank records from the relevant time period showed that the defendant's account (which he shared with his wife) "was regularly overdrawn before his bi-weekly paycheck," and each time, he "paid a $34 overdraft fee." *Id.* at 878. These personal financial records were admissible to show that the defendant "was unable to pay for basic living expenses like gas and groceries without incurring overdraft fees," and was "under significant financial pressure on the dates of the thefts" because his account was overdrawn or about to be overdrawn. *Id.* at 880. The Court rejected the suggestion that the evidence was used to argue that "people living paycheck to paycheck are more likely to commit crimes," explaining that "multiple overdraft fees incurred in a short period of time showed that [the defendant] was squeezed, not just that he had a financial interest in being richer." *Id.* at 881 (alterations and internal quotation marks omitted). Without that evidence, "the jury would have been left to wonder why [] a police officer making over $120,000 a year, might choose to steal relatively small amounts of money from vulnerable people in the community." *Id.*[3] Similarly, in *United States v. Fakhoury*, evidence of a defendant's "deteriorating financial condition," which included not only business debts but "a substantial number of insufficient checks" and bank

---

[3] Similarly, in *United States v. Caci*, the Second Circuit held that a defendant's "bad check[s]" had "particular significance" in a robbery case to show why a man the jury might perceive as "highly paid" had "a motive to participate in the planned thefts." 401 F.2d 664, 665, 670 (2d Cir. 1968), *judgment vacated on other grounds sub nom. Giordano v. United States*, 394 U.S. 310 (1969).

records showing a balance of just $400 in the defendant's personal bank account at the time his store caught fire, was relevant to show his motive to commit arson and insurance fraud. 819 F.2d 1415, 1421 (7th Cir. 1987).[4]

The law in the Ninth Circuit is equally clear. In *United States v. Feldman*, the defendant, convicted of bank robbery, argued that the district court improperly admitted his personal bank records showing that his account was overdrawn. 788 F.2d 544, 546, 557 (9th Cir. 1986). The Ninth Circuit disagreed, finding this "evidence of [the defendant's] impecunity" was probative of his motive—even where the defendant noted that motive was not an issue at trial (his defense was that he was not the robber). *Id.* at 557. In *United States v. Meling*, the court affirmed the admission of evidence that the defendant's spending put his family into "substantial debt" and "drove their checking account into the red." 47 F.3d 1546, 1557 (9th Cir. 1995). This evidence "was relevant to [the defendant's] motive—greed"—in his prosecution for poisoning his wife after securing her a life insurance policy. *Id.* And in *United States v. Saniti*, evidence of the defendant's costly drug habit was probative of his "motive for robbing [a] bank." 604 F.2d 603, 604 (9th Cir. 1979) (per curiam); *see also United States v. Tierney*, 424 F.2d 643, 646 (9th Cir. 1970) (finding evidence that defendant "needed more

---

[4] Other examples abound where courts have admitted evidence of personal financial circumstances to establish motive, knowledge, and intent in similar cases. In *United States v. Metallo*, the defendant was charged with credit card fraud; he ran up an unpaid balance of $122,000 on company credit cards obtained fraudulently. 908 F.2d 797 (11th Cir. 1990). The defendant's bankruptcy petition, filed at approximately the same time he applied for the credit cards, was probative of his "knowledge, absence of mistake, and intent in obtaining and using the cards with no intention to pay [the issuer] for the items charged." *Id.* at 798–99. In *United States v. Polansky*, 418 F.2d 444 (2d Cir. 1969), an IRS employee offered to approve a taxpayer's charitable deduction in exchange for a $1,000 bribe. *Id.* at 445. The Second Circuit held that evidence of the defendant's "liabilities in excess of $100,000" (elicited through the defendant's own testimony) was admissible "to show that [he] had a motive for seeking and accepting gratuities." *Id.* at 448. In *United States v. Blood*, the court held that evidence that the defendant had not filed tax returns was admissible to show that he was "living beyond his means and that he had created financial pressures for himself wholly in-consistent with any lawful source of funds available to him." No. CRIM.A. 04-61-KAJ, 2005 WL 3657945, at *3 (D. Del. Aug. 26, 2005).

money" admissible to show motive in counterfeiting trial).

