DAVID D. LESHNER
Attorney for the United States
Acting under Title 28, U.S.C. Section 515
EMILY W. ALLEN (Cal. Bar No. 234961)
W. MARK CONOVER (Cal. Bar No. 236090)
PHILLIP L.B. HALPERN (Cal. Bar No. 133370)
BRADLEY G. SILVERMAN (D.C. Bar No. 1531664)
Assistant United States Attorneys
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-6345
Email: bradley.silverman@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DUNCAN D. HUNTER,<br><br>Defendant. | Case No. 18CR3677(1)-W<br><br>**UNITED STATES' MOTION TO ADMIT EVIDENCE OF DEFENDANT'S USE OF CAMPAIGN FUNDS TO PURSUE PERSONAL RELATIONSHIPS** |

At trial, the United States will seek to admit evidence of defendant Duncan D. Hunter's ("Hunter") expenditure of campaign funds to pay for a host of personal expenses. Among these personal expenses were funds Hunter spent to pursue a series of intimate personal relationships. This evidence is necessary to establish the personal nature of the expenditures (an essential element under 52 U.S.C. § 30114(b)), to demonstrate Hunter's knowledge and intent to break the law, and to establish his motive to embezzle from his campaign.[1]

---

[1] Before filing this Motion, the United States offered to craft a factual stipulation that would eliminate the need to introduce this potentially sensitive evidence at trial (and eliminate the need to address this Motion). Hunter declined that proposal, however, so this Motion follows.

1

# I.

# STATEMENT OF FACTS

Hunter assumed office as a member of Congress in January 2009. Shortly after he arrived in Washington, Hunter began to use funds contributed to the Duncan D. Hunter for Congress Campaign to carry out a series of intimate relationships. The indictment identifies the individuals with whom Hunter carried on these intimate relationships, as well as numerous examples of Hunter's improper use of campaign funds to pay for their personal encounters. All of the women with whom Hunter pursued these relationships were involved in politics in some manner, and Hunter sometimes met or socialized with them in professional settings. Precisely because each of the women worked as lobbyists or congressional staffers, Hunter may suggest that he was justified in spending campaign funds on *all* of his "meetings" with these individuals. Evidence of the intimate, entirely personal quality of Hunter's specific encounters with these women is essential to demonstrate that his spending to facilitate those encounters was improper. At trial, the evidence will demonstrate that Hunter improperly used campaign funds to pursue these romances wholly unrelated to either his congressional campaigns or his official duties as a member of Congress.

A summary of the anticipated evidence, which will be admitted through eyewitness testimony, text messages, emails, phone logs, photographs, and social media communications, is presented next.[2]

### A. Individual 14

In April 2009, Hunter met Individual 14 ("I-14"), who worked as a lobbyist and encountered Hunter through her work. The two began to socialize, and spent time together with the same close-knit group of friends. Their relationship soon blossomed beyond a mere friendship. Although the pair kept their romance under wraps, taking care to not be seen

---

[2] Due to the voluminous nature of the evidence and the large number of sources, the United States submits this proffer to provide a basis for the Court's ruling, without submitting specific pieces of evidence to be introduced at trial. Should the Court require evidentiary support, the United States will supplement this motion with exhibits as appropriate.

together in public, they found excuses for occasional outings or getaways together. As the relationship grew more serious, Hunter began living with I-14 at her D.C.-area home. On occasion, Hunter used campaign funds to bring food or beverages back to her home.

Hunter paid for outings with I-14 using funds that belonged to his campaign. In early 2010, the couple planned a ski vacation as one of their first solo getaways. On the afternoon of Friday, January 22, 2010, Hunter flew to Reno, Nevada, ostensibly to attend the annual convention of a large non-profit advocacy group. The convention had begun a few days earlier, and I-14 was attending the meetings for her work. Hunter's flight landed at 2:10 pm, and he rented a car from the airport Alamo, using $351 in campaign funds. That evening, after a brief stop at the convention, Hunter drove to Heavenly Mountain Resort, a ski resort near Lake Tahoe in Incline Village, CA. By 11:39 pm, he had checked into their room at the Hyatt and visited the hotel's Cutthroats Saloon for a Sam Adams (which he paid for with $7 in campaign funds).[3] Hunter and I-14 spent the weekend skiing, ordering room service, and enjoying the amenities of the full-service resort. They checked out on Monday, January 25, 2010, when Hunter paid the $1,008 hotel tab using campaign funds from his campaign credit card.[4] He spent another $180 in campaign funds on airfare back to Washington.

