DAVID D. LESHNER
Attorney for the United States
Acting under Title 28, U.S.C. Section 515
EMILY W. ALLEN (Cal. Bar No. 234961)
W. MARK CONOVER (Cal. Bar No. 236090)
PHILLIP L.B. HALPERN (Cal. Bar No. 133370)
Assistant United States Attorneys
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-9738
Email: emily.allen@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DUNCAN D. HUNTER, <br><br> Defendant. | Case No. 18CR3677(1)-W <br><br> **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR CHANGE OF VENUE** |

    Defendant Duncan D. Hunter ("Hunter" or "the defendant") asks this Court to transfer the case to a different venue.  Doc. No. 37 ("Def. Mtn.").  To grant such a request prior to trial, the Court must find presumptive prejudice—that is, that the district has been so saturated with negative publicity against him, its effect "renders it impossible to empanel an impartial jury."

    Hunter makes no such showing.  Where disgraced CEOs, terrorists, Watergate conspirators, and drug lords have failed, Hunter offers only a half-dozen news articles and editorials, and backs up his request with completely irrelevant presidential election results. Worse still, he demands the Court transfer the case to a non-adjacent district for no other

1

reason than that then-presidential candidate Donald J. Trump fared better there than in this district in the 2016 presidential election. The Court should deny such an extraordinary request based on such unprecedented reasoning. This case should be tried in this district.

# I.
# BACKGROUND

Hunter's Motion requests a change of venue, and specifically demands that the Court transfer his case to Eastern District of California. To support his argument that he cannot receive a fair trial in this district, Hunter cites to six articles and editorials published by the San Diego Union-Tribune, and a single political cartoon. Def. Mtn. at 2, 3, 5. Only two, an editorial and the political cartoon, were published after August 23, 2018, and after he was reelected to Congress on November 6, 2018 (a reelection that he won, after indictment, by a majority vote in California's 50th House District,[1] most of which is located within the Southern District of California[2]). Hunter provides no evidence of how pervasively these seven publications have been consumed or even noticed by the jury pool, nor does he produce any evidence of the affect these publications have had on potential jurors' sentiments towards him. In support of his request to send this trial to the Eastern District of California, Hunter cites to the percentage of votes Donald J. Trump carried vis-à-vis Hillary Clinton in just three of the Eastern District's 34 counties. Def. Mtn. at 3.

# II.
# ANALYSIS

A.  **This Case Does Not Present the "Rare" and "Extreme" Scenario of a Jury Pool Presumptively Prejudiced by Inflammatory and Prejudicial Media Coverage**

   1.   **Legal Principles**

"The standards governing a change of venue ultimately derive from the Due Process Clause of the Fourteenth Amendment which safeguards a defendant's sixth amendment right

---

[1] https://www.nytimes.com/elections/results/california-house-district-50

[2] https://en.wikipedia.org/wiki/California%27s_50th_congressional_district

to be tried by 'a panel of impartial, 'indifferent" jurors.'" *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1989) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)). The Ninth Circuit "ha[s] identified two different types of prejudice in support of a motion to transfer venue: presumed or actual." *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (internal quotations omitted). Interference with a defendant's fair-trial right "is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. Actual prejudice, on the other hand, exists when voir dire reveals that the jury pool harbors "actual partiality or hostility [against the defendant] that [cannot] be laid aside." *Id.* at 1363. Screening questionnaires and voir dire are normally sufficient to "detect and deter juror bias" and ensure a fair trial. *See Skilling v. United States*, 561 U.S. 358, 385 (2010).

Because actual prejudice can only exist after voir dire demonstrates a jury pool's irreversible prejudice against a defendant, the only issue before the Court at this juncture concerns whether Hunter's right to a fair trial is presumptively prejudiced.

Presumptive prejudice is an extremely high barrier for Hunter to cross. "The presumed prejudice principle is rarely applicable and is reserved for an extreme situation." *Harris*, 885 F.2d at 1361 (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976) (citation and internal quotation marks omitted)). The Supreme Court has explained that a court may presume prejudice only when the "trial atmosphere [is] utterly corrupted by press coverage," *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (citing *Murphy v. Florida*, 421 U.S. 794, 798 (1975)), or when "a wave of public passion…ma[kes] a fair trial unlikely by the jury[.]" *Patton v. Yount*, 467 U.S. 1025, 1040 (1984) (internal quotation marks omitted). In deciding whether a change of venue is necessary, the Ninth Circuit typically considers three factors:

> whether there was a "barrage of inflammatory publicity immediately prior to trial amounting to a huge…wave of public passion," whether the media accounts were primarily factual or editorial in nature, and whether the media accounts "contained inflammatory, prejudicial information that was not admissible at trial."

