DAVID D. LESHNER.
Attorney for the United States
Acting under Title 28 U.S.C. § 515
California Bar No. 207815
EMILY W. ALLEN (California Bar No. 234961)
W. MARK CONOVER (California Bar No. 236090)
PHILLIP L.B. HALPERN (California Bar No. 133370)
BRADLEY G. SILVERMAN (D.C. Bar No. 1531664)
Assistant United States Attorney
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-6345
Email: bradley.silverman@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>DUNCAN D. HUNTER,<br><br>　　　　　　Defendant. | Case No. 18CR3677-W<br><br>**UNITED STATES' CONSOLIDATED RESPONSE IN OPPOSITION TO HUNTER'S MOTIONS (1) TO DISMISS INDICTMENT FOR VIOLATION OF SPEECH OR DEBATE CLAUSE OF THE CONSTITUTION; AND (2) FOR DISCLOSURE AND PRODUCTION OF GRAND JURY MATERIALS** |

Defendant Duncan D. Hunter was indicted by a federal grand jury on August 21, 2018, and charged with converting funds belonging to his congressional campaign to his personal use. He now moves to dismiss his indictment on the basis that three items of purported "legislative act" material were used improperly: (1) a report by the Office of Congressional Ethics ("OCE") regarding its investigation into Hunter's embezzlement of campaign funds ("OCE Report"), (2) testimony from Hunter's former chief of staff about his role in drafting

Hunter's response to the OCE Report; and (3) evidence regarding Hunter's attempt to schedule a tour of a Naval base during a Hunter family vacation in Italy. As explained in further detail below, these arguments fail. None of the evidence he cites is a "legislative act" protected by the Speech or Debate Clause of the U.S. Constitution, and Hunter has not come close to meeting his burden to demonstrate that the privilege applies. Moreover, the appropriate remedy for violations of the Speech or Debate privilege is to excise only those portions of an indictment that evidence of "legislative acts" caused a grand jury to return, rather than the entire 60-count indictment. This Court should deny Hunter's Motion to Dismiss the Indictment for Violation of the Speech or Debate Clause of the Constitution. ("Mtn to Dismiss") (Doc. No. 38) (filed Jun. 24, 2019). It should also deny his Motion for Disclosure and Production of Grand Jury Materials ("Mtn for Disclosure") (Doc. No. 40) (filed Jun. 24, 2019), as he offers no particularized need for such discovery.

# I.

# STATEMENT OF FACTS

## A.    The Offense Conduct

From as early as February 2010 through at least the end of 2016, Congressman Duncan D. Hunter ("Hunter" or "the defendant") and his wife, Margaret Hunter used funds owned by Hunter's congressional campaign to pay for a wide variety of personal expenses. During that time, the Hunters made scores of transactions purchasing items as inconsequential as fast food, movie tickets, and golf outings; as trivial as video games, clothing, and coffee; as mundane as groceries, utilities, and garage doors; and as self-indulgent as luxury hotels, overseas vacations, and designer face cream. Over the years, the Hunters spent in excess of $250,000 in campaign funds on improper personal expenses.

One of the overseas vacations Hunter funded using his campaign treasury was a family trip to Italy for Thanksgiving 2015. Hunter and his wife began making plans for the vacation in April 2015, when Margaret booked hotels in Rome and Florence. Exhibit 1 (hotel reservation emails). (They initially planned to take the trip in late July, but later pushed it

back to November.  Exhibit 2 (email correspondence)).  By September, Margaret confirmed with Hunter that they were "reserved in Rome Nov 21-24."  Exhibit 3 (text sent to Hunter).

From the start, this was intended as a family vacation.  When an associate of Hunter's asked in September why he couldn't go to Miami in November, Hunter explained, "Going to Italy over [T]hanksgiving with the family[.]"  Exhibit 4 (text from Hunter to associate).  In early November, Margaret told Hunter she "just got our tickets" to Italy.  Exhibit 5 (email correspondence).  At the time, the Hunters were in the midst of a marital spat, and Hunter said, "I'm starting to wonder what I'm getting out of all this."  Margaret replied, "A family trip.  I love you and I will make this weekend up to you[.]"  *Id.*

That same day, November 2, 2015—long after their reservations to Italy had been confirmed—Margaret emailed Hunter's chief of staff in Washington.  She told him,

> You may know we are headed to Italy over thanksgiving break.
> Looks like we will be in and around Naples Nov 25-26. There was a mention for Duncan to visit a base etc if possible. It's thanksgiving on 26th so may be tougher to arrange something but nonetheless wanted to throw this out to you
>
> Thanks!

Exh. 5.  In light of the timing of this request, and the private communications indicating that the trip was indeed simply a family vacation, it is clear that the Hunters sought to use the "visit a base etc" plan as a pretextual "business-related" purpose for their extravagant use of campaign funds.  Although the trip had been planned for months, it was just days before their departure that the Hunters even attempted to schedule any plausible work-related activity for the trip.

The Hunters flew to Italy on November 21, 2015 and stayed through November 28.  Exhibit 6 (airline reservation records).  While there, they charged thousands of dollars in campaign funds for hotels, restaurants, train tickets, museum fees, and shopping.  Exhibit 7 (campaign debit and credit card records).  They visited Positano, Pompeii, Florence, Naples, and Rome.  Exhibit 8 (photos in Italy).  They posted on social media to show their friends and

family the highlights of their trip.  Exhibit 9 (Facebook posts).  Margaret described the trip as "amazing.  Truly our best family trip so far.  Like that saying 'if traveling was free you'd never see me again'!"  Exhibit 10 (email correspondence).  All in all, the Hunters ultimately spent more than $14,000 in campaign funds, on this purely personal family vacation.

As if to prove the point that the base visit idea was simply an artifice, Hunter never even took the trouble to make the visit happen.  On November 25, when the family was in the midst of their vacation, Hunter's chief of staff texted him to follow up on Margaret's November 2 email.[1]  Exhibit 11 (text exchange).  He told Hunter, "Navy can only do 25 November."  Hunter texted back, "Rgr. I'll talk to [M]ag."  *Id.*  But in the end, it appears the Hunter family was having too much fun in Italy to rearrange their itinerary around a base visit, even for the purpose of generating a pretext for their embezzlement of $14,000 in campaign funds.  Just 40 minutes after hearing from his chief of staff, Hunter followed up: "tell the navy to go fuck themselves."[2]  *Id.*  No base visit ever occurred.

**B.    The Conspiracy Unravels**

On April 4, 2016, the Federal Election Commission ("FEC") sent a letter to Hunter's campaign treasurer, requesting clarification on a $1,650 disbursement of campaign funds to Christian Unified Schools and a total of $1,302 paid to the online video gaming company Steam Games.  These charges had been described in the campaign's publicly-filed 2015 Year-End Report as "Personal Expenses – To Be Paid Back."  In the letter, the FEC noted that if it "determined that the disbursement(s) constitute[d] the personal use of campaign funds, the Commission [might] consider taking further legal action."

---

[1] Between November 12 and 19, the chief of staff coordinated with representatives of the Navy and others about details and logistics for a potential visit; he specified that Hunter would be bringing his family.  The Navy proposed November 25, and the chief of staff reported that Hunter "said he's in."  But Hunter was not copied on this correspondence, so it is not clear whether Hunter was aware of the proposed date at that time.

[2] It appears that Hunter did, however, have the inclination to arrange a social visit for his family to the chief of staff's Italian aunt.  As Hunter put it, he "would just love for everybody to see some real shit.  Authenticity."  Due to the aunt's poor health, that did not work out either.  Exh. 11.

4

The very next day, April 5, 2016, media outlets around the country began to report on the questionable charges made by Hunter's campaign. The *San Diego Union Tribune*, for example, reported that the FEC had questioned Hunter's use of campaign funds to purchase video games. According to the article, Hunter, through his spokesperson, attributed the charges to a mistake by his son. In the following weeks, the media began reporting on other apparently personal charges the Hunter Committee made, using information contained in the Hunter Committee's FEC reports—reports required by federal law and publicly available on the FEC's website.

On April 28, 2016, the non-profit, non-partisan government ethics watchdog group Citizens for Responsibility and Ethics in Washington ("CREW") sent a letter to the Office of Congressional Ethics ("OCE") requesting an investigation into Hunter's campaign finances. Exhibit 12 (CREW letter). The 11-page letter detailed additional spending by the Hunter Committee on what appeared to be personal expenses—including a trip to Hawaii, charges to an oral surgeon, the family vacation to Italy, retail purchases questionably described as charitable donations, and more. CREW also made its letter, which relied primarily on Hunter's public FEC reports to draw its conclusions, available to the public on its website.[3] The letter concluded that further investigation was warranted, and asked the OCE to examine whether Hunter "violated federal law and House rules by using campaign funds to pay personal expenditures unrelated to any campaign activities." *Id.*

## C. The OCE Report

The OCE is an independent and non-partisan entity charged with reviewing allegations of misconduct by House of Representatives members and staff. It is an independent oversight body designed to help the House uphold high ethical standards "with an eye toward increasing

---

[3] Letter from Noah Bookbinder, Exec. Dir., Citizens for Responsibility & Ethics in Washington, to Omar Ashmawy, Staff Dir. & Chief Counsel, Office of Cong. Ethics (Apr. 28, 2016), https://s3.amazonaws.com/storage.citizensforethics.org/wp-content/uploads/2016/07/20021551/Duncan%20Hunter%20OCE%20request%20for%20investigation%204-28-16.pdf.

transparency and providing information to the public." *About*, Office of Congressional Ethics, https://oce.house.gov/about.  The OCE's Board of Directors is comprised of private citizens who are prohibited from serving as Members of Congress or working for the federal government.  Allegations of misconduct come to the OCE from many sources, including the public or referrals from organizations like CREW.

The OCE heeded CREW's request and investigated the allegations of Hunter's misuse of campaign funds.  Through its investigation, it found, in a later-publicized report, that "Hunter may have converted tens of thousands of dollars of campaign funds from his congressional campaign committee to personal use to pay for family travel, flights, utilities, health care, school uniforms and tuition, jewelry, groceries, and other goods, services, and expenses." Exhibit 13 (OCE Report of Aug. 26, 2016).[4]  Pursuant to the OCE's rules, when its investigation was complete, the OCE Board made a recommendation to the U.S. House Committee on Ethics[5] (hereinafter, "Ethics Committee"): that the Hunter matter required further review because Hunter's campaign "reported expenditures that may not be legitimate." *Id*.  When making that recommendation, the OCE typically provides the Ethics Committee with its full Report, including not only the recommendation for review but also extensive Findings of Fact and Citations to Law generated by the OCE investigation.[6]  *See generally Learn*, Office of Congressional Ethics, https://oce.house.gov/learn/.

---

[4] Office of Cong. Ethics, U.S. House of Representatives, Review No. 16-7162, Report, https://oce.house.gov/sites/congressionalethics.house.gov/files/migrated/wp-content/uploads/2017/03/Rev.-No-16-7162_-Report.pdf (last visited Jun. 27, 2019).

[5] The U.S. House Committee on Ethics is a standing committee of the U.S. House of Representatives that promulgates and enforces ethics rules for fellow Representatives, and has the power to investigate and recommend disciplinary action against fellow Members for violations of the ethics rules.  See *About*, Committee on Ethics, U.S. House of Representatives, http://ethics.house.gov/about/committee-history.

[6] The Ethics Committee is typically required to publicize the OCE's reports and factual findings within 90 days of a referral.  *See* House Comm. on Ethics Rules for the 115th Cong., Rule 17A(b).  If, however, the Department of Justice (or other "appropriate law enforcement" authority) requests that it defer taking action, the Ethics Committee may defer publication of

Hunter and his staff received a copy of the full OCE Report shortly after it was created in the fall of 2016.  In September 2016, the chief of staff emailed Duncan and Margaret to go through the OCE report: "Once you mark it up in the margins, I can fill in additional details." Exhibit 14 (email correspondence).  Noting the extensive detail in the report and the damaging facts it contained, Hunter's staff made efforts to mitigate the negative effects of the public release they knew was coming.  For example, in early 2017, Hunter's chief of staff discussed certain expenditures with Margaret Hunter, asking her for details that "might help with future U[nion-]T[ribune] inquiries and when the OCE report is released."  Exhibit 15 (email correspondence).  He was pleased when her answer included information that would be "great for optics."  *Id.*

The chief of staff also drafted a public response to the Report's "being made public[,]…to expose its errors, mischaracterizations and exaggerations."  Exhibit 16 (OCE response draft).  The very first point made in the draft response is that the "OCE is not the House Ethics Committee.  The OCE has no enforcement authority, and can only refer matters to the House Ethics Committee or to the [FEC]."  *Id.*  The response goes on to include responses to particular expenses addressed by the OCE, including the Hunters' family vacation in Italy, other trips to Hawaii, Arizona, and Idaho, and travel for the Hunters' extended family and friends and for the family's pet rabbit.[7]  *Id.*  With regard to the Italy vacation, the response claimed that "[t]here was an agenda with a military service for official activities and campaign funds are permitted for officially related travel/activities not otherwise permitted…. However, the planned events were cancelled, which therefore necessitated the reimbursement of expenditures to the campaign committee (which Rep. Hunter did on November 4, 2016)."  *Id.*

---

the OCE's factual findings—although it must "eventually" release the full document.  *See Learn*, *supra*.

[7] Regarding the rabbit, the response explains, "This is a tale of two rabbits.  One rabbit [named Cadbury] was kept in Hunter's official office and another rabbit was owned by Hunter's children."  The response acknowledged that the family rabbit—though not the "official office" rabbit—traveled with the Hunter family.  But it reported, incorrectly, that the rabbit's airfare fees were paid using reward miles rather than campaign funds.  *Id.*

The response did acknowledge certain "clear mistakes" in campaign spending, including, for example, dental care expenditures. But it claimed those were "attributed to simply pulling the wrong card," and other mistakes attributed to "poor coordination and communication" between staff in San Diego and Washington D.C. *Id.*

On March 23, 2017, the Ethics Committee published a statement explaining that the Justice Department had requested deferral of the Hunter investigation. Exhibit 17 (statement by Ethics Committee). At that time, the Committee released the OCE Report, but not the detailed factual findings. *Id.* Accordingly, the Hunter campaign never had the need to release its draft statement about the Report.[8]

## II.

## ANALYSIS

**A.    The Speech or Debate Clause Protects "Legislative Acts," and Hunter's Claims of Privilege Are Not "Legislative Acts" As Defined By the Courts**

### 1.    Legal Principles

The Speech or Debate Clause provides that "for any Speech or Debate in either House," Members of Congress "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The Clause was "not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *United States v. Brewster*, 408 U.S. 501, 507 (1972). It extends no further than "what is necessary to preserve the integrity of the legislative process," and does not "make Members of Congress super-citizens, immune from criminal responsibility," *id.* at 516–17, or "confer a general exemption upon Members of Congress from liability or process in criminal cases," *Gravel v. United States*, 408 U.S. 606,

---

[8] On September 6, 2018, following Hunter's indictment in this case, the Ethics Committee announced that it had established an Investigative Subcommittee to determine whether Hunter violated the House's Code of Official Conduct or any other rules, laws, or regulations relating to his misuse of campaign contributions. Exhibit 18. Again at the request of the Justice Department, the Ethics Committee recommended that the subcommittee defer action on its investigation while the criminal matter is pending. *Id.*

626 (1972). As the Ninth Circuit has recognized, "Congressmen may write the law, but they are not above the law." *United States v. Renzi* ("*Renzi II*"), 769 F.3d 731, 736 (9th Cir. 2014).

Accordingly, the Supreme Court has taken "a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings." *Gravel*, 408 U.S. at 620. "Claims under the Clause going beyond what is needed to protect legislative independence are to be closely scrutinized," *Hutchinson v. Proxmire*, 443 U.S. 111, 127 (1979), to protect against "abuses that could flow from too sweeping safeguards," *Brewster*, 408 U.S. at 517. Congressmen "may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." *Id.* at 512.

"Because the protections of the Clause apply absolutely when they apply, the limits of what may constitute a protected 'legislative act' is of fundamental importance." *United States v. Renzi* (*Renzi I*), 651 F.3d 1012, 1021 (9th Cir. 2011). A legislative act "has consistently been defined as an act generally done in Congress in relation to the business before it." *Brewster*, 408 U.S. at 512. "The heart of the Clause is speech or debate in either House;" it reaches only such "other matters" that are

> an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel*, 408 U.S. at 625. Thus, "only acts generally done in the course of the *process of enacting legislation* [a]re protected." *Brewster*, 408 U.S. at 514 (emphasis added). Legislative acts do not include "all things in any way related to the legislative process"—the Clause's "intended scope, literal language," and "history" all reject such a "sweeping reading," as "there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process." *Id.* at 516. The test for whether an act is legislative is "whether it is necessary to inquire into how [a member] spoke, how he debated, how he voted, or anything

he did in the chamber or in committee in order to make out a violation of this statute." *Id.* at 526.

If a member's activity constitutes a "legislative act," the Clause provides three distinct protections. *Renzi I*, 651 F.3d at 1020. First, the member is immune from civil or criminal liability for those acts. *Id.* (citing *Gravel*, 408 U.S. at 616). Second, the member and his or her aides cannot be compelled by the government to testify about those acts. *Id.* (citing *Gravel*, 408 U.S. at 622). And third, evidence of those acts could not be introduced to a jury.[9] *Id.* (citing *United States v. Helstoski*, 442 U.S. 477, 489 (1979)). The member asserting the privilege bears the burden of establishing, by a preponderance of the evidence, that the Speech or Debate privilege applies. *See Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 524 (3d Cir. 1985); *see also In re Grand Jury Investigation*, 587 F.2d 589, 597 (3d Cir. 1978) ("Since the Congressman is asserting a use privilege personal to him, and since the information as to which

_____

[9] Although *Renzi* is perhaps the most significant Speech or Debate Clause authority to be written in this circuit in nearly four decades, Hunter hardly acknowledges its existence, until on page 17 of his brief when he argues that it is "profoundly flawed" and an "outlier" decision. Instead of citing to this binding authority, Hunter urges this Court to adhere to *United States v. Rayburn House Office Building* ("*Rayburn*"), 497 F.3d 654 (D.C. Cir. 2007), which found a broad non-disclosure privilege hidden within the Speech or Debate Clause. *Renzi I* expressly considered and rejected *Rayburn*, rejecting the concept that "there exists some grandiose, yet apparently shy, privilege of non-disclosure that the Supreme Court has not thought fit to recognize." *Renzi I*, 651 F.3d at 1032. *Renzi I* very carefully evaluated Rayburn and repudiated it for a number of well-discussed reasons. *Id.* at 1034 ("Simply stated, we cannot agree with our esteemed colleagues on the D.C. Circuit. We disagree with both *Rayburn*'s premise and its effect and thus decline to adopt its rationale."). Hunter is wrong to suggest that the Speech or Debate Clause carries a privilege of non-disclosure.

He also incorrectly asserts that the Ninth Circuit's *Renzi I* decision is an "outlier." Mot. Dismiss at 17. Two Circuits—the Ninth and the Third—have held that the Speech or Debate privilege "is one of non-use versus non-disclosure," *In re Search of Electronic Communications in the Account of Chakafattah@gmail.com* ("*Chakafattah*"), 802 F.3d 516, 525 (3d. Cir. 2015), while the D.C. Circuit is the only circuit to have held otherwise (though a court in the Southern District of New York has agreed with it, *see SEC v. Comm. on Ways & Means*, 161 F. Supp. 3d 199, 242 (S.D.N.Y. 2015)). If anything, *Rayburn*, not *Renzi I*, is the outlier.

calls were legislative acts is in his possession alone, the burden of going forward and of persuasion by a preponderance of the evidence falls on him.").

