DAVID D. LESHNER
Attorney for the United States
Acting under Title 28, U.S.C. Section 515
EMILY W. ALLEN (Cal. Bar No. 234961)
W. MARK CONOVER I (Cal. Bar No. 236090)
PHILLIP L.B. HALPERN (Cal. Bar No. 133370)
Assistant United States Attorneys
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-6964
Email: Phillip.Halpern@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>v.<br><br>DUNCAN D. HUNTER (1),<br><br>Defendant. | Case No. 18CR3677-W<br><br>**UNITED STATES' MOTION TO DISQUALIFY HIGGS FLETCHER & MACK FROM REPRESENTING DUNCAN D. HUNTER** |
|---|---|

   The United States of America hereby moves to disqualify the law firm of Higgs Fletcher & Mack from representing Defendant Duncan D. Hunter because the firm simultaneously represents multiple witnesses who have already testified adversely to Hunter's interests in this same proceeding and will likely be called to testify to the same facts at Hunter's upcoming trial.

## I

## INTRODUCTION

   Defendant Duncan D. Hunter ("Hunter") seeks to retain the law firm of Higgs Fletcher & Mack ("Higgs") as his new lead trial counsel.  But Higgs is faced with an actual

and unwaivable conflict of interest because it has represented since early 2017—and continues to represent—multiple witnesses in this action, who have already provided adverse testimony leading to Hunter's indictment and are expected to provide equally damaging adverse testimony at trial.  Higgs' prior and ongoing representation of these witnesses disqualifies it from now representing Hunter in the same case.

Such joint representation by a single law firm of both a defendant and adverse witnesses in the same criminal case presents a textbook conflict of interest that is anathema to the fair administration of justice.  The Supreme Court and the Ninth Circuit have both urged district courts to immediately disqualify counsel who have conflicts of interest less severe than the one present here, even when defense counsel have obtained written waivers from current and former clients.  Indeed, the United States has been unable to unearth a single case in which a court has approved of the same law firm representing a criminal defendant and multiple key witnesses who have already testified against the defendant before the very grand jury that returned his indictment.

## II

## STATEMENT OF FACTS

Beginning in March 2017 and continuing to the present, Higgs has represented three government witnesses: Bruce Young, Sheila Hardison, and Joseph Browning.  It now seeks to also represent the defendant Duncan D. Hunter.  As explained below, the witnesses played central roles in this case and have already provided damaging testimony to the grand jury.  At trial, they are expected to testify consistent with their adverse grand jury testimony.

### A.    Hunter's Misuse of Campaign Funds from 2010 to 2016

Hunter was elected to Congress in 2008 and has served in Congress continually since that time, subject to re-election every two years.  As a candidate for federal office, Hunter's collection and use of campaign contributions is restricted, and he is prohibited from using those funds for his own or his family's personal use or enjoyment.

Despite this restriction, from as early as December 2009 through at least August 2016, Hunter and his wife Margaret Hunter improperly used funds owned by the "Duncan

D. Hunter For Congress" Campaign Committee (the Hunter "campaign") to pay for a wide variety of personal expenses.  During that time, the Hunters made scores of transactions illegally using campaign funds to purchase items as inconsequential as fast food, movie tickets, and golf outings; as trivial as video games, Lego sets, and Playdoh; as essential as groceries, utilities, and garage doors; and as self-indulgent as luxury hotels, overseas vacations, and designer face cream.

## 1. **Hunter's Statements and Likely Defense**

Hunter has denied knowingly misusing campaign funds.   As for his own expenditures, he has indicated that at trial he will maintain that he has been falsely accused of these charges (for "political" reasons).  Hunter has explained that if he has made any mistakes, it's that he "wasn't attentive enough to [his] campaign" – which is not a crime. He has maintained that his own expenditures of campaign funds had an appropriate fundraising or political purpose.  Significantly, Hunter has repeatedly stated that he had no knowledge of Margaret Hunter's admitted misuse of campaign funds.

But as explained next, each of the witnesses represented by Higgs describe facts that support the charges alleged in the indictment, and directly contradict Hunter's protestations of innocence.

## 2. **Bruce Young – Hunter's Campaign Treasurer**

Bruce Young became the Campaign Committee Treasurer for former Congressman Duncan L. Hunter in 1991.  He worked for the former Congressman on a volunteer basis for the next 16 years.  Throughout that time, he grew close to the Hunter family and came to know the younger Hunter well.  In 2007, Hunter announced that he would run for his father's seat in Congress.  At that time, Young agreed to continue in the role of campaign Treasurer (as well as the campaign's custodian of records) for the younger Hunter.  In this capacity, Young was responsible for preparing and filing all of Hunter's FEC reports and disclosures, until his "retirement" on February 1, 2013.

Each time Young filed an Federal Election Commission ("FEC") disclosure on behalf of the Hunter campaign, he was required to certify under oath to its accuracy and

truthfulness. Yet many of those reports are incontrovertibly false. As Young's testimony before the grand jury made clear, he reported various expenditures on FEC reports as legitimate campaign expenses, when in fact those representations were false. Young relied on false information provided to him by both Margaret and Duncan Hunter to make these incorrect disclosures. At trial, Young will testify about a host of specific instances in which he reported false information to the FEC based on false reports from Hunter himself.

