DAVID D. LESHNER
Attorney for the United States
Acting under Title 28, U.S.C. Section 515
EMILY W. ALLEN (CA Bar No. 234961)
W. MARK CONOVER (CA Bar No. 236090)
PHILLIP L.B. HALPERN (CA Bar No. 133370)
Assistant United States Attorneys
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-6964
Email: Phillip.Halpern@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> DUNCAN D. HUNTER (1), <br><br> Defendants. | Case No. 18CR3677-W <br><br> **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S LATEST MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO RECUSE THE UNITED STATES ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF CALIFORNIA** <br><br> DATE: March 17, 2020 <br> TIME: 9:00 AM <br> COURT: 3C (Schwartz) <br><br> HON. THOMAS J. WHELAN |

In his latest filing, Hunter resurrects an argument previously denied by this Court involving a routine invitation by the Secret Service to attend an event at which the agency provided protective service.   Once again, though, he fails to establish a rational basis for the Court to conclude that his indictment (for which he has pled guilty and accepted responsibility) was motivated by anything other than legitimate prosecutorial considerations.   As such, Hunter's motion should again be denied by this Court.

# I.

## STATEMENT OF FACTS

A.    The Secret Service Fundraiser

In August 2015, the U.S. Secret Service extended a routine invitation to three career federal prosecutors (including then-Assistant U.S. Attorney Emily Allen and then-Chief of the Criminal Division Alana Robinson) to attend an event at which the agency was providing protective service. The event, held at a private home, was a breakfast fundraiser for then-candidate for President, Hillary Clinton. The AUSAs' attendance was spurred and initiated entirely by the Secret Service. The federal prosecutors were not there as supporters for Candidate Clinton. Attorney Gregory A. Vega—who later would represent Hunter in this criminal case—attended the event as a paying contributor. During the event, he spoke at length with the AUSAs who attended, and learned that the Secret Service had invited their attendance.

This invitation was not unusual. For years, similar invitations to attend gatherings and events on both sides of the political spectrum had been extended throughout "the entire country without regard to political affiliation." *See* Hunter Motion Transcript (Dkt. 76) at 11; Government's June 2019 Response and Opposition (Dkt. 68) at 2. Indeed, the Secret Service regularly asks federal prosecutors around the country to attend such events as part of its "long standing practice of facilitating photograph opportunities [photo ops]." *Id.*[1]

B.    Initiation of the Federal Investigation into Hunter's Campaign

Eight months later, on April 4, 2016, the Federal Election Commission ("FEC") sent a letter to Duncan D. Hunter's campaign Treasurer asking for clarification about two categories of expenses that had been disclosed in required FEC filings as "personal expenses – to be paid back." The FEC letter was first picked up by The San Diego *Union-Tribune*

---

[1]  As previously noted, the Secret Service's rationale for the invitation (including the photo opportunity) had been highly publicized, was well-recognized by all parties, and reiterated in the United States' prior pleading on this issue. *See e.g.*, The San Diego Union-Tribune, *Secret Service explains why San Diego prosecutors were invited to Clinton fundraiser* (August 24, 2018).

and swiftly resulted in an avalanche of public revelations regarding Hunter's expenditures as enterprising reporters sifted through years of the Hunter campaign's publicly-filed FEC reports. Following up on these reports, Citizens for Responsibility and Ethics in Washington ("CREW") sent a letter to the Office of Congressional Ethics ("OCE") requesting an investigation into Hunter's FEC filings.[2]

Following the public release of CREW's letter, AUSA Phillip L.B. Halpern (then-Chief of this Office's Major Frauds and Special Prosecutions Section) informally discussed the possibility of opening up an investigation into potential improper spending by Hunter's campaign with FBI Special Agent Erin Phan. In turn, Agent Phan discussed this possibility with her boss, then-FBI Supervisory Special Agent ("SSA") Joey Mignon (who was then in charge of San Diego Field Office's Public Corruption squad). Agents Phan and Mignon determined that the matter warranted additional review.

In early May 2016, Special Agent Phan informally discussed a possible investigation into the Hunter campaign with Richard Pilger, the Director of Elections Crimes at the Department of Justice. Based upon her description of the investigation, Pilger suggested that Special Agent Phan take the required steps to officially open up the investigation. Agent Phan relayed this suggestion to SSA Mignon.

On May 18, 2016, SSA Mignon contacted AUSA Halpern to discuss the United States Attorney's office willingness to open an investigation into Hunter's campaign spending. After discussing the various allegations contained in the CREW letter, Halpern indicated that the matter warranted opening an official investigation. SSA Mignon

---

[2] CREW's 11-page letter detailed how Hunter's campaign had already acknowledged impermissibly spending more than $10,000 on personal expenses. The letter then went on to note an array of other suspicious expenditures, including: (1) thousands of dollars in payments to hotels and restaurants in Rome, Florence, and Positano – as well as other suspect travel costs; (2) a payment to a jewelry store in Florence; (3) payments to a beach resort in Lahaina, Hawaii; (4) a $1,137 charge to the Center for Oral & Facial Surgery; (5) Cox internet bills; (5) various retail stores such as Nordstrom, Macy's, Barnes & Noble, and Educational Outfitters; and (6) $116,000 in campaign management service payments to Margaret Hunter. *See* Exhibit 1 (April 28, 2016 CREW letter to OCE).

concurred and assigned Agent Phan and Special Agent Nicole McAfee to look into opening a Sensitive Investigative Matter ("SIM") focusing on the illegal use of campaign funds by a federal public official. AUSA Halpern also informed SSA Mignon that it was his intention to discuss with AUSA Emily Allen the possibility of assigning her to the investigation. Thereafter, Special Agent McAfee began reviewing publicly available records (including Hunter's publicly-available FEC filings) that could inform their investigative decisions.

