Pages 1 - 38

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas J. Whelan, Judge

```
UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )     NO. 18-CR-03677-W
                               )
DUNCAN D. HUNTER,              )
                               )
            Defendant.         )
_____)
```

San Diego, California
Tuesday, March 17, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

ROBERT S. BREWER, JR.
United States Attorney
880 Front Street, Suite 6293
San Diego, California 92101
BY: **PHILLIP L.B. HALPERN, ESQ.**
**W. MARK CONOVER, ESQ.**
**EMILY ALLEN, ESQ.**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

HIGGS FLETCHER & MACK LLP
401 West A Street, Suite 2600
San Diego, California 92101
BY: **PAUL JOSEPH PFINGST, ESQ.**
**ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                              WARREN & BURSTEIN
                              501 West Broadway, Suite 240
                              San Diego, California 92101
4                    BY:  **DEVIN JAI BURSTEIN, ESQ.**
                         **ATTORNEY AT LAW**
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Tuesday - March 17, 2020**                                          **9:00 a.m.**

### P R O C E E D I N G S

---oOo---

**THE COURT:**  Good morning, ladies and gentlemen.

Have a seat.

**ALL:**  Good morning, Your Honor.

**THE COURT:**  I want to address a housekeeping matter before we begin, the housekeeping matter having to do with the well-founded concern with regard to COVID-19.

As the parties are aware and the public is aware, the Federal Courts remain open.  In an effort to curb the spread of that virus, the Court has adopted several rules, which are posted in the lobby.  Those rules include we have suspended all civil and criminal jury trials.  We have done other things that are listed that I won't bother going into.

With regard to certain criminal matters such as the matters on my calendar, all matters on my calendar this morning, those go forward unless there's good cause not to proceed.  I've met with counsel for the parties in the Hunter case, and it is Mr. Hunter's desire to proceed this morning. So for that reason, we are going to proceed.

For those of you that are -- have been to these hearings before, you're probably wondering why I have not allowed members of the public to sit inside the well as I've done in the past.  The reason for that is I'm doing my best to comply

1  with the Center for Disease Control's suggestion that we not

2  have public hearings when there's more than 50 people.

3      There are 36 seats in the audience.  I'd note that all 36

4  of those are taken.  Everyone on this side of the bar is a

5  court officer, an employee, or someone that has -- otherwise is

6  allowed to be on this side of the bar.  So that's the reason I

7  haven't allowed the public to sit up here.

8      With that just by way of background, would you call the

9  first case, please.

10          **THE CLERK:**  Calling Matter No. 1, 18-CR-3677, USA

11  versus Duncan D. Hunter.

12          **MR. HALPERN:**  Good morning, Your Honor.  Phil Halpern,

13  Emily Allen, and Mark Conover for the Government.

14          **THE COURT:**  Good morning.

15          **MS. ALLEN:**  Good morning, Your Honor.

16          **MR. CONOVER:**  Good morning, Your Honor.

17          **MR. BURSTEIN:**  And good morning, Your Honor.  Devin

18  Burstein and Paul Pfingst on behalf of Congressman Hunter,

19  who's present.

20          **THE COURT:**  Good morning to all of you.

21      All right.  This matter, as the parties are aware, is on

22  calendar for sentencing.  However, the defense has filed a

23  motion that would indicate that it may have legal cause not to

24  proceed with sentencing.  Their motion is a renewed motion to

25  dismiss or, in the alternative, to recuse the Southern District

1    of California's U.S. Attorney's Office.

2         In that regard, the record can reflect that I've read and

3    considered the defense moving papers along with the

4    attachments.  I've read and considered the Government's

5    response along with the attachments.

6         In their original motion, the defense alleged that the

7    charges in the indictment were -- are baseless and politically

8    motivated.  That position is now foreclosed or moot due to the

9    fact that Mr. Hunter has entered a guilty plea with the advice

10   and consent of counsel.

11        The new motion contends that newly discovered e-mails

12   that, in effect, thanked the Secret Service for their

13   invitation to and their hospitality they extended to the

14   Assistant United States Attorneys at the fundraiser that was

15   held in La Jolla for then Presidential candidate Hillary

16   Clinton established a conflict of interest because the e-mails

17   infer that the U.S. Attorneys didn't attend in their official

18   capacity but, rather, that they attended as a supporter of -- a

19   personal supporter of their candidate.

20        The Court has reviewed the e-mails, and I respectfully

21   disagree.  The e-mails appear to say that -- or confirm to the

22   Court in the mind -- Court's mind, in any event, that the local

23   U.S. Attorney's Office does not, in fact, have a conflict of

24   interest at that time nor do they have one today.

25        I'd note that the e-mails are all sent to or from either

the Secret Service or U.S. Attorneys' work or government e-mail
address.  None are from personal addresses.  The e-mails
clearly confirm the attorneys were there by the -- as a result
of an invitation from the Secret Service.  They weren't there
because they paid to attend, as had other attendees done.

And for -- furthermore, the facts in the e-mails are
consistent with the press release that the Secret Service had
listed -- or released, I should say, some years ago.  The exact
wording of that can be found in the defendant's moving papers.
I believe it's on Page 8.

But the gist of what they said was that it was the
agency's policy to -- excuse me -- over their regular practice
to invite Assistant U.S. Attorneys to events where they are
providing protective services, and they give their reason for
that as being in case there's an incident, they have legal
advice right on site.