Evidence of Hunter's negative bank balances, overdue mortgage payments, credit card debts, and other aspects of their depleted financial condition is relevant to proving his motive, intent, knowledge, and absence of mistake in spending campaign funds for personal use. It explains why he himself used campaign funds to buy everything from cigarettes to gadgets to groceries to getaways—things he wanted but could not afford to buy with his own money.[5] It also explains why he insisted, against his advisors' judgments, on hiring Margaret as a salaried campaign staffer and allowing her access to campaign funds. And as in *Kostopoulos*, Hunter's financial distress likewise shows why a sitting Congressman earning more than $170,000 per year would embezzle campaign funds. This evidence also demonstrates that Hunter's use of campaign funds for personal adventures was no accident. As in *Metallo*, Hunter's use of campaign credit cards was not the product of "mistake" or sloppiness; he did not simply reach inadvertently for the wrong card in his wallet. Hunter was "living beyond his means," *Feldman*, 788 F.2d at 557, and took advantage of his access to campaign funds to fuel his and his family's wants and desires.

### B. The Hunters' Financial Difficulties Show the Existence of a Conspiratorial Agreement and Knowledge of Margaret's Spending

In light of the Hunters' serious and often-discussed financial difficulties, it is inconceivable that Hunter could be blind to Margaret's illegal campaign spending. Hunter is expected to argue that he had little knowledge of or interest in the family's finances; he may claim he relied on Margaret to handle these matters and was all too happy to stay out of her way. But the evidence shows otherwise. Financial records, and summaries of those records,

---

[5] In an improbable harbinger to this case, the Ninth Circuit described an obvious circumstance in which evidence of financial circumstances would clearly be admissible: "If a man is notoriously broke and cannot buy a pack of cigarettes Tuesday, that night a laundromat is burglarized, and on Wednesday the man buys a carton of cigarettes and a $40 bottle of scotch, all with quarters, the man's financial circumstances have obvious and significant probative value." *Mitchell*, 172 F.3d at 1108. Hunter is just such a notoriously broke man, and his campaign treasury is much the same as this burglarized laundromat.

will show that debts, negative account balances, and frequent overdraft fees were too numerous and overwhelming to ignore. Text messages, emails, and other communication records show many examples in which the Hunters explicitly discussed these troubles. In short, Hunter knew that the family did not have the money to support Margaret's spending habits. And that evidence strongly suggests that he knew she turned to campaign funds to make up the difference.

Evidence of financial difficulties is admissible to establish knowledge by coconspirators of another conspirator's misdeeds. In *United States v. Hampton*, for example, the defendants committed fraud using forged real property deeds, pretending that one of the defendants had purchased the properties. No. CR 15-00302, 2017 WL 1954369, at *1 (E.D. Pa. May 10, 2017). The government sought to admit evidence of that defendant's financial condition to prove that the coconspirators knew the deeds were forged—because they knew he "lacked the money necessary to purchase the properties." *Id.* The court agreed, because the evidence went directly to the coconspirators' knowledge. As the court described, "Evidence that the Defendants knew a co-conspirator could not afford those purchases is appropriate circumstantial evidence that he or she was aware of the alleged scheme and therefore participated in it knowingly." *Id.* at *2. Just as in *Hampton*, the Hunters' financial difficulties show Hunter's knowledge that Margaret "could not afford those purchases"—and, by extension, that she could only have done so using campaign funds.

Likewise, in *United States v. Tager*, the defendant lied about his financial worth in order to obtain credit. 788 F.2d 349, 353 (6th Cir. 1986). Around the same time, he wrote two bad checks that later bounced. *Id.* The court allowed the prosecution to establish the defendant's financial condition using evidence of the bad checks because it helped to establish that "he knew the representations of financial worth were false[.]" *Id.* And in *Metallo*, the defendant's bankruptcy petition "was probative of [his] knowledge" of the fraudulent nature of his corporate credit card charges. 908 F.2d at 799. Here, evidence of the Hunters' financial troubles likewise illustrates his knowledge of Margaret's illegal spending.

And the Hunters' finances show more than just Hunter's knowledge of Margaret's embezzlement—they establish his motive and intent to facilitate it. From his first year in Congress, Hunter went to lengths to ensure Margaret had regular access to campaign funds. He arranged for her to receive a campaign credit card, despite her lack of any role on his campaign. He ignored repeated warnings from his trusted staff of her questionable and downright illegal spending. He overruled his advisors and twice hired her on to his campaign staff, so that she could draw a salary. These otherwise-inexplicable actions by Hunter—all taken in furtherance of their conspiracy—make perfect sense in light of the Hunters' severe financial troubles. Hunter knew that he could not afford the lifestyle they wanted without allowing for Margaret's continuous theft. As she herself put it to Hunter: "you need the extra money as much as I do." The jury must be allowed to hear this evidence.