Hunter continued using campaign funds to allow for other trips with I-14. In March 2010, for example, the couple took a weekend "double date" road trip to Virginia Beach with their friends, one of whom was also a congressman. Hunter spent $905 in campaign funds to pay for the hotel bar tab and room he shared with I-14 that weekend. And he later sought and received an additional $257 in mileage reimbursement for the trip from his campaign treasurer—despite the fact that I-14 had driven the group to and from Virginia Beach using

---

[3] The hotel is approximately an hour's drive from the Reno airport. In light of this schedule, Hunter could not have spent more than a couple of hours at the convention in Reno on Friday afternoon.

[4] Hunter's personal bank records suggest that he could not have paid for the weekend without dipping into campaign funds: On January 25, the day he checked out of the Hyatt and paid his rental car bill, Hunter's personal bank accounts had a negative balance and he incurred six separate insufficient funds fees of $33 each.

her car.[5] Hunter and I-14 had other purely personal outings with the same couple, including, on March 24, 2010, when they had another "double date" at the Birchmere Music Hall in Alexandria, Virginia. There, they saw a Jack Ingram concert, and Hunter spent $121 in campaign funds on beer, nachos, and wings.

Another example of Hunter using campaign funds to pursue his personal relationship with I-14 came in June 2011, surrounding a dinner event held at a D.C. hotel. Margaret Hunter had planned a trip to Washington, and reserved a room at a Capitol Hill hotel for June 21 through 24. But she later changed her travel plans, and rebooked her flight from San Diego to arrive the next day, June 22. As it happens, Hunter was scheduled to attend an annual dinner event for a large non-profit advocacy group held on June 21, which I-14 helped to organize— and which was taking place at the same hotel. Hunter kept the June 21 room reservation and spent the night there with I-14. They paid the $455 hotel bill, for all three nights, using campaign funds. In describing this expenditure to his campaign treasurer later, Hunter never explained the reason he kept the first night at the hotel.

Hunter used campaign funds to pursue this purely personal romantic relationship again on June 29, 2011, when he took I-14 golfing at the Old Hickory Golf Club in Virginia. Hunter spent $253 in campaign funds on greens fees for two, 10 beers, an Adidas shirt, and a visor. He never attempted to justify these expenses to his treasurer.

Hunter and I-14 ended their romantic involvement in approximately April 2012.

**B.    Individual 15**

In August 2012, Hunter attended the Republican National Convention in Tampa, Florida. During that trip, he began a romantic relationship with Individual 15 ("I-15") who

---

[5] This is just one example of several instances of Hunter double-dipping by claiming mileage when he did not use his car. Later in 2010 and 2011, for example, he submitted requests for reimbursement for several trips around the San Diego area. But Hunter employed a driver during this period, who picked him up and delivered him to several of those events— and the driver also, legitimately, submitted his own mileage reimbursement request for the same trips. When a member of Hunter's campaign staff offered to help him format and submit his mileage claims, he declined her offer, preferring to submit them himself.

worked in the office of a member of the House of Representatives leadership. Over time, their relationship grew more serious, although once again Hunter was careful that the pair were not seen together in public. They often spent time together at I-15's D.C.-area home, and as the relationship developed, Hunter began staying there nearly every night. Hunter often took an Uber to I-15's home after work or evening events, which he typically paid for using campaign funds.[6]

As he had with I-14, Hunter used campaign funds to facilitate his intimate personal relationship with I-15. On February 11, 2014, for example, Hunter introduced I-15 for the first time to his friends, Individual 2A and Individual 2B. He spent $29 in campaign funds on an Uber to take I-15 to their home for an intimate dinner with his closest friends. Even after Hunter and I-15 ended their relationship, they continued to see each other on and off, and Hunter continued facilitating these encounters with campaign funds. On July 21, 2015, for example, Hunter used $93 in campaign funds to take I-15 out for cocktails at a quiet speakeasy-style bar near her home. After drinks, they went to I-15's home and spent the night together; Hunter used $21 in campaign funds on an Uber back to the office at 1:49 am that night.