1  *Randolph v. California*, 380 F.3d 1133, 1142 (9th Cir. 2004) (quoting *Ainsworth v. Calderon*,
2  138 F.3d 787, 795 (9th Cir. 1998)).  The adverse publicity must rise to such a pervasive and
3  inflammatory level "that jurors cannot be believed when they assert that they can be
4  impartial." *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997).

### 2. Hunter Fails to Demonstrate a "Barrage" of Negative Coverage

"Juror exposure to news reports of a crime—even 'pervasive, adverse publicity'—is not enough alone to trigger a presumption of prejudice to the defendant's due process rights." *Skilling*, 130 S. Ct. at 2916 (describing the "vivid, unforgettable" and "blatantly prejudicial" information at issue in the handful of cases in which the Supreme Court has presumed prejudice as a result of pretrial publicity).

Hunter's motion is long on superlatives and short on supporting facts.  While he references "enormous negative local media coverage," Def. Mtn. at 1, he cites roughly a half-dozen editorials, by a single newspaper, the San Diego Union-Tribune.  This falls woefully short of the "barrage" necessary to establish presumptive prejudice.  In *Harris*, the Ninth Circuit considered a kidnapping and murder case in San Diego in which 136 media references were entered into the record, some referencing the defendant's confession and prior criminal history.  885 F.2d at 1362.  Further complicating matters, a bitter disagreement between the District Attorney's Office and the United States Attorney's Office over who should prosecute the defendant splayed out over the pages of San Diego's major newspapers.  *Id.* at 1362-63.  Nonetheless, the court found no presumptive prejudice.  *Id.*  Hunter's risk of presumptive prejudice pales in comparison to *Harris*.  *See also Bergna v. Benedetti*, 721 F. App'x 729, 731 (9th Cir. 2018) (unpublished) (no presumptive prejudice where defendant submitted 66 news articles); *Murray v. Schriro*, 882 F.3d 778, 804-05 (9th Cir. 2018) (same, where defendant presented "a number of newspaper articles," 57 radio news reports, and testimony from a defense investigator that "a number of people" told him that they thought "the brothers were guilty"); *Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011) (same, where one local newspaper published 37 articles, another published 30 articles, and television and radio stations covered the investigation.).  Courts routinely reject motions to transfer venue where defendants

introduce dozens of examples of adverse local media coverage.   Hunter's evidence can be tallied on one hand.

### 3.     Hunter Fails to Show Sufficiently "Inflammatory" Media Coverage

Hunter's motion is equally vacant of evidence showing that the coverage of this case has been sufficiently inflammatory or prejudicial to warrant the drastic step of venue transfer.

In *Hayes*, a gruesome double-murder trial, the Ninth Circuit considered the effect of media coverage describing the victims' remains—the defendant had removed their heads and hands from their bodies—as well as the defendant's criminal history, his two prior acquittals for murder, and his past escape from a mental hospital. *Id.* at 508. While noting that "the stories about Hayes were unflattering," the Ninth Circuit found it "contained no confession" or "evidence of the smoking-gun variety" that would "invite[] pre-judgment of his culpability." *Id.* at 509 (quoting *Skilling*, 561 U.S. at 383). In *Yount*, the Supreme Court considered a case in which the press reported on not only the facts of the crime but also the defendant's prior confession, his prior plea of temporary insanity, and his conviction for the very same murder (which had been set aside on appeal for a *Miranda* violation). 467 U.S. at 1029. Yet even with publicity of an inadmissible prior conviction, and even after all but 2 of 163 of the venire admitted that they had read or heard about the case, and 126 of them (77%) admitted that they would bring opinions informed by pre-existing knowledge into the jury box, the Supreme Court held that a fair trial was not foreclosed. *Id.* at 1036-40; 1044-45. No straight-faced argument can be made that media coverage of Hunter's embezzlement case compares to that of dismembered murder victims or a previous jury's guilty verdict for the same offense a current jury would decide.