### 2. Hunter's Attempt to Arrange a Pretextual Naval Base Tour Was Not A "Legislative Act"

Hunter argues that the United States violated the Speech or Debate Clause by presenting to the grand jury evidence regarding his attempt to schedule a visit to a Naval base in Naples. He is wrong on a number of levels. First, scheduling an appointment or making arrangements for a *future* legislative act is decidedly not a "legislative act" protected by the clause. As the Supreme Court has explained, members of Congress engage in a host of "legitimate" and "expected" activities that are important parts of their jobs but nonetheless are not protected by the Speech or Debate Clause. *Brewster*, 408 U.S. at 512. In particular, the court noted that "the making of appointments with Government agencies" is among those activities that are not protected by the Speech or Debate privilege. *Id.* (adding that "it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause"); *see also Menendez*, 831 F.3d at 166 (citing *Brewster*'s example of "the making of appointments" as an act that is "so clearly non-legislative that no inquiry into their content or underlying motivation or purpose is needed to classify them" as non-legislative acts). Hunter's attempt to schedule an appointment for a future visit to the Naval base at Naples falls squarely within this non-protected category—an effort to make an appointment with the U.S. Navy, a government agency.

More broadly, the Supreme Court has consistently distinguished between completed legislative acts, which the Clause protects, and mere promises to perform future legislative acts, which receive no protection. Speech or Debate protection "extends only to an act that has already been performed[,]" and not to a promise to take some legislative action at a future date. *Helstoski*, 442 U.S. at 490 (noting that therefore the concept of a "'*past* legislative act' [i]s redundant"); *Brewster*, 408 U.S. at 526 (Clause did not prohibit evidence that Senator "promise[d] to act in a certain way[,]" even if that act was "legislative"). Similarly, in *United States v. Johnson*, the Supreme Court noted that a prosecution of a congressman for accepting

11

a bribe in exchange for delivering a speech on the House floor (perhaps the core value of Speech or Debate protection) could proceed consistent with the Clause's protections intact, so long as that prosecution did not require evidence of the completed legislative act—the speech. 383 U.S. 169, 185 (1966).

Here, the evidence of Hunter's base visit is limited only to his scheduling (and then cancelling) of the appointment. He and his chief of staff discussed the possibility of a future plan to visit a Naval base in Naples. The visit never took place. The Supreme Court has clarified that the Speech or Debate Clause is inapplicable here.

In any event, the tour itself, had it occurred, would not be a "legislative act" protected by the privilege. Hunter planned to take his wife and kids on a tour of a navy base during their family vacation. He was not engaged in the work of any committee, nor was he finding facts relating to any House inquiry. At best, he might claim he was conducting his own, independent, "individual" investigation. But "the Supreme Court has never recognized investigations by an individual Member to be protected." *Renzi I*, 651 F.3d at 1026 n.10 (citing *Brewster*, 408 U.S. at 525–26 and *Johnson*, 383 U.S. at 171–72, 185). Instead, the Supreme Court "has held only that when Congress, acting as a body, employs its constitutional power to investigate, such official investigations are quintessential 'legislative acts.'" *Id.* Expanding the Clause's protection to an individual member's tour of a military base would constitute a significant extension of Supreme Court precedent.

Furthermore, *Renzi I* explained that even "assuming" that the Clause protects "a Member's pre-legislation investigation and fact-finding," that protection applies only in 'circumstances in which no part of the investigation or fact-finding itself constituted a crime." 651 F.3d at 1025–26. In other words, "the Clause does not protect unlawful investigations by Members." *Id.* Or, as *Gravel* put it, the Clause "does not privilege [a Member] to violate an otherwise valid criminal law in preparing for or implementing legislative acts." 408 U.S. at 626. As this case makes crystal clear, extending Speech or Debate immunity to a congressman's efforts to schedule pretextual meetings would give members *carte blanche* to break the law by using campaign funds (or, for that matter, government funds) to pay for lavish

personal vacations, then attempting to arrange sham meetings for the sole purpose of disguising recreational travel as "official business."

The Third Circuit's opinion in *Government of the Virgin Islands v. Lee* is illustrative. There, a Virgin Islands state senator who faced criminal charges for seeking government reimbursement for expenses incurred on personal travel argued that his travel was protected by legislative privilege. 775 F.2d at 516, 522 (using Speech or Debate jurisprudence to interpret "closely parallel" provision of Virgin Islands law). The Third Circuit held that because his travel was not "manifestly" legislative, "it is Senator Lee's purpose or motive that will determine in part whether the trip was a legislative act at all." *Id.* at 524; *see also id.* at 522 ("such assertions cannot preclude a court of competent jurisdiction from determining whether Lee's conversations were, in fact, legislative in nature so as to trigger the immunity"). Since that required a factual determination, the Third Circuit remanded to the district court "to determine which acts were proper legislative acts and which were personal and non-legislative acts." *Id.* at 524. The district court "would be obliged to dismiss the indictment" *only* if the senator "established by a preponderance of the evidence that the legislative component of the trip was significant and bona fide and that the trip would not have been taken but for the legislative act involved, and that the trip was not improperly extended in order to obtain reimbursement for non-legislative acts." *Id.* at 525.

This determination does not require courts to scrutinize the "motivation" behind a true legislative act. *Renzi I*, 651 F.3d at 1025. Instead, the inquiry is limited to determining whether an act is in fact "legislative" in the first place. *See Lee*, 775 F.2d at 524 ("[T]he government here does not seek to inquire into motives for a legislative act, but rather questions whether certain legislative acts were in fact taken, and whether other non-legislative acts were misrepresented as legislative.") That is, when an act is "neither manifestly legislative nor clearly non-legislative, then it is ambiguously legislative"—in which case, the court must inquire into "the content, purpose, and motive of the act to assess its legislative or non-legislative character." *Menendez*, 831 F.3d at 166; *see also id.* at 167 ("Only after we conclude that an act is in fact legislative must we refrain from inquiring into a legislator's purpose or

motive."); *Renzi I*, 651 F.3d at 1024 (Clause does not "preclude inquiry into any legislative activity with some degree of facial validity.").

Here, the evidence is clear that Hunter's purpose in attempting to schedule the base visit was not to engage in actual legislative fact-finding, but rather, to generate a pretext for his embezzlement of campaign funds for a family vacation. The Hunters began planning the Italy trip in April 2015, but did not attempt to schedule any visit to a military base until early November, barely two weeks before their departure. By that time, the Hunters had belatedly realized that their lavish family vacation to Italy would be difficult to justify as a legitimate campaign expense, and scrambled to generate a pretextual "legislative" purpose for what was in reality purely recreational travel. Indeed, the Hunters booked their travel well before they had confirmed that a visit the day before Thanksgiving could be arranged.

Under these circumstances, there is little doubt that Hunter's "motive" in attempting to schedule the base tour was not to engage in genuine legislative fact-finding, but rather to conceal his theft from public scrutiny so that he could enjoy the bounty of his campaign coffers, unimpeded by prying eyes—*i.e.*, to see to it that his "non-legislative acts were misrepresented as legislative." *Lee*, 775 F.2d at 524; see also *Renzi I*, 651 F.3d at 1026 (Clause does not protect legislative fact-finding that "itself constituted a crime"). Because Hunter's purpose was not to engage in actual legislative fact-finding while visiting the base, his effort to schedule the visit does not constitute a "legislative act." *See Menendez*, 831 F.3d at 167 ("trips by legislators" are "only legislative to the extent [they] involved legislative fact-finding" (quotation marks omitted).

Hunter's efforts to schedule a base visit while vacationing in Italy are simply not protected "legislative acts" subject to any Speech or Debate privilege.

### 3.   The OCE Report Is Not Hunter's Own "Legislative Act"

Hunter also appears to argue that the OCE Report is itself a "legislative act," and its presentation to the grand jury would require dismissal. Mtn. to Dismiss at 10, 12. This is

incorrect.[10]  First, the OCE Report is not "legislative act" material, because the OCE is not part of the House of Representatives.  Rather, it "is an independent, non-partisan entity charged with reviewing allegations of misconduct against Members, officers, and staff of the United States House of Representatives and, when appropriate, referring matters to the House Committee on Ethics."  *About*, Office of Congressional Ethics, https://oce.house.gov/about. The OCE is governed not by the House, but by an eight-person Board of Directors composed of private citizens who can neither serve as members of Congress or work for the federal government.  *Id.*  As Hunter's team themselves conceded in their public response to the Report, "OCE is not the House Ethics Committee."  Exh. 16.  Their work is simply not covered by legislative privilege.

Moreover, the OCE's inquiry and resulting Report "was not, and does not report on, 'Speech or Debate'" of Hunter; "[i]t merely reports findings related to financial activities and affairs" of Hunter.  *Fed. Election Comm'n v. Wright*, 777 F. Supp. 525, 529 (N.D. Tex. 1991). In *Wright*, the former Speaker of the House invoked his legislative privilege to avoid testimony in an FEC inquiry related to his efforts to avoid the honorarium limits imposed by law.  *Id.* at 527.  The FEC's inquiry was based on a report prepared by a committee of the House, which Wright claimed cloaked the whole matter in the protection of Speech or Debate privilege.  *Id*. at 529.  But even though the report in that case (unlike here) was created by the House and "itself undoubtedly should be viewed as a legislative act," the court disagreed that it shielded Wright from compelled testimony.  *Id.* at 530.  As the subject of the House's inquiry, Wright was simply a witness relating to his own financial misconduct.  *Id.*

The OCE Report did not concern any legislative act; it related to allegations of financial misconduct in Hunter's personal capacity, rather than his capacity as a member of Congress. In *United States v. Rose*, the D.C. Circuit evaluated a Speech or Debate claim by a

---

[10] As an initial matter, this contention is speculative and baseless.  The indictment makes no reference to the OCE Report.  Furthermore, in June 2017, the United States agreed, by letter to defense counsel, that it would give Hunter both notice and the opportunity to respond prior to its making evidentiary use of the OCE Report before a grand jury.

congressman who was the subject of a House Committee investigation into his campaign finances. 28 F.3d 181, 184 (D.C. Cir. 1994). Congressman Rose maintained that the privilege prevented the government from using his Committee testimony to prepare a complaint against him for violations of the Ethics in Government Act. *Id.* at 186. Because his testimony related to his personal financial transactions, and "was not addressed to a pending bill or to any other legislative matter[,]" the court found that the privilege did not apply. *Id.* at 188. In short, Rose was simply a witness to "his private conduct; he was not acting in a legislative capacity." *Id.* Like both Wright and Rose, Hunter is the subject of an inquiry into his own personal financial transactions, and the OCE Report of those transactions is not protected by any legislative privilege.[11]

Further, even if the OCE Report were somehow a protected "legislative act," a member may invoke Speech or Debate privilege only as to his *own* legislative acts. *See Wright*, 777 F. Supp. at 530 ("[None of th[e] legislative acts [that went into the preparation of the House report] were of Wright. He is no more protected from the use of the report than is any other citizen."); *see also* 26A Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5675, at 88 (1992) ("The speech or debate privilege belongs to the legislator whose legislative act is involved in the evidence"); *cf. Renzi II*, 769 F.3d at 750 ("while Renzi may waive his own Speech or Debate privilege, he cannot waive the privilege of another Congressman."). The OCE Report certainly is not *Hunter's own* legislative act, as Hunter played no role in the Report's preparation. And the report on Hunter's personal use of funds belonging to his reelection campaign "concerns activities occurring outside, and away from, the House, and which are totally unrelated to anything done in the course of the legislative process or any motivation for any such thing." *Wright*, 777 F. Supp. at 529. Just as Hunter

---

[11] *In re Grand Jury Subpoenas*, 571 F.3d 1200 (D.C. Cir. 2009) and *Ray v. Proxmire*, 581 F.2d 998 (D.C. Cir. 1978) are inapposite. Both of these cases held that a member of Congress had Speech or Debate immunity for statements made to a congressional committee investigating that Member's misuse of their official powers. *Grand Jury Subpoenas*, 571 F.3d at 1203; *Ray*, 581 F.2d at 1000. Here, in contrast, the OCE was investigating Hunter's personal financial misconduct, not his abuse of office. *Rose* and *Wright* are more analogous.

cannot claim Speech or Debate immunity as to *another* Member's legislative acts, so can he not claim immunity as to a Report that he played no role in creating. For these reasons, the OCE Report is not covered by legislative privilege.

### 4. Hunter's Response to the OCE Report Is Not "Legislative Act" Material

In addition to the OCE Report itself, Hunter appears to argue that his public statement, drafted in response to his fear of the impending public release of the OCE Report, should also be protected by the Speech or Debate Clause. In addition, Hunter argues that his discussions with his chief of staff in preparing that statement are privileged. Mtn. to Dismiss at 16. This argument is flawed.

It is well-settled that the Speech or Debate Clause does not apply to a member's communications to the public through press releases and newsletters. *See Hutchinson*, 443 U.S. at 133 ("Newsletters and press releases…are not entitled to the protection of the Speech or Debate Clause"); *Brewster*, 408 U.S. at 512 ("preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress" are not "protected by the Speech or Debate Clause"). As the Supreme Court explained in *Brewster*, a press release or newsletter is "political in nature rather than legislative," and "it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause." 408 U.S. at 512.

### B. Any "Legislative Act" Materials Placed Before the Grand Jury Would Not Require the Indictment's Dismissal.

Any "legislative act" material erroneously placed before the grand jury would not require the indictment's dismissal. The appropriate remedy instead would be to dismiss only those portions of the indictment that the "legislative act" evidence caused the grand jury to return. *Renzi I*, 651 F.3d at 1029 ("the mere fact that some 'legislative act' evidence was presented to the grand jury cannot entitle [a defendant] to dismissal"). As the Eleventh Circuit explained in *United States v. Swindall*, "a member is not necessarily exposed to liability just because the grand jury considers improper Speech or Debate material." 971 F.2d 1531, 1548 (11th Cir. 1992). The Speech or Debate Clause, after all, allows a member of Congress to be

17

prosecuted so long as "the Government's case does not rely on legislative acts or the motivation for legislative acts." *Id.* (quoting *Brewster*, 408 U.S. at 512). If a reference to Speech or Debate privileged material before the grand jury "is irrelevant to the decision to indict, the improper reference has not subjected the member to criminal liability. The case can proceed to trial with the improper references expunged." *Id.* The Ninth Circuit considered *Swindall*, found that it represented "an elegant solution to an awkward problem," and expressly adopted the rule that it articulated—an indictment need not be dismissed unless "legislative act" materials "*caused* the grand jury to indict." *Renzi I*, 651 F.3d at 1029 (emphasis in original).

The indictment in this case contains sixty separate counts, and Count 1 alone enumerates 200 distinct overt acts committed in furtherance of the conspiracy. Indictment ¶¶ 1–34, Doc. No. 1. The vast majority of the indictment's counts, and of Count 1's overt acts, have absolutely nothing to do with any of the alleged "legislative acts" Hunter identifies. It thus cannot be said that "legislative act" materials "cause[d] the jury to indict" as to the overwhelming bulk of the indictment. *Renzi I*, 651 F.3d at 1029. Yet Hunter asks this court, without further explanation, to dismiss "the indictment." As the Ninth Circuit noted in *Renzi I*, it is incumbent on the defendant to identify the specific areas that raise Speech or Debate concerns. *Id.* at 1030 (citing *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1007 n. 1 (9th Cir.2000) ("[I]t behooves parties to treat appellate panels not as if we were pigs sniffing for truffles, but instead to fill our troughs to the brim with the relevant, let alone necessary, information." (internal citation omitted))). Hunter has made no effort to do so.

To the extent the Court determines that Hunter's indictment rests on privileged "legislative act" materials, it should excise only those portions of the indictment that the grand jury would not have returned but for such materials. Wholesale dismissal of a 60-count indictment, with no reasons provided by the defendant, is overbroad and unwarranted.

**C.    Hunter is Not Entitled to Disclosure of Grand Jury Materials**

Finally, Hunter is not entitled to disclosure of grand jury materials. "The burden…is on the defense to show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy." *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959), *see also United States v. Bennett*, 702 F.2d 833, 836 (9th Cir. 1983). Hunter argues that disclosure of grand jury materials is necessary to show that the United States presented "legislative acts" evidence to the grand jury, which would merit the indictment's dismissal. But as detailed above, neither the OCE Report, Hunter's draft public statement in response to the OCE Report, nor Hunter's attempt to schedule a base visit during his Italy vacation actually constitutes a privileged "legislative act." Accordingly, evidence of any of these subjects would not warrant dismissal of the indictment.

Hunter also argues that disclosure is necessary due to paragraph 4 of the indictment's reference to "federal law" as "requir[ing] regular disclosure of the receipt and disbursement of campaign funds." *See* Indictment ¶ 4 ("Federal law also requires regular disclosure of the receipt and disbursement of campaign funds."). Hunter argues that it is unclear what "federal law" paragraph 4 is referencing. This argument fails for two reasons. First, it is obvious in context that the indictment is referring to 52 U.S.C. § 30104. Paragraph 4 states:

> Federal law also requires regular disclosure of the receipt and disbursement of campaign funds. Specifically, candidates for election (or re-election) to the U.S. House of Representatives must periodically file public reports with the Federal Election Commission ("FEC") that disclose, among other things, the total amount of their disbursements, as well as the recipient and purpose of any expenditure totaling more than $200 (in aggregate) during any two-year election cycle.

Indictment ¶ 4. These words track § 30104's own language nearly verbatim. See 52 U.S.C. § 30104(a)(2)(A)(iii), (B) (candidates for the House of Representatives must file reports with FEC quarterly); *id.* § 30104(b)(4) (reports must contain "the total amount of all disbursements"); *id.* § 30104(b)(3) (reports must identify each "person . . . who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200"). Given that paragraph 4

closely tracks § 30104 in substance, the fact that it does not also explicitly cite § 30104 is immaterial.  Indeed, Hunter identifies no other source of federal law that paragraph 4 possibly could be referencing, and offers no reason to believe that the grand jury was instructed as to any other source of law.  Any suggestion that paragraph 4 could actually be referencing the House Rules, the House Ethics Manual, or any source of law other than § 30104, or that the grand jury was so instructed, is entirely speculative and meritless.  See *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980) ("Mere unsubstantiated, speculative assertions of improprieties in the proceedings do not supply the 'particular need' required to outweigh the policy of grand jury secrecy." (citation and quotation marks omitted); *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986) ("Walczak alleges no facts to support his second reason, which is therefore speculative.  Consequently, the district court's denial of Walczak's motion to discover the grand jury transcripts was correct.").

Second, and in any event, the precise legal source of the Hunter campaign's disclosure obligations is altogether legally irrelevant to the charges against him.  "[D]ismissal of the indictment is appropriate only if it is established that" an error in grand jury proceedings "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).  Whether § 30104 or some other source of federal law imposes such disclosure obligations is utterly immaterial to the elements of the conspiracy, wire fraud, falsification of records, and embezzlement charges against him.  Indeed, 18 U.S.C. § 1519, the statute that criminalizes Hunter's submission of falsified records to the FEC, does not even on its face require that a defendant had any legal duty *at all* to submit the records in question, much less indicate any concern for the source of such duty.  See 18 U.S.C. § 1519.  Any misstatement before the grand jury as to whether Hunter's disclosure obligations flowed from § 30104 or some other source of federal law thus could not possibly have affected the grand jury's decision to indict Hunter or otherwise prejudiced him.  For these reasons, Hunter cannot show a particularized need for disclosure of grand jury materials.