Although he is a loyal friend to the Hunter family in general and to Duncan Hunter in particular, Young's testimony is most certainly adverse to Hunter's case. Among other things, Young has already testified that: (i) Hunter was very engaged in the financial aspects of his campaign – and, in particular, continually reviewed all the expenditures; (ii) Young told Hunter that Margaret was spending too much money on items that would raise a red flag with auditors who could review the FEC reports; (iii) Young had to threaten Hunter that he'd leave his post as Treasurer if Hunter did not take away Margaret's campaign credit card due to her "questionable" spending; (iv) Hunter hired Margaret as a salaried employee in 2011 and gave her a new campaign credit card – despite Young's advice that he should not do so; and (v) Hunter told Young that his $399 charge to the campaign credit card at Best Buy was a legitimate campaign expense consisting of the purchase of "ink, paper, and software Microsoft office for mac (for the mac air)."[1]

### 3. Sheila Hardison – Hunter's Campaign Fundraiser

In 1989, Hunter's father hired Sheila Hardison as his campaign manager. She worked with Hunter's father off and on through his Congressional career and his unsuccessful Presidential bid. When Hunter announced his candidacy for his father's seat, he asked Hardison to stay on as his fundraiser. She worked closely with both Hunters over the years, and considered the entire Hunter family to be her close friends. She retired from the campaign at the end of 2013, at which time Margaret took over her local duties.

---

[1] In reality, financial records reveal that this payment was for a Nikon CoolPix digital camera used to photograph the Hunter family on a personal vacation in Idaho. *See* Indictment, p. 18, ¶44.

Hardison's testimony before the grand jury is adverse to Hunter's interests in this case and contrary to his trial defense. Among various subjects, she testified that: (i) as early as 2010, she met with Hunter and Young to discuss Margaret's failure to provide information necessary to verify that her expenditure of campaign funds was proper; (ii) as early as 2010, Hunter was aware that Margaret was using her campaign credit card for personal expenses and that it was a crime to do so; (iii) Young often told Hunter that campaign funds could not be used for leisure outings at which the discussion occasionally focused on the campaign; (iv) Young continually raised the problem of Margaret's improper use of the campaign card with Hunter; (v) Hunter decided to hire Margaret back as his campaign manager even after he was made aware that she had been using campaign funds for personal expenses.

#### 4. Joseph Browning – Hunter's Congressional Field Representative

Joe Browning met Hunter's father and mother at a Chamber of Commerce meeting in early 1997. Around early 2003, Browning and Browning's wife agreed to join the elder Hunter's local congressional staff as, respectively, a "field representative" and an "office manager." Browning developed a close relationship with the entire Hunter family, including the younger Hunter. In January 2009, the younger Hunter, then in Congress, hired Browning to join his congressional staff as a field representative. In addition, Browning also took on the duty of being Hunter's driver in San Diego. Over time, Browning spent a great deal of time with Hunter (who treated Browning like an uncle) and became one of the highest paid employees in his congressional office.

Despite being Hunter's close confidant, Browning's testimony before the grand jury was adverse to Hunter's interests and trial defense. Among other things, Browning testified that: (i) Hunter did not have enough personal funds to pay for basic necessities and would not have access to personal funds in the "beginning of the month or middle of the month or end of the month;" (ii) the Hunters' personal finances were so poor that they couldn't afford to pay for their daughter's dance lessons; (iii) Hunter recognized that campaign funds could not be spent on social activities; (iv) Hunter traveled to Las Vegas and Idaho in June and

July 2015 for a family vacation and wedding;[2] and (v) Hunter traveled to Phoenix in January 2016 for his daughter's Irish dance competition, and visited Browning to "take a look at [his] retirement place" – but did not discuss any campaign business.[3]   Browning is also aware of additional adverse sensitive activity that runs the risk of improperly tainting the jury pool before the trial begins and so will not be detailed herein.

**B.**   **Berke Farah – Hunter's First Conflicted Defense Counsel**

On April 4, 2016, the FEC sent a letter to the then-treasurer of the Hunter Committee, Chris Marston (who had replaced Bruce Young), requesting clarification on campaign expenditures that had been reported as "Personal Expenses."   To respond to the FEC notice, the Hunter campaign engaged the law firm Berke Farah LLC ("Berke Farah").   Lead counsel Elliot Berke assisted Hunter in amending his campaign finance disclosures and reimbursing the campaign $60,000 for "unauthorized expenditures" it now deemed "personal in nature" or "without adequate support."   In this (and a related OCE) inquiry, Berke Farah also represented Marston and Marston's associate Brenda Hankins.

In mid-2016, the Federal Bureau of Investigation ("FBI") began its own independent criminal investigation examining whether the Hunters violated federal law by embezzling funds from the Hunter campaign.   In the face of the criminal investigation (which encompassed the same facts as the FEC and Office of Congressional Ethics ("OCE") inquiries), Berke Farah sought to continue its representation of Duncan Hunter – despite having previously represented the campaign's Treasurer (Hankins and Marston) as well as campaign manager Margaret Hunter.

---

[2] Financial records demonstrate that Hunter used at least $3,724 in campaign funds to pay for this family vacation, where they attended Hunter's nephew's wedding in Boise with a stopover in Las Vegas.  *See* Indictment, pp. 31-32, ¶128.

[3] At the time of the trip, Hunter reported to his chief-of-staff that he timed the trip so that he could hold a campaign "meeting with a [charity event] coordinator" in Arizona. Campaign records demonstrate that Hunter used at least $632 in campaign funds to pay for this social visit to Phoenix.  *See* Indictment, p. 37, ¶165.

When this conflict crystalized, the United States filed a motion to disqualify Berke Farrah from representing Hunter in light of the firm's prior representation of adverse witnesses.  The basis for this conflict was strikingly similar to the present situation: the Treasurer had falsely reported various charges on FEC reports as legitimate campaign expenses – based upon false information provided by the Hunters.  This presented a real and actual conflict because it placed Berke Farah in the intolerable position of having to cross-examine at least two of the firm's *prior* clients in order to defend their *present* client.