On June 2, 2016, Agent Phan contacted AUSA Halpern to obtain his official concurrence to open a SIM into the misappropriation of funds by the Hunter Campaign. The following day, Agent Phan sent an email to AUSA Halpern confirming their conversation regarding opening the investigation. In her email, Agent Phan thanked AUSA Halpern for concurring with the decision to open up the investigation. On June 9, 2016, based on the media's findings, the CREW report, and preliminary investigation by the FBI, AUSAs Halpern and Allen sought approval from the Department of Justice, Criminal Division, Public Integrity Section ("PIN") to open an investigation. PIN's Director of Election Crimes, Richard Pilger, concurred officially with the request the following day.

On June 14, 2016, Agent Phan sent an electronic communication to FBI Headquarters (with a copy forwarded to PIN) confirming that the San Diego Field Office in conjunction with the United States Attorney's Office was opening a full investigation into Hunter's campaign spending. The request indicated that the officials reviewing and approving the investigation were FBI Assistant Special Agent-in-Charge Daron Borst, Chief Division Counsel Michael Leshnower, and Supervisory Special Agent Joey Mignon. The communication also specifically noted that DOJ attorney Richard Pilger and AUSA Phillip Halpern concurred with opening the sensitive investigative matter.

C.    Hunter's First Motion to Recuse the USOA-SDCA

On June 24, 2019, Hunter filed his first Motion to Dismiss or, in the alternative, to Recuse this Office ("First Recusal Motion") based upon AUSAs Emily Allen and Alana Robinson's attendance at the August 2015 Clinton event. *See* Hunter's First Recusal Motion (Dkt. 36-1). In his motion, Hunter recognized that the two federal prosecutors:

(1) did not contribute—or otherwise make any payment—to the Clinton campaign; and (2) availed themselves of the opportunity to take a picture with the candidate, *i.e.*, participated in a "Photo Op." *Id.* at 5-6, 9; Exhibit 2 ("You do not need to bring anything to the site [and will be led] inside to the photo op room.").

On June 28, 2019, the United States filed its Response to Hunter's First Recusal Motion. *See* Dkt. 68.  In this response, it confirmed that the two federal prosecutors were attending the Clinton event at the invitation of the U.S. Secret Service – which regularly asks federal prosecutors to attend such events.  Significantly, the United States made it clear that the prosecutors' participation involved the Secret Service's "long standing practice of facilitating photograph opportunities" with its law enforcement partners; and noted the Secret Service's statement that it asks federal prosecutors to attend "protective mission events" in case an incident might arise for which legal guidance is needed.  *See* June 2019 Response and Opposition (Dkt. 68) at 2.

On July 8, 2019, this Court held oral argument on Hunter's Recusal Motion.  *See* Dkt. 76.  At the hearing, Hunter's counsel reiterated the uncontested facts.  In doing so, he once again revealed that Hunter was aware that the federal prosecutors were not there as supporters of Candidate Clinton, but for a photo op at the invitation of the Secret Service. *See* Hunter Motion Transcript (Dkt. 76) at 6, 8.  Following oral argument, this Court denied Hunter's Motion finding, *inter alia*, that there was no conflict of interest and the government had probable cause to commence the investigation in any event.  *Id.* at 4-6, 14-15.

### D.    Hunter's Second Motion to Recuse the USOA-SDCA

On March 3, 2020, Hunter filed his second Motion to Dismiss or, in the alternative, to Recuse this Office ("Second Recusal Motion"), Dkt. 126.  This motion was again based upon the two federal prosecutors' attendance at the August 2015 Clinton event.  *Id*. Hunter's Second Recusal Motion repeats almost verbatim the allegations and arguments contained in his First Recusal Motion.

The only real difference in the two pleadings was that his Second Recusal Motion attached a handful of additional emails (received pursuant to a FOIA request initiated by

Judicial Watch), which confirmed that: (1) the prosecutors were attending at the request of the Secret Service; and (2) the Secret Service were very gracious hosts.  *See* Second Recusal Motion at Exhibit 2.   Significantly, Hunter failed to produce any new evidence that was not abundantly clear and fully admitted by the United States the last time this issue was brought before the Court.[3]

## II.

## ANALYSIS

A.    Legal Argument

The handful of additional emails attached to Hunter's Second Recusal Motion merely confirm the operative facts relied upon by this Court in denying his First Recusal Motion. Once again, they establish that the federal prosecutors attended the event, not as supporters or contributors, but due to a Secret Service invitation to take a picture with the candidate. If anything, the additional emails demonstrate that the Court's factual and legal analysis was eminently sound.

The emails—while adding a bit of gloss—simply confirm the operative facts.  It is irrelevant that they also establish that: (i) there was "a lot of traffic on La Jolla Parkway between 7:30 am and 8:30 am;" (2) the federal prosecutors offered to bring coffee; (3) the Secret Service were incredibly hospitable; (4) the event was a fabulous party; and (5) the federal prosecutors did not expect to be invited into the house where the event was held. Although these details may be amusing, they do nothing to change the Court's analysis.

Put simply, nothing has changed.  Last time around, this Court recognized that solid Supreme Court precedent required that Hunter's First Recusal Motion be denied.   *See*

---

[3]  The lack of any new information is unsurprising as Hunter's counsel was, as noted, present as a paying contributor at the fundraiser.  In this capacity, attorney Vega spoke at length with the AUSAs who attended, and was thus well aware since August 2015 that the Secret Service invited their attendance.  Without question, Hunter's counsel (who was a former U.S. Attorney) would have attended many similar "photo ops" with various elected officials and candidates for federal office.  To say the least, the United States finds it ironic that Hunter continues to act surprised about the parameters of an event in which his own counsel participated.