I would also note that the Government's response to the
defense motion in this matter contain considerably more detail
as to how the decision to open the investigation was arrived
at, more detailed than I had originally made in my ruling.
However, the additional information clearly supports in my mind
the Court's prior finding that there was, in fact, probable
cause to open the investigation, regardless of anyone's
attendance at a fundraiser.

I would note the defense underlying premise, I guess I

1    should say, that a person's political affiliation somehow

2    affects their moral compass appears to be refuted by a document

3    that is actually attached to the Government -- to the defense's

4    sentencing memorandum.  There's one particular one I want to

5    highlight.

6         The person -- the writer of that states in his words that

7    his views and that of Mr. Hunter are polar -- I believe his

8    exact words are "polar opposite."  He describes himself as a

9    liberal Democrat, he described Mr. Hunter as a conservative

10   Republican, yet the writer of that letter took the time to

11   compose and handwrite a four-page letter that is extremely

12   supportive of Mr. Hunter.

13        That, to me, is not consistent with the underlying premise

14   that one's political affiliation somehow has a negative affect

15   on their moral compass, for lack of a better term.

16   Significantly, there's no allegations in the defense moving

17   papers that the Government's sentencing recommendation in any

18   way violates the plea agreement between the parties.

19        So by way of tentative, I would find that the -- that an

20   objective, unbiased observer would not find that there would be

21   an appearance of impropriety by the U.S. Attorney's Office for

22   the Southern District of California continuing to handle the

23   sentencing in this matter.  My tentative would be to deny it,

24   but I'll certainly listen to everybody.

25        Mr. Pfingst, it's your motion.

1          **MR. PFINGST:**  In light of the tentative, we'll submit,

2   Your Honor.

3          **THE COURT:**  Government want to --

4          **MR. CONOVER:**  Your Honor, the tentative is absolutely

5   correct, and the fact that Congressman Hunter has made these

6   arguments is exactly why he should go to prison.

7      Unless the Court has different questions, we would submit.

8          **THE COURT:**  All right.  I'll adopt my tentative.  The

9   defense motion to dismiss or recuse the -- dismiss the

10  indictment or recuse the United States District Attorney's

11  Office for the Southern District of California is denied.

12     That takes us to sentencing.  The matter is on calendar

13  for sentencing.

14     Who is going to handle it, Mr. Pfingst or Mr. Burstein?

15         **MR. PFINGST:**  We're going to break it up, if the Court

16  please.  Mr. Burstein will explain that to you.

17         **THE COURT:**  Oh, that's fine.  That's fine.

18     Well, from the defense standpoint, do you waive

19  arraignment for judgment and sentence?

20         **MR. BURSTEIN:**  Yes, Your Honor.

21         **THE COURT:**  Is there any legal cause not to proceed?

22         **MR. BURSTEIN:**  No, Your Honor.

23         **THE COURT:**  By way of background, I have read and

24  considered the presentence report, the plea agreement.  I

25  have -- excuse me.  I should indicate that the -- the

1  Government's sentencing memorandum -- or presentence report, I

2  should say, actually has a letter attached from Mr. Hunter,

3  which I have read, sir, just so that's clear.

4          **MR. BURSTEIN:**  Thank you, Your Honor.

5          **THE COURT:**  The Government's sentencing memorandum

6  along with the attachments, and I've reviewed the no less than

7  215 exhibits that they filed.  Thank you very much,

8  Mr. Halpern.

9       I have read the defendant's sentencing memorandum along

10  with the attachments, the defendant's supplemental sentencing

11  memorandum, which has been filed under seal.  I have read the

12  defense objection to the presentence report, the Government's

13  response to the objections, and the addendum to the presentence

14  report that has been filed by the probation officer.

15       By way of tentative, starting with the objections, I am

16  aware that the objections by the defense were filed

17  approximately a week prior to their filing of their sentencing

18  memorandum.  And their sentencing memorandum on -- actually, it

19  was filed, I'd say, about a week later.

20       They basically -- it's at Page 3, Footnote 2, if I'm not

21  mistaken, Mr. Burstein, where you indicate that the objections

22  that you filed with regard to misappropriating funds --

23  actually, that some of those funds were actually used for

24  campaign-related purposes -- that those are now moot in view of

25  the guilty plea.

1    But you would like me to rule on the objections to the

2    supervised release conditions, which I will do.   My tentative

3    on that would be that I would not impose the financial

4    conditions.   I'd sustain your objection to that.   That's, I

5    believe, Supervised Release Conditions 4, 5, 6, and 7.

6         **MR. BURSTEIN:**   That's correct, Your Honor.

7         **THE COURT:**   With regard to the guideline calculations,

8    I agree with the calculations as submitted by the parties in

9    their plea agreement as well as by those in -- they're

10   identical to the ones adopted by the probation department.   I

11   would grant the Government's motion for a third level off for

12   acceptance of responsibility.

13   I agree with the parties and the probation officer that

14   Mr. Hunter certainly deserves a four-level downward adjustment

15   for his military service, which is clearly commendable.   I

16   agree with the parties and the probation officer that he should

17   get an additional four-level downward adjustment for

18   combination of factors, which includes his medical history.

19   The defense requests a split sentence.   The -- I should

20   say -- I'll start with saying both the defense and the

21   probation department suggest a sentence in the midrange of 11

22   months.   The Government requests the high end of the guideline

23   range, which would be 14 months.

24   The defendant's requested a split sentence.   The probation

25   department recommends that I deny that for the reasons stated

1    in the probation report.  I think there are additional reasons

2    to deny it in all respects, the additional reasons being

3    specifically the number of violations over multiple years.