### C. Evidence of the Hunters' Personal Finances Is Not Unduly Prejudicial

Finally, the probative value of the Hunters' finances is not substantially outweighed by a risk of unfair prejudice.[6] As the Ninth Circuit has explained, the traditional concern with allowing evidence of a defendant's financial condition is that "it is of slight probative value and would be unfairly prejudicial to poor people charged with crimes." *Mitchell*, 172 F.3d at 1108. Neither of these conditions hold here. First, the Hunters' dire financial circumstances show far "more than the mere fact that the defendant is poor." *Id.* (quotation marks omitted). Instead, this evidence is highly probative of Hunter's knowledge, motive, and intent to embezzle from his campaign and to allow Margaret to do the same—crucial issues in a prosecution for conspiracy to convert campaign funds.

Second, the Hunters' finances do not suggest that Hunter was likelier to commit a crime because he was poor, because he wasn't poor at all. To the contrary, Hunter's congressional salary placed him in an income bracket well above most Americans. The Hunters' problem was not that they lacked money to provide for their family, but that they spent recklessly on a

---

[6] Because a defendant's difficult financial circumstances are "not a crime, wrong, or act," Rule 404(b) does not apply. *Mitchell*, 172 F.3d at 1107.

17

luxurious lifestyle well beyond their already-comfortable means. *Cf. Mitchell*, 172 F.3d at 1109 (contrasting the evidence appropriately admitted in *Feldman* because "Feldman was squeezed, not just poor"). Because "there is no evidence or argument offered to suggest that [Hunter] was poverty stricken," as opposed to merely financially irresponsible, "the specific concern about unequal justice for the poor does not appear to be implicated here." *Blood*, 2005 WL 3657945, at *3; *compare Hampton*, 2017 WL 1954369, at *3 (barring admission of evidence that defendant "participated in social welfare programs").

Third, the financial evidence is tailored to show that specific financial pressures, such as declined credit card payments or an overdrawn bank account, motivated the Hunters to engage in the theft at the time of the conspiracy. *See Metallo*, 908 F.2d at 798-99 (bankruptcy petition probative of "knowledge, absence of mistake, and intent" where "filed at approximately the same time" defendant applied for credit cards used for fraud); *Kostopoulos*, 2019 WL 1220841, at *5 ("the district court carefully limited the financial motive evidence that it admitted…to the four months of records immediately surrounding the thefts"); *United States v. Shelow*, No. CRIM.A. 10-0037, 2011 WL 6130974, at *7 (E.D. Pa. Dec. 9, 2011) ("To be relevant, the evidence of the financial motive must be close in time to the charged crime."). Among other things, the United States intends to introduce bank records showing that the Hunters' personal account was overdrawn and incurred insufficient funds fees on or around specific days when they used campaign funds to make personal purchases, and that throughout the conspiracy the Hunters maintained low or negative balances or faced mountainous consumer, mortgage, and education debt.

Moreover, the Hunters' personal financial records will not be introduced to show that they spent their personal funds on luxuries or extravagances—indeed, the evidence will show the opposite, that they often turned to illegally spending from the *campaign*'s coffers to fund their more lavish desires. Thus, as opposed to their campaign spending, the evidence of the Hunters' *personal* finances will not be prejudicial in the way the Eleventh Circuit feared in *Kostopoulos*. Here, as there, the defendant's personal financial records will not be used to

show "that he was purchasing luxury items or needed money to sustain an extravagant lifestyle[;]" thus, "the danger of undue prejudice [i]s relatively low." 766 F. App'x at 881.

Finally, to allay any fears that the prejudicial impact of such evidence might be unfair, this Court may deliver a limiting instruction admonishing the jury to consider the financial evidence only for the purpose of showing Hunter's knowledge, motive, intent, and other permissible grounds. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (evidence of "wealth, or lack thereof…may be admitted where other safeguards are employed such as limiting instructions…"); *cf. United States v. Stahl*, 616 F.2d 30, 32 (2d Cir. 1980) ("[T]he jury had been given curative instructions against drawing adverse inferences from the defendant's wealth or social status.").

## IV.
## CONCLUSION

For the reasons set forth above, evidence of the Hunter's personal finances should be admitted at trial.

DATED: June 24, 2019

    Respectfully submitted,

    DAVID D. LESHNER
    Attorney for the United States

    *s/ Bradley G. Silverman*
    EMILY W. ALLEN
    W. MARK CONOVER
    PHILLIP L.B. HALPERN
    BRADLEY G. SILVERMAN
    Assistant U.S. Attorney