### C. Individual 16

In January 2015, Individual 16 ("I-16") began work in Hunter's congressional office. Hunter and I-16 began a romantic relationship not long afterward. The two occasionally spent nights together at his office, and Hunter took I-16 out to socialize with his friends, using campaign funds to pay for their dates. For example, on June 3, 2015, the two of them went on a "triple date" with two other couples at the H Street Country Club. Hunter spent $202 in campaign funds for drinks and snacks at the bar, plus another $20 on the Uber ride. A few days later, on June 12, 2015, Hunter's high-school age relative came to Washington for the night. Hunter took the relative, along with I-16 and a small group of friends, out for what

---

[6] As alleged in the indictment, between 2013 and 2016, Hunter spent a total of $990.60 in campaign funds on Uber rides to socialize with his friends, including I-15. *See* Indictment, Doc. No. 1, at 27 ¶97. Approximately $200 of this was spent on rides to or from I-15's home.

Hunter described in a text message as "a nice family evening" at Matchbox Pizza. He paid the $352 tab using campaign funds.

### D. Individual 17

At a political event held at the Hamilton Hotel on October 27, 2015, Hunter met up with Individual 17 ("I-17"). I-17 was a lobbyist Hunter knew both professionally and through the D.C. social scene. In the past, she had organized events and fundraisers for Hunter, and her organization had supported his congressional campaigns. That night, however, was not about business: at around 11:00 pm, Hunter and I-17 departed the Hamilton together for her home, where they engaged in intimate personal activities unrelated to Hunter's congressional campaign or duties as a member of Congress. Hunter left her house at 1:23 am. Although this was a strictly personal encounter, Hunter used campaign funds to pay the $42 in Uber fares.

### E. Individual 18

Individual 18 ("I-18") was another lobbyist with professional and social ties to Hunter. After a weekend political event in Florida in 2016, they became closer, and they carried their relationship back to Washington. On September 14, 2016, following a political event they attended with several mutual friends, Hunter went back to I-18's home, where they engaged in intimate personal activities unrelated to Hunter's congressional campaign or duties as a member of Congress. At 7:08 am the next morning, Hunter used $32 in campaign funds to Uber back to his office. About two weeks later, on September 26, 2016, Hunter again used campaign funds to Uber back to his office at 3:21 am after a night out socializing with I-18 and others.

# II.

# ARGUMENT

### A. Evidence of Hunter's Use of Campaign Funds to Pursue Intimate Personal Relationships Is Relevant and Admissible at Trial

As the above facts make clear, evidence of Hunter's intimate relationships is admissible to show the "personal" nature of his expenditures, his knowledge that these expenditures were for an unlawful purpose, and his motive to steal campaign funds.

First, by their very nature, these relationships establish the wholly personal nature of Hunter's related expenditures of campaign funds. Federal law prohibits conversion of campaign funds to "personal use"—that is, to fulfill obligations "that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office." 52 U.S.C. § 30114(b)(1), (2); *accord FEC v. Craig for U.S. Senate*, 816 F.3d 829, 835 (D.C. Cir. 2016) ("Whether [certain expenses] were expenses that would exist 'irrespective' of his election campaign or official duties is the central question in this case."). Evidence that Hunter spent campaign funds to carry out intimate affairs establishes the "personal" nature of those expenditures—the very fact the United States is required to prove in this case—by demonstrating that the payments had no legitimate campaign or congressional purpose. *See United States v. Dingle*, No. 12-30098, 2014 WL 5152109, at *4 (C.D. Ill. Oct. 14, 2014), *affirmed at* 862 F.3d 607, 609 (7th Cir. 2017) (allowing evidence of defendant's infidelity in fraud trial where "[i]t would be difficult for the Government to present its theory of the case without some reference to the nature of these relationships."). Without this evidence, the jury might be left to believe—wrongly—that Hunter's "meetings" with these women, and the associated expenditures, were work-related; after all, Hunter had professional connections to each of them. The intimate nature of these relationships is, in short, direct proof an essential element of the crimes charged in the indictment, and as such it must be admitted to show Hunter's knowing illegal expenditures of campaign funds.