Hunter cites *Sheppard v. Maxwell*, 384 U.S. 333 (1966) in support of his argument, contending that it bears "eerie" similarity to his own case. If so, his motion should be denied. In *Sheppard*, despite "months [of] virulent publicity"—including a front-page "editorial artillery," a search of the defendant in front of hundreds of spectators, and press coverage of his refusal to take a polygraph—the Supreme Court found no denial of due process in the refusal to change venue due to pretrial publicity. *Id.* at 338-41 and 354.   Instead, the

interference with due process the court found in *Sheppard* was based on <u>actual prejudice</u>, after trial commenced, when "newsmen took over practically the entire courtroom." *Id.* at 355. Because Hunter's trial can only be transferred at this stage upon showing of presumptive prejudice, *Sheppard* supports denial of Hunter's request.[3]

### 4. Hunter Fails to Show a "Wave of Public Passion" Against Him

Hunter professes a lathering antipathy against him from local media, but bases this on only a handful of editorials by a single newspaper. Furthermore, he makes no showing of how these editorials so saturated the community that prejudice should be presumed. At least two of the editorials, including one that "actively called for Hunter's resignation," Def. Mtn. at 2, were published shortly before the 2018 congressional race and published more than a year before this case will be tried. The passing of time dampens his argument. *See Casey v. Moore*, 386 F.3d 896, 909 (9th Cir. 2004) (motion to transfer venue denied where coverage was four to eight months before trial); *Harris*, 885 F.2d at 1363 (same, where peak coverage was four months before trial); *United States v. Philpot*, 733 F.3d 734, 741 (7th Cir. 2013) (same, where most of the media coverage was one year prior to trial in a "fairly large" community); *United States v. Lehder-Rivas*, 955 F.2d 1510 (11th Cir. 1992) (same, where peak coverage was five months before trial).

Moreover, in highlighting these negative newspaper articles, Hunter buries the headline: he was reelected to Congress <u>after</u> the indictment was filed and most of the media coverage he cites was published. A congressman on trial in the very federal district where he was

---

[3] The other two cases cited in Hunter's motion are inapposite. In *Farr v. Pitchess*, the Ninth Circuit considered the dueling interests of a trial judge's power to enforce court orders and the First Amendment, and affirmed the contempt conviction of a reporter who refused to disclose his confidential source during the trial of Charles Manson. 522 F.2d 464, 469 (9th Cir. 1975). In *Levine v. United States Dist. Court for Cent. Dist.*, a case also involving the freedom of the press, the Court affirmed the denial of newspaper association's request for change of venue as an alternative to a restraining order. 764 F.2d 590, 600 (9th Cir. 1985) Neither of these cases relate to a defendant's motion for a change of venue.

popularly elected less than a year earlier stands a far better chance of an impartial jury than all of the following defendants, whose motions to transfer venue were denied:

- The CEO who presided over Enron's propping up of stock prices before its collapse into bankruptcy. *See Skilling*, 561 U.S. at 385;

- The "Boston Marathon Bomber." *See United States v. Tsarnaev*, 2014 U.S. Dist. LEXIS134596, at *5-9 (D. Mass. Sept. 24, 2014);

- The "Underwear Bomber." *See United States v. Umar Farouk Abdulmutallab*, 2011 Dist. LEXIS 104159, at * 15 (E.D. Mich. Aug. 27, 2013);

- An American heiress turned bank robber. *See United States v. Hearst*, 466 F. Supp. 1068, 1076 (N. D. Cal. 1978), *modified*, 638 F.2d 1190 (9th Cir. 1980);

- Members of a "highly controversial" spiritual community who conspired to kill the United States Attorney. *See Croft*, 124 F.3d at 1113-15;

- A notorious Columbian drug lord. *See U.S. v. Lehder-Rivas*, 955 F.2d 1510; 1525 (11th Cir. 1992);

- Cliven Bundy, after the local press reported that Senator Harry Reid condemned his supportive protestors on the Senate floor, calling them "a dangerous group of militants" and "domestic terrorists." *United States v. Payne*, No. 16-CR-046, 2016 WL 7380744, at *4 (D. Nev. Dec. 20, 2016);