1    Hunter claims that he need not demonstrate a "particularized need" to obtain the grand

2    jury's instructions.  Mtn. for Disclosure at 4.  He is mistaken.  The Supreme Court and the

3    Ninth Circuit have consistently maintained that defendants must demonstrate particularized

4    need sufficient to outweigh the long-established policy protecting grand jury secrecy.  *See*

5    *Pittsburgh Plate Glass Co.*, 360 U.S. at 400; *Bennett*, 702 F.2d at 836; *see also Douglas Oil*

6    *Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979); *United States v. Walczak*, 783 F.2d

7    852, 857 (9th Cir. 1986).[12]

---

[12] The cases Hunter cites in support of his assertion each rely on *United States v. Alter*, which said that a defendant is "entitled to know the content of the court's charges to the grand jury. The proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not."  482 F.2d 1016, 1029 n.21 (9th Cir. 1973).  As numerous courts have recognized, this aspect of *Alter* is mere dicta, as the United States had in fact already produced the instructions given to the grand jury.  *Id.* at 1028–29; *see also United States v. Bravo-Fernandez*, 239 F. Supp. 3d 411, 415 n.5 (D.P.R. 2017) (describing this aspect of *Alter* as "dictum"); *United States v. Larson*, No. 07CR304S, 2012 WL 4112026, at *4 (W.D.N.Y. Sept. 18, 2012) (noting that *Alter* "declined to address the merits of his Grand Jury instruction argument since defendant was not prejudiced by the timing of the responses to his requests to obtain the charges"); *United States v. Morales*, No. CR. S-05-0443 WBS, 2007 WL 628678, at *4 (E.D. Cal. Feb. 28, 2007) ("Ultimately, the court declined to address Alter's complaint of errors in the instructions to the grand jury"); *United States v. Hooks*, No. 05-20329 B, 2005 WL 3370549, at *15 n.4 (W.D. Tenn. Dec. 12, 2005) ("because the instructions had already been produced, the *Alter* court did not in fact address the disclosure as part of the holding of the case").

Moreover, the instructions at issue in *Alter* "appeared to focus on the court's general instructions about the rights of witnesses and on the role of the grand jury," rather than on "the prosecutor's legal instructions," which are more revealing of the substance of the investigation and thus "covered by grand jury secrecy."  *Morales*, 2007 WL 628678, at *4; *Larson*, 2012 WL 4112026, at *4–5 (noting that the instructions in *Alter* "appear to be the general directions given to Grand Jurors as how they are to proceed, their powers and duties, without a focus on the particulars of the suspect or case they are investigating").  Indeed, Alter only made "requests for the *court's* general and special grand jury instructions," not for the *prosecutor's* instructions.  *Alter*, 482 F.2d at 1029 (emphasis added).  The fact that *Alter* did not even consider whether disclosure of the instructions given to the grand jury would be lawful under Federal Rule of Criminal Procedure 6(e) further suggests that it applied only to general instructions about the grand jury's role or witness' rights, rather than instructions that shed light on the substance of a specific investigation.  *See Bravo-Fernandez*, 239 F. Supp. 3d 411, 415 (D.P.R. 2017) ("*Alter* is distinguishable because the court did not analyze disclosure

Here, granting Hunter's request for the grand jury's instructions would do nothing but enable him to "engage in a fishing expedition in hopes of uncovering an impropriety or defect in the proceeding where he has no basis to conclude that an impropriety or defect exists." *United States v. Faltine*, No. 13-CR-315 KAM, 2014 WL 4370811, at *5 (E.D.N.Y. Sept. 2, 2014); *see id.* at *6 (denying motion for disclosure of jury empanelment instructions). *Alter* does not require this Court to indulge such mischief, and Hunter identifies no good reason why such indulgence would be proper here. Hunter's request for disclosure of the grand jury's instructions should be denied.

### D.   The Court Should Issue An Order Denying Hunter's Motions And Finding that Hunter's Non-Legislative Acts Are Not Covered by Speech or Debate Privilege

Should this Court deny Hunter's motion to dismiss the indictment for violations of the Speech or Debate Clause, this Court's factual findings and legal conclusions will assist the parties in determining the related question of use immunity at trial. *See Renzi I*, 651 F.3d at 1020 (describing the third prong of the legislative privilege that prevents the introduction of evidence of legislative acts to the jury); *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether…a privilege exists, or evidence is admissible."). Moreover, Speech or Debate claims challenging the validity of an indictment fall within the narrow band of issues in which a litigant has a right to an interlocutory appeal. *Id*. at 1018-19. Accordingly, this Court's findings will be helpful to facilitate appellate review and to expedite those proceedings if appropriate. Based on the evidence submitted by the parties, the United

pursuant to Rule 6(e)"); *Larson*, 2012 WL 4112026, at *4–5 (rejecting request for disclosure of grand jury instructions that go "to the substance of the charge being laid before the Grand Jury as well as how the Grand Jury is to proceed regarding the type and manner of produced evidence before the panel" because "[w]hether a witness was called or how that witness's testimony was presented to the Grand Jury reveals the deliberative process for that body, as with the decision of which law upon which to instruct the panel (or whether to give any instruction beyond reading the text of the statute the suspect is thought to have violated)"); see also *United States v. Chambers*, No. 3:18-CR-00079 (KAD), 2019 WL 1014850, at *3 (D. Conn. Mar. 4, 2019) (alterations omitted) ("The Court is not persuaded that [*Alter*'s] relaxed approach adequately protects the long-recognized goals of grand jury secrecy.").

States respectfully requests that this Court issue an Order with the following findings.  A proposed Order will be submitted to the Court.

There is sufficient evidence in the record to support the Court's preliminary determination, pursuant to Rule 104(a), of the following facts:

- The Hunter family trip to Italy in November 2015 was a personal vacation the primary purpose of which was unrelated to Hunter's work as a member of Congress or candidate for federal office.

- Duncan Hunter's primary motive in attempting to schedule the November 2015 visit to a base was to generate a pretextual purpose so that he could misrepresent his personal use of campaign funds for the family vacation.

- The proposed November 2015 visit to a base in or around Naples, Italy in conjunction with the Hunter family trip was ambiguously legislative, and evidence of the content, purpose, and motives for the visit demonstrates that the visit was a non-legislative act.

- Evidence relating to Duncan Hunter's attempts to schedule (and then cancel) the visit to a base in or around Naples, Italy, does not relate to any legislative act, and Hunter has failed to demonstrate that the use of that evidence at trial should be prohibited by the Speech or Debate Clause.

- The OCE Report of August 26, 2019, which Duncan Hunter played no role in preparing, is not a legislative act of Hunter's and was not related to the process of enacting legislation.  Hunter has failed to demonstrate that the use of evidence relating to the OCE report at trial should be prohibited by the Speech or Debate Clause.

- Duncan Hunter's public response to the release of the OCE Report, and the responses of members of Hunter's staff, was drafted in an effort to mitigate negative effects of the public release of the Report, and was, like a news release, political in nature rather than legislative.

- Evidence relating to Duncan Hunter's response to the release of the OCE Report does not relate to any legislative act, and Hunter has failed to demonstrate that the use of that evidence at trial should be prohibited by the Speech or Debate Clause.

- The defendant has failed to demonstrate any particularized need for disclosure of grand jury materials.

- The defendant's claim that the indictment as a whole, without specifying particular counts, overt acts, or other allegations, should be dismissed for violation of his Speech or Debate Clause protections is wholly without merit.

## III.

## CONCLUSION

This Court should deny Hunter's motions to dismiss the indictment based on the Speech or Debate Clause and for disclosure and production of grand jury materials.

DATED: June 28, 2019

Respectfully submitted,

DAVID D. LESHNER
Attorney for the United States

*s/ Bradley G. Silverman*
EMILY W. ALLEN
W. MARK CONOVER
PHILLIP L.B. HALPERN
BRADLEY G. SILVERMAN
Assistant U.S. Attorney

| From: | Duncan <█████@yahoo.com> |
|-------|---------------------------|
| **Sent:** | Monday, April 27, 2015 10:01 AM |
| **To:** | Margaret Hunter <█████@gmail.com> |
| **Subject:** | Fwd: Reservation Confirmation #83570433 for Boscolo Exedra Roma, Autograph Collection |

*This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

Begin forwarded message:

**From:** Autograph Collection Reservations <reservations@autographcollectionhotels-res.com>
**Date:** April 27, 2015 at 09:56:20 PDT
**To:** █████@YAHOO.COM
**Subject: Reservation Confirmation #83570433 for Boscolo Exedra Roma, Autograph Collection**
**Reply-To:** "Autograph Collection Reservations" <reservations.reply@autographcollectionhotels.com>

Please review your reservation details and keep for your records.



### Boscolo Exedra Roma, Autograph Collection

Piazza della Repubblica 47 . Rome 00185 Italy [[[|:AK|CNF|en_US]]]

39-06-489381   **Hotel Website**   **Map & Directions**   **Plan Your Stay**

### Reservation Confirmation: 83570433

#### For Mr. Duncan Hunter

| | | **MARRIOTT REWARDS MEMBER** | |
|---|---|---|---|
| CHECK-IN DATE | **Friday, July 31, 2015** | CHECK-OUT DATE | **Monday, August 3, 2015** |
| CHECK-IN TIME | **02:00 PM** | CHECK-OUT TIME | **12:00 PM** |

Modify your reservation                    Cancel your reservation

#### Dear Mr. Duncan Hunter,

You're on the guest list. Your hotel reservation is confirmed and we look forward to welcoming you to Autograph Collection Hotels. Each Autograph Collection hotel has been selected for its rich character and uncommon details. A summary of your reservation is outlined below; please review it carefully and enjoy your stay.

Sincerely,

**GOVERNMENT EXHIBIT**
**Ex. 1, Pg. 1**
18CR3677-W
PENGAD 800-631-6989

| | |
|---|---|
| **From:** | Expedia Travel Confirmation <Confirmation@ExpediaConfirm.com> |
| **Sent:** | Wednesday, April 29, 2015 10:06 AM |
| **To:** | ▮▮▮▮▮▮▮@gmail.com |
| **Subject:** | Expedia travel confirmation - Aug 3 - (Itin# 7110581710399) |



**Thank you for booking with Expedia!**
**Your booking is confirmed.**

You can manage your reservation or review your itinerary online for the most up-to-date information.

 **Access your itinerary anywhere.**
GET THE FREE APP

# Bernini Palace, Florence
Mon Aug/3/2015 - Wed Aug/5/2015
Itinerary # 7110581710399

## Bernini Palace
Mon Aug/3/2015 - Wed Aug/5/2015
2 rooms | 2 nights
BOOKED

Your reservation is booked. No need to call us to reconfirm this reservation.

 View hotel details
Piazza San Firenze 29, Florence, Fl, 50122 Italy
**Tel: 39 (055) 288621, Fax: 39 (055) 268272**

## Checking in
- Check-in time starts at 2 PM
- If a late check-in is planned, contact this hotel directly for their late check-in policy.

## Important Hotel Information
Although Expedia does not charge a fee to change or cancel your booking, **Bernini Palace** may still charge a fee in accordance with its own rules & regulations.



GOVERNMENT
EXHIBIT

Ex. 1, pg. 2

18CR3677-W

- Cancellations or changes made after 11:59 PM (W. Europe Daylight Time) on August 01, 2015 or no-shows are subject to a hotel fee equal to 100% of the total amount paid for the reservation.
- In the case of multiple rooms booked together, fees charged by the hotel apply to each room that is canceled or changed.
- View your online itinerary for additional rules and restrictions.

## Room 1
### Triple Room

Includes:
Free Wireless Internet Breakfast Buffet

Reserved for
Margaret Hunter 3 adults

Requests
1 double and 1 single bed, non-smoking room

## Room 2
### Triple Room

Includes:
Free Wireless Internet Breakfast Buffet

Reserved for
Margaret Hunter 2 adults

Requests
1 double and 1 single bed, non-smoking room

## Price Summary

| | |
|---|---|
| | $1,624.23 |
| **Total** | **€1,480.00** |
| Collected by the hotel | |

| | | |
|---|---|---|
| **Room 1** | | **€740.00** |
| 2 nights | | €370.00 /night |
| Taxes | | included |
| **Room 2** | | **€740.00** |
| 2 nights | | €370.00 /night |
| Taxes | | included |

Rate quotes in USD are based on current exchange rates, which may vary at time of travel. Final payment will be settled in local currency directly with the hotel.

## Additional Hotel Services

The below fees and deposits only apply if they are not included in your selected room rate.

GOVERNMENT EXHIBIT
Ex. 1, Pg. 3
18CR3677-W
PENGAD 800-631-6989

**From:**  Expedia Travel Confirmation <Confirmation@ExpediaConfirm.com>
**Sent:**  Wednesday, April 29, 2015 9:10 AM
**To:**  ██████████@gmail.com
**Subject:**  Expedia travel confirmation - Jul 31 - (Itin# 7110573276558)



**Thank you for booking with Expedia!**
**Your booking is confirmed.**

You can manage your reservation or review your itinerary online for the most up-to-date information.

 **Access your itinerary anywhere.**
GET THE FREE APP

# Boscolo Exedra Roma, Autograph Collection, Rome
Fri Jul/31/2015 - Mon Aug/3/2015
Itinerary # 7110573276558

## Boscolo Exedra Roma, Autograph Collection
Fri Jul/31/2015 - Mon Aug/3/2015
1 room | 3 nights
BOOKED

Your reservation is booked. No need to call us to reconfirm this reservation.

 View hotel details
Piazza Della Republica 47, Rome, RM, 00185 Italy
**Tel: 39 (06) 489 381, Fax: 39 (049) 8287702**

## Checking in
▸ Check-in time starts at 2 PM
▸ If a late check-in is planned, contact this hotel directly for their late check-in policy.

## Important Hotel Information
Although Expedia does not charge a fee to change or cancel your booking, **Boscolo Exedra Roma, Autograph Collection** may still charge a fee in accordance with its own rules & regulations.



GOVERNMENT
EXHIBIT

**Ex. 1, Pg. 4**

18CR3677-W

- Cancellations or changes made after 3:00 PM (W. Europe Daylight Time) on July 31, 2015 or no-shows are subject to a hotel fee equal to the first night's rate plus taxes and fees.
- View your online itinerary for additional rules and restrictions.

## Room
Exclusive Room

Includes:
Free Wireless Internet

Reserved for
Margaret Hunter 2 adults

Requests
1 king bed, non-smoking room

## Price Summary

| Total | $1,352.06 |
| Collected by the hotel | **€1,232.00** |

| | |
|---|---|
| **Room Price** | **€1,232.00** |
| **3 nights** | €373.33 avg./night |
| 7/31/15 | €395.00 |
| 8/1/15 | €375.00 |
| 8/2/15 | €350.00 |
| Taxes | €112.00 |

Rate quotes in USD are based on current exchange rates, which may vary at time of travel. Final payment will be settled in local currency directly with the hotel.

## Additional Hotel Services

The below fees and deposits only apply if they are not included in your selected room rate.

You'll be asked to pay the following charges at the hotel:

- A tax is imposed by the city: EUR 7 per person, per night, up to 10 nights. This tax does not apply to children under 10 years of age.

We have included all charges provided to us by the property. However, charges can vary, for example, based on length of stay or the room you book.

The following fees and deposits are charged by the property at time of service, check-in, or check-out.

- Breakfast fee: EUR 25 per person (approximately)

GOVERNMENT
EXHIBIT

Ex. 1, Pg. 5

18CR3677-W

PENGAD 800-631-6989

| | |
|---|---|
| **From:** | Duncan <​█████████@gmail.com> |
| **Sent:** | Thursday, July 16, 2015 1:19 PM |
| **To:** | Margaret <​█████████@gmail.com> |
| **Subject:** | Re: Italy trip |

I thought that they couldn't go to Rome

*This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

On Jul 16, 2015, at 16:09, Margaret <​█████████@gmail.com> wrote:

> █████████
>
> Things change quickly sometimes and here's another:
>
> Need to move Rome trip to possibly
> Aug 30-sept 7    Or over Thanksgiving break which for us is Nov 22-29. :))
>
> Let me know if these work for you guys!
>
> Cooler weather on both too really



**GOVERNMENT EXHIBIT**

**Ex. 2**

**18CR3677-W**

**Margaret** 09/15/2015 3:59 PM

We are reserved in Rome Nov 21-24. Leaving Dulles on 20th evening flight

GOVERNMENT EXHIBIT

**Ex. 3**

18CR3677-W

PENGAD 800-631-6989

1B78 Apple iPad_Other Items_pg 392

**Duncan** 09/22/2015 6:33 PM

Going to Italy over thanksgiving with the family



| | |
|---|---|
| **From:** | Margaret ‹▓▓▓▓▓▓▓@gmail.com› |
| **Sent:** | Monday, November 2, 2015 11:13 AM |
| **To:** | D ‹▓▓▓▓▓▓▓@gmail.com› |
| **Subject:** | Re: upcoming |

A family trip. I love you and I will make this weekend up to you  I know it really sucked and I was out of it in some way

On Nov 2, 2015, at 11:06 AM, D ‹▓▓▓▓▓▓▓@gmail.com› wrote:

> I'm starting to wonder what I'm getting out of all this
>
>
> Sent from my iPad
>
> *This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*
>
>
>
> On Nov 2, 2015, at 11:49, Margaret ‹▓▓▓▓▓▓▓@gmail.com› wrote:
>
>> I just got our tickets
>>
>> On Nov 2, 2015, at 10:41 AM, D ‹▓▓▓▓▓▓▓@gmail.com› wrote:
>>
>>> ▓▓▓▓▓ can get us in touch w/ BGen ▓▓▓▓, USA Europe. I already mentioned it to ▓▓▓▓.
>>>
>>> Sent from my iPad
>>>
>>> *This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*
>>>
>>>
>>>
>>> On Nov 2, 2015, at 11:09, Margaret ‹▓▓▓▓▓▓▓@gmail.com› wrote:
>>>
>>>> Joe
>>>>
>>>> You may know we are headed to Italy over thanksgiving break. Looks like we will be in and around Naples Nov 25-26. There was a mention for Duncan to visit a base etc if possible. It's thanksgiving on 26th so may be tougher to arrange something but nonetheless wanted to throw this out to you
>>>>
>>>> Thanks!