In other words, this is the second time the United States has been compelled to alert the Court to a conflict of interest that jeopardized the fairness and finality of the proceedings.  When the conflict issue first arose in 2017, Hunter's counsel initially refused to acknowledge any actual conflict and argued—if one existed—it could be cured by waivers.  Ultimately, however, counsel abandoned their efforts to represent Hunter and withdrew from any further representation of Hunter *or* the adverse witnesses.  Hunter's defense team has thus long been aware of the perils of multiple representation.

## C.    Higgs Fletcher & Mack's Representation of Witnesses

On February 23, 2017, the same day the FBI executed search warrants in relation to its criminal investigation, agents interviewed Bruce Young at his home and served him with a grand jury subpoena for records and testimony.  A few days later, agents served Sheila Hardison with a grand jury subpoena that similarly called both for her testimony and a variety of documents related to her work on the Hunter campaign.  (Ms. Hardison declined to speak with the agents until she had consulted with an attorney.)

On March 3, 2017, Higgs partner John Rice contacted government counsel and indicated that he had been retained to represent both Young and Hardison.  Mr. Rice spoke to the government about the production of documents in response to the subpoenas issued to Young and Hardison.  In addition, he agreed to make his clients available for interviews in advance of any grand jury appearance.  Government counsel provided its view, based on the evidence available at that time, that it did not appear a conflict existed that would prevent Higgs from representing both Young and Hardison—and noted that both Young and

Hardison were believed to be subject/witnesses and not targets of the ongoing federal investigation into potential improper spending by the Hunter campaign.

In the following weeks and months, Mr. Rice—using his Higgs email address, Higgs staff, and Higgs offices—engaged in ongoing discussions with his clients and government counsel about their production of records to the grand jury and expected testimony.  He collected and reviewed volumes of records with his clients before making them available to the government to retrieve from Higgs' office space.[4]

On July 31, 2017, the FBI served Joe Browning with a grand jury subpoena that called for both his testimony and documents.  On August 1, 2017, Mr. Rice called government counsel and informed them that that he would also be representing Joe Browning.  Once again, government counsel indicated the additional representation did not appear to present a conflict, as Browning was considered a subject/witness in the case and did not appear to have interests adverse to Higgs' other clients.  As with Young and Hardison, Mr. Rice worked with Browning to collect volumes of responsive records for the grand jury, review those records before providing them to the government, and discuss the scope of the production with government counsel.

Mr. Rice made all three of his clients available for interviews with the government.  On October 25, 2017, Mr. Rice accompanied Young to the U.S. Attorney's Office for a several-hour interview with the government.  On January 22, 2018, Mr. Rice accompanied

---

[4] For example, on March 21, 2017, the FBI picked up Hardison's initial responsive production (containing approximately 3,900 documents) from Higgs' San Diego office. Later that same day, government counsel sent an email to Mr. Rice noting that there was a folder in Hardison's production marked "legal" and requesting that he confirm that there were no privileged documents inadvertently included in this folder.  Mr. Rice promptly replied that he had "reviewed all of those documents with [his] client" and he did not believe there was anything that was privileged.  Similarly, on March 29, 2017, Mr. Rice provided approximately 8,500 emails and approximately 2,300 campaign documents on behalf of Bruce Young.  In discussions with government counsel regarding these documents, Mr. Rice made it clear that he had also reviewed them prior to delivering them to the government.

Browning for a several-hour interview with the government. On January 29, 2018, Mr. Rice accompanied Hardison for an hours-long interview with the government. And, on February 12, 2018, he accompanied Young for a follow-up meeting. During each of these in-depth interviews, Mr. Rice participated in the interview process and provided his clients with advice from time to time—both within and outside the presence of government counsel.

In addition to these interviews, Mr. Rice represented each of the witnesses before, during, and after their respective grand jury appearances in January and February 2018. On each occasion, Mr. Rice remained outside the grand jury room to offer guidance to each of his clients, if needed.[5] On August 21, 2018, relying on evidence that included the testimony of Young, Hardison, and Browning, the grand jury returned a 60-count indictment charging both Duncan and Margaret Hunter with conspiracy, wire fraud, falsification of records related to campaign finance, and prohibited use of campaign contributions.

**D.      Higgs Fletcher & Mack's Representation of Hunter**

On October 17, 2019, defense counsel informed the United States that Paul Pfingst intended to enter the present litigation as Hunter's trial counsel.[6] Government counsel immediately noted its concern regarding a conflict of interest due to Higgs' previous and continued representation of the three adverse witnesses expected to testify at Hunter's trial. In response, Mr. Pfingst noted his belief that his participation was sanctioned by California Rule of Professional Conduct 1.7. In addition, he explained that his retainer agreement with

---

[5] Publicly available FEC filings reveal that Hunter's campaign has paid Mr. Rice (through Higgs) $20,000 thus far for representing the firm's three witness clients. They reveal (through September 2019) no such payments for Mr. Pfingst.

[6] Following a Status Hearing on October 7, 2019, at which attorneys Gregory Vega and Devin Burstein represented Hunter along with additional attorneys from Mr. Vega's firm Seltzer Kaplan, Mr. Burstein alluded to the possibility that Mr. Pfingst could be joining the defense team. He indicated that this information should be kept confidential as it was unclear at that time whether Pfingst would, in fact, join Hunter's trial team. He agreed to alert the government when, and if, such an event occurred. Defense counsel further indicated that the addition of new counsel would not affect the defense's readiness to proceed to trial as scheduled on January 22, 2020.