Hunter Motion Transcript (Dkt. 76) at 4-6, 14-15 (AUSAs Robinson and Allen had no potential for financial gain, citing *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987)). This time around, Hunter fails to raise any new arguments (or, for that matter, facts) suggesting that the Court's ruling was inaccurate. Accordingly, his latest Recusal Motion must be denied. *See* June 2019 Response and Opposition (Dkt. 68) at 2-8.

### B.     Initiation of Hunter Investigation

It is clear that—as a legal matter—Hunter's Second Recusal Motion must be denied. Nevertheless, the United States feels constrained to comment on Hunter's continuing misconception that "both [AUSAs] were involved in initiating an investigation of the first Congressman to endorse candidate Trump," *see* Hunter's Second Recusal Motion at 8, and that "the prosecutors who initiated the investigation had a conflict of interest." *Id.* at 9. This is simply not true.

Interestingly, this Court previously recognized that the investigation into Hunter's improper campaign spending was, in fact, begun by the FEC letter:

> There seems to be no question that this incident allegedly came to light, the first violation, I should say, in early 2016 as a result of the Federal Election Commission sending a letter to Mr. Hunter's campaign treasurer regarding disbursement of campaign funds for school and a video game company. That particular inquiry received national attention almost immediately.

*See* Hunter Motion Transcript (Dkt. 76) at 4. Following this letter (and based upon additional news coverage and the CREW letter), the decision to open up an investigation at the U.S. Attorney's Office was first made by AUSA Phillip Halpern (Chief of the Major Frauds Section), and approved by Richard Pilger (DOJ Public Integrity Director, Election Crimes). At the same time, a panoply of officials at the FBI, including Assistant Special Agent-in-Charge Daron Borst, Supervisory Special Agent Joey Mignon, and FBI Chief Division Counsel Michael Leshnower, made the decision to open an FBI investigation.

Furthermore, even if AUSAs Allen and Robinson had initiated this investigation, it matters naught. Indeed, it does a disservice to our system of Justice to assume that simply because career prosecutors, agents, or for that matter judicial officers, supported—or voted

for—a particular candidate of one party that they would be unable thereafter to investigate or preside over a trial of any politician that belonged to a different party, let alone require the recusal of an entire office.  This line of thinking is anathema to the democratic process and antithetical to the fair administration of justice.

DATED: March 10, 2020.

Respectfully submitted,

DAVID D. LESHNER
Attorney for the United States

*Phillip L.B. Halpern*

EMILY W. ALLEN
W. MARK CONOVER I
PHILLIP L.B. HALPERN
Assistant U.S. Attorneys

8

# CREW | citizens for responsibility and ethics in washington

April 28, 2016

Omar Ashmawy
Staff Director and Chief Counsel
Office of Congressional Ethics
1017 Longworth HOB
Washington, D.C. 20515

      Re:  <u>Request for Investigation into Rep. Duncan D. Hunter (R-CA)</u>

Dear Mr. Ashmawy:

      Citizens for Responsibility and Ethics in Washington ("CREW") respectfully requests that the Office of Congressional Ethics ("OCE") investigate whether Rep. Duncan D. Hunter (R-CA) violated federal law and House rules by using campaign funds to pay personal expenditures unrelated to any campaign activities.

      In recent months, Rep. Hunter's principal campaign committee, Duncan D. Hunter for Congress ("the Hunter Committee"), has acknowledged spending thousands of dollars on purchases not related to campaign activity. The committee spent campaign funds, for example, on video games, an oral surgeon, travel to Hawaii, and Rep. Hunter's children's school tuition, expenses it characterized as "personal" or "mistaken." While Rep. Hunter reimbursed the committee almost $12,000 for these purchases, the spending was not for legitimate campaign expenditures, and the amount and frequency of these improper expenditures warrants a further investigation.

      A review of the Hunter Committee's Federal Election Commission ("FEC") disclosure reports further indicates there may be additional non-campaign spending not previously identified or reimbursed. Notably, the committee's most recent report disclosed payments for expenses in Italy during the Thanksgiving holiday week in 2015, including payments to hotels and restaurants in Rome, Florence, and Positano, payments for train tickets, and other travel costs. One particularly suspect expense was reported by the committee as being for "food/beverages," but the payment was made to a jewelry store in Florence. This spending and other evidence suggests the trip was a family vacation.

      The Hunter Committee also admitted that more than $2,000 in disbursements it made to Rep. Hunter's wife, Margaret Hunter, were not for campaign purposes and needed to be refunded. In all, however, the committee reimbursed Mrs. Hunter approximately $14,000 in the last six years, and paid her $116,000 for work as a campaign consultant. The improper payments to Mrs. Hunter already acknowledged by the committee indicate that the other expenditures involving her also should be investigated.

      Accordingly, OCE should conduct an investigation of Rep. Hunter's campaign spending.

GOVERNMENT
EXHIBIT
1
18CR3677-W

PENGAD 800-631-6989

Mr. Omar Ashmawy
April 28, 2016
Page 2

## Factual Allegations

Duncan D. Hunter for Congress is Rep. Hunter's principal campaign committee.[1]

*Acknowledged "Mistaken" and "Personal" Spending*

In 2015, the Hunter Committee's FEC reports began disclosing disbursements labeled as "mistaken charge[s]" for which the committee had been or purportedly would be reimbursed. The Hunter Committee's initial 2015 April Quarterly report, for example, disclosed payments of $530 and $598 to the Aston Kaanapali Shores, a beach resort in Lahaina, Hawaii.[2] Each was described as a "mistaken charge – to be reimbursed."[3] An amended report, filed four hours after the first one, changed the name of the payee to Expedia, removing any reference to Hawaii.[4] Three more payments to Aston Kaanapali Shores totaling $5,160 were similarly disclosed as "mistaken charge[s]" on the Hunter Committee's initial 2015 July Quarterly report, with an added notation asserting they had been reimbursed on June 30, 2015.[5]