4        That all by way of tentative, I'll certainly listen to

5    everybody.

6        Mr. Burstein, do you want to go first?

7            **MR. BURSTEIN:**  Your Honor, I was planning to handle

8    the PSR objections, which we've now done.  Thank you, Your

9    Honor.  Mr. Pfingst is going to speak to the merits of the

10   sentencing.

11           **THE COURT:**  That's fine.

12       Go ahead.

13           **MR. BURSTEIN:**  And I would like to address the split

14   issue at the end.

15           **THE COURT:**  That's fine.

16           **MR. BURSTEIN:**  Thank you, Your Honor.

17           **THE COURT:**  Go ahead, Mr. Pfingst.

18           **MR. PFINGST:**  It -- it's somewhat awkward, Your Honor,

19   because you've been in this case longer than I have and

20   substantially longer than I have; and so therefore, speaking to

21   you about the case makes me somewhat uncomfortable because,

22   certainly, you have followed this matter for a substantial

23   period of time.

24       I'm also a little uncomfortable because in most

25   sentencings, there's not so much agreement.  There's an

1    enormous amount of agreement in this case about Duncan Hunter.

2    That agreement is -- some of that is outlined in our sentencing

3    memorandum and attachments thereto, some of them probably not

4    as frequently discussed as others.  And I would bring a few of

5    those to the Court's attention that I think and I hope bear

6    some -- bear on an appropriate sentence in this case.

7         The portrayal of Duncan Hunter as being someone who is --

8    I'm trying to choose my words carefully -- by the prosecution

9    as being someone who had somewhat of a casual indifference to

10   the duties of a Congressman.  I suggest to the Court we have

11   submitted information to support the view that Duncan Hunter

12   was an industrious, effective, attentive, diligent, and

13   hard-working member of Congress who was consistently rated by

14   those organizations that rate such things as among the most

15   effective and the most accomplished member of Congress.

16        Why do I bring that out?  It's because I suspect by the

17   publicity in the case, that that's been lost.  There has been

18   no question -- there's certainly great agreement among both the

19   prosecution and the defense that Duncan Hunter is a loving

20   father.  I don't think either side would contest that.

21        There is no dispute between the prosecution and the

22   defense that Duncan Hunter is a patriot.  There is no dispute

23   between the prosecution and the defense that Duncan Hunter put

24   his life on the line for his country, and there is no dispute

25   between the prosecution and the defense that his volunteering

1    for service for his country has cost him and cost his family

2    some substantial distress.

3        Without going into the details, the Court is -- has enough

4    information to understand that it contributed in some respects

5    to, according to both parties, the deterioration of his marital

6    relationship and had other psychological impacts on him, which

7    we have submitted to the Court.  All of that is without

8    dispute.

9        There is no dispute that as a member of the military,

10   Duncan Hunter distinguished himself through -- not only through

11   his operations in the field of battle but also through

12   promotions, and the Court is aware through its long history

13   that those promotions up to Major do not come easily, and he

14   has distinguished himself in the military.  He has

15   distinguished himself in Congress.

16       He has had some problems from his -- his history of

17   service to his country that have affected his emotional and, to

18   some extent, physical health.

19       I would suggest to the Court and recommend to the Court

20   that what is notable to those of us who have been in law

21   enforcement/prosecution/defense for some period of time is that

22   there is not a single penny of taxpayer dollar involved in any

23   of this, despite what, from the People's position -- from the

24   Government's position, may be a temptation because of financial

25   distress to abuse taxpayer funds.  And there is not any

1    accusation of any type of an abuse of taxpayer funds.

2        There is no hint or suggestion that Duncan Hunter betrayed

3    his office through any type of -- of corruption of any type

4    having to do with abuse of his office, which we see in other

5    types of corruption cases, which are pointed out in the -- in

6    the Government's sentencing memorandum, where they try to make

7    parallels -- and I don't think unfairly, but try to make

8    parallels to other cases where members of Congress had been

9    sentenced -- some would say -- acknowledge were not on the mark

10   but were intended, I believe, in fairness, to give a range of

11   sentencing and give the Court some -- some background

12   information.

13       So together, these things created an environment of Duncan

14   Hunter's initial deployment, his redeployment, and then his

15   re-redeployment, which, as noble as it was for the country, was

16   not something that assisted his marriage.  When he went to

17   Congress, it was like being redeployed again.

18       The reason why I bring that to the Court's attention is

19   because I think the Court, through its observation in this case

20   and the information before the Court in the case, finds that

21   the relationship -- the marital relationship at this time was

22   not one that had a great deal of communication and that there

23   were -- this was not a team effort, in fact, even by the

24   Government's standards.

25       Both husband and wife were concealing information from

each other, and that -- it was not a case where I think either

party, Mrs. Hunter or Mr. Hunter, were fully aware of the

amount that was involved in going out of the campaign.

And this statute, as the Court knows, is an unusual

statute in that anything under $2,000 is not a criminal

offense, and anything under $25,000 is a misdemeanor offense.

And so it creates one of those unusual statutes that -- in this

case, I would suggest that the deterioration of the marital

relationship was also a contributing factor to the amount that

was -- that was ultimately determined to be improperly used

from the campaign funds.

So as we look at the Government's sentencing memorandum

and the Government's extensive sentencing memorandum, unlike

any sentencing memorandum -- memorandum I have the privilege to

see in my career --

**THE COURT:**  The Court hasn't seen many that long,

either.