Second, Hunter's intimate relationships demonstrate his knowledge and intent to embezzle campaign funds. At trial, Hunter is likely to suggest that he sincerely (if mistakenly)

7

believed his expenditures in the Washington area, particularly those surrounding events with lobbyists or congressional employees, were appropriate.  Evidence that Hunter was using campaign funds to pursue romantic and intimate relationships is necessary for the jury to consider in evaluating the case.  Simply put, carrying out a sequence of romantic liaisons is so far removed from any legitimate campaign or congressional activity as to rebut any argument that Hunter believed these were proper uses of campaign funds.  *See United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009) (finding evidence that defendant cheated on his wife with co-conspirator relevant to show he "was a knowing participant in the fraudulent scheme"); *cf. United States v. Nosal*, No. CR-08-0237 EMC, 2013 WL 11327121, at *6 (N.D. Cal. Mar. 29, 2013) (admitting evidence of defendant's infidelity to show his "intentions during the course of events at issue here").

Third, Hunter's intimate relationships furnished part of his motive to embezzle from the campaign.  Carrying out all these affairs did not come cheap—Hunter spent thousands of dollars treating women to meals, drinks, and vacations, and traveling to and from their homes.  Given the pronounced financial difficulties the Hunters were facing,[7] his use of campaign funds to pursue these relationships was necessary for Hunter to satisfy his desire for intimacy.  *See, e.g., United States v. Shayota*, No. 15-CR-00264-LHK, 2016 WL 6534248, at *3 (N.D. Cal. Oct. 28, 2016) ("[e]vidence of…extramarital affairs is relevant to [defendant]'s financial motivation for engaging in the alleged crimes" and thus admissible under Rule 403); *Nosal*, 2013 WL 11327121, at *6 (evidence of infidelity admissible under Rule 403 to "provide insight into Defendant's motivation for various actions taken around the time and after he left his employment" with firm whose trade secrets he misappropriated).

### B. Rule 404(b) is Inapplicable and Does Not Bar Evidence of Hunter's Use of Campaign Funds to Pursue Personal Relationships

Any argument that Rule 404(b) bars evidence of Hunter's use of campaign funds to pursue personal relationship must fail, as the Rule is simply inapplicable here.  Rule 404(b)

---

[7] The details of the Hunters' financial difficulties are set forth in the indictment and in a separate motion filed concurrently.  The United States incorporates those facts herein.

prohibits admission of "[e]vidence of a crime, wrong, or other act…to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The Rule does not apply, however, to "evidence of the very acts charged as crimes in the indictment." *United States v. Loftis*, 843 F.3d 1173, 1176 (9th Cir. 2016). Hunter's expenditure of campaign funds related to his personal relationships is exactly what make these expenditures criminal. They are not "other acts" at all, but rather, "direct evidence of the fact in issue." 22B Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5239, at 117 (2014) ("the court would have no discretion to exclude it because it is proof of the ultimate issue in the case."); *compare Loftis*, 843 F.3d at 1177 (evidence that defendant defrauded investors not named in indictment not subject to Rule 404(b) because it was part of overall "scheme to defraud"). Evidence of the intimate nature of Hunter's relationships is, moreover, "inextricably intertwined with the charged offense" because those facts (1) "are part of a single criminal transaction," and (2) are "necessary to admit in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. Wells*, 879 F.3d 900, 928 (9th Cir. 2018) (quotation marks omitted). And the evidence will not be used to argue anything about Hunter's character or propensity to embezzle campaign funds. *Dingle*, 2014 WL 5152109, at *4 (rejecting any Rule 404(b) analysis to evidence of defendant's extramarital affairs because government was "not attempting to prove that by engaging in these acts, [defendant] was acting in accordance with his character"). Rule 404(b) simply does not apply.[8]

---

[8] Even if Rule 404(b) did apply, it explicitly *allows* the evidence described above to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Evidence of Hunter's intimate relationships not only demonstrates the "personal" nature of his expenditures, but establishes his intent to misuse the funds, knowledge that he was breaking the law, and his motive to do so—not that he acted in accordance with a character for infidelity.

### C. The Clear Probative Value of this Evidence is Not Substantially Outweighed by Any Unfair Prejudice

Evidence of Hunter's use of campaign funds to pursue these intimate relationships is not unfairly prejudicial under Rule 403. Hunter's personal relationships are direct evidence of the very *actus reus* of the crime—the conversion of campaign funds for personal use. It would be impossible to show the personal nature of the expenditures Hunter made pursuing those relationships without description of the relationships themselves. The probative value of the evidence is high. *See Old Chief v. United States*, 519 U.S. 172, 184 (1996) ("[T]he Rule 403 'probative value' of an item of evidence…may be calculated by comparing evidentiary alternatives."); Fed. R. Evid. 403 advisory committee note ("The availability of other means of proof may also be an appropriate factor" in determining "whether to exclude on grounds of unfair prejudice[.]"). *Cf. United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) (noting that probative value of evidence is low where it does not go to an element of the charge, and finding admission of heat stroke suffered by witnesses in alien smuggling trial was therefore unduly prejudicial).