- The six conspirators to the 1993 World Trade Center bombing. *See United States v. Yousef*, No. S12 93-Cr.0180, 1997 U.S. Dist. LEXIS 10449, at *8-10 (S.D.N.Y. July 18, 1997);

- Zacharias Moussaoui, a plotter of the September 11th hijacking. *See In re Tsarnaev*, 780 F.3d 14, 16 (1st Cir. 2015) (describing the Fourth Circuit's dismissal of Moussaoui's interlocutory appeal of a motion to change venue);

- A man who bombed the very courthouse where Hunter will be tried. *See United States v. Love*, 642 F. App'x 700, 701 (9th Cir. 2016) (unpublished) (rejecting argument that prejudice should be presumed because "the [Edward J. Schwartz United States Courthouse] was the crime scene").

Hunter's case is far less notorious than any of these examples.[4]

---

[4] It is also unlikely the news outlets these defendants argued were so adverse that a change in venue was justified published opinion columns by the same defendants. But not

Hunter also makes no showing of any <u>actual affect</u> that adverse media coverage has had on his potential jury pool. In *Croft,* the Ninth Circuit found no presumptive prejudice even where the defendants presented evidence that more than 40% of Oregonians (the district they were tried) believed that the defendants were guilty. 124 F.3d at 1113. In *United States v. Sherwood*, the Ninth Circuit found no presumed or actual prejudice where 96% of the jurors admitted that they were aware of the case and 60% mentioned that the victim, the daughter of Mirage Resorts CEO Steven Wynn, was kidnapped. 98 F.3d 402, 410 (9th Cir. 1996). By contrast, all Hunter offers in support of his request is meager evidence of media coverage, which attends any trial of a high-profile defendant.

Even if Hunter's motion demonstrated the level of negative media scrutiny the law demands for a transfer of venue—and he hasn't come close—there is no evidence it has so pervasively consumed the region that it would be "impossible" to find twelve unbiased jurors in a district of more than 3.5 million people.[5] *See Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (potential for prejudice mitigated by the size of the "metropolitan Washington [D. C.] statistical area, which has a population of over 3 million"); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals); *Skilling*, 561 U.S. at 382 (noting Houston's "large, diverse pool" of more than 4.5 million potential jurors made the defense claim of prejudice "hard to sustain").

Without evidence of a presumptively tainted jury pool, Hunter makes a disquieting and novel argument: he points to the fact that he supported the presidential bid of then-candidate

---

only has the Union-Tribune done just that, Hunter has broadcast their publications of his op-eds to his followers and supporters. As just one example, the first of the scrolling news articles on the marquee of the Congressman Duncan Hunter's House of Representatives website (https://hunter.house.gov/) (accessed June 26, 2019) promotes his March 8, 2019 op-ed in that very paper.

[5] *See* https://www.census.gov/quickfacts/fact/table/sandiegocountycalifornia,CA/PST045218 (listing San Diego County's population at 3,343,364 as if July 1, 2018) and https://www.census.gov/quickfacts/imperialcountycalifornia (listing Imperial County's population as 181,827 as of July 1, 2018).

Donald J. Trump, who received 38% of San Diego County's votes, to Hillary Clinton's 56%. Hunter is suggesting that a defendant's public support for a political candidate should justify the transfer of his federal criminal trial. He does not even attempt to demonstrate how his endorsement of a (winning) candidate "renders it impossible to empanel an impartial jury." *Bergna v. Benedetti*, 721 F. App'x 729, 730 (9th Cir. 2018) (unpublished). *See also Payne*, 2016 WL 7380744, at *6 (denying transfer of venue where "television commercial depicting Cliven Bundy's recorded statements which questioned whether African Americans were 'better off as slaves'" and where the Democratic party mailed printed advertisements that negatively tied Cliven Bundy to President Elect Donald Trump). And much closer relationships to much more politically embattled politicians have fallen short of qualifying for the extreme remedy of pre-trial transfer. *See, e.g, United States v. Haldeman*, 559 F.2d 31, 59-64 (1976) (former Attorney General John Mitchell, former Assistant to the President Harry R. Haldeman, and once Assistant for Domestic Affairs to the President John D. Ehrlichman not entitled to pre-trial venue transfer despite "extraordinarily heavy" coverage of Watergate break-in and allegations of wrongdoing in upper-levels of Nixon administration unrelated to break-in). If there is any legal precedent, from any federal or state court, trial or appellate, for transferring the venue of a case based on a defendant's political endorsement, Hunter certainly has not sniffed it out.