GOVERNMENT EXHIBIT

**Ex. 5**

18CR3677-W

PENGAD 800-631-6989

| From: | Duncan <​███████████@gmail.com> |
|---|---|
| **Sent:** | Friday, November 27, 2015 8:38 AM |
| **To:** | Margaret Hunter <​███████████@gmail.com> |
| **Subject:** | Fwd: eTicket Itinerary and Receipt for Confirmation J9QT5Q |

*This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

Begin forwarded message:

**From:** "United Airlines, Inc." <<u>unitedairlines@united.com</u>>
**Date:** November 27, 2015 at 16:14:01 GMT+1
**To:** ███████████@GMAIL.COM
**Subject: eTicket Itinerary and Receipt for Confirmation J9QT5Q**



|  | Confirmation: |
|---|---|
|  | **J9QT5Q** |
|  | Check-In > |

Issue Date: November 02, 2015

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| HUNTER/DUNCANDUANEMR | 0162469384336 | UA-XXXXX170 Premier 1K / *G | ---/---/---/24K |

**FLIGHT INFORMATION**

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Sat, 21NOV15 | UA974 | S | WASHINGTON, DC (IAD - DULLES) **5:40 PM** | GENEVA, SWITZERLAND (GVA) **7:35 AM** | | Dinner |
| Sun, 22NOV15 | LX1754 | S | GENEVA, SWITZERLAND (GVA) **1:20 PM** | ROME, ITALY (FCO) **2:50 PM** | | Snack |
| Flight operated by SWISS INTERNATIONAL. | | | | | | |
| Sat, 28NOV15 | LX1735 | Y | ROME, ITALY (FCO) **6:30 AM** | ZURICH, SWITZERLAND (ZRH) **8:10 AM** | A-321 | |
| Flight operated by SWISS INTERNATIONAL AIRLINES. | | | | | | |
| Sat, 28NOV15 | UA53 | Y | ZURICH, SWITZERLAND (ZRH) **11:35 AM** | WASHINGTON, DC (IAD - DULLES) **3:15 PM** | 767-400 | Lunch |

**FARE INFORMATION**

**Fare Breakdown**

| | | **Form of Payment:** |
|---|---|---|
| Airfare: | 1,254.00 USD | VISA |
| U.S. Transportation Tax: | 35.40 | Last Four Digits 4065 |
| September 11th Security Fee: | 5.60 | |
| U.S. Customs User Fee: | 5.50 | |
| U.S. Immigration User Fee: | 7.00 | |
| U.S. APHIS User Fee: | 5.00 | |
| Switzerland Airport Passenger/Security Charge: | 17.40 | |
| Italy Security Bag Charge: | 2.20 | |
| Italy Council City Tax: | 8.20 | |
| Italy Embarkation Tax: | 18.50 | |
| Italy Passenger Service Charge: | 0.80 | |

**GOVERNMENT EXHIBIT**

**Ex. 6, Pg. 1**

18CR3677-W

PENGAD 800-631-6989

**From:** United Airlines, Inc. <unitedairlines@united.com>
**Sent:** Friday, November 27, 2015 6:08 AM
**To:** ████████████@GMAIL.COM
**Subject:** MileagePlus eTicket Itinerary and Receipt for Confirmation J9VBV6

 

Confirmation:
# J9VBV6
Check-In >

Issue Date: November 02, 2015

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| HUNTER/MARGARETEMRS | 0162469383639 | | ---/---/---/27F |

## FLIGHT INFORMATION

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Sat, 21NOV15 | UA974 | X | WASHINGTON, DC (IAD - DULLES) **5:40 PM** | GENEVA, SWITZERLAND (GVA) **7:35 AM** | | Dinner |
| Sun, 22NOV15 | LX1754 | X | GENEVA, SWITZERLAND (GVA) **1:20 PM** | ROME, ITALY (FCO) **2:50 PM** | | |
| Flight operated by SWISS INTERNATIONAL. | | | | | | |
| Sat, 28NOV15 | LX1735 | X | ROME, ITALY (FCO) **6:30 AM** | ZURICH, SWITZERLAND (ZRH) **8:10 AM** | A-321 | |
| Flight operated by SWISS INTERNATIONAL AIRLINES. | | | | | | |
| Sat, 28NOV15 | UA53 | X | ZURICH, SWITZERLAND (ZRH) **11:35 AM** | WASHINGTON, DC (IAD - DULLES) **3:15 PM** | 767-400 | Lunch |

## FARE INFORMATION

**Fare Breakdown**

| | | |
|---|---|---|
| Airfare: | 0.00 USD | |
| September 11th Security Fee: | 5.60 | |
| U.S. Customs User Fee: | 5.50 | |
| U.S. Immigration User Fee: | 7.00 | |
| U.S. APHIS User Fee: | 5.00 | |
| Switzerland Airport Passenger/Security Charge: | 17.40 | |
| Italy Security Bag Charge: | 2.20 | |
| Italy Council City Tax: | 8.20 | |
| Italy Embarkation Tax: | 18.50 | |
| Italy Passenger Service Charge: | 0.80 | |
| Italy Security Charge: | 2.90 | |
| Germany Airport Security Charge: | 9.00 | |
| Germany Passenger Service Charge: | 23.20 | |
| Per Person Total: | 105.30 USD | |

**MileagePlus Account Debited:** ██████
**MileagePlus Miles Debited/ Award Used:** ██████

**Form of Payment:**
VISA
Last Four Digits 4065

**eTicket Total:** **105.30 USD**

The airfare you paid on this itinerary totals: 0.00 USD

**The taxes, fees, and surcharges paid total: 105.30 USD**

Award Rules:   Additional charges may apply for changes in addition to any fare rules listed.
RWD YC53/NONEND/-TRAN;VALID UA/LX/LH;NOT VALID AFTER 11/2/2016
All changes must be made prior to the departure date, or the ticket has no value.

Additional
Charges:   Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703685

Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703674

GOVERNMENT
EXHIBIT
**Ex. 6, Pg. 2**
18CR3677-W
PENGAD 800-631-6989

| **From:** | United Airlines, Inc. <unitedairlines@united.com> |
|---|---|
| **Sent:** | Friday, November 27, 2015 6:08 AM |
| **To:** | ███████████@GMAIL.COM |
| **Subject:** | MileagePlus eTicket Itinerary and Receipt for Confirmation J9VBV6 |

 

Confirmation:

## J9VBV6

Check-In >

Issue Date: November 02, 2015

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| HUNTER II,████████ | 0162469383637 | | ---/---/---/27D |

**FLIGHT INFORMATION**

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Sat, 21NOV15 | UA974 | X | WASHINGTON, DC (IAD - DULLES) **5:40 PM** | GENEVA, SWITZERLAND (GVA) **7:35 AM** | | Dinner |
| Sun, 22NOV15 | LX1754 | X | GENEVA, SWITZERLAND (GVA) **1:20 PM** | ROME, ITALY (FCO) **2:50 PM** | | |
| Flight operated by SWISS INTERNATIONAL. | | | | | | |
| Sat, 28NOV15 | LX1735 | X | ROME, ITALY (FCO) **6:30 AM** | ZURICH, SWITZERLAND (ZRH) **8:10 AM** | A-321 | |
| Flight operated by SWISS INTERNATIONAL AIRLINES. | | | | | | |
| Sat, 28NOV15 | UA53 | X | ZURICH, SWITZERLAND (ZRH) **11:35 AM** | WASHINGTON, DC (IAD - DULLES) **3:15 PM** | 767-400 | Lunch |

**FARE INFORMATION**

**Fare Breakdown**

| | | |
|---|---|---|
| Airfare: | 0.00 USD | |
| September 11th Security Fee: | 5.60 | |
| U.S. Customs User Fee: | 5.50 | |
| U.S. Immigration User Fee: | 7.00 | |
| U.S. APHIS User Fee: | 5.00 | |
| Switzerland Airport Passenger/Security Charge: | 17.40 | |
| Italy Security Bag Charge: | 2.20 | |
| Italy Council City Tax: | 8.20 | |
| Italy Embarkation Tax: | 18.50 | |
| Italy Passenger Service Charge: | 0.80 | |
| Italy Security Charge: | 2.90 | |
| Germany Airport Security Charge: | 9.00 | |
| Germany Passenger Service Charge: | 23.20 | |
| Per Person Total: | 105.30 USD | |
| **eTicket Total:** | **105.30 USD** | |

**MileagePlus Account Debited:**
JCM91170

**Form of Payment:**
VISA
Last Four Digits 4065

**MileagePlus Miles Debited/ Award Used:**
240000/YC53

The airfare you paid on this itinerary totals: 0.00 USD

**The taxes, fees, and surcharges paid total: 105.30 USD**

| Award Rules: | Additional charges may apply for changes in addition to any fare rules listed. |
|---|---|
| | RWD YC53/NONEND/-TRAN;VALID UA/LX/LH;NOT VALID AFTER 11/2/2016 |
| | All changes must be made prior to the departure date, or the ticket has no value. |

| Additional Charges: | Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703685 |
|---|---|
| | Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703674 |

**GOVERNMENT EXHIBIT**

**Ex. 6, Pg. 3**

18CR3677-W

PENGAD 800-631-6989

**From:** United Airlines, Inc. <unitedairlines@united.com>
**Sent:** Friday, November 27, 2015 6:08 AM
**To:** ████████████@GMAIL.COM
**Subject:** MileagePlus eTicket Itinerary and Receipt for Confirmation J9VBV6

 

Confirmation:
## J9VBV6
Check-In >

Issue Date: November 02, 2015

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| HUNTER ████████ | 0162471991834 | | ---/---/---/27E |

**FLIGHT INFORMATION**

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Sat, 21NOV15 | UA974 | X | WASHINGTON, DC (IAD - DULLES) **5:40 PM** | GENEVA, SWITZERLAND (GVA) **7:35 AM** | | Dinner |
| Sun, 22NOV15 | LX1754 | X | GENEVA, SWITZERLAND (GVA) **1:20 PM** | ROME, ITALY (FCO) **2:50 PM** | | |
| Flight operated by SWISS INTERNATIONAL. | | | | | | |
| Sat, 28NOV15 | LX1735 | X | ROME, ITALY (FCO) **6:30 AM** | ZURICH, SWITZERLAND (ZRH) **8:10 AM** | A-321 | |
| Flight operated by SWISS INTERNATIONAL AIRLINES. | | | | | | |
| Sat, 28NOV15 | UA53 | X | ZURICH, SWITZERLAND (ZRH) **11:35 AM** | WASHINGTON, DC (IAD - DULLES) **3:15 PM** | 767-400 | Lunch |

**FARE INFORMATION**

**Fare Breakdown**

| | | |
|---|---|---|
| Airfare: | 0.00 USD | |
| U.S. Customs User Fee: | 5.50 | |
| U.S. Immigration User Fee: | 7.00 | |
| U.S. APHIS User Fee: | 5.00 | |
| September 11th Security Fee: | 5.60 | |
| Switzerland Airport Passenger/Security Charge: | 35.50 | |
| Italy Security Bag Charge: | 2.20 | |
| Italy Council City Tax: | 8.00 | |
| Italy Embarkation Tax: | 18.00 | |
| Italy Passenger Service Charge: | 0.80 | |
| Italy Security Charge: | 2.80 | |
| Per Person Total: | 90.40 USD | |

**MileagePlus Account Debited:**
JCM91170

**MileagePlus Miles Debited/ Award Used:**
240000/YC53

**Form of Payment:**
VISA
Last Four Digits 4065

**eTicket Total:** **90.40 USD**

The airfare you paid on this itinerary totals: 0.00 USD

**The taxes, fees, and surcharges paid total: 90.40 USD**

Award Rules:
All changes must be made prior to the departure date, or the ticket has no value.

GOVERNMENT EXHIBIT

Ex. 6, Pg. 4

18CR3677-W

PENGAD 800-631-6989

| Additional Charges: | Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703685 |
|---|---|
| | Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703674 |
| | Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703663 |

| **From:** | United Airlines, Inc. <unitedairlines@united.com> |
|---|---|
| **Sent:** | Friday, November 27, 2015 6:08 AM |
| **To:** | ████████████@GMAIL.COM |
| **Subject:** | MileagePlus eTicket Itinerary and Receipt for Confirmation J9VBV6 |

 

Confirmation:
# J9VBV6
Check-In >

Issue Date: November 02, 2015

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| HUNTER/████ | 0162469383640 | | ---/---/---/25E |

## FLIGHT INFORMATION

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Sat, 21NOV15 | UA974 | X | WASHINGTON, DC (IAD - DULLES) **5:40 PM** | GENEVA, SWITZERLAND (GVA) **7:35 AM** | | Dinner |
| Sun, 22NOV15 | LX1754 | X | GENEVA, SWITZERLAND (GVA) **1:20 PM** | ROME, ITALY (FCO) **2:50 PM** | | |
| Flight operated by SWISS INTERNATIONAL. | | | | | | |
| Sat, 28NOV15 | LX1735 | X | ROME, ITALY (FCO) **6:30 AM** | ZURICH, SWITZERLAND (ZRH) **8:10 AM** | A-321 | |
| Flight operated by SWISS INTERNATIONAL AIRLINES. | | | | | | |
| Sat, 28NOV15 | UA53 | X | ZURICH, SWITZERLAND (ZRH) **11:35 AM** | WASHINGTON, DC (IAD - DULLES) **3:15 PM** | 767-400 | Lunch |

## FARE INFORMATION

**Fare Breakdown**

| | | |
|---|---|---|
| Airfare: | 0.00 USD | |
| September 11th Security Fee: | 5.60 | |
| U.S. Customs User Fee: | 5.50 | |
| U.S. Immigration User Fee: | 7.00 | |
| U.S. APHIS User Fee: | 5.00 | |
| Switzerland Airport Passenger/Security Charge: | 17.40 | |
| Italy Security Bag Charge: | 2.20 | |
| Italy Council City Tax: | 8.20 | |
| Italy Embarkation Tax: | 18.50 | |
| Italy Passenger Service Charge: | 0.80 | |
| Italy Security Charge: | 2.90 | |
| Germany Airport Security Charge: | 9.00 | |
| Germany Passenger Service Charge: | 23.20 | |
| Per Person Total: | 105.30 USD | |
| **eTicket Total:** | **105.30 USD** | |

**MileagePlus Account Debited:**
JCM91170

**MileagePlus Miles Debited/ Award Used:**
240000/YC53

**Form of Payment:**
VISA
Last Four Digits 4065

The airfare you paid on this itinerary totals: 0.00 USD

**The taxes, fees, and surcharges paid total: 105.30 USD**

Award Rules:   Additional charges may apply for changes in addition to any fare rules listed.
RWD YC53/NONEND/-TRAN;VALID UA/LX/LH;NOT VALID AFTER 11/2/2016
All changes must be made prior to the departure date, or the ticket has no value.

**GOVERNMENT EXHIBIT**
**Ex. 6, Pg. 5**
**18CR3677-W**
PENGAD 800-631-6989

Additional Charges:   Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703685

Sat., Nov. 21, 2015/Visa 4799 was charged 134.00 USD for the following: Economy Plus Seat / EDD 01629204703674

Date 11/30/15                Page    3
Account
Enclosures

Easy Business Checking          ████████  (Continued)

Activity in Date Order

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| | 208 S AKARD | | |
| | 08002882020    TX C#3050 | | |
| 11/10 | Payment     ATT | 69.41- | 144,790.87 |
| | CCD | | |
| 11/10 | DBT CRD 0422 11/09/15 27371156 | 1,000.00- | 143,790.87 |
| | BB *WREATH | | |
| | 9605 SCRANTON RD | | |
| | 2074700967    ME C#3050 | | |
| 11/16 | DBT CRD 1442 11/14/15 00098042 | 59.26- | 143,731.61 |
| | CHEVRON 03 | | |
| | 1145 TAVERN ROAD | | |
| | ALPINE        CA C#3050 | | |
| 11/17 | POS DEB 1034 11/17/15 969553 | 10.79- | 143,720.82 |
| | 06704 ALB | | |
| | 2955 ALPINE BLVD. | | |
| | ALPINE        CA C#3050 | | |
| 11/17 | DBT CRD 1528 11/16/15 45294959 | 99.00- | 143,621.82 |
| | C M D I* | | |
| | 1593 SPRING HILL R | | |
| | TYSONS CORNER VA C#6641 | | |
| 11/19 | DBT CRD 1324 11/17/15 58810148 | 40.44- | 143,581.38 |
| | RUBIO S  0 | | |
| | 707 FRIARS RD  931 | | |
| | SAN DIEGO     CA C#3050 | | |
| 11/19 | DBT CRD 1538 11/17/15 00101719 | 58.30- | 143,523.08 |
| | CHEVRON 00 | | |
| | 8200 UNIVERSITY AV | | |
| | LA MESA       CA C#3050 | | |
| 11/23 | MERCH DEP  MERCHE-SOLUTIONS | 20.00 | 143,543.08 |
| | CCD | | |
| 11/23 | DEBIT      FEDERAL EXPRESS | 105.44- | 143,437.64 |
| | CCD | | |
| 11/23 | DBT CRD 0000 11/21/15 90396282 | 16.99- | 143,420.65 |
| | UNITED | | |
| | 600 Jefferson Stre | | |
| | 800-932-2732  TX C#3050 | | |
| 11/23 | DBT CRD 0000 11/20/15 01764798 | 30.00- | 143,390.65 |
| | District L | | |



GOVERNMENT
EXHIBIT
Ex. 7, Pg. 1
18CR3677-W

PENGAD 800-631-6989

HG-CBB-005-000184

Date 11/30/15       Page    4
Account     ███████████
Enclosures

Easy Business Checking     ███████████   (Continued)

Activity in Date Order

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| | 1240 9th St NW | | |
| | Washington    DC C#3050 | | |
| 11/23 | DBT CRD 0000 11/21/15 25078708 | 115.54- | 143,275.11 |
| | APPLE STOR | | |
| | 2700 Clarendon Blv | | |
| | ARLINGTON     VA C#3050 | | |
| 11/23 | DBT CRD 0000 11/21/15 25078709 | 157.94- | 143,117.17 |
| | APPLE STOR | | |
| | 2700 Clarendon Blv | | |
| | ARLINGTON     VA C#3050 | | |
| 11/23 | DBT CRD 0000 11/21/15 25078723 | 252.18- | 142,864.99 |
| | APPLE STOR | | |
| | 2700 Clarendon Blv | | |
| | ARLINGTON     VA C#3050 | | |
| 11/24 | ONLINE PMT 1ST BANKCARD CTR | 10,533.43- | 132,331.56 |
| | CCD | | |
| 11/24 | Payables    Bill.com | 11,436.13- | 120,895.43 |
| | CCD | | |
| 11/24 | DBT CRD 2341 11/22/15 13826372 | 783.28- | 120,112.15 |
| | HYATT REGE | | |
| | 400 NEW JERSEY AVE | | |
| | WASHINGTON    DC C#3050 | | |
| 11/24 | DBT CRD 1039 11/23/15 47182833 | 798.00- | 119,314.15 |
| | C M D I* | | |
| | 1593 SPRING HILL R | | |
| | TYSONS CORNER VA C#6641 | | |
| 11/24 | DBT CRD 2341 11/22/15 13826347 | 964.42- | 118,349.73 |
| | HYATT REGE | | |
| | 400 NEW JERSEY AVE | | |
| | WASHINGTON    DC C#3050 | | |
| 11/27 | ATM W/D 1031 11/26/15 09846001 | 264.20- | 118,085.53 |
| | MONTE DEI | | |
| | MONTE DEI PASCHI D | | |
| | POSITANO    SAI 00 C#3050 | | |
| 11/27 | C/C Fee 0330 11/26/15 09846001 | .53- | 118,085.00 |
| | MONTE DEI PASCHI DI SI | | |
| | POSITANO    SAI00 | | |
| | Card# 3050 | | |
| 11/30 | DBT CRD 0056 11/28/15 09900178 | 17.19- | 118,067.81 |
| | DULLES GOU | | |

GOVERNMENT
EXHIBIT

Ex. 7, Pg. 2

18CR3677-W

PENGAD 800-631-6989

HG-CBB-005-000185

```
                                        Date 11/30/15              Page     5
                                        Account
                                        Enclosures              ███████████
```

Easy Business Checking            ██████████   (Continued)

```
                  Activity in Date Order
Date  Description                              Amount              Balance
            DULLES INTL AIRPOR
            DULLES        VA C#3050
11/30 DBT CRD 0000 11/27/15 18293442            52.07-         118,015.74
            BILL.COM,
            1810 EMBARCADERO R
            PALO ALTO      CA C#6641
11/30 DBT CRD 0000 11/27/15 58233722           190.92-         117,824.82
            EXPEDIA*11
            333 108th Ave NE
            EXPEDIA.COM    WA C#3050
11/30 DBT CRD 0000 11/27/15 17433135           200.00-         117,624.82
            UNITED
            600 Jefferson Stre
            800-932-2732   TX C#3050
11/30 DBT CRD 0000 11/27/15 17433136           200.00-         117,424.82
            UNITED
            600 Jefferson Stre
            800-932-2732   TX C#3050
11/30 DBT CRD 0000 11/27/15 17433137           200.00-         117,224.82
            UNITED
            600 Jefferson Stre
            800-932-2732   TX C#3050
11/30 DBT CRD 0000 11/27/15 17433138           200.00-         117,024.82
            UNITED
            600 Jefferson Stre
            800-932-2732   TX C#3050
11/30 DBT CRD 0000 11/27/15 58233851           275.77-         116,749.05
            EXPEDIA*11
            333 108th Ave NE
            EXPEDIA.COM    WA C#3050
```

To report a lost or stolen ATM or Debit Card, call 1-866-546-8273.

**GOVERNMENT EXHIBIT**

**Ex. 7, Pg. 3**

**18CR3677-W**

PENGAD 800-631-6989

HG-CBB-005-000186

```
        Duncan D. Hunter for Congress          Date 12/31/15          Page   1
        Operations Account                     Account
                                               Enclosures                    1
```

We're everywhere your mobile device is!  Download our mobile app from the Apple App
   Store or the Google Play Store.  Then go one step further and activate Mobile
   Deposit on our website.  For questions contact us at 703-748-2005.