Hunter included a waiver of any conflicts, and that he believed Mr. Rice intended to provide (but had not yet provided) notice (but not a waiver) to his clients.  Government counsel indicated that they would study the California Rule and look at the applicable state and federal law.

On October 18, 2019, government counsel discussed with Mr. Pfingst the facts as the government understood them.  In short, that: (i) Higgs partner John Rice has represented three witnesses in this investigation since at least March 2017; (ii) throughout his representation Mr. Rice has met with his clients on a number of occasions and has provided and received confidential communications; and finally (iii) throughout his years-long representation of these witnesses, Mr. Rice and Mr. Pfingst were both partners at Higgs Fletcher & Mack.  Government counsel repeatedly sought guidance from Mr. Pfingst and Hunter's counsel as to whether the facts laid out were correct.

Defense counsel's only stated disagreement with the facts was their claim that the witnesses had not disclosed client confidences to Mr. Rice "that could adversely impact [Mr. Pfingst]'s ability to zealously represent Congressman Hunter."[7]  The defense further argued that any conflict was "waivable" as the witnesses represented by Higgs were not actually "adverse" to Hunter's position.  The government disagreed, noting that simply because a particular witness may feel friendly or sympathetic towards a defendant, or even make themselves available to meet with the defense, their interests can still be (and in this case are) "adverse" — because the witnesses would testify in ways contrary to Hunter's interests and contrary to his likely trial defenses.

---

[7] This position only highlights the conflict inherent in Higgs' simultaneous representation of Hunter and the three adverse witnesses.  Without having access to the very confidential communications they describe, it is difficult to understand how Mr. Pfingst could determine whether those client confidences were or were not of a nature that "could adversely impact" Higgs' ability to effectively represent Hunter.  It appears that Mr. Pfingst has either already gained access to client confidences of these witnesses (which would be troubling to say the least); or more likely, is simply speculating about the type of confidences those witnesses have disclosed to Mr. Rice.  If it is the latter, it simply underlines the intractable nature of this actual conflict.

Accordingly, the government indicated its belief that Higgs faces an actual, unwaivable conflict that bars Mr. Pfingst's participation in the case as Hunter's trial counsel. In the following days, Mr. Pfingst and Hunter's appellate counsel also suggested that a conflict could be cured with an appropriate appellate waiver that would "protect the government's interest in finality, while honoring the Congressman's constitutional right to select his counsel." Throughout these discussions, defense counsel indicated that any effort by the government to raise its conflict concerns with the court (that would result in Mr. Pfingst's disqualification) could cause the defense to seek a continuance of the trial date.

On October 28, 2019, before Mr. Pfingst entered a notice of appearance, Mr. Burstein emailed all counsel (including Greg Vega) indicating that the government's "efforts to disqualify Paul [Pfingst] are likely to further delay this case." Mr. Burstein claimed, "[i]f he is removed at this point, the defense cannot be prepared by the original trial date." In response, government counsel noted that they were compelled to raise the issue to protect the verdict and would not "modify [their] position because it might make [their] lives easier." On October 28, 2019, more than 31 months after first representing witnesses against Hunter and less than 3 months before trial, Mr. Pfingst and Higgs filed a notice of appearance seeking to represent Hunter at trial.[8]

## III

## LEGAL DISCUSSION

Supreme Court, Ninth Circuit and California precedent require this Court to disqualify the law firm of Higgs Fletcher & Mack from simultaneously representing Hunter and three key government witnesses. These witnesses have already testified adversely to Hunter in the grand jury and are expected to do so again at trial. The adverse nature of their

---

[8]   Throughout this time, Mr. Rice has continued his representation of Young, Hardison, and Browning. In fact, on October 23, 2019, government counsel met with Mr. Rice for a pre-scheduled "prep" session to review Young's anticipated trial testimony. This meeting had been scheduled since October 2, 2019, before government counsel knew anything of Mr. Pfingst's appearance in this case. Following the meeting, Mr. Rice indicated he would contact both Hardison and Browning to schedule their pre-trial "prep" sessions.

testimony prevents Higgs from simultaneously representing Hunter at trial because it presents an *actual* conflict of interest, which cannot be cured by waiver or other voluntary measures.

**A.     An Actual Conflict Exists as Multiple Higgs Clients have Provided Adverse Testimony in the Present Proceeding**

Individuals with "adverse" interests include parties and witnesses who testify in ways that harm or could harm that party's interest in the litigation.  Put simply, an actual conflict of interests occurs if the parties' interests diverge with respect to a material factual or legal issue or course of action.  *See Cuyler v. Sullivan*, 446 U.S. 335, 356 n.3 (1980) (Marshall, J., concurring in part and dissenting in part); *see also Mickens v. Taylor*, 535 U.S. 162, 166-69 (2002).

This conflict is particularly acute in a criminal case where a witness is called by the government to give testimony against the defendant. *See e.g., United States v. Henke,* 222 F.3d 633, 636 (9th Cir. 2000) (per curiam)  (lawyer's simultaneous representation of both a defendant and a government witness may constitute an actual conflict of interest); *United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir. 1994) ("an attorney has an actual conflict of interest…when he has previously represented a person who will be called as a witness against a current client at a criminal trial"); *United States v. Lorenzana-Cordon*, 125 F. Supp. 3d 129, 135 (D.D.C. 2015) (the simultaneous representation of a defendant and a witness testifying against the defendant creates an actual conflict of interest); *United States v. Daugerdas*, 735 F. Supp. 2d 113, 116 (S.D.N.Y. 2010) ("[T]he unusual circumstance of a law firm seeking to simultaneously represent a defendant and a cooperating witness in the same criminal proceeding…creates a clear conflict of interest.").