The Hunter Committee's 2015 October Quarterly and Year-End reports disclosed another group of mistaken and personal expenditures. The largest group included at least 68 charges totaling more than $1,300 to Steam Games, a video game company.[6] Each was listed as either a "mistaken purchase – to be reimbursed" or a "personal expense – to be paid back."[7] The committee also paid $1,137 to the Center for Oral & Facial Surgery in San Diego in June 2015, listing the expense as a mistaken purchase to be reimbursed,[8] and in September gave $1,650 to the Christian Unified Schools, the schools Rep. Duncan's children attend, describing it as a personal expense to be paid back.[9]

---

[1] Duncan D. Hunter for Congress, <u>FEC Form 1, Statement of Organization, Amended</u>, Jan. 7, 2015, *available at* http://docquery.fec.gov/pdf/488/15970003488/15970003488.pdf.

[2] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 April Quarterly Report</u>, Apr. 15, 2015 at 6:17 p.m., *available at* http://docquery.fec.gov/pdf/890/15951164890/15951164890.pdf; http://www.astonkaanapalishoresresort.com.

[3] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 April Quarterly Report</u>, Apr. 15, 2015.

[4] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 April Quarterly Report, Amended</u>, Apr. 15, 2015 at 10:37 p.m., *available at* http://docquery.fec.gov/pdf/889/15970362889/15970362889.pdf.

[5] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 July Quarterly Report</u>, July 15, 2015, *available at* http://docquery.fec.gov/pdf/333/201507159000172333/201507159000172333.pdf.

[6] Morgan Cook, <u>FEC Questions Duncan Hunter's Video Game Charges</u>, *San Diego Union-Tribune*, Apr. 5, 2016, *available at* http://www.sandiegouniontribune.com/news/2016/apr/05/hunter-video-games/; Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 October Quarterly Report</u>, Oct. 15, 2015, *available at* http://docquery.fec.gov/pdf/512/201510159003083512/201510159003083512.pdf; Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 Year-End Report</u>, Jan. 31, 2015, *available at* http://docquery.fec.gov/pdf/281/201601319005014281/201601319005014281.pdf.

[7] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 October Quarterly Report</u>, Oct. 15, 2015; Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 Year-End Report</u>, Jan. 31, 2015.

[8] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 October Quarterly Report</u>, Oct. 15, 2015. The committee also received a $325 repayment from the oral surgeon in July 2015. *Id.*

[9] Duncan D. Hunter for Congress, <u>FEC Form 3, 2015 Year-End Report</u>, Jan. 31, 2015; Tom Jones and R. Stickney, <u>Congressman Questioned About Campaign Funds Used on Video Games, Child's School</u>, *7 San Diego*, Apr. 6, 2016, *available at* http://www.nbcsandiego.com/news/politics/Congressman-Campaign-Funds-Credit-Card-Video-Games-374816191.html; Olivia Nuzzi, <u>Trump Co-Chair Paid for Kids' School With Campaign Cash</u>, *Daily Beast*,

Mr. Omar Ashmawy
April 28, 2016
Page 3

Noting the personal disbursements on the Hunter Committee's 2015 Year-End report, the FEC's Reports Analysis Division sent the committee a request for additional information about the charges in April 2016 and instructing it to seek reimbursement for any "personal use" spending.[10]  In response to the letter and press coverage of the questioned charges, the Hunter Committee amended several earlier reports to disclose additional personal and mistaken disbursements.  A note attached to the amended 2015 July Quarterly asserted there had been additional "mistaken" charges to Steam Games and two other video game companies, Blizzard.com and Origin.com, but it did not disclose how much was spent.[11]  The committee also amended the 2015 October Quarterly report to disclose that another $3,500 disbursement to Christian Unified Schools was mistaken.[12]  A note attached to the amended 2015 Year-End report also asserted that the report provided "clarifying" information about the video game purchases, "specifically a large number of those items were fraudulent charges that have been challenged and refunded."[13]

Along with the amended 2015 reports, the Hunter Committee filed its 2016 April Quarterly report.  This report also disclosed numerous "mistaken" charges or transactions.[14]  These included a $1,200 disbursement to a garage door repair company, $360 paid to a surf and skate shop, and more than $160 spent at Barnes & Noble.[15]  The committee also reported that $2,023 disbursed to Margaret Hunter was mistaken and had been refunded.[16]

According to Rep. Hunter's spokesman, just before the amendments and new report were filed, Rep. Hunter reimbursed his campaign committee nearly $12,000 for charges the committee described as mistaken and personal expenses.[17]

Rep. Hunter and his representatives have provided a series of explanations for the improper spending.  According to his spokesperson, at least some of the video games charges resulted from Rep. Hunter's son taking the wrong credit card from the congressman's wallet to

---

Apr. 6, 2016, *available at* http://www.thedailybeast.com/articles/2016/04/06/trump-co-chair-paid-for-kids-tuition-with-campaign-cash.html.

[10] Letter from Bradley Matheson to Duncan D. Hunter for Congress, Apr. 4, 2016, *available at* http://docquery.fec.gov/pdf/712/201604040300040712/201604040300040712.pdf.

[11] Duncan D. Hunter for Congress, FEC Form 3, 2015 July Quarterly Report, Amended, Apr. 15, 2016, *available at* http://docquery.fec.gov/pdf/206/201604159012566206/201604159012566206.pdf.

[12] Duncan D. Hunter for Congress, FEC Form 3, 2015 October Quarterly Report, Amended, Apr. 15, 2016, *available at* http://docquery.fec.gov/pdf/723/201604169012567723/201604169012567723.pdf.