**MR. PFINGST:**  And for an eight-to-14-month sentence,

it -- it is one -- well, I'm going to get away from that.

It's just -- let's just go on to say that as unusual as it

was, what did it provide to the Court that the probation

department -- the probation report did not supply?  And we

suggest very little except substituting perhaps an opening

statement that was not given but does not really bear upon the

count and the overt acts to which Duncan Hunter pled and

1   accepts responsibility.

2       So then the Court -- to the extent that the Court says the

3   relevant conduct -- other relevant conduct may bear upon his

4   sentence, that was the reason for our discussion and objections

5   to the probation report, to indicate that some of these things

6   would have been contested before, but they're not really

7   appropriate to have a trial by motion now.

8       So -- so as the Court contemplates the appropriate

9   sentence in this case, there is no, for lack of a better

10  word -- and I don't want the Government to jump on me for this.

11  I just can't find a better word -- no direct victim of the --

12  of the spending as opposed to a theft coming from government --

13  or from an individual person.

14      And that -- so the deterrent value to do -- commit a crime

15  against another victim is really not something that is dominant

16  in this case.  It seems to me from the basis of looking at

17  the -- the Government's motion that they -- they tend to focus

18  on general deterrence and that the concept of general

19  deterrence is really here that should -- should be required.

20      Now, some of the cases cited by the Government to that

21  effect, I think, are in opposite, really don't apply here

22  because they apply to areas where there was a departure from

23  the guidelines.  And -- and if there's no departure from the

24  guidelines, I don't think really that they help the Court

25  analyze this particular case.

1    And so because the guidelines in here go between obviously

2    14 -- and as the Court indicated, Probation recommended 11.  I

3    would suggest that at a minimum -- that the Probation

4    recommendation actually split the baby and found -- found a

5    middle ground without trying to.  I don't think Probation was

6    aware of what we were -- looked for or the Government's going

7    to look for, but it seems to have hit right in the middle

8    range.

9    For our -- for our purposes, for purposes of the

10   accusations made against Duncan Hunter -- if I may pick up a

11   piece of paper over here and continue.

12           **THE COURT:**  Certainly.

13           **MR. PFINGST:**  The Government's brief talking about how

14   Duncan Hunter is a threat to democracy is a bit over the top.

15   The hyperbole for someone who has served his country both

16   in the field of battle and in Congress, to suggest directly

17   that he is a threat to democracy, really belittles -- although

18   they say they respect, it really belittles that sacrifice, and

19   it's really unworthy of the Government to which Duncan Hunter

20   lent his service and volunteered his service.

21   The notion that Duncan Hunter has attacked his country is

22   also beneath the Government.  It is true that at the time of

23   financial distress and a decaying marriage that campaign funds

24   were used inappropriately.  That is correct.  But to go over

25   the top, to suggest the language that was used by the

 1   Government, I think, is unfair and unreasonable.

 2        So as the Court confronts it -- and I don't want to get

 3   into a verbal battle with the Government.  Besides, I think it

 4   doesn't help the Court, and I'm trying to focus on helping the

 5   Court -- is there is a man who has honorably served his country

 6   and has honorably served in Congress and has been a good father

 7   and, yes, abused campaign funds over a period of years.

 8        And for that, he stands before the Court willing to accept

 9   punishment, whatever that punishment will be.  Of course, the

10   Court has an opportunity to fashion that punishment in a

11   variety of ways.  Mr. Burstein is going to discuss that in just

12   a minute.

13        But I would ask the Court, in summary, that since this

14   prosecution has started -- and, again, I am embarrassed because

15   the Court has been here longer than I have.  But since this

16   prosecution has started, through the indictment and through the

17   whole process, there has been a discussion of bad, bad, bad,

18   bad, bad of Duncan Hunter from the Government.  And some things

19   that were done were certainly not good and violated the law.

20        But on balance, on balance, Duncan Hunter has contributed

21   so much to this country and so much to his constituents and so

22   much to his children, that that is something on balance that

23   weighs very heavily or we hope will weigh very heavily in

24   constructing a sentence that acknowledges those things and

25   respects those things because they deserve to be respected, and

1   they have been earned.  They have been earned.

2        There is a time in front of a court when one accepts

3   punishment that a defendant has an opportunity to come forward

4   and say, "These are the good things that I have done.  These

5   are the bad things that I have done."  There is a lot of good

6   that has been lost in a lot of the public discussion, an

7   extraordinary amount of good, both as a soldier, as a citizen,

8   and as a member of Congress.

9        And we hope the Court will consider those.  I know the

10  Court is going to consider those.  You've thought about this,

11  as every judge does, before coming into a sentencing.  You will

12  reflect on this, and I know this Court has done that as well.

13  But sometimes, it just has to be said that some of the -- some

14  of the things that he has done have been extraordinary,

15  extraordinary.

16       And for that reason, his punishment should be mitigated to

17  the extent that the Court feels is appropriate, and I will

18  defer to Mr. Burstein with respect to the rest and the

19  construction of the sentence.

20            **THE COURT:**  Thank you, sir.

21       Mr. Burstein?

22            **MR. BURSTEIN:**  Thank you very much, Your Honor.

23       Your Honor, I'll be brief.  We are recommending a

24  guideline sentence, and I would like to talk to the Court about

25  the guidelines.

1      One point before that I think needs to be addressed and

2   needs to be clarified is the idea that Congressman Hunter has

3   somehow improperly or unduly dragged this out, and I am

4   confident -- and my colleagues will agree -- that the very

5   first plea offer that was made was accepted shortly after it

6   was made, in fact.  But for the litigation about whether

7   Mr. Pfingst could continue to represent Congressman Hunter, it

8   would have been accepted even faster.