Courts routinely admit evidence of infidelity over Rule 403 objections when that evidence relates even indirectly to the charged crimes. In *United States v. Dingle*, for example, a married couple was charged with mail fraud and money laundering for obtaining grants from the state to provide health services, then "spend[ing] the diverted funds on personal luxuries." 862 F.3d 607, 609 (7th Cir. 2017). At trial, the district court allowed evidence of the husband's affairs with a state employee who steered grants to his straw charities and with the head of one of those charities. *Id.* at 612. The Seventh Circuit agreed that Rule 403 did not prohibited this evidence, because it "explained the structure of the fraudulent scheme, [the husband's] leadership role, and the trust displayed by the participants." *Id.*[9] In *United States v. Dimora*,

---

[9] In *Dingle*, the defense argued that the fact Mrs. Dingle would be tried together with Mr. Dingle made the admission of evidence of infidelity more prejudicial. The district court agreed this fact "may slightly increase the risk of prejudice," but nevertheless did not conclude that the evidence prejudice was unfair. *Dingle*, 2014 WL 5152109, at *4. Here, by contrast, Duncan will be tried without Margaret Hunter.

10

the district court admitted evidence that a county employee visited his mistress on work time to show the benefits he received from participating in a conspiracy by purchasing a county job—"namely, the collection of a public paycheck for little or no work performed." 843 F. Supp. 2d 799, 854 (N.D. Ohio 2012). And in *United States v. Isley*, 369 F. App'x 80, 91 (11th Cir. 2010) (unpublished), the Eleventh Circuit upheld the admission of "evidence of [the defendant's] infidelity" elicited during testimony by the defendant's spouse in an embezzlement case. There, the defendant's infidelity was relevant only to the witness's potential bias (it explained the reason they were no longer in a relationship), because the personal expenditures were made by the defendant and her spouse. Even under these circumstances, Rule 403 did not require exclusion of that testimony.

Any concern about an unfair impact this evidence might have on Hunter's trial can be minimized by limiting, for example, testimony outlining "'any prurient details' of the affair[s]." *Nosal*, 2013 WL 11327121, at *7. Here, however, the circumstances of Hunter's personal encounters with Individuals 14, 15, 16, 17, and 18 are direct evidence that he improperly converted campaign funds for personal use, that he knew his expenditures were improper, and that he intended to make them using campaign funds. While this evidence will certainly help to prove Hunter's guilt, when introduced for these perfectly proper purposes and appropriately limited to those encounters during which Hunter improperly used campaign funds, it is not unfairly prejudicial under Rule 403.

## III.

## ADDITIONAL POTENTIALLY SENSITIVE CONDUCT

In addition to pursuing intimate personal relationships, Hunter improperly used campaign funds to pursue other clearly non-work related activity during get-togethers with his close personal friends. As with the evidence described above, the United States has offered to craft a factual stipulation that would eliminate the need to introduce this potentially sensitive evidence at trial. With respect to this evidence, Hunter has indicated that he may seek such a stipulation; the parties are discussing the specifics.

Public disclosure of this additional activity runs the risk of improperly tainting the jury pool before the trial begins. Accordingly, in the event the parties are unable to reach a stipulation on this matter, the United States respectfully requests that the Court grant leave to: (1) file a motion on this topic outside of the previously set deadlines; and (2) file the statement of facts related to this motion under seal.

## IV.
## CONCLUSION

This Court should admit evidence of Hunter's use of campaign funds to pursue personal, intimate relationships as direct evidence of the facts at issue.

DATED: June 24, 2019

Respectfully submitted,

DAVID D. LESHNER
Attorney for the United States

*s/ Bradley G. Silverman*
EMILY W. ALLEN
W. MARK CONOVER
PHILLIP L.B. HALPERN
BRADLEY G. SILVERMAN
Assistant U.S. Attorneys