**B.    Hunter Fails to Explain Why the Eastern District of California Would Be A More Appropriate Venue**

Hunter insists that this Court "must transfer [his] case…to the Eastern District of California." Def. Mtn. at 4. The reasoning that he provides for transferring venue to this non-adjacent district is that Donald Trump fared better with voters in three of its 34 counties than he did in San Diego County. This is a remarkable request - the Court is charged with empaneling an impartial jury, not a jury of people Hunter believes will be like-minded supporters of his factually irrelevant political positions.

As an initial matter, Courts have stated that criminal defendants are not entitled to forum shop, even in the context of Rule 21(b) motions to transfer venue for the convenience of the

9

parties. *See, e.g., United States v. Miller*, 314 F.R.D. 574, 576 (S.D. Ohio 2016) (citing *United States v. Jamal*, 246 F. App'x 351, 369 (6th Cir. 2007) (unpublished) ("A defendant does not have the right to shop for a forum in which his criminal case may be heard.")).

More importantly, the jury pool's 2016 preference for Republican over Democratic presidential candidates is at best irrelevant. It is not uncommon for a trial judge to ask a venire, for example, what kind of bumper stickers they have on their cars. The purpose of this type of question is to flag jurors who could, potentially, allow their political viewpoints to come between the facts and the law during jury deliberations; it is designed to eliminate, to the best extent possible, political passions infecting the jury room. The reasoning Hunter provides for his request to transfer venue to the Eastern District of California reveals that his motion is less an attempt to eliminate politics from seeping into jury deliberations and more a conscientious effort to enable it.

Even if his motives were well grounded, Hunter's analysis is not. Inevitably, the prosecution of a politician will generate significant media coverage. Hunter asserts that Google users have searched his investigation 7.5 million times and that "potential jurors are just a keystroke away from hundreds of thousands of press articles and blog postings online, most if not all of a very negative nature." Def. Mtn. at 3. The jury pool in the Eastern District of California also has access to the internet, and, like the rest of the country, has been exposed to news about this case. Hunter fails to explain why potential jurors in this district face greater exposure to internet articles and blog posts than those in other districts. Courts have rejected requests for venue transfer where, as here, the media coverage will follow the case. *United States v. Menendez*, 109 F. Supp. 3d 720, 732 (D.N.J. 2015) (rejecting "pervasive pretrial publicity" in New Jersey regarding fraud charges against a U.S. Senator as basis for transfer from New Jersey to Washington, D.C., because "publicity would follow [the trial] to Washington."); *United States v. Avery*, No. 09-CR-196, 2010 WL 1541342, at *7 (E.D. Wis. Apr. 19, 2010) (no merit to contention that transfer to another district would alleviate publicity concerns). Were internet stories alone sufficient to establish presumptive prejudice, federal trials would be litigated into constant nomadic searches for venues somehow isolated from

highly publicized trials. Hunter's politically motivated attempt at forum shopping should be rejected by the Court.

## III

## CONCLUSION

This district is demographically diverse in every sense of the word: ethnically and economically, politically and religiously, by those who claim it as home by birthright and those who migrated here from other states and nations. And it includes most of the very same congressional district that reelected Congressman Hunter after his indictment in this case.[6] Hunter makes no showing that it cannot produce 12 jurors who can be entrusted with this trial.

DATED: June 28, 2019

Respectfully submitted,

DAVID D. LESHNER
Attorney for the United States

*s/ Emily W. Allen*
EMILY W. ALLEN
W. MARK CONOVER
PHILLIP L.B. HALPERN
Assistant U.S. Attorneys

---

[6] California's 50th Congressional District (Hunter's district) encompasses the central and northeastern parts of San Diego County, and a small part of Riverside County. *See* https://www.casd.uscourts.gov/Jurors/Jurisdiction-Map.aspx; https://en.wikipedia.org/wiki/California%27s_50th_congressional_district