CHECKING ACCOUNT

Account Title: Duncan D. Hunter for Congress
               Operations Account

```
Easy Business Checking              Number of Enclosures                 1
Account Number                      Statement Dates  12/01/15 thru 12/31/15
Previous Balance         116,749.05 Days in the Statement Period         31
      7 Deposits           2,129.72 Average Ledger            79,685.43
     45 Checks/Charges    63,227.36 Average Collected         79,685.43
Service Charge                  .00
Interest Paid                   .00
Current Balance           55,651.41
```

```
              Activity in Date Order
Date  Description                           Amount            Balance
12/01 Payables    Bill.com             10,777.23-          105,971.82
      CCD
12/02 DBT CRD 2349 11/30/15 13033476      432.44-          105,539.38
      HYATT REGE
      400 NEW JERSEY AVE
      WASHINGTON    DC C#3050
12/03 DBT CRD 1512 12/02/15 49609196        1.08-          105,538.30
      C M D I*
      1593 SPRING HILL R
      TYSONS CORNER VA C#6641
12/03 DBT CRD 1712 12/01/15 46534770      572.77-          104,965.53
      AT&T*BILL
      208 S AKARD
      08002882020    TX C#3050
12/03 DBT CRD 2346 12/01/15 13523452      735.05-          104,230.48
      HYATT REGE
```



GOVERNMENT
EXHIBIT
Ex. 7, Pg. 4
18CR3677-W

HG-CBB-005-000187

```
                                      Date 12/31/15          Page     2
                                      Account          ██████████████
                                      Enclosures                     1

Easy Business Checking       ████████████ (Continued)

              Activity in Date Order
Date  Description                            Amount           Balance
      400 NEW JERSEY AVE
      WASHINGTON    DC C#3050
12/04 ONLINE PMT 1ST BANKCARD CTR           3,225.26-      101,005.22
      CCD
12/04 DBT CRD 1323 12/02/15 43601757           53.11-      100,952.11
      SHELL OIL
      13538 CAMINO CANAD
      EL CAJON      CA C#3050
12/07 MERCH DEP  MERCHE-SOLUTIONS           1,025.00       101,977.11
      CCD
12/07 CMDI       CMDI                          50.97-      101,926.14
      WEB
12/07 POS DEB 1857 12/06/15 18565070        1,267.32-      100,658.82
      APPLE STOR
      7007 FRIARS RD STE
      SAN DIEGO     CA C#3050
12/07 DBT CRD 1204 12/05/15 00077215           61.73-      100,597.09
      CHEVRON 03
      1145 TAVERN ROAD
      ALPINE        CA C#3050
12/07 DBT CRD 1420 12/05/15 33801023          269.00-      100,328.09
      A-1 SELF S
      1370 N MAGNOLIA
      06192878873   CA C#6641
12/08 DBT CRD 0228 12/07/15 50996235           27.82-      100,300.27
      GRASSHOPPE
      197 1ST AVENUE SUI
      NEEDHAM       MA C#6641
12/10 Payment     ATT                          69.41-      100,230.86
      CCD
12/11 AMEX DEP    MERCHE-SOLUTIONS            500.00       100,730.86
      CCD
12/11 DBT CRD 1323 12/09/15 44500095           53.09-      100,677.77
      SHELL OIL
      13538 CAMINO CANAD
      EL CAJON      CA C#3050
12/14 CMDI        CMDI                          10.25-      100,667.52
      WEB
12/14 Payables    Bill.com                 33,691.22-       66,976.30
      CCD
```

**GOVERNMENT EXHIBIT**

**Ex. 7, Pg. 5**

**18CR3677-W**

HG-CBB-005-000188



# A note of thanks
## for being our cardmember!

We're proud to be your credit card of choice. And we're here for you as your financial needs change. Count on us for practical solutions to any financial challenge you face.

**Contact us 24 hours a day by phone or online.**

Account Number:

Page 002 of 004

🔍 Transaction Detail

| Trans Date | Post Date | Reference Number | Transaction Description | Credits (CR) and Debits |
|---|---|---|---|---|
| 11-14 | 11-16 | 24445005319100619366616 | WALGREENS #5844   EL CAJON CA | $61.56 |
| 11-13 | 11-16 | 24445735318600243700113 | MACY'S EAST #552  EL CAJON CA | $286.41 |
| 11-13 | 11-16 | 24445005318400176984533 | WM SUPERCENTER #2253   EL CAJON CA | $234.69 |
| 11-15 | 11-17 | 24445005320200148625008 | JUSTICE #0328  EL CAJON CA | $51.86 |
| 11-16 | 11-17 | 24692165320000726289148 | HOTELDELCORONADOPARKIN  CORONADO CA | $30.00 |
| 11-16 | 11-18 | 24412895321700188309450 | TACO BELL #25491  EL CAJON CA | $19.04 |
| 11-17 | 11-17 | 24164075321418233394063 | USPS 05415895524903338     LA MESA CA | $5.75 |
| 11-17 | 11-18 | 24164075321418191378108 | USPS 05238200234906131     EL CAJON CA | $18.00 |
| 11-18 | 11-20 | 24431055323206988100505 | CARL'S JR 1100629   ALPINE CA | $9.27 |
| 11-19 | 11-23 | 24164075324513379566673 | THE LOCAL C IA22300503  HOUSTON TX | $65.41 |
| 11-19 | 11-23 | 24307925324900180869991 | HOUSTON GEORGE BUSH 0366B    HOUSTON TX | $170.07 |
| 11-19 | 11-23 | 24692165324000709968218 | BAN CAMDEN T2W  SAN DIEGO CA | $19.69 |
| 11-19 | 11-23 | 24692165324000765629160 | UNITED     0162920327492   800-932-2732 TX | $7.99 |
| 11-21 | 11-23 | 74418005327007327021607 | ONLINE PAYMENT THANK YOU | $2,341.52 (CR) |
| 11-21 | 11-23 | 24445005326100509896346 | BARNES & NOBLE #2068  ARLINGTON VA | $144.63 |
| 11-22 | 11-23 | 74595725326112201780134 | Cafe Under Construction    Geneve I5 Aer | $10.21 |
| 11-22 | 11-23 | 74595725326112201663315 | Le Snack  Cosntrun | $10.01 |
| 11-21 | 11-23 | 24071145326900019881120 | CHEF GEOFF  STERLING VA | $36.41 |
| 11-21 | 11-23 | 24692165326000880764619 | UNITED    0162920470365   800-932-2732 TX | $127.00 |
| 11-21 | 11-23 | 24692165326000880764672 | UNITED    0162920470366   800-932-2732 TX | $134.00 |
| 11-21 | 11-23 | 24692165326000880764635 | UNITED    0162920470367   800-932-2732 TX | $134.00 |
| 11-21 | 11-23 | 24692165326000880764643 | UNITED    0162920470368   800-932-2732 TX | $134.00 |
| 11-21 | 11-23 | 24391215326613140532548 | HERTZ RENT-A-CAR WASHINGTON DC | $389.11 |
| 11-21 | 11-23 | 24326885326207899500275 | THE BOULEVARD WOODGRILL ARLINGTON VA | $104.85 |
| 11-20 | 11-23 | 24692165325000359543750 | UNITED     0162920350034   800-932-2732 TX | $7.99 |
| 11-20 | 11-23 | 24692165325000359543768 | UNITED     0162920350035   800-932-2732 TX | $9.99 |
| 11-22 | 11-24 | 74595725327112201781132 | Cafe Under Construction    Geneve I5 Aer | $10.21 |
| 11-23 | 11-24 | 74472455327401108271574 | COOPCULTURE  ROMA | $25.58 |
|  | 11-24 |  | Frgn Amt: $24.00 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-23 | 11-24 | 74986655328000028083089 | FRGN TRAN FEE PUR  05    25.58 | $0.76 |
| 11-21 | 11-24 | 24445005327300439322314 | TRAVEL TRADERS 0200  WASHINGTON DC | $23.46 |
| 11-23 | 11-25 | 74935005328552863625472 | L GIUBILEO ROMA | $213.50 |
|  | 11-25 |  | Frgn Amt: $200.00 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-24 | 11-25 | 74598345329030538580063 | CAVI DI POMPEI POMPEI | $27.75 |
|  | 11-25 |  | Frgn Amt: $26.00 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-24 | 11-25 | 74986655329000329083089 | FRGN TRAN FEE PUR  05    27.75 | $0.83 |
| 11-24 | 11-27 | 74539975330532923036468 | STARHOTELS MICHELANGELO R  ROMA | $161.65 |
|  | 11-27 |  | Frgn Amt: $152.00 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-24 | 11-27 | 74988655331000311083089 | FRGN TRAN FEE PUR  05   161.65 | $4.84 |
| 11-25 | 11-27 | 74318855330533020392373 | RIST CUMPA' COSIMO  RAVELLO | $138.25 |
|  | 11-27 |  | Frgn Amt: $130.00 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-25 | 11-27 | 74988655331000311083089 | FRGN TRAN FEE PUR  05   138.25 | $4.14 |
| 11-26 | 11-27 | 74598345331030516601100 | HOTEL L ANCORA POSITANO | $683.29 |
|  | 11-27 |  | Frgn Amt: $642.50 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-26 | 11-27 | 74988655331000311083089 | FRGN TRAN FEE PUR  05   683.29 | $20.49 |
| 11-24 | 11-27 | 74935005329532990587279 | ROMA TERMINI SELF SERVICE  ROMA | $248.03 |
|  | 11-27 |  | Frgn Amt: $232.00 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-24 | 11-27 | 74318875329532920525790 | RIST IL RITROVO POSITANO | $294.53 |
|  | 11-27 |  | Frgn Amt: $275.50 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-24 | 11-27 | 74988655331000311083089 | FRGN TRAN FEE PUR  05   294.53 | $8.83 |
| 11-28 | 11-30 | 74539975333533601550898 | SAN GALLO PALACE FIRENZE | $169.16 |
|  | 11-30 |  | Frgn Amt: $159.00 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-28 | 11-30 | 74988655334000334083089 | FRGN TRAN FEE PUR  05   169.16 | $5.07 |
| 11-29 | 11-30 | 24431065334400511001787 | HUDSON NEWS  ST1303   WASHINGTON DC | $61.81 |
| 11-29 | 11-30 | 24445005334207899950203 | NATIONAL AIRPORT GRILL WASHINGTON DC | $34.88 |
| 11-26 | 11-30 | 74935005331531905510489 | NAPOLI CENTRALE SELF SERV  NAPOLI | $289.38 |
|  | 11-30 |  | Frgn Amt: $272.00 EUROPEAN CURRENCY EXCHANGE     IT | |
| 11-26 | 11-30 | 74988655334000334083089 | FRGN TRAN FEE PUR  05   289.38 | $8.68 |

Continued next page

GOVERNMENT
EXHIBIT

Ex. 7, Pg. 6

18CR3677-W

PENGAD 800-631-6989



## Our Commitment To You

We are committed to providing our customers
with quality products, superior service,
and our continued support and respect.

Account Number: ▮▮▮▮▮

Page 003 of 004



### Transaction Detail

| Trans Date | Post Date | Reference Number | Transaction Description | Credits (CR) and Debits |
|---|---|---|---|---|
| 11-27 | 11-30 | 74317715332006703240101 | GIOIELLERIA MANETTI FIRENZE | $216.76 |
| | 11-30 | Frgn Amt: $203.74 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-27 | 11-30 | 74988655334000334083083 | FRGN TRAN FEE PUR  05   216.76 | $6.50 |
| 11-27 | 11-30 | 74943305331067617929465 | H & M          856  FIRENZE | $134.61 |
| 11-27 | 11-30 | 74943305331067618377557 | D.S8 MONDO LINDT FIREN 994  FIRENZE | $29.76 |
| | 11-30 | Frgn Amt: $27.97 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-27 | 11-30 | 74988655334000334083083 | FRGN TRAN FEE PUR  05    29.76 | $0.89 |
| 11-27 | 11-30 | 24692165331000439207071 | EXPEDIA*112213972532 3   EXPEDIA.COM NV | $180.70 |
| 11-27 | 11-30 | 74539975332533260153008 | SAN GALLO PALACE FIRENZE | $23.94 |
| | 11-30 | Frgn Amt: $22.50 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-27 | 11-30 | 74988655334000334083083 | FRGN TRAN FEE PUR  05    23.94 | $0.71 |
| 11-27 | 11-30 | 74539975332533260153013 | SAN GALLO PALACE FIRENZE | $122.35 |
| | 11-30 | Frgn Amt: $115.00 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-27 | 11-30 | 74988655334000334083083 | FRGN TRAN FEE PUR  05   122.35 | $3.67 |
| 11-27 | 11-30 | 74935005332532612898650 | QUEEN VICTORIA SAS FIRENZE | $35.11 |
| | 11-30 | Frgn Amt: $33.00 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-27 | 11-30 | 74988655334000334083083 | FRGN TRAN FEE PUR  05    35.11 | $1.05 |
| 11-27 | 11-30 | 74935005332532612898570 | QUEEN VICTORIA SAS  FIRENZE | $38.41 |
| | 11-30 | Frgn Amt: $36.10 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-27 | 11-30 | 74988655334000334083083 | FRGN TRAN FEE PUR  05    38.41 | $1.15 |
| 11-27 | 11-30 | 74935005332533290654875 | FIRENZE S.M.N.SELF SERVIC  FIRENZE | $160.12 |
| | 11-30 | Frgn Amt: $150.50 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-27 | 11-30 | 74988655334000334083083 | FRGN TRAN FEE PUR  05   160.12 | $4.80 |
| 11-27 | 11-30 | 74935005332532262070967 | FARMACIA DEL CINGHIALE FIRENZE | $12.77 |
| | 11-30 | Frgn Amt: $12.00 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-27 | 11-30 | 74988655334000334083083 | FRGN TRAN FEE PUR  05    12.77 | $0.38 |
| 11-30 | 12-01 | 24427335334720025013421 | ALBERTSONS #6704  ALPINE CA | $167.21 |
| 11-30 | 12-01 | 24427335334720049309434 | MCDONALD'S F34847  ALPINE CA | $6.25 |
| 11-27 | 12-01 | 74943305334067618388965 | SATA 72610      443  FIRENZE | $70.06 |
| 11-29 | 12-01 | 24164075334531366469248 | STARBUCKS T 2 32361578   SAN DIEGO CA | $12.85 |
| 11-28 | 12-01 | 74539975334533320081966 | HILTON GARDEN INN FIUMICINO | $69.95 |
| | 12-01 | Frgn Amt: $66.00 EUROPEAN CURRENCY EXCHANGE       IT | | |
| 11-28 | 12-01 | 74988655335000335083084 | FRGN TRAN FEE PUR  05    69.95 | $2.09 |
| 11-28 | 12-01 | 74950515334006407711023 | kiosk Airsidecenter    Z rich Flugha | $11.07 |
| | 12-01 | Frgn Amt: $11.35 SWISS FRANC       CH | | |
| 11-28 | 12-01 | 74988655335000335083084 | FRGN TRAN FEE PUR  05    11.07 | $0.33 |
| 11-30 | 12-02 | 24412895335700188309567 | TACO BELL #25491  EL CAJON CA | $15.14 |
| 11-30 | 12-02 | 24692165335000024738670 | UNITED     0162921057063   800-932-2732 TX | $18.48 |
| 11-30 | 12-02 | 24316055335484380126558 | SHELL OIL 57442729208   EL CAJON CA | $45.00 |
| 12-01 | 12-02 | 24164075335211038455273 | PIER 1 IMPORTS00005983   LA MESA CA | $148.68 |
| 12-01 | 12-02 | 24431065335206831201082 | KTS SCHOOL LUNCHES  707-436-5236 CA | $67.50 |
| 12-01 | 12-03 | 24692165336000768292236 | UNITED     0162921218080   800-932-2732 TX | $23.97 |
| 12-01 | 12-03 | 24692165336000768292244 | UNITED     0162921218081   800-932-2732 TX | $3.99 |

Your Annual Percentage Rate (APR) is the annual interest rate on your account.        (v) Variable Rate   (f) Fixed Rate

| Charge Summary | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Days Rate Used | Interest Charge |
|---|---|---|---|---|
| Purchases | 12.99% (v) | $2,847.14 | 30 | $0.00 |
| Cash Advance | 25.24% (v) | $0.00 | 30 | $0.00 |

2015 Total Year-to-Date

Total fees charged in 2015      ............................................  $89.05
Total interest charged in 2015   ............................................  $0.00

GOVERNMENT EXHIBIT

Ex. 7, Pg. 7

18CR3677-W

PENGAD 800-631-6989



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 1

18CR3677-W



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 2

18CR3677-W



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 3

18CR3677-W



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 4

18CR3677-W

PENGAD 800-631-6989



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 5

18CR3677-W



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 6

18CR3677-W



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 7

18CR3677-W



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 8

18CR3677-W



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 9

18CR3677-W



GOVERNMENT
EXHIBIT

Ex. 8, Pg. 10

18CR3677-W

Facebook Business Record                                    Page 588

**Image**



**Photo Id:** ███████████

**Id** ███████████

**Title** We made it Italy! Beautiful first evening around St. Peter's Basilica, Roma

**Photo** █████████████████████████████

**Link** █████████████████████████████

**Upload Ip** █████████████████████████████

**Album Name** Mobile Uploads

**Uploaded** 2015-11-22 16:26:41 UTC

**Tags**

**Comments**            **User** ███████████████

**Text** Beautiful!!!!!

**Time** 2015-11-22 18:23:05 UTC

**User** ███████████████

**Text** Wonderful experience! Soak it all up.

**Time** 2015-11-22 22:12:22 UTC

**User** ███████████████

**Text**

**Time** 2015-11-22 23:35:13 UTC

GOVERNMENT EXHIBIT

Ex. 9, Pg. 1

18CR3677-W

PENGAD 800-631-6989

**Image**



**Photo Id:** 1683151018621644
**Id** 1683151018621644
**Title** Our view this morning. Incredible Amalfi coast
**Photo**



**Link**


**Upload Ip**
**Album Name** Mobile Uploads
**Uploaded** 2015-11-25 07:57:28 UTC
**Tags**
**Comments**
    **User**
    **Text** Beautiful. ..
    **Time** 2015-11-25 14:51:47 UTC

    **User**
    **Text** Wow!
    **Time** 2015-11-25 16:38:15 UTC

    **User**
    **Text** Bellisimo!
    **Time** 2015-11-25 17:05:48 UTC

GOVERNMENT EXHIBIT
Ex. 9, Pg. 2
18CR3677-W

Facebook Business Record                                    Page 575

**Image**



**Photo Id:** 1683565708580175
**Id** 1683565708580175
**Title** Happy Thanksgiving!
**Photo**

**Link**

**Upload Ip**
**Album Name** Mobile Uploads
**Uploaded** 2015-11-26 14:15:31 UTC
**Tags**
**Comments**
    **User** Margaret Hunter
    **Text** THE BEST ▮▮▮▮▮▮▮▮▮▮▮▮!
    **Time** 2015-11-26 14:18:07 UTC

    **User**
    **Text** Happy Thanksgiving to all of you!
    **Time** 2015-11-26 14:57:25 UTC

    **User**
    **Text** Beautiful picture!
    **Time** 2015-11-26 15:08:14 UTC



GOVERNMENT EXHIBIT

**Ex. 9, Pg. 3**

18CR3677-W

**User** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Text** Happy thanksgiving to a special family..

**Time** 2015-11-26 15:20:08 UTC

**Use** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Text** Beautiful where r u now?  Happy thanksgiving

**Time** 2015-11-26 15:45:59 UTC

**User** Margaret Hunter ▮▮▮▮▮▮▮▮

**Text** This was Amalfi/Sorrento earlier today ▮▮▮▮▮▮

We just arrived in Florence       will post pics asap!