Here, the three Higgs witness-clients all testified in the grand jury and provided damaging testimony adverse to Hunter's defense.  Although it is impossible to predict with any certainty the multitude of potential conflicts that may arise at trial, it is easy to illustrate a few actual conflicts that have *already emerged* from the witnesses' grand jury testimony.

12

Hunter's first Treasurer, Bruce Young, indicated in the grand jury that he was an active (if unwitting) participant in the charged crimes.  Among other duties, he filed numerous FEC forms containing false entries, which disguised tens of thousands of dollars in embezzled campaign funds.  Young's testimony shows that he was essentially an unwitting scribe, who believed and reported the information given to him by the Hunters about what he trusted were appropriate campaign expenses.  To the extent that Young made false entries in the FEC forms, it was only because he was given false information by both Margaret and Duncan Hunter.  This testimony is squarely adverse to Hunter, and therefore, highlights an actual conflict requiring recusal.

Even more troubling, Young (along with Hunter's fundraiser, Sheila Hardison) put Hunter on notice about Margaret's questionable, inappropriate expenditures—in sharp contrast to Hunter's claim that he was unaware of countless illegal expenditures admitted by his wife.  This testimony is especially damaging as Hunter's only defense to the conspiracy charged in Count 1 is to claim that he was unaware of—and did not assist—his wife's criminal conduct.  Such a defense, though, is entirely incompatible and squarely adverse to Hardison's testimony that Hunter was aware that Margaret (as early as 2010) was using her campaign credit card for personal expenses ***and that it was a crime to do so***.  Despite this knowledge of Margaret's improper spending, Young testified that Hunter allowed Margaret to keep her campaign credit card (even when she didn't have an official role with the campaign) and despite Young's advice that it be taken away.

Hunter's Congressional Field Representative and personal driver, Joe Browning, among other things, testified about Hunter family vacations (where the Hunters spent thousands of dollars in campaign funds).  One of these vacations was a trip to Hunter's daughter's Irish dance competition in Phoenix, Arizona.  At the time of the trip, Hunter reported to his chief-of-staff that he timed the trip to facilitate a campaign "meeting with a [charity event] coordinator" [Browning] in Arizona.  Hunter's report is in direct conflict with Browning's testimony, in which he stated that the purpose of his Arizona meeting was

13

not to conduct charitable or any other business with Hunter, but rather for Hunter to "take a look at [Browning's future] retirement place."

It is hard to imagine more adverse, incompatible testimony than that offered by these three witnesses. Even without the ability to foresee all the many possible "nascent conflicts of interest [which] are notoriously hard to predict," this Court is not forced to stare "though a glass, darkly." *See United States v. Wheat*, 486 U.S. 153, 163-64 (1988) (quoting 1 Corinthians 13:12 (KJV) ("For now we see through a glass, darkly; but then face to face: now I know in part; but then shall I know even as also I am known.")). To the contrary, this Court *can* turn its gaze to clear grand jury testimony, which establishes that Hunter is faced with multiple, *actual* present conflicts of interest that are palpable even before trial commences.

## B.    The Presence of an Actual Conflict Requires Disqualification of Counsel.

The only appropriate solution in the face of these actual conflicts is disqualification of counsel. It is simply inappropriate for defense counsel to cross-examine a former (or worse, a current) client who has testified adversely to the defendant's interests. As indicated, the United States has been unable to find a single case in which a court approved of a law firm simultaneously representing both a defendant and a key witness in a criminal trial who had already testified adversely to the defendant during the same proceeding.

In *Wheat v. United States*, the Supreme Court affirmed the disqualification of counsel that faced a *potential* conflict. 486 U.S. 153 (1988). Defendant Marc Eric Wheat and a number of codefendants were charged with participating in a far-flung drug distribution conspiracy. One attorney represented two of Wheat's codefendants – one in a separate trial and one during a plea. Prior to his own trial, Wheat sought to retain that same attorney to represent him. The government objected, arguing that one or both of those codefendants could potentially be called as witnesses during Wheat's upcoming trial, and therefore that the attorney had a conflict of interest. *Id.* at 155-57.

Wheat argued (both in the trial court and on appeal) that there was no actual conflict because: (1) the potential witnesses' testimony was not actually adverse to his defense; and

(2) both Wheat and the potential witnesses had waived any right to object to any conflicts that arose. *Id.* at 155. The trial court disagreed, and the Supreme Court affirmed. In dismissing Wheat's claim that the witnesses were not really adverse (and did thus not present an "actual conflict"), the Court observed that to justify the disqualification of counsel, the trial court needed to find only "a showing of a serious potential for conflict." *Id*. at 163-64; *see also id*. at 161-62 (affirming the rejection of Wheat's proffered waiver and holding that "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver").

Here, the conflict is even starker as it is not merely "potential," but "actual." *See also Luis v. United States*, 136 S. Ct. 1083, 1089 (2016) (defendant has no right to attorney "who has a conflict of interest due to a relationship with an opposing party."). In these circumstances, counsel laboring under the presence of an actual conflict *must* be disqualified—as the Ninth Circuit has repeatedly found. *See e.g., United States v. Henke,* 222 F.3d 633, 636-38 (9th Cir. 2000) (per curiam) (conviction reversed because defense counsel could not ethically cross-examine government witness who formerly belonged to joint defense agreement); *United States v. Stites*, 56 F.3d 1020, 1025 (9th Cir. 1995) (upholding disqualification of attorney who sought to represent the codefendant of her former client because "[s]he was bound by her duty to her former client not to enter into a relation where she would, almost by necessity, have to draw on knowledge she had obtained in the earlier relationship"); *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992) ("prejudice is presumed if the alleged violation is based on an actual conflict of interest"); *United States v. Kenney*, 911 F.2d 315, 321 (9th Cir. 1990) (the mere potential for a conflict of interest at trial level is sufficient to justify disqualification); *United States v. Wheat* 813 F.2d 1399, 1402 (9th Cir. 1987), *aff'd*, 486 U.S. 153 (1988), hereinafter *"Wheat (9th Cir)"* (attorney disqualified because he "could have misused those communications in cross-examining" his former clients, now government witnesses); *Trone v. Smith,* 621 F.2d. 994, 998-99 (9th Cir. 1980) ("Both the fact and the appearance of total professional commitment are endangered by adverse representation in related cases."). *See also Lockhart v. Terhune*,