[13] Duncan D. Hunter for Congress, FEC Form 3, 2015 Year-End Report, Amended, Apr. 15, 2016, *available at* http://docquery.fec.gov/pdf/096/201604159012567096/201604159012567096.pdf.

[14] Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016, *available at* http://docquery.fec.gov/pdf/269/201604159012567269/201604159012567269.pdf.

[15] *Id.*; Morgan Cook, Hunter Repaid Funds Spent on Surf Shop, Garage Door, *San Diego Union-Tribune*, Apr. 19, 2016, *available at* http://www.sandiegouniontribune.com/news/2016/apr/19/hunter-garage-door/.

[16] *Id.*; Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016.

[17] Morgan Cook, Hunter Repays $12,000 to Campaign, *San Diego Union-Tribune*, Apr. 11, 2016, *available at* http://www.sandiegouniontribune.com/news/2016/apr/11/hunter-repay/.

Mr. Omar Ashmawy
April 28, 2016
Page 4

set up a subscription on a gaming account.[18]  Rep. Hunter's spokesman added that several
unauthorized charges resulted after he tried to close to the account.[19]

Rep. Hunter's spokesman also provided changing explanations for the $1,650 the
committee paid in September 2015 to his children's school.  The spokesman first claimed the
disbursement was a legal contribution to the school, but the campaign's treasurer mistakenly
thought it was tuition and thus it needed to be paid back.[20]  However, after a school
administrative assistant said the school had not received any contributions from Rep. Hunter or
his campaign, the spokesman asserted the contribution was meant for the school's sports fund,
but was accidentally diverted to the "general fund" for Rep. Hunter that includes tuition
payments.[21]  As a result, the payment did go to his children's tuition and needed to be paid back
or transferred to a different account.[22]  The spokesman later claimed two other charges paid to
the school also were intended as contributions but were mistakenly applied as tuition.[23]  Only
one payment of $3,500, however, appears to have been repaid.[24]

The disbursements to the Hawaii beach resort were supposed to cover Rep. Hunter's
lodging at a planned campaign event, his spokesman said.[25]  When the campaign event was
cancelled, the trip became personal travel, according to the spokesman.[26]  Rep. Hunter tried to
get charges switched to his personal credit card, but could not, so he reimbursed the campaign.[27]

No explanation has been provided to date for the disbursement to the oral surgeon.  Rep.
Hunter told a reporter he did know how the oral surgery came to be paid for with his campaign
funds, and suggested he did not know who in his family received the oral surgery.[28]

Rep. Hunter's spokesman also said Rep. Hunter, in an abundance of caution, repaid
several expenses that might appear personal but were not.[29]  The disbursements to Mrs. Hunter
were for petty cash to make campaign purchases, the spokesman claimed, and the payment to the
surf and skate shop was for items for a community event.[30]  The spokesman also said the garage
door repair expense was related to an incident that occurred at Rep. Hunter's home, where his
campaign is located, "as a result of moving campaign materials on campaign time."[31]

[18] Jones and Stickney, *7 San Diego*, Apr. 6, 2016; Nuzzi, *Daily Beast*, Apr. 6, 2016.

[19] *Id.*; Cook, *San Diego Union-Tribune*, Apr. 5, 2016.

[20] Nuzzi, *Daily Beast*, Apr. 6, 2016.

[21] *Id.*

[22] *Id.*; Duncan D. Hunter for Congress, FEC Form 3, 2015 Year-End Report, Amended, Apr. 15, 2016.

[23] Cook, *San Diego Union-Tribune*, Apr. 11, 2016.

[24] Duncan D. Hunter for Congress, FEC Form 3, 2015 October Quarterly Report, Amended, Apr. 15, 2016.

[25] Cook, *San Diego Union-Tribune*, Apr. 11, 2016.

[26] *Id.*

[27] *Id.*

[28] Rep. Duncan Hunter Under Fire Over Spending, *ABC 10News*, Apr. 7, 2016, *available at*
https://www.youtube.com/watch?v=xnwjzaUhRpc.

[29] Cook, *San Diego Union-Tribune*, Apr. 19, 2016.

[30] *Id.*

[31] *Id.*

Mr. Omar Ashmawy
April 28, 2016
Page 5

Overall, the Hunter Committee acknowledged it made thousands of dollars in personal and mistaken expenditures that needed to be paid back, and some of its explanations are open to doubt. While the committee reported those disbursements as improper – though some only after the FEC sent its request for additional information and the reports received press attention – the problems with accounting and financial controls highlight the need for a further investigation.

*Potential Additional Disbursements for Personal Use*

Despite the Hunter Committee's attempts to address disbursements it identified as unrelated to campaign expenses, a review of the committee's FEC reports reveals several additional charges that may have been for personal use, further demonstrating the need for an investigation.

Most notably, the committee's 2016 April Quarterly report disclosed thousands of dollars of disbursements related to travel in tourist areas of Italy over the 2015 Thanksgiving holiday. On November 25, 2015, the Hunter Committee paid $213 for "food/beverages" at the Ristorante Il Giubileo in Rome, and two days later paid $248 for "travel tickets" at Rome's Termini Station.[32]  That same say, November 27, the committee disbursed $683 to the Hotel L'Ancora in Positano – a resort town on the Amalfi Coast – for "catering and venue," and $294 to the Il Ritrovo Restaurant, also in Positano, for "food/beverages."[33]  On November 30, the Hunter Committee spent another $289 on train tickets, this time at Naples' central train station.[34]  It also paid Expedia $645 that day for three separate charges described only as "travel."[35]  Also on November 30, the committee made two disbursements totaling $145 for "food/beverages" at the Hotel San Gallo Palace in Florence, and another $169 for "travel" at the same hotel.[36]