9      So I just -- I want that to be a hundred percent clear for

10   the record.

11      **THE COURT:**  Well, just so the record is also clear, I

12   don't consider the case being dragged out.  I rule on motions

13   in every case that are filed, and I don't consider it to be

14   dragged out at all.

15      **MR. BURSTEIN:**  Thank you, Your Honor.

16      What the guidelines say is that if a defendant is a

17   nonviolent first offender and the applicable guideline range is

18   in Zone A or B of the sentencing table, the Court should

19   consider imposing a sentence other than a sentence of

20   imprisonment in accordance with, in this case, Subsection

21   (c)(3), which in turn calls for a sentence of probation that

22   includes a condition or combination of conditions that

23   substitute for.

24      And then there's a number of things, and one of them is

25   home detention.  And in our sentencing memorandum -- our

1   supplemental sentencing memorandum and Congressman Hunter's

2   letters, I think there have been provided a number of reasons

3   why that is the appropriate sentence.

4         But as I was thinking through the sentencing today and

5   where we are today and how that's different than where we were

6   just two weeks ago, I was reminded of the first time that

7   Mr. Pfingst came into this court on this case.  And the Court

8   told everybody that when the Court was a senior DDA, I believe,

9   Mr. Pfingst was a brand-new one.

10        And I started thinking about that, and I was thinking

11  about this Court being a DDA, being on the state court bench,

12  being here, and how much this Court in particular within this

13  courthouse has seen, and that this Court knows the value of a

14  case and that -- the idea that we have that, you know, when

15  every -- when the only tool is a hammer, everything looks like

16  a nail, and it can't just be a nail.  Jail can't always be the

17  answer.

18        And I was thinking about all the things this Court has

19  seen, and then I was thinking about, "Well, we're here now,"

20  something that this Court hasn't seen, that none of us have

21  seen.  It's unprecedented, the closing of the courts, the

22  closing of everything.  If there's ever a time to put an extra

23  pebble, an extra rock on the scale of not putting somebody in a

24  custodial setting, it's now.

25        And whatever those conditions need to be and however harsh

1    the restrictions need to be, I think I'd be remiss if I didn't

2    say we're learning now more than ever, given the issues in our

3    supplemental sentencing memorandum, that putting somebody with

4    that -- in that context, in a custodial setting, is -- is too

5    much for what we're all dealing with, with all the concerns.

6         So because the guidelines strongly suggest it, because of

7    all the good that Mr. Pfingst talked about, and really because

8    of, more than anything, what's in the letter that the Court

9    alluded to -- I mean, I think -- we're lawyers, and we're going

10   to do a lot of talking, but I think Congressman Hunter's letter

11   speaks the loudest.

12        And for all those reasons and everything that's going on,

13   we would ask the Court to follow Subsection 5C1.1 and impose a

14   sentence that is consistent with the guidelines but is not

15   custodial.

16        **THE COURT:**  Thank you, sir.

17        Mr. Halpern?

18        **MR. HALPERN:**  Thank you, Your Honor.

19        I want to start out first off where Mr. Pfingst did

20   because I do think this is an unusual case in certain respects

21   because there is much agreement between the parties, and I

22   think that's one of the reasons we're here today.

23        I want to thank Mr. Pfingst also for the professionalism

24   he's shown.  Although we've all been around town a long time,

25   this is my first chance to work a case with Mr. Pfingst, and I

1    think the reason we're here today and not at trial is in great

2    part due to the fact that he was able to see how much agreement

3    there was between the parties.

4         And it is my hope, if nothing else, in the tome I forced

5    the Court to look through, that the Government agrees, as

6    Mr. Pfingst has indicated, that his client was a patriot.

7    There's no question about that.  He did serve his country

8    honorably.  The Government doesn't deny that; and, in fact, the

9    Government wants to give him credit for it, as we pointed out.

10        The fact is he didn't steal taxpayer money.  We pointed

11   that out before Mr. Pfingst pointed it out to you, and I think

12   that is an important part because it played into our

13   recommendation.  This was not a bribery case, as some other

14   ones that this Court has seen.

15        Also, we agree with him that this has had a great toll on

16   his family life.  From somebody who has spent perhaps more time

17   with Margaret Hunter than most, certainly more than she would

18   have liked, it's clear the impact this had on the family life

19   in the way it's deteriorated as a result of what's happened

20   here.

21        These are all facts that we believe the Court should take

22   into consideration.  We believe they're facts that the

23   probation department, you know, with a very fine job by

24   Ms. Gitana, did take into consideration.  So that's where we

25   agree.  So let's talk about the few places we disagree.

Number 1, the Congressman did betray his office.  There is no question about that.  The fact of the matter is there are too many people already in this country who believe that the people who write the laws feel they are above the laws.  This is an individual who all too well knew what the campaign finance laws were and who abused it right from the very beginning.  That in and of itself would call for a sentence at the top of the range.

And Mr. Pfingst asked the question "What did the sentencing memo provide?  Why did it have to be, you know, as long as it was?"  Well, I'm glad I have a chance to answer that.

The reason the sentencing memo was as detailed as it was is because of the very position that the Congressman took from the day this case was announced many years ago, how he started right from the outset with deflecting responsibility, trying to blame his wife and his family.