**Time** 2015-11-26 15:50:27 UTC

**User** ▮▮▮▮▮▮▮▮▮▮▮▮▮

**Text** Are you guys hitch hiking?

**Time** 2015-11-26 16:07:51 UTC

**User** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Text** Happy Gobble Gobble Day!!!

**Time** 2015-11-26 16:09:25 UTC

**User** Margaret Hunter ▮▮▮▮▮▮▮

**Text** trains are too fun!

**Time** 2015-11-26 16:13:02 UTC

**User** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Text** I'm sooooo happy for you guys..Awesome
vacation. Just awesome. ..Love this picture with
my love ones in it..Happy Thanksgiving. ..I'm so
thankful to have you in my life.

**Time** 2015-11-26 17:40:05 UTC

**User** ▮▮▮▮▮▮▮▮▮▮▮▮

**Text** Love seeing you all ...great memories.

**Time** 2015-11-26 18:43:44 UTC

**User** ▮▮▮▮▮▮▮▮▮▮

**Text** Happy Thanksgiving to you and your family!
Looks like you're having a blast!

**Time** 2015-11-26 18:45:08 UTC

**User** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Text** Glad you are all happy. Miss you and happy for
you. Love you and be safe

**Time** 2015-11-27 05:36:15 UTC

**GOVERNMENT EXHIBIT**

**Ex. 9, Pg. 4**

18CR3677-W

PENGAD 800-631-6989

| | |
|---|---|
| **From:** | Margaret <███████@gmail.com> |
| **Sent:** | Saturday, December 19, 2015 12:01 AM |
| **To:** | ████████████████████@gmail.com> |
| **Subject:** | Re: Dads retirement |

Hey!

I'll think up some fun stuff and it will all come together. :). I'll get names together with the office folks they'll be a lot of help there. Italy was amazing. Truly our best family trip so far. Like that saying "if traveling was free you'd never see me again"!

And hey I'll be out in Phoenix with the girls January 16th weekend for a dance comp...you guys up for company??

Best
M

> On Dec 15, 2015, at 8:29 PM, ████████████████████@gmail.com> wrote:
>
> Hi!
> I just wanted to email to see what else we can do for this. I got swamped with work- sorry about that. You were traveling to ITALY! My fave! Was it amazing?
> Ok so I will talk to ███████ again about 9-12 in the restaurant. Any other info about who to invite or how to get the word out?
> Hope you're ready for Christmas. It's here!!
>
> Sent from my iPhone
>
>> On Nov 11, 2015, at 11:27 AM, Margaret <███████@gmail.com> wrote:
>>
>> Yeah that's so him ok :))
>> I thought we'd be doing a band and stuff!!  so open house morning style?
>>
>>> On Nov 11, 2015, at 10:07 AM, ████████████████████@gmail.com> wrote:
>>>
>>> Awesome!!!!
>>> He mentioned he talked to ███████ at cottonwood and she has the restaurant open to do like 9-12 on Saturday the 27th. He said he wanted refreshments and people to be able to come and go and still keep their Saturday afternoon available. How does that sound?
>>>
>>> Sent from my iPhone
>>>
>>>> On Nov 11, 2015, at 9:59 AM, Margaret ███████@gmail.com> wrote:
>>>>
>>>> Hi!
>>>> I think we tackle the personal side of things so he has the setting he enjoys then I'll mess with the professional buds etc
>>>> Let me know what you think he'd enjoy :)
>>>>
>>>> Loves
>>>> Margaret
>>>>
>>>>> On Nov 9, 2015, at 9:05 PM, ████████████████████@gmail.com> wrote:
>>>>>
>>>>> Hi Margaret!
>>>>> How's it going there!?
>>>>> Things have been so busy here - but good.
>>>>>
>>>>> My dad mentioned that you were going to be heading up his retirement party on Feb 27th - so I wanted to see what I can do to help and get the ball rolling with the planning?
>>>>>
>>>>> Let me know! Love to all your kiddos. Miss you guys!
>>>>>
>>>>> Sent from my iPhone

GOVERNMENT
EXHIBIT

Ex. 10

18CR3677-W

PENGAD 800-631-6989

# Chat with Duncan Hunter

11/23/2015 1:02:44 PM - 11/25/2015 11:14:59 AM

**Export Details:**

| | |
|---|---|
| Device Phone Number | +1 ███████ |
| Device Name | iPhone (2) |
| Device ID | ████████████████ |
| Backup Date | Tuesday, May 09, 2017 9:26 AM |
| Backup Directory | C:\Users\JKasper\V ████████████████ |
| iOS | 10.3.1 |
| Current Time Zone | (UTC-05:00) Eastern Time (US & Canada) |
| Created with | iExplorer v4.1.4.1 |

**Participants:**

+1 ██████  Duncan Hunter

---

Monday, November 23, 2015

**Me** — 1:02 PM
Navy can only do 25 November.

**Duncan Hunter** — 1:03 PM
Rgr. I'll talk to mag

**Me** — 1:04 PM
K. Let me know so I can tell them either way.

**Duncan Hunter** — 1:04 PM
And the ladies are good. Not crazy but there is a healthy population of hotties. It's not like Germany where they all suck

**Duncan Hunter** — 1:41 PM
Is your family going to have us in?

**Duncan Hunter** — 1:41 PM
And tell the navy to go fuck themselves.

**Me** — 1:41 PM
Hahaha.

**Me** — 1:41 PM
K.

GOVERNMENT EXHIBIT
Ex. 11, Pg. 1
18CR3677-W
PENGAD 800-631-6989

HG-KASPER-098-000873

Me

My mom had called my aunt there. She's the only 1 you would want doing it my mom said. I will call her to see what she said. What days you in Rome/Naples Themis week?

1:42 PM

Duncan Hunter

Leaving Rome tomorrow for Naples then Positano tomorrow afternoon

2:33 PM

Duncan Hunter

I would just love for everybody to see some real shit. Authenticity

2:33 PM

Me

My mom said that since her cousin died that my aunt is the only one who would be good to do it. But she's not doing well--but she said under different circumstances (health) she would show everyone a good time.

8:14 PM

Tuesday, November 24, 2015

Duncan Hunter

No worries

1:11 AM

Wednesday, November 25, 2015

Me

Hey man. Saw you called 5 AM. You okay?!?

10:17 AM

Duncan Hunter

Hmmm. Yeah. Forgot what I was gonna tell you

11:14 AM

GOVERNMENT EXHIBIT

Ex. 11, Pg. 2

18CR3677-W

HG-KASPER-098-000874

# CREW | citizens for responsibility and ethics in washington

April 28, 2016

Omar Ashmawy
Staff Director and Chief Counsel
Office of Congressional Ethics
1017 Longworth HOB
Washington, D.C. 20515

Re:  Request for Investigation into Rep. Duncan D. Hunter (R-CA)

Dear Mr. Ashmawy:

Citizens for Responsibility and Ethics in Washington ("CREW") respectfully requests that the Office of Congressional Ethics ("OCE") investigate whether Rep. Duncan D. Hunter (R-CA) violated federal law and House rules by using campaign funds to pay personal expenditures unrelated to any campaign activities.

In recent months, Rep. Hunter's principal campaign committee, Duncan D. Hunter for Congress ("the Hunter Committee"), has acknowledged spending thousands of dollars on purchases not related to campaign activity. The committee spent campaign funds, for example, on video games, an oral surgeon, travel to Hawaii, and Rep. Hunter's children's school tuition, expenses it characterized as "personal" or "mistaken." While Rep. Hunter reimbursed the committee almost $12,000 for these purchases, the spending was not for legitimate campaign expenditures, and the amount and frequency of these improper expenditures warrants a further investigation.

A review of the Hunter Committee's Federal Election Commission ("FEC") disclosure reports further indicates there may be additional non-campaign spending not previously identified or reimbursed. Notably, the committee's most recent report disclosed payments for expenses in Italy during the Thanksgiving holiday week in 2015, including payments to hotels and restaurants in Rome, Florence, and Positano, payments for train tickets, and other travel costs. One particularly suspect expense was reported by the committee as being for "food/beverages," but the payment was made to a jewelry store in Florence. This spending and other evidence suggests the trip was a family vacation.

The Hunter Committee also admitted that more than $2,000 in disbursements it made to Rep. Hunter's wife, Margaret Hunter, were not for campaign purposes and needed to be refunded. In all, however, the committee reimbursed Mrs. Hunter approximately $14,000 in the last six years, and paid her $116,000 for work as a campaign consultant. The improper payments to Mrs. Hunter already acknowledged by the committee indicate that the other expenditures involving her also should be investigated.

Accordingly, OCE should conduct an investigation of Rep. Hunter's campaign spending.

**GOVERNMENT EXHIBIT**

**Ex. 12, Pg. 1**

18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 2

## Factual Allegations

Duncan D. Hunter for Congress is Rep. Hunter's principal campaign committee.[1]

### *Acknowledged "Mistaken" and "Personal" Spending*

In 2015, the Hunter Committee's FEC reports began disclosing disbursements labeled as "mistaken charge[s]" for which the committee had been or purportedly would be reimbursed. The Hunter Committee's initial 2015 April Quarterly report, for example, disclosed payments of $530 and $598 to the Aston Kaanapali Shores, a beach resort in Lahaina, Hawaii.[2] Each was described as a "mistaken charge – to be reimbursed."[3] An amended report, filed four hours after the first one, changed the name of the payee to Expedia, removing any reference to Hawaii.[4] Three more payments to Aston Kaanapali Shores totaling $5,160 were similarly disclosed as "mistaken charge[s]" on the Hunter Committee's initial 2015 July Quarterly report, with an added notation asserting they had been reimbursed on June 30, 2015.[5]

The Hunter Committee's 2015 October Quarterly and Year-End reports disclosed another group of mistaken and personal expenditures. The largest group included at least 68 charges totaling more than $1,300 to Steam Games, a video game company.[6] Each was listed as either a "mistaken purchase – to be reimbursed" or a "personal expense – to be paid back."[7] The committee also paid $1,137 to the Center for Oral & Facial Surgery in San Diego in June 2015, listing the expense as a mistaken purchase to be reimbursed,[8] and in September gave $1,650 to the Christian Unified Schools, the schools Rep. Duncan's children attend, describing it as a personal expense to be paid back.[9]

---

[1] Duncan D. Hunter for Congress, FEC Form 1, Statement of Organization, Amended, Jan. 7, 2015, *available at* http://docquery.fec.gov/pdf/488/15970003488/159700034488.pdf.

[2] Duncan D. Hunter for Congress, FEC Form 3, 2015 April Quarterly Report, Apr. 15, 2015 at 6:17 p.m., *available at* http://docquery.fec.gov/pdf/890/15951164890/15951164890.pdf; http://www.astonkaanapalishoresresort.com.

[3] Duncan D. Hunter for Congress, FEC Form 3, 2015 April Quarterly Report, Apr. 15, 2015.

[4] Duncan D. Hunter for Congress, FEC Form 3, 2015 April Quarterly Report, Amended, Apr. 15, 2015 at 10:37 p.m., *available at* http://docquery.fec.gov/pdf/889/15970362889/15970362889.pdf.

[5] Duncan D. Hunter for Congress, FEC Form 3, 2015 July Quarterly Report, July 15, 2015, *available at* http://docquery.fec.gov/pdf/333/201507159000172333/201507159000172333.pdf.

[6] Morgan Cook, FEC Questions Duncan Hunter's Video Game Charges, *San Diego Union-Tribune*, Apr. 5, 2016, *available at* http://www.sandiegouniontribune.com/news/2016/apr/05/hunter-video-games/; Duncan D. Hunter for Congress, FEC Form 3, 2015 October Quarterly Report, Oct. 15, 2015, *available at* http://docquery.fec.gov/pdf/512/201510159003083512/201510159003083512.pdf; Duncan D. Hunter for Congress, FEC Form 3, 2015 Year-End Report, Jan. 31, 2015, *available at* http://docquery.fec.gov/pdf/281/201601319005014281/201601319005014281.pdf.

[7] Duncan D. Hunter for Congress, FEC Form 3, 2015 October Quarterly Report, Oct. 15, 2015; Duncan D. Hunter for Congress, FEC Form 3, 2015 Year-End Report, Jan. 31, 2015.

[8] Duncan D. Hunter for Congress, FEC Form 3, 2015 October Quarterly Report, Oct. 15, 2015. The committee also received a $325 repayment from the oral surgeon in July 2015. *Id.*

[9] Duncan D. Hunter for Congress, FEC Form 3, 2015 Year-End Report, Jan. 31, 2015; Tom Jones and R. Stickney, Congressman Questioned About Campaign Funds Used on Video Games, Child's School, 7 San Diego, Apr. 6, 2016, *available at* http://www.nbcsandiego.com/news/politics/Congressman-Campaign-Funds-Credit-Card-Video-Games-374816191.html; Olivia Nuzzi, Trump Co-Chair Paid for Kids' School With Campaign Cash, *Daily Beast*,



GOVERNMENT
EXHIBIT

Ex. 12, Pg. 2

18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 3

      Noting the personal disbursements on the Hunter Committee's 2015 Year-End report, the FEC's Reports Analysis Division sent the committee a request for additional information about the charges in April 2016 and instructing it to seek reimbursement for any "personal use" spending.[10]  In response to the letter and press coverage of the questioned charges, the Hunter Committee amended several earlier reports to disclose additional personal and mistaken disbursements.  A note attached to the amended 2015 July Quarterly asserted there had been additional "mistaken" charges to Steam Games and two other video game companies, Blizzard.com and Origin.com, but it did not disclose how much was spent.[11]  The committee also amended the 2015 October Quarterly report to disclose that another $3,500 disbursement to Christian Unified Schools was mistaken.[12]  A note attached to the amended 2015 Year-End report also asserted that the report provided "clarifying" information about the video game purchases, "specifically a large number of those items were fraudulent charges that have been challenged and refunded."[13]

      Along with the amended 2015 reports, the Hunter Committee filed its 2016 April Quarterly report.  This report also disclosed numerous "mistaken" charges or transactions.[14]  These included a $1,200 disbursement to a garage door repair company, $360 paid to a surf and skate shop, and more than $160 spent at Barnes & Noble.[15]  The committee also reported that $2,023 disbursed to Margaret Hunter was mistaken and had been refunded.[16]

      According to Rep. Hunter's spokesman, just before the amendments and new report were filed, Rep. Hunter reimbursed his campaign committee nearly $12,000 for charges the committee described as mistaken and personal expenses.[17]

      Rep. Hunter and his representatives have provided a series of explanations for the improper spending.  According to his spokesperson, at least some of the video games charges resulted from Rep. Hunter's son taking the wrong credit card from the congressman's wallet to

---

Apr. 6, 2016, *available at* http://www.thedailybeast.com/articles/2016/04/06/trump-co-chair-paid-for-kids-tuition-with-campaign-cash.html.

[10] Letter from Bradley Matheson to Duncan D. Hunter for Congress, Apr. 4, 2016, *available at* http://docquery.fec.gov/pdf/712/201604040300040712/201604040300040712.pdf.

[11] Duncan D. Hunter for Congress, FEC Form 3, 2015 July Quarterly Report, Amended, Apr. 15, 2016, *available at* http://docquery.fec.gov/pdf/206/201604159012566206/201604159012566206.pdf.

[12] Duncan D. Hunter for Congress, FEC Form 3, 2015 October Quarterly Report, Amended, Apr. 15, 2016, *available at* http://docquery.fec.gov/pdf/723/201604169012567723/201604169012567723.pdf.

[13] Duncan D. Hunter for Congress, FEC Form 3, 2015 Year-End Report, Amended, Apr. 15, 2016, *available at* http://docquery.fec.gov/pdf/096/201604159012567096/201604159012567096.pdf.

[14] Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016, *available at* http://docquery.fec.gov/pdf/269/201604159012567269/201604159012567269.pdf.

[15] *Id.*; Morgan Cook, Hunter Repaid Funds Spent on Surf Shop, Garage Door, *San Diego Union-Tribune*, Apr. 19, 2016, *available at*  http://www.sandiegouniontribune.com/news/2016/apr/19/hunter-garage-door/.

[16] *Id.*; Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016.

[17] Morgan Cook, Hunter Repays $12,000 to Campaign, *San Diego Union-Tribune*, Apr. 11, 2016, *available at* http://www.sandiegouniontribune.com/news/2016/apr/11/hunter-repay/.


GOVERNMENT
EXHIBIT
**Ex. 12, Pg. 3**
18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 4

set up a subscription on a gaming account.[18]  Rep. Hunter's spokesman added that several
unauthorized charges resulted after he tried to close to the account.[19]

Rep. Hunter's spokesman also provided changing explanations for the $1,650 the
committee paid in September 2015 to his children's school.  The spokesman first claimed the
disbursement was a legal contribution to the school, but the campaign's treasurer mistakenly
thought it was tuition and thus it needed to be paid back.[20]  However, after a school
administrative assistant said the school had not received any contributions from Rep. Hunter or
his campaign, the spokesman asserted the contribution was meant for the school's sports fund,
but was accidentally diverted to the "general fund" for Rep. Hunter that includes tuition
payments.[21]  As a result, the payment did go to his children's tuition and needed to be paid back
or transferred to a different account.[22]  The spokesman later claimed two other charges paid to
the school also were intended as contributions but were mistakenly applied as tuition.[23]  Only
one payment of $3,500, however, appears to have been repaid.[24]

The disbursements to the Hawaii beach resort were supposed to cover Rep. Hunter's
lodging at a planned campaign event, his spokesman said.[25]  When the campaign event was
cancelled, the trip became personal travel, according to the spokesman.[26]  Rep. Hunter tried to
get charges switched to his personal credit card, but could not, so he reimbursed the campaign.[27]

No explanation has been provided to date for the disbursement to the oral surgeon.  Rep.
Hunter told a reporter he did know how the oral surgery came to be paid for with his campaign
funds, and suggested he did not know who in his family received the oral surgery.[28]

Rep. Hunter's spokesman also said Rep. Hunter, in an abundance of caution, repaid
several expenses that might appear personal but were not.[29]  The disbursements to Mrs. Hunter
were for petty cash to make campaign purchases, the spokesman claimed, and the payment to the
surf and skate shop was for items for a community event.[30]  The spokesman also said the garage
door repair expense was related to an incident that occurred at Rep. Hunter's home, where his
campaign is located, "as a result of moving campaign materials on campaign time."[31]

---

[18] Jones and Stickney, *7 San Diego*, Apr. 6, 2016; Nuzzi, *Daily Beast*, Apr. 6, 2016.
[19] *Id.*; Cook, *San Diego Union-Tribune*, Apr. 5, 2016.
[20] Nuzzi, *Daily Beast*, Apr. 6, 2016.
[21] *Id.*
[22] *Id.*; Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 Year-End Report, Amended</u>, Apr. 15, 2016.
[23] Cook, *San Diego Union-Tribune*, Apr. 11, 2016.
[24] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 October Quarterly Report, Amended</u>, Apr. 15, 2016.
[25] Cook, *San Diego Union-Tribune*, Apr. 11, 2016.
[26] *Id.*
[27] *Id.*
[28] <u>Rep. Duncan Hunter Under Fire Over Spending</u>, *ABC 10News*, Apr. 7, 2016, *available at*
https://www.youtube.com/watch?v=xnwjzaUhRpc.
[29] Cook, *San Diego Union-Tribune*, Apr. 19, 2016.
[30] *Id.*
[31] *Id.*



GOVERNMENT
EXHIBIT

Ex. 12, Pg. 4

18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 5

     Overall, the Hunter Committee acknowledged it made thousands of dollars in personal and mistaken expenditures that needed to be paid back, and some of its explanations are open to doubt. While the committee reported those disbursements as improper – though some only after the FEC sent its request for additional information and the reports received press attention – the problems with accounting and financial controls highlight the need for a further investigation.

*Potential Additional Disbursements for Personal Use*

     Despite the Hunter Committee's attempts to address disbursements it identified as unrelated to campaign expenses, a review of the committee's FEC reports reveals several additional charges that may have been for personal use, further demonstrating the need for an investigation.