15

250 F.3d 1223, 1226 (9th Cir. 2001) (even if the clients' interests are not inherently adverse, the likelihood that an attorney will have to divide his loyalties may create a serious *potential* conflict warranting disqualification).[9]

Other circuits agree: when an actual conflict exists, the attorney or the law firm with the conflict must be disqualified. *See e.g.*, *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996) (upholding disqualification of counsel who would have had to cross examine a former client who was a significant potential witness); *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) (upholding disqualification based upon prior representation of a government witness); *United States v. Moscony*, 927 F.2d 742, 747-48 (3d Cir. 1991) (upholding disqualification because defense counsel could not zealously represent current client through cross-examination while maintaining confidences of former client); *United States v. Kelly*, 870 F.2d 854, 857 (2d Cir. 1989) (holding defense counsel's prior representation of government witness prevented the necessary vigorous cross-examination); *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1987) (observing that attorney who cross-examines former clients inherently encounters divided loyalties); *United States v. Martinez*, 630 F.2d 361, 362 (5th Cir.1980) ("[w]hen an actual conflict of interest exists, the client is denied effective assistance of counsel, and the attorney may be disqualified); *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1318 (7th Cir. 1978) (district court reversed for failing to disqualify attorney as disclosure of confidential information to one attorney should be imputed to entire law firm).[10]

---

[9] In *United States v. Penn*, No. 16CR1695-BEN, 2017 WL 4077253, at *2 (S.D. Cal. Sept. 14, 2017), Judge Benitez was recently faced with the question of whether to disqualify defense counsel who sought to simultaneously represent both a defendant and a government witness who could potentially testify against defendant at trial. Despite the presence of waivers, Judge Benitez disqualified counsel simply because of the potential that an actual conflict could develop as the defendant might find it was in his best interests "to discredit the testimony" of the witness at trial.

[10] California state law also supports the principle that when a single law firm represents clients with conflicting interests, "disqualification follows automatically" when

16

## C. An Actual Conflict Cannot Be Cured

An actual conflict cannot be cured by obtaining waivers, an ethical wall, substitute counsel, or other voluntary measures.

### 1. A Waiver is Insufficient

It is extremely difficult for a trial court to ensure that clients have knowingly and voluntarily waived actual conflicts of interest; for this reason, such waivers are routinely rejected. *Wheat*, 486 U.S. at 162 ("[W]here a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that the defendants be separately represented."). Conflicts are often very difficult for even an experienced attorney (much less his client) to appreciate, particularly because trial strategy must be fluid. *Id*. at 162-63 (predicting conflicts is notoriously hard even for those thoroughly familiar with criminal trials); *United States v. Stewart*, 185 F.3d 112, 121-22 (3d Cir. 1999) (court disapproved waivers, observed that trial strategy was not fixed, and disqualified law firm from representing defendant and multiple government witnesses); *United States v. Garafola*, 428 F. Supp. 620, 623 (D.N.J. 1977) ("The average defendant cannot possibly understand fully and completely the extent to which his counsel's trial strategy may be affected by his representation of other[s]."). The Ninth Circuit has also

---

"the representation is simultaneous and involves parties involved in the same litigation." *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc*., 20 Cal. 4th 1135, 1147 (1999) (finding that more stringent per se rule applies where law firm simultaneously represents clients with conflicting interests). *See also Flatt v. Superior Court*, 9 Cal. 4th 275, 284 n.3 (1994) ("The most egregious conflict of interest is representation of clients whose interests are directly adverse in the same litigation."). Indeed, state courts have gone so far as to observe that "it would be unthinkable to permit an attorney to assume a position at a trial or hearing where he could not advocate the interests of one client without adversely injuring those of the other." *Klemm v. Superior Court*, 75 Cal. App. 3d 893, 898 (Cal. Ct. App. 1977) (cited by Cal. Rules of Prof'l Conduct R. 1.7, cmt. 8). *See also William H. Raley Co., Inc. v. Sup.Ct. (Carroll)* 149 Cal. App. 3d 1042, 1049-50 (Cal. Ct. App. 1983) (a member of a law firm shall not knowingly represent a client when any of them practicing alone would be prohibited from doing so).

recognized that attorneys "may not be totally disinterested" when seeking waivers from their clients. *Wheat (9th Cir.)*, 813 F.2d at 1403. Indeed, "the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them[.]" *Wheat*, 486 U.S. at 163.[11]

The Supreme Court and the Ninth Circuit have rejected waivers in cases with conflicts less troublesome than those presented here. *See United States v. Rewald*, 889 F.2d 836, 857 (9th Cir. 1989) (defendant's waiver of conflict is not dispositive; potential for conflict is determinative) *amended*, 902 F.2d 18 (9th Cir.), *cert. denied*, 498 U.S. 819 (1990).[12] Moreover, Hunter cannot prospectively waive his ability to seek review or collateral attack based on a later claim that his actually-conflicted counsel provided ineffective assistance at trial. *See Rojas v. United States*, No. 17CR337-LAB, 2019 WL 183850, at *2 (S.D. Cal. Jan. 14, 2019) ("[A] waiver cannot bar a claim that relates to the validity of the waiver itself, such as ineffective assistance of counsel" (citing *United States v. Pruitt*, 32 F.3d 431, 433 (9th Cir. 1994)); *see also United States v. Abarca*, 985 F.2d 1012,

---

[11] Conversely, the unwillingness of a client to waive a conflict could be attributable to the fact that the defendant (Hunter's campaign, in this case) is paying for their attorney.