The Hunter Committee also paid $216 for what it categorized as "food/beverages" to Gioielleria Manetti in Florence.[37]  Gioielleria Manetti, however, is a jewelry store.[38]

During this period, the Hunter Committee made several other disbursements that appear related to travel.  Between November 24 and December 1, the committee made 20 small payments to First Bankcard for bank fees that may have been foreign transaction fees.[39]  On both November 23 and November 30, the Hunter Committee made several disbursements to United Airlines that suggest several people were traveling together. On November 30, for example, the committee made four separate $200 payments to United, which may have been for luggage fees

---

[32] Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016.
[33] *Id.*
[34] *Id.*
[35] *Id.*; Duncan D. Hunter for Congress, FEC Form 3, 2015 Year-End Report, Amended, Apr. 15, 2016.
[36] Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016.
[37] *Id.*
[38] *See* http://www.gioielleriamanetti.it/.
[39] Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016.

Mr. Omar Ashmawy
April 28, 2016
Page 6

or upgrades.[40]  Similarly, on November 23, the committee made three $134 payments and one $129 payment to United.[41]

      This spending, the timing of the trip over the Thanksgiving holiday, and photographs Rep. Hunter posted on his Facebook page suggest the trip was a family vacation.[42]  None of these expenditures, however, has been identified as personal or mistaken.

      Other payments by the Hunter Committee also raise questions about whether they were entirely for campaign purposes.  As noted, the committee is operated out of Rep. Hunter's home.[43]  Before May 2015, the committee had not made any expenditures for Internet or cable service since 2012.  Starting that month, however, the Hunter Committee began paying Cox Communications between $277 and $368 every month for the rest of 2015 for "Internet services."[44]  The amount of these charges suggest it is possible the committee paid for Internet service for both the campaign and for Rep. Hunter's personal use.

      The Hunter Committee further made purchases in 2015 purportedly for contributions to local charitable organizations, including disbursements to Nordstrom, Macy's, Barnes & Noble, and Educational Outfitters, the company that supplies uniforms to Rep. Hunter's children's school.[45]  While these disbursements may be legitimate, the committee has acknowledged other contributions to the school and purchases for community events were personal or mistaken.

      The Hunter Committee made expenditures in 2015 that may have been for uses unrelated to Rep. Hunter's campaign, further suggesting an investigation is warranted.

## _Reimbursements and Payments to Margaret Hunter_

      Margaret Hunter is both Rep. Hunter's wife and his campaign manager.[46]  As the Hunter Committee has admitted, some payments to her were "mistaken" and needed to be refunded.[47]  The committee identified $2,023 in such payments.[48]  However, between 2010 and 2016, Mrs.

---

[40] Duncan D. Hunter for Congress, FEC Form 3, 2015 Year-End Report, Amended, Apr. 15, 2016.

[41] Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016.

[42] _See_ Facebook page for Duncan Duane (identifying poster as "Representative CA-50 at United States Congress"), Nov. 26, 2015 post, _available at_ https://www.facebook.com/photo.php?fbid=10207803271822583&set=a.3362050052887.154859.1318150197&type=3&theater; _id._, Nov. 26, 2015 post, _available at_ https://www.facebook.com/photo.php?fbid=10207803281302820&set=a.1585543521334.77432.1318150197&type=3&theater.

[43] Cook, _San Diego Union-Tribune_, Apr. 19, 2016.

[44] Duncan D. Hunter for Congress, FEC Form 3, 2015 Reports.  Some of these charges are described as "utilities."  No charges to Cox were made in January or February 2016, but the committee paid it $293 on March 9, 2016. Duncan D. Hunter for Congress, FEC Form 3, 2016 April Quarterly Report, Apr. 15, 2016.

[45] Duncan D. Hunter for Congress, FEC Form 3, 2015 Reports; http://sandiego.educationaloutfitters.com/find-my-school/christian-unified-schools/.

[46] Cook, _San Diego Union-Tribune_, Apr. 19, 2016.

[47] _Id._

[48] _Id._

Mr. Omar Ashmawy
April 28, 2016
Page 7

Hunter was reimbursed approximately $14,000 by the committee for a variety of items.[49]  The FEC should examine whether all of these were proper.

Mrs. Hunter also has been paid $116,000 by the Hunter Committee since 2010 for "campaign management services," "campaign consulting," and "salary."[50]  The House Ethics Manual warns members to "exercise great care" in paying for services from family members, and directs members to FEC regulations on the issue.[51]  Under those regulations, paying a family member a salary is a personal use of campaign funds unless that family member provides *bona fide* services to the campaign and the payment is a fair market value for those services.[52]  The payments to Mrs. Hunter may have been for *bona fide* services at a fair market rate, but due to the other questions involving personal and mistaken expenses, any investigation should examine these payments as well.

## Potential Violations

### *Personal Use of Campaign Funds – House Rule 23*

House Rule 23, clause 6 prohibits members from converting campaign funds to personal use beyond "reimbursement for legitimate and verifiable campaign expenditures," prohibits the expenditure of funds from campaign accounts "that are not attributable to bona fide campaign or political purposes," and requires members to keep campaign funds separate from personal funds.[53]

The House Ethics Committee has interpreted this provision narrowly to allow campaign funds to be spent only in connection with *bona fide* campaign purposes.[54]  A strict construction of this provision is necessary to prevent

> a potentially wide range of abuse . . . [that] could result in situations
> where campaign moneys were expended for personal enjoyment,
> entertainment, or economic well-being of an individual without any
> clear nexus that the funds so expended achieved any political benefit.[55]

With respect to travel expenses, House rules limit the use of campaign funds "to pay travel expenses when the **primary purpose** of the trip is activity that serves a bona fide

---

[49] Duncan D. Hunter for Congress, FEC Form 3, 2010-2016 Reports.
[50] *Id.*
[51] House Comm. on Standards of Official Conduct, House Ethics Manual, at 153, 167, 171 & n.97 (110th Cong., 2d Sess., 2008 ed.).
[52] 11 C.F.R. § 113.1(g)(1)(i)(H).  *See also* FEC Advisory Opinion 2001-10 (permitting Rep. Jesse Jackson, Jr. (D-IL) to hire his wife as a consultant as long as she entered a contract to provide bona fide services at a fair market rate).
[53] House Rule 23, cl. 6; House Ethics Manual, at 163.
[54] *See generally id.* at 163-165.
[55] *Id.* at 164.