Only through a detailed recitation of the facts were we able to make it clear to the Court that, in fact, this crime began almost from the beginning he took office.  The first charges here are in late 2009, 2010, and we even talk about some things that happened, you know, halfway through 2009.

Right from the very beginning, almost a decade ago, upon taking office, he used campaign funds so he could take a mistress on a vacation.  That was in January of 2010.

1    Worse than that, in December of 2009, he made the

2  decision, the same person who threw his wife under the bus --

3  he made the decision to give his wife a credit card.  She

4  didn't have a position in the campaign then.  She wasn't doing

5  anything in the campaign then, as we showed.

6    But he gave her a credit card, and then he acts surprised

7  that she abused it?  And when he was told repeatedly that she

8  abused it, what did he do?  He gave it to her not one more time

9  but a second time.  When the campaign had no money, he took it

10  away but then gave it back to her.

11    So not only is he responsible because he was the

12  individual running the campaign, but he was responsible because

13  he was the individual who enabled his wife to do the spending,

14  a spending which, I would suggest to the Court, he didn't

15  complain about because he was doing the exact same spending.

16  And this was mapped out in page after page so that everybody

17  could see that this is the reality.

18    Now, again, we don't argue that he did his job in

19  Congress.  I think that's clear, and we don't take a position

20  either way on that, and the reason we don't is because the

21  guidelines make it clear.

22    This Court has heard more people than I will ever who are

23  in Mr. Hunter's position -- educated, brought up in a good

24  household, you know, had every advantage that an American

25  citizen could have -- and yet he comes before the Court and

claims that he deserves a break.  He deserves, you know, some type of home-confinement setting because he's been punished enough.

Now, the fact is that the guidelines and many courts suggest just the opposite, and I'm quoting that from Ninth Circuit precedent, which says, "A crime of fraud by one who already has more than enough and who could not argue that he suffered a deprived or abusive childhood or the compulsion of an expensive addition is simply a crime of greed.  A crime of fraud by one who is otherwise successful apparently by legitimate means is particularly disturbing."

So the fact of the matter is as opposed to hundreds, if not thousands of people that come before this Court, he had options.  He wasn't starving.  He wasn't poor, an indigent in another country trying to get a job.  He had every advantage, and still he was motivated by this crime of greed.

As the Court knows, to consider these would be absolutely inappropriate.  Indeed, in bribery cases, sentences have been reversed because the courts have considered publicity that somebody in his position would have that another person wouldn't, loss of position, deterioration of financial health as punishment.  He doesn't get an advantage because of his position.

Now, Mr. Pfingst also suggests -- and, frankly, this is most disturbing to the United States -- that we were over the

top in saying he was a threat to democracy.  Well, Your Honor,
the fact of the matter is we said that because of his very
words.

I'm going to quote his words, what he said about our
country, our system of justice.  And I will give you just a
couple because, frankly, I can go on for well longer than the
Court would let me if I was to quote everything he said.

But just to give you an idea, right from the outset,
quote, "This is the Department of Justice that we're watching
lie, show their corruption.  The Department of Justice right
now unfortunately is more political than politicians are," end
quote.  This being said by somebody who is guilty and we all
know is guilty.

Quote, "The local Department of Justice is being run by
the *Union Tribune* and the local folks here with no oversight."

Quote, "This is a political late hit.  They're hoping that
this charge takes the Republican seat and moves it to their
column, the Democrat column.  It's a late political hit."

Quote, "The fact is there is a culture operating within
our Justice Department that's politically motivated.  It's a
sad state of affairs."

Quote -- arguing about his indictment, he said, quote,
"This is a product of a partisan, biased Department of Justice
wanting to rig the elections.  You have a culture of
corruption.  The Number 1 enemy right now is the U.S.

1  Congress."

2      I could go on.  Right from the beginning, this man -- all

3  he did was attack our very system of justice, to suggest it was

4  unfair.  He attacked Congress in doing so and said they were

5  politically motivated.  He attacked the Department of Justice

6  in particular.  He attacked the FBI in particular.  He attacked

7  individual prosecutors in particular.

8      We know now that in doing so, the only person that was

9  lying was Duncan Hunter.  We know now he lied to the people in

10  the 50th District and the other people in the nation in

11  demonstrating, you know, and arguing these wild conspiracy

12  theories that we know now are not true.

13      These lies -- when people perpetuate wild conspiracy

14  theories, they are a threat to justice.  This notion that

15  anything was done politically, which the Court has ruled was

16  not, is a threat to justice because that's what our system of

17  law is based on, the fact that people will be treated fairly

18  here, you know, by the courts, by a probation department.  That

19  is the very essence of our democracy and our system of justice,

20  and people who attack it are, in fact, a threat.

21      Now, before closing, let me just also mention briefly some

22  comments by Mr. Burstein.  I think this is unprecedented.

23  Frankly, I don't think we should have gone forward today, and

24  because of these times, the Government didn't want to go

25  forward today.

1    This Court -- and I appreciate it, you know, and I

2  appreciate the wisdom that the Court has shown not only today

3  but in administering justice because I do believe in justice,

4  and this Court was willing to put off today's proceedings.

5          MR. PFINGST:  Your Honor, I'm going to object to this

6  as being irrelevant to the purposes of sentencing.

7          THE COURT:  Sustained.

8          MR. HALPERN:  Oh, I'll show it's relevant, Your Honor.

9          THE COURT:  All right.  Go ahead.  If you can show

10  it's relevant, go ahead.