     Most notably, the committee's 2016 April Quarterly report disclosed thousands of dollars of disbursements related to travel in tourist areas of Italy over the 2015 Thanksgiving holiday. On November 25, 2015, the Hunter Committee paid $213 for "food/beverages" at the Ristorante Il Giubileo in Rome, and two days later paid $248 for "travel tickets" at Rome's Termini Station.[32] That same say, November 27, the committee disbursed $683 to the Hotel L'Ancora in Positano – a resort town on the Amalfi Coast – for "catering and venue," and $294 to the Il Ritrovo Restaurant, also in Positano, for "food/beverages."[33] On November 30, the Hunter Committee spent another $289 on train tickets, this time at Naples' central train station.[34] It also paid Expedia $645 that day for three separate charges described only as "travel."[35] Also on November 30, the committee made two disbursements totaling $145 for "food/beverages" at the Hotel San Gallo Palace in Florence, and another $169 for "travel" at the same hotel.[36]

     The Hunter Committee also paid $216 for what it categorized as "food/beverages" to Gioielleria Manetti in Florence.[37] Gioielleria Manetti, however, is a jewelry store.[38]

     During this period, the Hunter Committee made several other disbursements that appear related to travel. Between November 24 and December 1, the committee made 20 small payments to First Bankcard for bank fees that may have been foreign transaction fees.[39] On both November 23 and November 30, the Hunter Committee made several disbursements to United Airlines that suggest several people were traveling together. On November 30, for example, the committee made four separate $200 payments to United, which may have been for luggage fees

---

[32] Duncan D. Hunter for Congress, <u>FEC Form 3, 2016 April Quarterly Report</u>, Apr. 15, 2016.
[33] *Id.*
[34] *Id.*
[35] *Id.*; Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 Year-End Report, Amended</u>, Apr. 15, 2016.
[36] Duncan D. Hunter for Congress, <u>FEC Form 3, 2016 April Quarterly Report</u>, Apr. 15, 2016.
[37] *Id.*
[38] *See* http://www.gioielleriamanetti.it/.
[39] Duncan D. Hunter for Congress, <u>FEC Form 3, 2016 April Quarterly Report</u>, Apr. 15, 2016.



GOVERNMENT EXHIBIT
Ex. 12, Pg. 5
18CR3677-W
PENGAD 800-631-6989

Mr. Omar Ashmawy
April 28, 2016
Page 6

or upgrades.[40]  Similarly, on November 23, the committee made three $134 payments and one $129 payment to United.[41]

       This spending, the timing of the trip over the Thanksgiving holiday, and photographs Rep. Hunter posted on his Facebook page suggest the trip was a family vacation.[42]  None of these expenditures, however, has been identified as personal or mistaken.

       Other payments by the Hunter Committee also raise questions about whether they were entirely for campaign purposes.  As noted, the committee is operated out of Rep. Hunter's home.[43]  Before May 2015, the committee had not made any expenditures for Internet or cable service since 2012.  Starting that month, however, the Hunter Committee began paying Cox Communications between $277 and $368 every month for the rest of 2015 for "Internet services."[44]  The amount of these charges suggest it is possible the committee paid for Internet service for both the campaign and for Rep. Hunter's personal use.

       The Hunter Committee further made purchases in 2015 purportedly for contributions to local charitable organizations, including disbursements to Nordstrom, Macy's, Barnes & Noble, and Educational Outfitters, the company that supplies uniforms to Rep. Hunter's children's school.[45]  While these disbursements may be legitimate, the committee has acknowledged other contributions to the school and purchases for community events were personal or mistaken.

       The Hunter Committee made expenditures in 2015 that may have been for uses unrelated to Rep. Hunter's campaign, further suggesting an investigation is warranted.

### *Reimbursements and Payments to Margaret Hunter*

       Margaret Hunter is both Rep. Hunter's wife and his campaign manager.[46]  As the Hunter Committee has admitted, some payments to her were "mistaken" and needed to be refunded.[47]  The committee identified $2,023 in such payments.[48]  However, between 2010 and 2016, Mrs.

---

[40] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 Year-End Report, Amended</u>, Apr. 15, 2016.

[41] Duncan D. Hunter for Congress, <u>FEC Form 3, 2016 April Quarterly Report</u>, Apr. 15, 2016.

[42] *See* Facebook page for Duncan Duane (identifying poster as "Representative CA-50 at United States Congress"), Nov. 26, 2015 post, *available at* https://www.facebook.com/photo.php?fbid=10207803271822583&set= a.3362050052887.154859.1318150197&type=3&theater; *id.*, Nov. 26, 2015 post, *available at* https://www.facebook.com/photo.php?fbid=10207803281302820&set=a.1585543521334.77432.1318150197&type =3&theater.

[43] Cook, *San Diego Union-Tribune*, Apr. 19, 2016.

[44] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 Reports</u>.  Some of these charges are described as "utilities." No charges to Cox were made in January or February 2016, but the committee paid it $293 on March 9, 2016. Duncan D. Hunter for Congress, <u>FEC Form 3, 2016 April Quarterly Report</u>, Apr. 15, 2016.

[45] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 Reports</u>; http://sandiego.educationaloutfitters.com/find-my-school/christian-unified-schools/.

[46] Cook, *San Diego Union-Tribune*, Apr. 19, 2016.

[47] *Id.*

[48] *Id.*



GOVERNMENT EXHIBIT
Ex. 12, Pg. 6
18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 7

Hunter was reimbursed approximately $14,000 by the committee for a variety of items.[49]  The FEC should examine whether all of these were proper.

Mrs. Hunter also has been paid $116,000 by the Hunter Committee since 2010 for "campaign management services," "campaign consulting," and "salary."[50]  The House Ethics Manual warns members to "exercise great care" in paying for services from family members, and directs members to FEC regulations on the issue.[51]  Under those regulations, paying a family member a salary is a personal use of campaign funds unless that family member provides *bona fide* services to the campaign and the payment is a fair market value for those services.[52]  The payments to Mrs. Hunter may have been for *bona fide* services at a fair market rate, but due to the other questions involving personal and mistaken expenses, any investigation should examine these payments as well.

## **Potential Violations**

### *Personal Use of Campaign Funds – House Rule 23*

House Rule 23, clause 6 prohibits members from converting campaign funds to personal use beyond "reimbursement for legitimate and verifiable campaign expenditures," prohibits the expenditure of funds from campaign accounts "that are not attributable to bona fide campaign or political purposes," and requires members to keep campaign funds separate from personal funds.[53]

The House Ethics Committee has interpreted this provision narrowly to allow campaign funds to be spent only in connection with *bona fide* campaign purposes.[54]  A strict construction of this provision is necessary to prevent

> a potentially wide range of abuse . . . [that] could result in situations where campaign moneys were expended for personal enjoyment, entertainment, or economic well-being of an individual without any clear nexus that the funds so expended achieved any political benefit.[55]

With respect to travel expenses, House rules limit the use of campaign funds "to pay travel expenses when the **primary purpose** of the trip is activity that serves a bona fide

---

[49] Duncan D. Hunter for Congress, FEC Form 3, 2010-2016 Reports.
[50] *Id.*
[51] House Comm. on Standards of Official Conduct, House Ethics Manual, at 153, 167, 171 & n.97 (110th Cong., 2d Sess., 2008 ed.).
[52] 11 C.F.R. § 113.1(g)(1)(i)(H).  *See also* FEC Advisory Opinion 2001-10 (permitting Rep. Jesse Jackson, Jr. (D-IL) to hire his wife as a consultant as long as she entered a contract to provide bona fide services at a fair market rate).
[53] House Rule 23, cl. 6; House Ethics Manual, at 163.
[54] *See generally id.* at 163-165.
[55] *Id.* at 164.


GOVERNMENT EXHIBIT
Ex. 12, Pg. 7
18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 8

campaign or political purpose."[56]  Determining the "primary purpose" of a trip "must be made in a **reasonable** manner, taking into account all of the activities in which the Member intends to engage during the course of the trip."[57]  If the primary purpose of a trip is personal or recreational but involves some campaign activity, campaign funds may not be used to pay for transportation costs, and only may be used to pay the additional meal or lodging expenses from the campaign activity.[58]  In addition, the use of campaign funds to pay for any meal when the only individuals present are a member and his or her friends or family "inherently raises concerns of conversion of campaign funds to personal use."[59]  To verify that such meals are, in fact, legitimate campaign expenses, the House Ethics Committee has stated that "the maintenance of specific, written records is essential" and when "frequent or extensive" the maintenance of such records is "paramount."[60]

The House Ethics Manual also warns that "under these rules, a Member . . . must take reasonable steps to ensure that any outside organization over which he or she exercises control . . . operates in compliance with applicable law."[61]  When a member controls a political organization and has notice of a campaign violation or later ratifies the conduct of the organization, those actions can be imputed to the member.[62]

The Hunter Committee already has admitted that thousands of dollars in 2015 disbursements were for personal use.  Even if these payments have been reimbursed or refunded, the spending still was not for legitimate and verifiable campaign expenditures and not attributable to bona fide campaign or political purposes.

Other expenditures not identified or reimbursed by the Hunter Committee also do not appear to be campaign-related.  The committee spent thousands of dollars in travel-related costs to tourist areas of Italy over Thanksgiving in 2015, and additional funds on airline costs that may be related to the trip.  It does not appear likely that the primary purpose of the trip was for a *bona fide* campaign or political purpose.  Rather, it appears the trip was a family vacation.  In that case, any transportation costs could not have been paid for by the Hunter Committee under the rules.  Furthermore, many of those expenditures were for food and catering at restaurants and hotels.  If those meals were not legitimate campaign expenses – verifiable through written records – they may have been an improper personal use of campaign funds.

---

[56] *Id.* at 157 (emphasis in original).
[57] *Id.* at 168 (emphasis in original).
[58] *Id.* at 168-69.
[59] House Ethics Manual, at 169
[60] *Id.* at 168.
[61] *Id.* at 123; *see also* Office of Congressional Ethics, *In the Matter of Representative Michele Bachmann*, Review No. 13-1274, May 31, 2013.
[62] House Comm. on Standards of Official Conduct, *In the Matter of Representatives Tony Coehlo, Edward Feighan and Mike Andrews*, H. Rep. No. 99-277, 99th Cong., 1st Sess. 4, 9 & n.4 (1985).

GOVERNMENT EXHIBIT
Ex. 12, Pg. 8
18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 9

In addition, one of the payments in Italy was to a jewelry store in Florence, purportedly for "food/beverages." It is unlikely this payment was legitimately campaign-related or that there are written records to verify that it was.

The Hunter Committee also suddenly began paying hundreds of dollars each month for Internet service in May 2015. While this may have been for the committee's Internet service, the OCE should investigate to determine if it also paid for the service used by Rep. Hunter and his family.

OCE also should examine the $14,000 in reimbursements to Mrs. Hunter and the $116,000 in payments to her. The Hunter Committee already has acknowledged some of its reimbursements to her were mistaken. An investigation should review the other reimbursements to her to ensure they were proper and assess if the payments were for *bona fide* campaign services at a fair market rate.

Finally, OCE should examine the Hunter Committee's other disbursements to determine if they were campaign-related. As the committee eventually acknowledged, several of its disbursements to Rep. Hunter's children's school were credited to their tuition. It remains unclear, however, if the committee has properly classified all of the payments to and related to his children's school. Other questionable disbursements supposedly were made for campaign purposes, including payments to Nordstrom, Macy's, Barnes & Noble, a garage door repair company, an oral surgeon, and a surf and skate shop.

Accordingly, Rep. Hunter appears to have violated House rules, and OCE should conduct a further investigation into his campaign spending.

### *Personal Use of Campaign Funds – the FECA and FEC Regulations*

The FECA and FEC regulations separately prohibit a candidate for federal office from using campaign funds to pay the personal obligations of the candidate. The FECA states that "a contribution or donation . . . shall not be converted by any person to personal use,"[63] specifying that "a contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office."[64]

The statute and regulations specify several types of purchases that constitute personal use. Payments for "a vacation or other noncampaign-related trip" are a personal use,[65] and the FEC evaluates spending on other travel on a case-by-case basis.[66] Salary payments to a member

---

[63] 52 U.S.C. § 30114(b)(1).
[64] 52 U.S.C. § 30114(b)(2).
[65] 52 U.S.C. § 30114(b)(2)(E); 11 C.F.R. § 113.1(g)(1)(i)(J).
[66] 11 C.F.R. § 113.1(g)(1)(ii)(C).



GOVERNMENT
EXHIBIT
**Ex. 12, Pg. 9**
18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 10

of the candidate's family, unless the family member is providing *bona fide* services to the campaign, also are specified as a personal use.[67]  In addition, even if a family member does provide *bona fide* services to the campaign, any salary payment in excess of the fair market value of the services provided is a personal use.[68]  Tuition payments, other than those for used to train campaign staff, also are listed as a personal use.[69]

The types of expenditures that constitute personal use, however, are not limited to those identified in the statute and regulations.[70]  Any expenditures that would exist irrespective of the candidate's campaign or duties as a federal officeholder are treated as personal.  As a result, spending on items unrelated to campaign activity would represent improper personal use of campaign funds.

The Hunter Committee already has admitted that thousands of dollars in 2015 disbursements were for personal use.  In addition, as described above, other expenditures not identified or reimbursed by the Hunter Committee also do not appear to be campaign-related. These include disbursements for costs related to the Italy trip, payments and reimbursements to Mrs. Hunter, payments to and related to Rep. Hunter's children's school, and disbursements to Nordstrom, Macy's, Barnes & Noble, a garage door repair company, an oral surgeon, and a surf and skate shop.

### *Conduct Not Reflecting Creditably on the House*

House Rule 23, clause 1 also requires all members of the House to conduct themselves "at all times in a manner that reflects creditably on the House."[71]  This ethics standard is considered to be "the most comprehensive provision" of the code.[72]  When this section was first adopted, the Select Committee on Standards of Official Conduct noted it was included within the Code to deal with "flagrant" violations of the law that reflect on "Congress as a whole," which might otherwise go unpunished.[73]  This rule has been relied on by the committee in numerous prior cases in which the committee found unethical conduct including: the failure to report campaign contributions,[74] making false statements to the committee,[75] criminal convictions for

---

[67] 11 C.F.R. § 113.1(g)(1)(i)(H).

[68] *Id.*

[69] 52 U.S.C. § 30114(b)(2)(G); 11 C.F.R. § 113.1(g)(1)(i)(D).

[70] 11 C.F.R. § 113.1(g)(1)(i) ("personal use includes but is not limited to" the listed uses).

[71] Rule 23, cl. 1.

[72] House Ethics Manual, at 12.

[73] House Comm. on Standards of Official Conduct, *Report Under the Authority of H. Res. 418*, H. Rep. No. 1176, 90th Cong., 2d Sess. 17 (1968).

[74] House Comm. on Standards of Official Conduct, *In the Matter of Representative John J. McFall*, H. Rep. No. 95-1742, 95th Cong., 2d Sess. 2-3 (1978) (Count 1); *In the Matter of Representative Edward R. Roybal*, H. Rep. No. 95-1743, 95th Cong., 2d Sess. 2-3 (1978).

[75] House Comm. on Standards of Official Conduct, *In the Matter of Representative Charles H. Wilson (of California)*, H. Rep. No. 95-1741, 95th Cong., 2d Sess. 4-5 (1978); H. Rep. No. 95-1743 (Counts 3-4).

GOVERNMENT EXHIBIT
Ex. 12, Pg. 10
18CR3677-W

Mr. Omar Ashmawy
April 28, 2016
Page 11

bribery,[76] accepting illegal gratuities,[77] and accepting gifts from persons with interest in legislation in violation of the gift rule.[78]

Rep. Hunter's campaign has admitted spending thousands of dollars in 2015 disbursements were for personal use, and other expenditures not identified or reimbursed by the Hunter Committee also do not appear to be campaign-related. Accordingly, Rep. Hunter appears to have conducted himself in a matter that does not reflect creditably on the House.

## Conclusion

To ensure that the money raised for political campaigns is not misused, House rules and campaign finance law clearly forbids spending campaign funds on the personal expenses of a candidate or a candidate's family. The Hunter Committee already has admitted it did exactly that, making thousands of dollars in payments for expenditures unrelated to Rep. Hunter's campaign. A review of the committee's disclosure reports further indicates it may have made additional disbursements for personal expenses. The OCE should commence an immediate investigation and forward this matter to the House Ethics Committee for appropriate action.

I am aware that the False Statements Act, 18 U.S.C. § 1001, applies to information submitted to the Office of Congressional Ethics.

Sincerely,

Noah Bookbinder
Executive Director
Citizens for Responsibility and Ethics in Washington
455 Massachusetts Ave., NW, Sixth Floor
Washington, D.C. 20001
(202) 408-5565 (phone)
(202) 588-5020 (fax)

---

[76] House Comm. on Standards of Official Conduct, *In the Matter of Representative Michael J. Myers*, H. Rep. No. 96-1387, 96th Cong., 2d Sess. 2, 5 (1980); *see* 126 Cong. Rec. 28953-78 (Oct. 2, 1980) (debate and vote of expulsion); *In the Matter of Representative John W. Jenrette, Jr.*, H. Rep. No. 96-1537, 96th Cong., 2d Sess. 4 (1980) (member resigned); *In the Matter of Representative Raymond F. Lederer*, H. Rep. No. 97-110, 97th Cong., 1st Sess. 4, 16-17 (1981) (member resigned after Committee recommended expulsion). In another case, the Committee issued a Statement of Alleged Violation concerning bribery and perjury, but took no further action when the member resigned (*In the Matter of Representative Daniel J. Flood*, H. Rep. No. 96-856, 96th Cong., 2d Sess. 4-16, 125-126 (1980)).

[77] House Comm. on Standards of Official Conduct, *In the Matter of Representative Mario Biaggi*, H. Rep. No. 100-506, 100th Cong., 2d Sess. 7, 9 (1988) (member resigned while expulsion resolution was pending).

[78] House Comm. on Standards of Official Conduct, *In the Matter of Representative Charles H. Wilson (of California)*, H. Rep. No. 96-930, 96th Cong. 2d Sess. 4-5 (1980); *see* 126 Cong. Rec. 13801-20 (June 10, 1980) (debate and vote of censure).

GOVERNMENT EXHIBIT

Ex. 12, Pg. 11

18CR3677-W

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

OFFICE OF CONGRESSIONAL ETHICS
UNITED STATES HOUSE OF REPRESENTATIVES

## **REPORT**

Review No. 16-7162

The Board of the Office of Congressional Ethics (hereafter "the Board"), by a vote of no less than four members, on August 26, 2016, adopted the following report and ordered it to be transmitted to the Committee on Ethics of the United States House of Representatives.

SUBJECT:  Representative Duncan D. Hunter

NATURE OF THE ALLEGED VIOLATION:  Representative Duncan D. Hunter's congressional campaign committee, Duncan D. Hunter for Congress, reported expenditures that may not be legitimate and verifiable campaign expenditures attributable to bona fide campaign or political purposes.  Rep. Hunter may have converted tens of thousands of dollars of campaign funds from his congressional campaign committee to personal use to pay for family travel, flights, utilities, health care, school uniforms and tuition, jewelry, groceries, and other goods, services, and expenses.

If Rep. Hunter converted funds from his congressional campaign committee for personal use, then he may have violated House rules, standards of conduct, and federal law.

RECOMMENDATION:  The Board recommends that the Committee on Ethics further review the above allegations concerning Rep. Hunter because there is substantial reason to believe that Rep. Hunter converted campaign funds to personal use to pay expenses that were not legitimate and verifiable campaign expenditures attributable to bona fide campaign or political purposes.

VOTES IN THE AFFIRMATIVE:  5

VOTES IN THE NEGATIVE:  0

ABSTENTIONS:  0

MEMBER OF THE BOARD OR STAFF DESIGNATED TO PRESENT THIS REPORT TO THE COMMITTEE ON ETHICS: Omar S. Ashmawy, Staff Director & Chief Counsel.