[12] *See* also *Lockhart v. Terhune*, 250 F.3d 1223, 1232-33 (9th Cir. 2001) (reversing conviction because of ineffective waiver of conflict); *Mannhalt v. Reed*, 847 F.2d 576, 581 (9th Cir. 1988) (holding that defendant did not knowingly or intelligently waive conflict of interest); United States *v. Allen*, 831 F.2d 1487, 1502 (9th Cir. 1987) (same); *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994) (upholding district court's refusal to accept waiver because of "several actual or potential conflicts of interest"); *United States v. Montevecchio*, 645 F. Supp. 497, 499 (W.D. Pa. 1986) ("[T]here is no way in which a defendant can make a valid waiver of the potential conflict. It is well-settled that judges can never fully explain to a defendant (especially one in which the complex is so palpable) all of the permutations and combinations of circumstances of the evidence to be presented"); *United States v. Arnold*, 913 F. Supp. 348, 351 (E.D. Pa. 1995) (refusing to take waiver because court could not "begin to project all of the possible conflicts which may arise"); *United States v. Calabria*, 614 F. Supp. 187, 193 (E.D. Pa. 1985) (refusing to accept waiver because defendant "is not aware of the foreseeable prejudice his attorney's continued representation will entail for his trial and the possible detrimental consequences of those prejudices").

1014 (9th Cir. 1993) (expressly declining to hold that a waiver forecloses a claim of ineffective assistance or involuntariness of the waiver).

Any waiver here would be doubly inappropriate given Higgs' lengthy representation of multiple grand jury witnesses, who are also currently represented during trial preparation. Higgs was privy to years' worth of confidential disclosures by these clients. The firm oversaw the production of thousands of documents during the grand jury proceedings and assisted in the preparation of extensive grand jury testimony. Indeed, during meetings with Higgs and its witness-clients, government counsel was asked to leave the room from time to time to allow Mr. Rice to speak to his clients in private. In this situation, it is difficult to believe that Mr. Rice has obtained no confidential information during this process.

Moreover, even if Young, Hardison, and Browning did not share confidential information with Higgs as part of their attorney-client relationship, the fact that they have already testified in the same criminal case is sufficient to warrant disqualification. *United States v. Koon*, 34 F.3d 1416, 1437 (9th Cir. 1994) ("[E]ven if there is no sharing of confidences, the substantial relationship between the two representations is itself sufficient to disqualify.") (internal quotation marks omitted)) *rev'd in part on other grounds by Koon v. United States*, 518 U.S. 81 (1996). Given the longstanding relationship with key government witnesses possessing actual conflicts with Hunter, disqualification is the only appropriate option.

## 2.    An Ethical Wall is Ineffective

Lawyers associated in a firm are generally prohibited from representing a client when any one of them practicing alone would be prohibited from doing so. Cal. Rules of Prof'l Conduct R. 1.10; *see also Trone*, 621 F.2d at 999 n.4 ("Once the attorney is found to be disqualified, both the attorney and the attorney's firm are disqualified[.]"); *Paul E. Iacono Structural Eng'r, Inc. v. Humphrey*, 722 F.2d 435, 442 (9th Cir. 1983) (holding that "entire law firm must be disqualified when of its members was counsel for an adverse party"). It does not matter whether confidential information was actually shared between the law firm partners: "the firm as a whole is disqualified whether or not its other members were actually

exposed to the information."[13] *Trone*, 621 F.2d at 999. *See also United States v. Kitchin*, 592 F.2d 900, 904 (5th Cir. 1979) (if one attorney in a firm has an actual conflict of interest due to disclosure of information, the conflict is imputed to all the attorneys in the firm, subjecting the entire firm to disqualification).

Thus, any effort by Higgs to distinguish the firm's simultaneous representation of adverse parties by "walling off" partners Mr. Rice and Mr. Pfingst from one another is fruitless. *See Stites*, 56 F.3d at 1020 (upholding decision to reject defense counsel's ethical wall because arrangement was "an unusual arrangement, almost impossible to monitor," as the ethical "wall might have crumbled"); *Iacono*, 722 F.2d at 442 (finding no evidence of a sufficient ethical wall where the firm could show no measures "to avoid either inadvertent or intentional disclosure" of information about the case, and only argued that the disqualified attorney never worked on the case and never entered an appearance); *see also Concat LP v. Unilever, PLC*, 350 F.Supp. 2d 796, 821-22 (N.D. Cal. 2004) (the fact that firm "instituted screening procedures or an 'ethical wall' to prevent a breach of confidentiality is irrelevant in concurrent representation cases").