Mr. Omar Ashmawy
April 28, 2016
Page 8

campaign or political purpose."[56]  Determining the "primary purpose" of a trip "must be made in a **reasonable** manner, taking into account all of the activities in which the Member intends to engage during the course of the trip."[57]  If the primary purpose of a trip is personal or recreational but involves some campaign activity, campaign funds may not be used to pay for transportation costs, and only may be used to pay the additional meal or lodging expenses from the campaign activity.[58]  In addition, the use of campaign funds to pay for any meal when the only individuals present are a member and his or her friends or family "inherently raises concerns of conversion of campaign funds to personal use."[59]  To verify that such meals are, in fact, legitimate campaign expenses, the House Ethics Committee has stated that "the maintenance of specific, written records is essential" and when "frequent or extensive" the maintenance of such records is "paramount."[60]

The House Ethics Manual also warns that "under these rules, a Member . . . must take reasonable steps to ensure that any outside organization over which he or she exercises control . . . operates in compliance with applicable law."[61]  When a member controls a political organization and has notice of a campaign violation or later ratifies the conduct of the organization, those actions can be imputed to the member.[62]

The Hunter Committee already has admitted that thousands of dollars in 2015 disbursements were for personal use.  Even if these payments have been reimbursed or refunded, the spending still was not for legitimate and verifiable campaign expenditures and not attributable to bona fide campaign or political purposes.

Other expenditures not identified or reimbursed by the Hunter Committee also do not appear to be campaign-related.  The committee spent thousands of dollars in travel-related costs to tourist areas of Italy over Thanksgiving in 2015, and additional funds on airline costs that may be related to the trip.  It does not appear likely that the primary purpose of the trip was for a *bona fide* campaign or political purpose.  Rather, it appears the trip was a family vacation.  In that case, any transportation costs could not have been paid for by the Hunter Committee under the rules.  Furthermore, many of those expenditures were for food and catering at restaurants and hotels.  If those meals were not legitimate campaign expenses – verifiable through written records – they may have been an improper personal use of campaign funds.

---

[56] *Id.* at 157 (emphasis in original).
[57] *Id.* at 168 (emphasis in original).
[58] *Id.* at 168-69.
[59] House Ethics Manual, at 169
[60] *Id.* at 168.
[61] *Id.* at 123; *see also* Office of Congressional Ethics, *In the Matter of Representative Michele Bachmann*, Review No. 13-1274, May 31, 2013.
[62] House Comm. on Standards of Official Conduct, *In the Matter of Representatives Tony Coelho, Edward Feighan and Mike Andrews*, H. Rep. No. 99-277, 99th Cong., 1st Sess. 4, 9 & n.4 (1985).

Mr. Omar Ashmawy
April 28, 2016
Page 9

In addition, one of the payments in Italy was to a jewelry store in Florence, purportedly for "food/beverages." It is unlikely this payment was legitimately campaign-related or that there are written records to verify that it was.

The Hunter Committee also suddenly began paying hundreds of dollars each month for Internet service in May 2015. While this may have been for the committee's Internet service, the OCE should investigate to determine if it also paid for the service used by Rep. Hunter and his family.

OCE also should examine the $14,000 in reimbursements to Mrs. Hunter and the $116,000 in payments to her. The Hunter Committee already has acknowledged some of its reimbursements to her were mistaken. An investigation should review the other reimbursements to her to ensure they were proper and assess if the payments were for *bona fide* campaign services at a fair market rate.

Finally, OCE should examine the Hunter Committee's other disbursements to determine if they were campaign-related. As the committee eventually acknowledged, several of its disbursements to Rep. Hunter's children's school were credited to their tuition. It remains unclear, however, if the committee has properly classified all of the payments to and related to his children's school. Other questionable disbursements supposedly were made for campaign purposes, including payments to Nordstrom, Macy's, Barnes & Noble, a garage door repair company, an oral surgeon, and a surf and skate shop.

Accordingly, Rep. Hunter appears to have violated House rules, and OCE should conduct a further investigation into his campaign spending.

## *Personal Use of Campaign Funds – the FECA and FEC Regulations*

The FECA and FEC regulations separately prohibit a candidate for federal office from using campaign funds to pay the personal obligations of the candidate. The FECA states that "a contribution or donation . . . shall not be converted by any person to personal use,"[63] specifying that "a contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office."[64]

The statute and regulations specify several types of purchases that constitute personal use. Payments for "a vacation or other noncampaign-related trip" are a personal use,[65] and the FEC evaluates spending on other travel on a case-by-case basis.[66] Salary payments to a member

---

[63] 52 U.S.C. § 30114(b)(1).
[64] 52 U.S.C. § 30114(b)(2).
[65] 52 U.S.C. § 30114(b)(2)(E); 11 C.F.R. § 113.1(g)(1)(i)(J).
[66] 11 C.F.R. § 113.1(g)(1)(ii)(C).