11          MR. HALPERN:  And so right now, we have an individual

12  asking for home confinement because he doesn't want to take the

13  chance of being exposed.  The reason we're here today --

14  because the Court agreed to a continuance.  We're here for this

15  reason, and yet he asks the Court --

16          MR. PFINGST:  Yet again, Your Honor, I'm going to

17  interpose an objection as being irrelevant to the sentencing of

18  this matter.

19          THE COURT:  Sustained.

20          MR. HALPERN:  Well, let me put it this way,

21  Your Honor.

22          MR. PFINGST:  I still object.

23          MR. HALPERN:  We agreed to go forward today --

24          MR. PFINGST:  I still object.

25          MR. HALPERN:  -- and we believe, Your Honor, that home

 1  confinement is not appropriate.  We believe if he -- if Mr.

 2  Hunter -- and I get it -- wants to have this hearing past him,

 3  he wants to get this behind him, well, we have no --

 4      **MR. PFINGST:**  Again, Your Honor, what does that -- I

 5  object to the relevance of this --

 6      **THE COURT:**  Sustained.

 7      **MR. PFINGST:**  -- to the sentencing.

 8      **THE COURT:**  Sustained.

 9      **MR. HALPERN:**  Your Honor, at this point, in order to

10  move ahead, we would like Mr. Hunter to be remanded.  We think

11  that's appropriate.  And if he wants to get it behind him,

12  we're ready to get it behind today.

13      **MR. PFINGST:**  Again -- no.  Again, Your Honor --

14      **MR. HALPERN:**  And --

15      **MR. PFINGST:**  -- I would like to perfect the record

16  with respect to what Counsel is speaking about.  We --

17      **THE COURT:**  I'll give you a chance.

18      **MR. HALPERN:**  We believe, Your Honor, that a sentence

19  within the guideline range is appropriate.  We believe his

20  conduct was reprehensible and a betrayal of his office, and we

21  believe he should have the option to be remanded today by the

22  Court.

23      **THE COURT:**  Thank you.

24      Mr. Pfingst, just to make the record clear, there's

25  absolutely no question whatsoever that your client is entitled

1  to go forward today, period.

2      If you want to improve on that, go ahead.

3          **MR. PFINGST:**  No, Your Honor.  I just have to say we

4  conferred -- that is, the Court -- with both counsel yesterday

5  about going forward today.  The record down the line may not

6  reflect that things have been changing with this virus hour by

7  hour rather than day by day.

8          **THE COURT:**  That's correct.  In fact, we discussed it

9  again this morning.

10         **MR. PFINGST:**  Yes.

11         **MR. BURSTEIN:**  And, Your Honor, just -- if the Court

12  does impose any type of custodial sanction, we anticipate, just

13  like everybody else -- I think it's borderline vindictive to

14  suggest a remand today, and I don't think that's going to be an

15  issue.

16         **THE COURT:**  Let's not get to that right at this point.

17      Mr. Hunter, you have a right to say anything you want to,

18  sir.  On the other hand, you don't have to say anything at all.

19  If you'd like to speak, you certainly can.

20         **THE DEFENDANT:**  Thank you, Your Honor, and thanks for

21  proceeding today and accomplishing the mission.  This was the

22  date that we set, and I appreciate the Court being here today.

23      Number 1, I take full responsibility for any dime spent by

24  my campaign by me or anybody else, period.

25      Number 2, it's been an honor to serve my nation in the

```
 1   Marine Corps and in Congress and as a citizen of this nation.
 2        And lastly, Your Honor, I -- as cliche as it is, I would
 3   ask the Court to take sympathy on the mother of my children,
 4   two of which are teenage girls, and -- and not give her time in
 5   custody, if it's the Court's possibility to do so.
 6        And with that, I await my sentencing, Your Honor.
 7             THE COURT:  Thank you, Mr. Hunter.
 8        Well, just so you know, I certainly -- I stated earlier I
 9   certainly am willing to give you a downward adjustment for your
10   military service.  Nobody actually mentioned it, but I know you
11   did two tours of war zones, Iraq and Fallujah.
12        Just so you know, I really do read this stuff, sir.  And
13   if you haven't read the letter that your parents wrote on your
14   behalf, I suggest you do that because you have excellent family
15   support.
16             THE DEFENDANT:  Yes, Your Honor.
17             THE COURT:  Anything further from either counsel?
18             MR. PFINGST:  No, Your Honor.
19             MR. HALPERN:  No, Your Honor.
20             THE COURT:  All right.  Well, in this matter, just a
21   couple brief comments.
22        The Court is used to having counsel vigorously represent
23   their clients, and I have always for many years and continue to
24   this very day do my very best to remain neutral and base my
25   decisions strictly on the facts and evidence in the case.
```

1       And what Mr. Hunter in this case was accused of doing and

2   pled guilty of doing -- as the parties basically pointed out,

3   he's been convicted of misuse -- of using campaign funds for

4   noncampaign purposes.  As they pointed out, he's not accused of

5   selling his office.  He didn't take money to sponsor

6   legislation, anything of that nature.

7       The parties -- and I know the parties know this, but the

8   public perception -- the Court has absolutely nothing to do

9   with the negotiations of the plea agreement in any case and

10  particularly not in this case, either.  The parties have, in

11  the Court's mind, reached a reasonable disposition, and I

12  intend to follow the -- go with their suggested guideline

13  range, as I've indicated earlier.

14      With regard to the imposition of sentence, the Court finds

15  that the plea agreement does comply with the provisions of

16  Section 6B1.2 of the sentencing guidelines.  It does adequately

17  reflect the seriousness of the offense, will not undermine the

18  statutory purposes of sentencing.