GOVERNMENT EXHIBIT

Ex. 13

18CR3677-W

PENGAD 800-631-6989

| **From:** | Joey Kasper <████████@gmail.com> |
| **Sent:** | Friday, September 16, 2016 9:57 AM |
| **To:** | Margaret Hunter <████████@gmail.com> |
| **Cc:** | Duncan Hunter <████████@gmail.com> |
| **Subject:** | OCE |

Margaret -- Duncan can fill you in on specifics, but before he comes back you'll need to go through the OCE report.  Once you mark it up in the margins, I can help fill in additional details.  To include money raised, ect.

GOVERNMENT
EXHIBIT

Ex. 14

18CR3677-W

PENGAD 800-631-6989

**Kasper, Joe**

This is about their 2015 party... they have one every year. This years was same. Table for 8 and a basket. <u>I always do Pier 1 and there are previous purchases on camp card in that store for very same reason same time of year.</u> Baskets are for raffle they raise $ for additional various club activities

On Jan 18, 2017, at 8:05 AM, Joey Kasper █████████@gmail.com> wrote:

That can help too -- as a for instance. And the fact you did personal was great for optics. Can you tell me what it included? I can reference it. It'll help, if substantive.

On Wed, Jan 18, 2017 at 11:03 AM, Margaret █████████@gmail.com> wrote:
This already happened. Their heist mad party was dec 5. I did a PERSONAL purchase for this

On Jan 18, 2017, at 7:59 AM, Joey Kasper █████████@gmail.com> wrote:

Margaret. Question on this--what basket are they picking up and for what? What's in it? asking because it might help with future UT inquiries and when the OCE report is released. tnx.

On Tue, Jan 17, 2017 at 3:43 PM, Duncan █████████@gmail.com> wrote:
████ Please inform me about the delay this time.

*This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

Begin forwarded message:

**From:** Margaret█████████@gmail.com>
**Date:** January 17, 2017 at 12:41:22 PST
**To:** Hub █████████@gmail.com>
**Subject: Fwd: FOOTHILLS CHRISTMAS PARTY 12/3/5**

Got an email from ████ today. They never got the check

Begin forwarded message:

**From:** █████████@gmail.com>
**Date:** November 30, 2015 at 2:14:57 PM PST
**To:** Margaret <█████████@gmail.com>
**Subject: Re: FOOTHILLS CHRISTMAS PARTY 12/3/5**

Thanks!!!!!!

On Mon, Nov 30, 2015 at 1:46 PM, Margaret █████████@gmail.com> wrote:
Check is on the way!

On Nov 30, 2015, at 12:27 PM, █████████@gmail.com> wrote:

GOVERNMENT EXHIBIT
**Ex. 15, Pg. 1**
18CR3677-W

1

Hi again.   Just talked to ▓▓▓▓▓▓.   She is going to pick up the basket at the office for me.   She said Tuesday afternoon, tomorrow, would be the best for her.   It would be early afternoon when she will be in that area.

Still have not received the Hunter's check for the table.   Hope it didn't get lost.

Thanks so much and I hope to see you Thursday,.

As E ver   ▓▓▓▓▓

On Mon, Nov 30, 2015 at 8:33 AM, Margaret Hunter ◄▓▓▓▓▓▓▓@gmail.com> wrote:
Hi ▓▓▓▓▓

We just got back in town from a fabulous Thanksgiving trip but I have not forgotten!  I'll have the basket ready let me know please if Tues or Wedn is best to meet you for drop off. :)

And I hope to be there on Thursday!

Margaret

On Sat, Nov 28, 2015 at 11:04 AM, ▓▓▓▓▓▓▓▓▓@gmail.com> wrote:
ATT:   FOOTHILLS MEMBERS

Any one who has not made their reservation for a fun day at the Foothills Christmas Party, please give send me a message or give me a call with your reservation!!!!
Come and help support your club    The invitation is attached.

I need this information by Monday morning.   Have to let the catering service know how many of us will be there.   Just remember a reservation made is a reservation paid for!

Look forward to seeing all of you!

▓▓▓▓▓▓

2



The Office of Congressional Ethics (OCE) initiated a review of Rep. Duncan Hunter's Congressional Campaign Committee—Duncan D. Hunter for Congress—last year following a complaint from the liberal watchdog group CREW and misleading reports from the *San Diego Union Tribune*. With the OCE Report now being made public today, the office of Rep. Hunter is responding to expose its errors, mischaracterizations and exaggerations.

OCE is not the House Ethics Committee. The OCE has no enforcement authority, and can only refer matters to the House Ethics Committee or to the Federal Election Commission (FEC). Once the OCE commenced its review, Rep. Hunter proactively reached out to the FEC and the House Ethics Committee – thus rendering moot any review by the OCE. He did not see a need to waste his own funds or taxpayer funds by participating in the OCE's redundant process. The OCE should have ceased any review at that time in deference to both the FEC and the House Ethics Committee.

The OCE built a false narrative based on a complaint from a liberal interest group that wrongly and subjectively applies facts and confuses events and timelines. In one instance, OCE states Hunter used the campaign committee account to fund various aspects of a "lifestyle—big and small." Not only is that suggestion absolutely false, it's insulting. Rep. Hunter lives a modest life and always strives to operate his office and his campaign in a fiscally sound way. And it's a suggestion that's made without the right information and with reliance on a liberal interest group and slanted public reporting, mainly from the *San Diego Union Tribune*.

Here are the facts: Once he became aware that expenditure issues existed within his campaign committee, Rep. Hunter personally reimbursed $ 11,896 and then directed his campaign committee to undergo a full independent financial review. That independent financial review resulted in Rep. Hunter reimbursing his campaign committee an additional $48,650.98 for expenditures that were either determined to be mistakes or lacked the proper supporting documentation and information [even if determined appropriate]. This was done out of the absolute abundance of caution.

*Specific expenditures on reporting documents drew Hunter's attention in early-2016 and prompted known-items to be identified as "personal" and necessary for reimbursement. Repayment, as directed by Hunter, occurred following a preliminary internal review and then followed by a secondary and lengthy independent financial review.

Statement attributable to Rep. Duncan Hunter:

*"The buck stops with me. And I take fully responsibility for any expenditure made by the campaign committee, period. I also made a point to reimburse the campaign committee ahead of the last election and to publicly disclose that fact."*

The following is a limited response to specific sections in the OCE report:

Italy

In November of 2015, Rep. Hunter traveled to Italy. There was an agenda with a military service for official activities and campaign funds are permitted for officially related travel/activities not otherwise permitted by a Member's Representational Allowance. However, the planned events were cancelled, which therefore necessitated the reimbursement of expenditures to the campaign committee (which Rep. Hunter did on November 4, 2016). OCE also identifies a "jewelry store" purchase as being personal use —when in fact the item was purchased and donated to a charity, which was permissible and therefore did not constitute personal use.

**OCE states it could not find a campaign or political purpose.**



GOVERNMENT EXHIBIT
Ex. 16, Pg. 1
18CR3677-W
PENGAD 800-631-6989

HG-KASPER-098-000013

HG-KASPER-098-000636

OCE also wrongly states that travel for Hunter and his family from San Diego to Washington, DC prior to the Italy trip was improper. It was not. The Hunters traveled from San Diego to Washington, DC, to hold a fundraiser that raised upwards of $12,000. OCE does correctly state that reward miles, and not campaign funds, paid for the four round trip flights from Dulles to Rome. The use of reward miles is permissible. But the assumption that campaign funds were improperly used to coordinate travel before departing Washington, DC for Italy is simply false.

**\*OCE states it could not find a campaign or political purpose.**

Specific to Italy, OCE also makes a point to suggest that Hunter made no effort to reimburse for the travel once official activities were cancelled. Hunter intentionally delayed reimbursement due to his own discovery of expenses that required review and he requested that certain expenditures be included with the findings of the internal audit.

Hawaii

In 2015, Hunter and his family traveled to Hawaii coinciding with the intent to host a fundraiser focused on maritime issues. He also intended to meet with other potential donors. Hunter later decided not to hold the fundraiser, therefore prompting reimbursement, which occurred. In Hawaii, Hunter also obtained several support items.

**\*OCE states it could not find a campaign or political purpose.**

The Hunter family does plan an annual trip to Hawaii. OCE notes that Hunter's sister-in-law might have traveled with them. Hunter's sister-in-law did not travel with the family.

Arizona

OCE reviewed travel to Arizona in 2016, concluding hotel costs were for a dance competition in which Hunter's daughter participated. The Hunters coordinate and Hunter himself co-hosts a *major* charity event—which attracts large donors and supporters—that was the primary focus of the trip. The organizers are based in Arizona. And in one instance even, Hunter himself had meetings at the hotel at which they were staying. Otherwise, the cost to the campaign committee would have been significantly more, requiring travel and other accommodations for event planning and organization.

**\*OCE states it could not find a campaign or political purpose.**

Idaho

OCE also highlights "family trips" to Idaho in 2015 and 2011. In one instance, a family wedding occurred at the same time of his trip. During this time, Hunter held meetings in Idaho and raised money for his campaign committee—amounting to *at least* several thousands of dollars. Travel was paid for using reward miles.

**\*OCE states it could not find a campaign or political purpose.**

Rabbit

This is a tale of two rabbits. One rabbit was kept in Hunter's official office and another rabbit was owned by Hunter's children. OCE is absolutely wrong to connect cabin fees associated for the transport of the rabbit paid for with reward miles to a rabbit that was kept in the office by Hunter's former Chief of Staff. That rabbit, named Cadbury, was under the care of Hunter's then-Chief of

GOVERNMENT
EXHIBIT
**Ex. 16, Pg. 2**
18CR3677-W

Staff, who paid expenses personally. Any suggestion that a fee was knowingly paid for with campaign funds for the pet rabbit of Hunter's children—which couldn't be left alone for extended periods of time—is not accurate. OCE is right to state that travel was facilitated on reward miles, which are permitted for use.

This information was previously publicly disclosed by Hunter to demonstrate overreach by OCE.

<u>"Family & Friends"</u>

OCE also makes several references to travel that included Hunter's mother— ███████████ . Her travel was also facilitated with reward miles. And her intended purpose was to provide child care for their young children, which has been determined to be perfectly permissible by the FEC.

OCE also wrongly suggests additional travel for "family and friends." In one instance, Hunter's sister-in-law was supporting the campaign as an unpaid volunteer. Charges referenced in Tucson for instance were for a flight layover—not direct travel. There is also no recollection that Mrs. Hunter and her children accompanied her on the trip in question. OCE is correct to state that reward miles were used—which is permissible. Another individual named was a guest of the Hunter's during an official event in New York. In other instances where individuals are named, to include wrongly identified "school faculty travel," those individuals were recipients of auction items as part of charity events, which the campaign committee did on several occasions for educational opportunities in Washington, DC.

**\*OCE states it could not find a campaign or political purpose.**

<u>Internet and Cable</u>

OCE refers to other expenditures, including multiple Ultimate Fighting Championship fights and NFL Red Zone, as part of cable expenditures. In these instances, including NFL games, Hunter hosted supporters, donors and volunteers at his home for events. OCE is correct to state Hunter was paying for internet service, since he closed his campaign office and ran all campaign duties out of his personal residence.

**\*OCE states it could not find a campaign or political purpose.**

The campaign committee believed internet and cable service packages were permissible but upon understanding they are not, the expenditures were included for repayment as part of the financial review.

<u>Food and Gas</u>

When local in San Diego, rarely does Hunter host major events with catered food or plated meals—much different than when doing the same in DC or conducting campaign activities elsewhere. The same goes for hosting supporters, donors and volunteers (to include parades and other official/unofficial functions)—which coincided with store purchases. Hunter also supplied food items.

Hunter and the campaign committee prefer events with very low overhead whenever possible, and he even prefers small events, to include one-on-ones. Even in DC, Hunter has hosted many fundraisers at places like We the Pizza and Good Stuff Eatery, which are not exactly "big lifestyle" places.

**\*OCE states it could not find a campaign or political purpose.**



GOVERNMENT EXHIBIT

Ex. 16, Pg. 3

18CR3677-W

Upon reviewing gas charges as part of the financial review, it proved difficult to find documentation or itemization for campaign versus non-campaign expenses. Hunter decided out of the abundance of caution to include all gas purchases for personal repayment even though a portion of them would have been campaign-related. Further, he chose not to request reimbursement for a single mile over the time covered by the financial review.

Mistakes

Hunter has accounted for clear mistakes as part of the independent financial review that was conducted and expenses he first reported to the FEC as requiring reimbursement.

Expenses attributed to utilities and a garage repair where a product of the campaign committee moving offices to Hunter's residence. The garage door was damaged during the movement of campaign materials on campaign time by a campaign volunteer. The committee assumed the repair cost was appropriate at the time. Mistakes were also made by the committee in the payment of limited utility bills for gas and water. In OCE's uniform reference, there was an incorrect understanding that replacement items could be obtained due to the donation of all previous articles. Despite the charitable intent, this was an expense requiring reimbursement. The campaign committee believed these expenditures were permissible, but once it was understood they are not permissible, the expenditures were included for repayment as part of the financial review.

The dental care expenditure is attributed to simply pulling the wrong card.

It was these expenditures on reporting documents that largely drew Hunter's attention in early-2016 and prompted known-items to be identified as "personal" and necessary for reimbursement. Repayment, as directed by Hunter, occurred following a preliminary internal review and then followed by a secondary and lengthy independent financial review.

Errors also included several misidentified expenditures. These were the result of poor coordination and communication between the campaign committee, in San Diego, and the committee's Treasurer, who is based in the DC region. Too often, assumptions were made at both ends that were incorrect and the process for recording expenditures has since been adjusted.

Treasurers

Lastly, OCE refers to the accounting methods of Hunter's former Treasurer. Since first elected, Hunter has had two treasurers. Hunter is not aware of how they individually account for expenditures or their process for internal bookkeeping.

However, in light of the independent financial review that occurred at Hunter's request, specific structural changes were ordered to ensure the highest level of transparency and disclosure.



GOVERNMENT EXHIBIT
Ex. 16, Pg. 4
18CR3677-W

HG-KASPER-098-000016

HG-KASPER-098-000639



Susan W. Brooks, Indiana
*Chairwoman*
Theodore E. Deutch, Florida
*Ranking Member*

Patrick Meehan, Pennsylvania
Trey Gowdy, South Carolina
Kenny Marchant, Texas
Leonard Lance, New Jersey

Yvette D. Clarke, New York
Jared Polis, Colorado
Anthony Brown, Maryland
Steve Cohen, Tennessee

ONE HUNDRED FIFTEENTH CONGRESS

# U.S. House of Representatives

COMMITTEE ON ETHICS

Thomas A. Rust
*Staff Director and Chief Counsel*

Donna Herbert
*Director of Administration*

Sheria A. Clarke
*Counsel to the Chairwoman*

Daniel J. Taylor
*Counsel to the Ranking Member*

1015 Longworth House Office Building
Washington, D.C. 20515–6328
Telephone: (202) 225–7103
Facsimile: (202) 225–7392

**FOR RELEASE: Upon Receipt**                         **March 23, 2017**

### STATEMENT OF THE CHAIRWOMAN AND RANKING
### MEMBER OF THE COMMITTEE ON ETHICS REGARDING
### REPRESENTATIVE DUNCAN HUNTER

Pursuant to Committee Rule 7(g), the Chairwoman and Ranking Member of the Committee on Ethics (Committee) determined on March 23, 2017, to release the following statement:

On August 31, 2016, the Committee on Ethics received a referral from the Office of Congressional Ethics (OCE) regarding Representative Duncan Hunter. Pursuant to House Rule XI, clause 3(b)(8)(A) and Committee Rules 17A(b)(1)(A), 17A(c)(1) and 17A(j), the Chairman and Ranking Member jointly decided on December 15, 2016 to extend the Committee's review of the matter.

The Department of Justice has asked the Committee to defer consideration of this matter and the Committee, following precedent, unanimously voted on March 22, 2017, to defer consideration of this matter at this time. Pursuant to Committee Rule 17A(h)(1), the Committee is making the OCE's Report in this matter public. Under that rule, when the Committee votes to defer in this manner, it must release the Report, but not the Findings, along with a public statement announcing its deferral. At least annually, the Committee will make a public statement if it continues to defer taking action on the matter. The Committee notes that the mere fact of its decision to defer action on this matter, and any mandatory disclosure of that decision and the OCE's Report, does not itself indicate that any violation has occurred.

### 



**GOVERNMENT
EXHIBIT**

**Ex. 17**

**18CR3677-W**



Susan W. Brooks, Indiana
*Chairwoman*
Theodore E. Deutch, Florida
*Ranking Member*

Kenny Marchant, Texas
Leonard Lance, New Jersey
Mimi Walters, California
John Ratcliffe, Texas

Yvette D. Clarke, New York
Jared Polis, Colorado
Anthony Brown, Maryland
Steve Cohen, Tennessee

Thomas A. Rust
*Staff Director and Chief Counsel*

Donna Herbert
*Director of Administration*

Megan Savage
*Chief of Staff and Counsel to
the Chairwoman*

Daniel J. Taylor
*Counsel to the Ranking Member*

1015 Longworth House Office Building
Washington, D.C. 20515–6328
Telephone: (202) 225–7103
Facsimile: (202) 225–7392

### ONE HUNDRED FIFTEENTH CONGRESS

# 𝕌.𝕊. 𝕳𝖔𝖚𝖘𝖊 𝖔𝖋 𝕽𝖊𝖕𝖗𝖊𝖘𝖊𝖓𝖙𝖆𝖙𝖎𝖛𝖊𝖘

### COMMITTEE ON ETHICS

**FOR RELEASE: Upon Receipt**                              **September 6, 2018**

## STATEMENT OF THE CHAIRWOMAN AND RANKING MEMBER
## OF THE COMMITTEE ON ETHICS REGARDING
## REPRESENTATIVE DUNCAN HUNTER

On March 23, 2017, the Committee on Ethics ("Committee") announced that it was reviewing allegations referred by the Office of Congressional Ethics ("OCE") regarding Representative Duncan Hunter. The Committee also announced that because the Department of Justice ("DOJ") had asked the Committee to defer its consideration of the matter, the Committee had followed precedent and voted unanimously to defer its review at that time. Accordingly, pursuant to Committee Rule 17A(h)(1), the Committee made OCE's Report, but not its Findings, public at that time. On March 23, 2018, the Committee announced that it was continuing to defer its consideration of the matter at the request of DOJ.

Subsequently, on August 21, 2018, Representative Hunter was indicted on federal charges of conspiracy, wire fraud, falsifying campaign finance records, prohibited use of campaign contributions, and false statements. Pursuant to Committee Rule 18(e)(2), within 30 days of a Member being indicted or otherwise formally charged with criminal conduct, the Committee shall either establish an Investigative Subcommittee ("ISC") or report to the House describing its reasons for not establishing an ISC.

In accordance with House Rule XI, clause 3, and Committee Rules 10(a)(2) and 18(e)(2), and following Committee precedent, the Committee unanimously voted on September 6, 2018, to establish an ISC. Pursuant to the Committee's action, the ISC shall have jurisdiction to determine whether Representative Duncan Hunter violated the Code of Official Conduct or any law, rule, regulation, or other applicable standard of conduct in the performance of his duties or the discharge of his responsibilities, with respect to allegations that he engaged in unlawful conspiracy, fraud, falsification of campaign finance records, and prohibited use of campaign contributions.

The Honorable Leonard Lance will serve as the Chairman of the ISC, and the Honorable Anthony Brown will serve as the Ranking Member. The other two members of the ISC are the Honorable John Katko and the Honorable Joaquin Castro.

DOJ has requested that the Committee defer consideration of the matters in the ISC's jurisdiction. The Committee, again following precedent, unanimously recommended to the ISC



GOVERNMENT
EXHIBIT

Ex. 18, Pg. 1

18CR3677-W

that it defer action on its investigation at this time.  No other public comment will be made on this matter except in accordance with Committee rules.

### 

GOVERNMENT
EXHIBIT

Ex. 18, Pg. 2

18CR3677-W