Even if such a solution could once have been possible, the time for any effective wall has long passed. Higgs has represented the three witnesses since early 2017, when the firm was first exposed to client confidences. Unless Mr. Pfingst and any additional partners, associates, paralegals, legal assistants, and other members of the defense team had been formally and effectively screened off *at that early date* from any knowledge of the investigation, establishing an ethical wall would be of no value now. *See, e.g.*, *Western Sugar Coop. v. Archer-Daniels-Midland Co.*, 98 F.Supp.3d 1074, 1090 (C.D. Cal. 2015)

---

[13] This doctrine has led to the disqualification of an entire law firm where one "of counsel" lawyer had previously worked for the law firm representing an opposing party—even though that "of counsel" lawyer did not participate in the litigation at his new firm. *Atasi Corp. v. Seagate Tech.*, 847 F.2d 826 (Fed. Cir. 1988) (interpreting and applying Ninth Circuit law).

("[B]elated ethical walls and separation of documents cannot restore [client's] legitimate expectation of loyalty.")

### 3. **Limits on Cross-Examination are Improper**

Limits on the scope of the conflicted attorney's questioning or reliance on separate trial counsel to conduct cross-examination of adverse witnesses is equally insufficient to address conflicts like those present here. Any cross-examination raises "the possibility of an unwitting disclosure of confidential communications." United States v. Baker, 10 F.3d 1374, 1399 (9th Cir. 1993).

Federal courts routinely reject proposals to use substitute lawyers to maneuver around the conflict problem. *Calabria*, 614 F. Supp. at 193 (refusing to accept defense counsel's predicted limits on cross-examination of former client because trials are unpredictable and the tactic "puts the lawyer's concerns ahead of the defendant's needs and then shapes the defendant's needs to eliminate the attorney's problems created by a direct conflict of interest"). As one court explained in rejecting this proposal, "we are not sure that this will be quite the miracle cure that [the defense attorney] seems to think it will be." *United States v. Sanders*, 688 F. Supp. 373 (N.D. Ill. 1988). Similarly, in *United States v. Cheshire*, 707 F. Supp. 235 (M.D. La. 1989), the court refused to allow a defense attorney to use substitute counsel when he had formerly represented a key government witness. *Cheshire*, 707 F. Supp. at 240 (observing that defendant's attorney "must be completely free and unfettered to analyze, characterize and repudiate the testimony of his former client in closing argument" and "it as an almost impossible task for a lawyer to participate throughout the course of a trial but not suggest a single question or style of cross examination[.]").

The court should not facilitate Hunter's attempts to skirt important ethical rules and allow counsel to shape Hunter's and Higgs' needs in an Rube Goldberg-esque effort to avoid the problem of Mr. Pfingst's actual conflict. A fair balancing of "considerations of judicial administration against the right to counsel" must result in Mr. Pfingst's disqualification in face of his actual conflict of interest. *United States v. McDade*, 404 Fed.

Appx. 681, 684 (3d Cir. 2010) (affirming trial court's decision to disqualify counsel because his law partner had previously represented a potential government witness).

**D.      The Duty of the Court to Guard Against Actual Conflicts**

The disqualification of conflicted counsel protects important rights of defendants, witnesses, and the public to fair, loyal representation and transparent proceedings with reliable verdicts.  First and foremost, these principles protect criminal defendants.  The Supreme Court has long counselled that courts be vigilant in addressing conflicts, as their existence may result in an attorney's assistance being deemed ineffective.  *See, e.g., Strickland v. Washington*, 466 U.S. 668, 692 (1984).  As a result, the trial court has an independent duty to ensure that criminal defendants receive a trial that is free from conflicts of interest that would contravene the Sixth Amendment.  *See Wheat v. United States*, 486 U.S. 153, 161 (1988); *Holloway v. Arkansas,* 435 U.S. 475, 484-85 (1978); *see also* Fed. R. Crim. P. 44(c) (discussing the court's duty to inquire into conflicts involving joint representation).  Accordingly, when considering whether to disqualify an attorney, "any doubt is to be resolved in favor of disqualification."  *See Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir. 1975).

Second, these principles also protect important rights of witnesses and clients.  If a lawyer were allowed to "change sides," it would prevent that witness from communicating fully and freely with his or her lawyer.  *Trone*, 621 F.2d at 998-99.  "[T]he fact and the appearance of total professional commitment are endangered by adverse representation in related cases."  *Id.*; *see also Thomas v. Mun. Ct. of Antelope Valley Judicial Dist. of Cal.*, 878 F.2d 285, 289 (9th Cir. 1989) ("The interest to be preserved by preventing attorneys from accepting representation adverse to a former client is the protection and enhancement of the professional relationship in all of its dimensions.").

Finally, these principles protect the integrity of the judicial process and public confidence in fair and equitable proceedings.  "[C]ourts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  *Wheat*, 486 U.S. at 160.  Courts

thus may deny a defendant his "choice" of a conflicted attorney in order to maintain the integrity of the judicial system. *Id.* at 162; *see also Stewart*, 185 F.3d at 122 ("[T]he trial court has an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver[.]") (quotation omitted).

Hunter has repeatedly attacked the integrity of this judicial proceeding, in general, and the motivations of the Department of Justice, in particular. Although this might be fair game whenever an elected official is indicted for corruption, it is critical that the public have no reason to call into question the legitimacy of the jury's verdict – whether it be guilty or not guilty. Further, the Court should prevent the perception that Hunter is permitted to use his position and resources to secure counsel who offers unfair access to the private thoughts of witnesses he will be called to cross examine. The public's confidence in the proceedings and the outcome must not be placed in jeopardy.

## IV

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court disqualify Mr. Pfingst and the law firm Higgs Fletcher & Mack from any further representation of Duncan Hunter.

DATED: November 11, 2019.

Respectfully submitted,

DAVID LESHNER
Attorney for the United States

*Phillip L.B. Halpern*
EMILY W. ALLEN
W. MARK CONOVER I
PHILLIP L.B. HALPERN
Assistant U.S. Attorneys