Mr. Omar Ashmawy
April 28, 2016
Page 10

of the candidate's family, unless the family member is providing *bona fide* services to the campaign, also are specified as a personal use.[67]  In addition, even if a family member does provide *bona fide* services to the campaign, any salary payment in excess of the fair market value of the services provided is a personal use.[68]  Tuition payments, other than those for used to train campaign staff, also are listed as a personal use.[69]

The types of expenditures that constitute personal use, however, are not limited to those identified in the statute and regulations.[70]  Any expenditures that would exist irrespective of the candidate's campaign or duties as a federal officeholder are treated as personal.  As a result, spending on items unrelated to campaign activity would represent improper personal use of campaign funds.

The Hunter Committee already has admitted that thousands of dollars in 2015 disbursements were for personal use.  In addition, as described above, other expenditures not identified or reimbursed by the Hunter Committee also do not appear to be campaign-related. These include disbursements for costs related to the Italy trip, payments and reimbursements to Mrs. Hunter, payments to and related to Rep. Hunter's children's school, and disbursements to Nordstrom, Macy's, Barnes & Noble, a garage door repair company, an oral surgeon, and a surf and skate shop.

### *Conduct Not Reflecting Creditably on the House*

House Rule 23, clause 1 also requires all members of the House to conduct themselves "at all times in a manner that reflects creditably on the House."[71]  This ethics standard is considered to be "the most comprehensive provision" of the code.[72]  When this section was first adopted, the Select Committee on Standards of Official Conduct noted it was included within the Code to deal with "flagrant" violations of the law that reflect on "Congress as a whole," which might otherwise go unpunished.[73]  This rule has been relied on by the committee in numerous prior cases in which the committee found unethical conduct including: the failure to report campaign contributions,[74] making false statements to the committee,[75] criminal convictions for

---

[67] 11 C.F.R. § 113.1(g)(1)(i)(H).

[68] *Id.*

[69] 52 U.S.C. § 30114(b)(2)(G); 11 C.F.R. § 113.1(g)(1)(i)(D).

[70] 11 C.F.R. § 113.1(g)(1)(i) ("personal use includes but is not limited to" the listed uses).

[71] Rule 23, cl. 1.

[72] House Ethics Manual, at 12.

[73] House Comm. on Standards of Official Conduct, *Report Under the Authority of H. Res. 418*, H. Rep. No. 1176, 90th Cong., 2d Sess. 17 (1968).

[74] House Comm. on Standards of Official Conduct, *In the Matter of Representative John J. McFall*, H. Rep. No. 95-1742, 95th Cong., 2d Sess. 2-3 (1978) (Count 1); *In the Matter of Representative Edward R. Roybal*, H. Rep. No. 95-1743, 95th Cong., 2d Sess. 2-3 (1978).

[75] House Comm. on Standards of Official Conduct, *In the Matter of Representative Charles H. Wilson (of California)*, H. Rep. No. 95-1741, 95th Cong., 2d Sess. 4-5 (1978); H. Rep. No. 95-1743 (Counts 3-4).

Mr. Omar Ashmawy
April 28, 2016
Page 11

bribery,[76] accepting illegal gratuities,[77] and accepting gifts from persons with interest in legislation in violation of the gift rule.[78]

Rep. Hunter's campaign has admitted spending thousands of dollars in 2015 disbursements were for personal use, and other expenditures not identified or reimbursed by the Hunter Committee also do not appear to be campaign-related. Accordingly, Rep. Hunter appears to have conducted himself in a matter that does not reflect creditably on the House.

### Conclusion

To ensure that the money raised for political campaigns is not misused, House rules and campaign finance law clearly forbids spending campaign funds on the personal expenses of a candidate or a candidate's family. The Hunter Committee already has admitted it did exactly that, making thousands of dollars in payments for expenditures unrelated to Rep. Hunter's campaign. A review of the committee's disclosure reports further indicates it may have made additional disbursements for personal expenses. The OCE should commence an immediate investigation and forward this matter to the House Ethics Committee for appropriate action.

I am aware that the False Statements Act, 18 U.S.C. § 1001, applies to information submitted to the Office of Congressional Ethics.

Sincerely,

Noah Bookbinder
Executive Director
Citizens for Responsibility and Ethics in Washington
455 Massachusetts Ave., NW, Sixth Floor
Washington, D.C. 20001
(202) 408-5565 (phone)
(202) 588-5020 (fax)

---

[76] House Comm. on Standards of Official Conduct, *In the Matter of Representative Michael J. Myers*, H. Rep. No. 96-1387, 96th Cong., 2d Sess. 2, 5 (1980); *see* 126 Cong. Rec. 28953-78 (Oct. 2, 1980) (debate and vote of expulsion); *In the Matter of Representative John W. Jenrette, Jr.*, H. Rep. No. 96-1537, 96th Cong., 2d Sess. 4 (1980) (member resigned); *In the Matter of Representative Raymond F. Lederer*, H. Rep. No. 97-110, 97th Cong., 1st Sess. 4, 16-17 (1981) (member resigned after Committee recommended expulsion). In another case, the Committee issued a Statement of Alleged Violation concerning bribery and perjury, but took no further action when the member resigned (*In the Matter of Representative Daniel J. Flood*, H. Rep. No. 96-856, 96th Cong., 2d Sess. 4-16, 125-126 (1980)).

[77] House Comm. on Standards of Official Conduct, *In the Matter of Representative Mario Biaggi*, H. Rep. No. 100-506, 100th Cong., 2d Sess. 7, 9 (1988) (member resigned while expulsion resolution was pending).

[78] House Comm. on Standards of Official Conduct, *In the Matter of Representative Charles H. Wilson (of California)*, H. Rep. No. 96-930, 96th Cong. 2d Sess. 4-5 (1980); *see* 126 Cong. Rec. 13801-20 (June 10, 1980) (debate and vote of censure).