19      For advisory purposes under the guidelines, the base

20  offense level would be 8.  Because the amount involved is

21  greater than 150,000 but less than $250,000, the base offense

22  level is increased by ten.  Because there were more than 30

23  illegal transactions, the base offense level is increased to an

24  additional two.  Because there was an abuse of position of

25  public trust, the base offense level is then -- is again

1   increased to an additional two.

2       I would grant the Government's motion for a third level

3   off for acceptance of responsibility pursuant to Guideline

4   Section 3E1.1.  I would depart for his military service

5   pursuant to Guideline Section 5H1.11 four levels pursuant to

6   the plea agreement between the parties and the recommendation

7   of the probation department.

8       I further depart for a combination of factors pursuant to

9   Guideline Section 5K2.0 an additional four levels for those

10  combination of factors, including his medical background and

11  medical history.  That would give me an Adjusted Offense Level

12  11, criminal history score of zero, criminal history category

13  of I.  The resulting advisory guideline range is eight to 14

14  months.

15      Mindful of the fact the statutory maximum for this offense

16  is up to five years in custody, reviewing the criteria set

17  forth in Title 18, Section 3553(a), I find that a sentence in

18  the middle of the guideline range would be sufficient but not

19  greater than necessary.

20      Therefore, pursuant to the Sentencing Reform Act of 1984,

21  it would be the judgment and sentence of this Court that the

22  defendant be and hereby is committed to the custody of the

23  Bureau of Prisons for a term of imprisonment of 11 months.  The

24  statutory fine is not imposed due to his inability to pay.  I

25  will impose the mandatory special assessment of $100.

1   Following your release from custody, Mr. Hunter, I'll

2   place you on supervised release for a period of three years,

3   impose all the standard terms and conditions of supervision and

4   the following special conditions:

5   First, you are to participate in a program of drug or

6   alcohol abuse treatment, including urinalysis testing and

7   counseling, as directed by your supervising probation officer.

8   Report all vehicles that you own or operate or in which

9   you have an interest to your probation officer.

10   Submit to a search of your person, property, place of

11   residence, vehicle, and personal effects, "personal effects" to

12   include computers and any other electronic storage devices,

13   whenever requested to do so at a reasonable time and in a

14   reasonable manner by a probation officer or law enforcement

15   officer provided the request is based on a reasonable suspicion

16   of possession of contraband or violation of a condition of your

17   supervised release.

18   For reasons I previously stated, I will not impose the

19   financial conditions, which are Supervised Release Conditions

20   4, 5, 6, and 7.

21   With regard to the stay of execution of custody, as is

22   normal for this department, for this judge, when people show

23   up -- made all their appearances, show up for sentence, I do

24   grant them a stay of execution of custody.

25   I see no reason to treat Mr. Hunter any different than

1    that, and I'm aware from other letters submitted that he

2    certainly has a faith-based bringing-up in any event.  And I'm

3    willing to give him a stay of execution of custody until

4    probably after Easter, which is next -- I believe it's the 12th

5    or so of April.

6         What would you like, Mr. Burstein?

7         **MR. BURSTEIN:**  Your Honor, my understanding just from

8    e-mailing around is that given what's going on -- I think Judge

9    Hayes was giving 120 days yesterday.  I don't know if that's --

10   we can always come back to the Court if -- I don't think the

11   Bureau of Prisons wants -- wants to limit things at this point.

12        So if we could have a little longer than normal.

13        **THE COURT:**  Well, why don't we do it this way.  Why

14   don't I give you a stay of execution of custody until -- I'll

15   go out a little better than 60 days to see how things with the

16   coronavirus are going.

17        I'll give you until -- let's say Friday, May 29th, on or

18   before 12:00 noon.  And if things have not settled down by

19   then, counsel can call my clerk and put the matter on calendar

20   to discuss the extension of the self-surrender date.

21        **MR. BURSTEIN:**  Thank you, Your Honor.

22        And by noon to the -- to the designated facility, I

23   assume?

24        **THE COURT:**  He can -- he can either report to the

25   designated facility or he can report to the Marshal's Office,

1   which, as you know, is located in the adjacent courthouse on

2   the bottom floor.  You can show him where that is.

3        Mr. Hunter, with the stay of execution of custody, just so

4   you don't forget, you will still be on Pretrial Services

5   supervision.  So just keep in touch with your Pretrial Services

6   officer --

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  -- as you have in the past, sir.

9        And for the record, does the Government want to object to

10  that?

11           MR. HALPERN:  No, Your Honor.

12           THE COURT:  All right.  That will be the order.  Thank

13  you.

14       We'll be in a brief recess before I do the rest of my

15  calendar.

16           MR. BURSTEIN:  Your Honor, can we just ask for Western

17  Region?

18           THE COURT:  Yes.  I will recommend that Mr. Hunter be

19  housed in the Western Region.

20       And one last thing, Mr. Burstein.  Has appeal been waived

21  in this matter?

22           MR. BURSTEIN:  It has, Your Honor.

23           THE COURT:  Thank you.

24       We'll be in about a ten-minute recess while we change.

25           MR. BURSTEIN:  Thank you, Your Honor.

1          **THE COURT:**  You're welcome.

2          **MR. CONOVER:**  Thank you, Your Honor.

3          **THE COURT:**  You're welcome.

4               (Proceedings adjourned at 9:53 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, April 2, 2020


_____ /S/ James C. Pence-Aviles _____

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter